## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **AUDREY L. SEWELL** | ) | |
| | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | Civil Action No.  06-1534 (ESH) |
| **v.** | ) | |
| | ) | |
| | ) | |
| **ELAINE L. CHAO** | ) | |
| **Secretary, Dept. Of Labor** | ) | |
| | ) | |
| **Defendant.** | ) | |

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, and LCvR 56.1, Defendant

Elaine L. Chao, Secretary, Department of Labor, respectfully moves for summary judgment on

the grounds that:  (1) Plaintiff fails to establish a *prima facie* case of discrimination or retaliation;

(2) Defendant had legitimate, non-discriminatory, and non-retaliatory reasons for all actions it

took vis-a-vis Plaintiff, and Plaintiff cannot show pretext; (3) Plaintiff was not constructively

discharged; (4) Plaintiff cannot show a hostile work environment; and (4) Plaintiff cannot

establish a Privacy Act violation.  In support of this motion, Defendant respectfully refers the

Court to the attached Statement of Material Facts Not In Genuine Dispute and to the attached

memorandum of points and authorities.

Because this is a dispositive motion, Defendant has not sought Plaintiff's consent.  <u>See</u>

LCvR 7(m).

Respectfully submitted,


_____/s/_____
JEFFREY A. TAYLOR, DC Bar #498610
United States Attorney



_____/s/_____
RUDOLPH CONTRERAS, DC Bar #434122
Assistant United States Attorney



_____/s/_____
KAREN L. MELNIK DC BAR # 436452
Assistant United States Attorney
555 4TH Street, N.W. Rm. E-4112
Washington, D.C. 20530
(202) 307-0338

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **AUDREY L. SEWELL** | ) | |
| | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | **Civil Action No. 06-1534 (ESH)** |
| **v.** | ) | |
| | ) | |
| | ) | |
| **ELAINE CHAO** | ) | |
| **Secretary, Dept. Of Labor** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
## OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant, Elaine Chao, Secretary, Department of Labor, respectfully submits this
memorandum of points and authorities in support of her motion for summary judgment.  Plaintiff
alleges that she was the victim of age discrimination when her position as Financial Systems
Specialist was transferred from the Director of the Division of Financial Management to the
Budget Branch.  Plaintiff further claims that the transfer and the absence of training for one new
duty caused her to retire involuntarily.  Lastly, Plaintiff claims that Defendant violated the
Privacy Act.  As the Defendant explains below, Plaintiff's claims are without merit because (1)
she cannot produce evidence establishing a *prima facie* case of discrimination or retaliation, (2)
she has not adduced evidence showing that Defendant's legitimate non-discriminatory and non-
retaliatory reasons for transferring her position are pretextual, (3) she cannot demonstrate
intolerable working conditions needed to support a constructive discharge claim, and (4) she
cannot show a Privacy Act violation.

## I.    FACTUAL BACKGROUND

Plaintiff Audrey Sewell ("Plaintiff") began her employment with the United States Department of Labor ("DOL") in 1972.  See Complaint at ¶ 6.  In 1997, she began working for the Division of Financial Management ("DFM"), Office of Administration and Planning ("OMAP"), Employment Standards Administration ("ESA").  See id.  On July 14, 1999, Plaintiff was promoted from a GS-9 to a GS-11 Financial Systems Specialist.  See Exhibit 1 (Position Description); Exhibit 2 (Deposition of Audrey Sewell) ("Sewell Dep.") at 10:22-25; 11:1-7.  She retired from the DFM on June 24, 2005.  See Complaint at ¶¶ 6, 24.

### A.    Plaintiff's Duties And Responsibilities

From approximately 2000 to 2005, Plaintiff performed numerous financially analytical duties.  See Exhibit 2 (Sewell Dep.) at 13:20 - 29:8.   For example, she performed analysis of the Working Capital Fund.  See Complaint at ¶ 6, Exhibit 2 (Sewell Dep.) at 13:14-23.  To accomplish this task, Plaintiff "used Excel to do the spreadsheet.  [She] would . . . take the actual data, the charges that would come from the Department, and [she] would put them into [her] spreadsheet, . . . [a]nd then [she] had several spreadsheets with formulas where it would be the calculation on what the projected picture would look like at the end of the fiscal year minus a seven percent cost overrun . . ."  See Exhibit 2 (Sewell Dep.) at 14:4-11.  Plaintiff also used spreadsheets to keep track of funds collected nationwide as civil money penalties for violations of the Fair Labor Standards Act.  See Complaint at ¶ 6, Exhibit 2 (Sewell Dep.) at 17:14-25.  She "not only accounted for the deposits that the . . . national office . . . made, but [she] also accounted for the fees that Treasury collected on the part of Labor as a debt collector for people that did not pay their fines and penalties . . ."  See Exhibit 2 (Sewell Dep.) at 17:19-24.  Notably,

Plaintiff "took that over from an accountant.  When [she] got those duties, an accountant was doing what [she] was doing.  In fact, a GS-13 at one point did the accounting for the FLSA."  See id. at 19:21-24.

In addition, Plaintiff did the accounting for the Object Class Status of Funds Reports ("OCSF") "for the agency nationwide, total agency and by program.  See id. at 20:18 - 21:3.  The OCSF Reports are financial reports which, in order to complete, required that Plaintiff set up 10 to 12 spreadsheets that she would "link" and "roll over."  See id. at 21:6-9.  "For example, Federal Employees Comp, Black Lung, Energy Program, the Office of Workman's Compensation, and they were set up to roll into one main spreadsheet for total, plus the individual."  See id. at 21:9-13.  Plaintiff set up the formulas which permitted her to complete the spreadsheets for the individual programs, and then link them to create one main spreadsheet.  See id. at 21:20-23.

Moreover, Plaintiff prepared the Permanent Change of Station Report, as well as reports that kept track of cash awards that were given to employees.  See id. at 24:3-12.  Additionally, she "had built a data base out of all the essential people that would need to come to work if we had to shut down due to - - for lack of funding, no appropriate [sic] and no continuing resolution - - the people that would have to work regardless, called essential personnel."  See id. at 26:24 - 27:5.  Plaintiff "created a data base that contained the name, the title, the location, the national office, as well as all over the United States and Guam, and calculated to a 'T' how many employees they had out there, and subtotaled and grand totaled, prepared for the entire Employment Standards Administration."  See id. at 27:5-10.  Lastly, as a special project, Plaintiff assisted the Chief Financial Officer "do the financial reports for the Agency at the end of the year

3

. . ." See id. at 31:4-11.

**B.     Plaintiff's Two New Assignments**

On March 14, 2005, Anne Baird-Bridges, the Director of OMAP ESA, gave Plaintiff two

new assignments:  the Detailed Fund Report and the Space Rent Report.  See Exhibit 2 (Sewell

Dep.) at 62:7-16; Exhibit 3 (Affidavit of Audrey Sewell) ("Sewell Aff.") at ¶¶ 8-9.  Plaintiff

received training for the Detailed Fund Report from George Bailey, a private contractor who had

previously completed the reports.  See Exhibit 2 (Sewell Dep.) at 63:3-9; 69:6 - 71:17; Exhibit 3

(Sewell Aff.) at ¶ 8; Exhibit 4 (Deposition of Anne Baird-Bridges) ("Bridges Dep.") at 83:8-14.

Plaintiff admits that she "could have done the Detailed Fund Report without even talking to

Bailey about it . . . because years ago [she] had worked . . . at Salary and Expense Accounting . . .

so [she] was familiar with the accounting runs."  See Exhibit 2 (Sewell Dep.) at 64:16-21.[1]

Ms. Baird-Bridges also gave Plaintiff the Space Rent Report to complete.  See Exhibit 2

(Sewell Dep.) at 62:14-16.  Ms. Baird-Bridges "noted that responsibility for the GSA rent

programs is the first major duty listed in [Plaintiff's] position description and has been there

since 1999."  See Exhibit 5 (Affidavit of Anne Baird-Bridges) ("Bridges Aff.") at ¶ 9; Exhibit 1

(Position Description).[2]  As such, Ms. Baird-Bridges believed that Plaintiff "should have been

---

[1]  Plaintiff testified that she believes Anne Baird-Bridges was "mad" at her because she
was able to complete the Detailed Fund Report, and that "[t]hey had to come up with things that
[she] could not do.".  See Exhibit 2 (Sewell Dep.) at 125:16-23.

[2]  Plaintiff's Position Description states in pertinent part the following:

> The incumbent monitors the GSA RENT program.  When monthly
> Rent bills are received, he/she checks for billing accuracy to insure
> that ESA is not paying for some other Federal agency's space, both
> in the District as well as the regions.  Contacts GSA Rental Agent
> to correct the mistakes when they occur.  Also, works with the

capable of doing the rent report without the need for a substantial amount of training. <u>See</u> Exhibit 5 (Bridges Aff.) at ¶ 9. "All that it required was to go the GSA web site, download their program, and input data into it. This generated figures that allowed each office within ESA to make sure it was allocating sufficient money to cover rent." <u>See</u> Exhibit 6 (Affidavit of Charlene Dunn) ("Dunn Aff.") at ¶ 7. Additionally, "[y]ou don't need any Budget or Accounting knowledge to be able to understand" the format of the report. <u>See id.</u> "It is a lower level task . . ." <u>See id.</u>

On the date Plaintiff received the new assignment, she met with Vicente Sanabria, who had been responsible for completing the Space Rent Report. <u>See</u> Exhibit 2 (Sewell Dep.) at 72:16 - 73:8.[3] According to Plaintiff, Mr. Sanabria was surprised that she was assuming the responsibility for the Space Rent Report. <u>See</u> Exhibit 3 (Sewell Aff.) at ¶ 9. As a result, during the weeks of March 21, March 28, and April 4, 2005, Plaintiff chose not to approach Mr. Sanabria about training for the Space Rent Report. <u>See</u> Exhibit 2 (Sewell Dep.) at 80:15 - 83:25. Moreover, she did not alert Ms. Baird-Bridges that she remained untrained. <u>See id.</u>

## C.    Plaintiff's Reassignment To The Budget Branch

On April 18, 2005, Plaintiff, Mr. Vicente Sanabria, and Ms. Bettye Keller attended a meeting called by Ms. Baird-Bridges. <u>See</u> Exhibit 2 (Sewell Dep.) at 99:16-25. Each received a memorandum stating that he/she would be reassigned to a different division effective May 1,

---

budget staff to insure that RENT records are accurately recorded in DOLAR$.

<u>See also</u> Exhibit 2 (Sewell Dep.) at 23:20-25 (DOLAR$ is an accounting system).

[3]  Plaintiff and Mr. Sanabria worked in cubicles located in the same work space, approximately two rows apart from each other. <u>See</u> Exhibit 2 (Sewell Dep.) at 73:9 - 74:7.

2005. See Exhibit 2 (Sewell Dep.) at 100:5 - 101:1; Exhibit 7 (April 18, 2005 Memorandum).[4]

Plaintiff was reassigned from the Division of Financial Management Director's staff to the

Division of Financial Management, Branch of Budget Formulation and Implementation ("Budget

Branch"). See Exhibit 7. This reassignment did not change the duties in [Plaintiff's] position

description nor did it change her pay or grade.[5] See Exhibit 5 (Bridges Aff.) at ¶ 6. Notably,

"there was promotion potential for" Plaintiff in the Budget Branch. See Exhibit 6 (Dunn Aff.) at

¶ 6. "In Accounting, it was only possible to move up if you had an accounting degree." See id.

Plaintiff "does not have an accounting degree." See id.

Ms. Baird-Bridges's decision to reassign Plaintiff, Ms. Keller, and Mr. Sanabria was

based on several factors affecting DFM. At the time, Ms. Baird-Bridges was serving as both the

Acting Director of DFM, as well as the Director of OMAP. See Exhibit 8 (Organizational

Chart).[6] As a manager, Ms. Baird-Bridges looked "to see how work has shifted over time, where

we might have shortages, and then make assignments as they best meet the current needs." See

Exhibit 5 (Bridges Aff.) at ¶ 6. Notably, DFM had undergone a number of changes during the

preceding year. See Exhibit 9 (Bridges talking points - April 18, 2005 Meeting). There were a

---

[4] Bettye Keller was reassigned from the Accounting Branch to the Budget Branch. See Exhibit 2 (Sewell Dep.) at 100:16-22. Vincente Sanabria was reassigned from the Budget Branch to the Accounting Branch. See id. at 100:23 - 101:1.

[5] Although Plaintiff's "major duties and responsibilities did not change, . . . some of her specific assignments changed after the reassignment. For example, . . . Ms. Dunn [Chief, Budget Branch] assigned her responsibility for completing a table for inclusion in the Departmental budget." See Exhibit 5 (Bridges Aff.) at ¶ 6.

[6] As the Acting Director of DFM, she was responsible for work performed by the Budget Branch, the Branch of Accounting and Financial Systems ("Accounting Branch"), and the Branch of Management Review and Internal Control. See Exhibit 8 (Organizational Chart).

6

number of staff retirements, as well as staff departures for other organizations.  See id.

Moreover, there were a number of new initiatives and increasing demands on DFM.  See id.  In

addition, while Ms. Baird-Bridges had filled several key managerial positions, including the

Budget Branch Chief, the Accounting Branch Chief, and the Senior Budget Analyst position, the

DFM Director position was still vacant.  See id.

   In light of the foregoing, Ms. Baird-Bridges "pulled [Plaintiff's] position description and

upon reviewing it realized that the duties clearly included budget responsibilities."  See Exhibit 5

(Bridges Aff.) at ¶ 6.  For instance, the Major Duties and Responsibilities portion of Plaintiff's

position description includes the following:

> Performs routine *budget* analysis functions and special projects anywhere within
> ESA.  Work may be performed in any segment of the normal range of *budget*
> administration work performed by DFM including budget formulation,
> presentation, and implementation.

> Duties include assisting in the preparation of *budget* estimates; justification;
> interpreting OMB directives and circulars; providing information and advice to
> program managers; reviewing bureau and office *budget* submissions for
> reasonableness, accuracy, and conformance with procedures and guidelines;
> *budget* monitoring, and recommending reprogramming of funds as needed.

See Exhibit 1 (Position Description) (emphasis added).  Because Plaintiff's duties clearly

included budget responsibilities, Ms. Baird-Bridges believed that Plaintiff "could better

contribute to the Division of Budget than in a position which reported to the vacant Director's

position."  See Exhibit 5 (Bridges Aff.) at ¶ 6; Exhibit 4 (Bridges Dep.) at 94:12-17.  Ms. Baird-

Bridges knew that Plaintiff had "analytical skills and [had] proved herself to be very capable in

the past."  See Exhibit 5 (Bridges Aff.) at ¶ 8.  Moreover, Plaintiff "was available and capable

and the reassignment required no alteration to her position description."  See  id.  Ms. Baird-

Bridges's decision to reassign Plaintiff was "a business decision."  See Exhibit 5 (Bridges Aff.) at ¶ 6.

Like Plaintiff, Bettye Keller "had reported organizationally to the DFM Director.  Since there was no DFM Director at present and no expectation that we would fill the position in the foreseeable future, it was a better use of resources to transfer Ms. Keller to Budget where we had need of her [clerical] skills."  See id. at ¶ 7; Exhibit 4 (Bridges Dep.) at 94:18 - 95:1; Exhibit 6 (Dunn Aff.) at ¶ 4.  Regarding Mr. Sanabria, he "was an accountant and he . . . had been in [B]udget doing primarily execution work, which he was good at, but he had indicated . . . not as much concern or liking for the formulation part of the budget, which is a lot different."  See Exhibit 4 (Bridges Dep.) at 93:19 - 94:2.  Ms. Baird-Bridges "had vacancies in accounting," see id. at 94:6, and since Mr. Sanabria "was an Accountant by trade . . . it seemed a better fit to reassign him to a vacant Accountant position in the Accounting Branch where we had greater need for him than in the Budget Branch.  See Exhibit 5 (Bridge Aff.) at ¶ 7; see also Exhibit 6 (Dunn Aff.) at ¶ 4.  Ms. Baird-Bridges "took both of these actions for good business reasons." See id.

### D.  Plaintiff's Purported Evidence Of Constructive Discharge

Plaintiff alleges that giving her a deadline to complete the Space Rent Report and then failing to adequately train her amounts to a "constructive termination."  See Complaint at ¶¶ 17-24.  Although Plaintiff officially received responsibility for the Space Rent Report in March 2005, see Exhibit 2 (Sewell Dep.) at 62:7-16, it was not until her reassignment to the Budget Branch in May 2005, that she was instructed to pursue training and deadlines for the reports were set.  Specifically, "Ms. Dunn [Chief, Budget Branch] told [Plaintiff] at the May 4, 2005, meeting

to go to Mr. Sanabria, and tell him to stop whatever he was doing and to train [Plaintiff] in the space rent reporting." See Exhibit 3 (Sewell Aff.) at ¶ 12. Plaintiff approached Mr. Sanabria about training, but apparently he "was busy being trained for his new job by another accountant." See id. When Plaintiff reported this to Ms. Dunn, she instructed Plaintiff "that if Mr. Sanabria did not stop whatever he was doing and train [Plaintiff], to come back and tell her."[7] See id. While Plaintiff made efforts to meet with Mr. Sanabria, and spoke with him briefly once or twice, she never received the training she believed was sufficient to complete the report. See id.; Exhibit 6 (Dunn Aff.) at ¶ 8; Exhibit 12 (Sewell/Sanabria email).

In any event, whether because of Plaintiff's procrastination or because of logistical problems in the Division, the Space Rent Report for May was not timely completed and the June report deadline was fast approaching.[8] See Exhibit 6 (Dunn Aff.) at ¶¶ 7-9; Exhibit 3 (Sewell Aff.) at ¶¶ 12, 14-17; Exhibit 10 (Dunn - June 10, 2005 email). On June 7, 2005, Ms. Dunn called Plaintiff at her "flexi place" to check on the status of the report.[9] During that conversation, Plaintiff informed Ms. Dunn that she planned to retire, effective September 3, 2005, "because of [Ms. Dunn's] assignment to [her] of the budget table . . . [and] the space rent report," both of which Plaintiff alleged she did not have the experience or training to complete. See Exhibit 3

----

[7] Plaintiff admits that she did not tell Ms. Dunn about Mr. Sanabria's unavailability because she "was not going to participate directly or in-directly [sic] in the harassment of Mr. Sanabria." See Exhibit 3 (Sewell Aff.) at ¶ 14.

[8] "Some of [Plaintiff's] prior duties involved the WEBPARS System (which tracked Personnel actions) and had been transferred to Madeline Nelson so [Plaintiff] should have had time to do the rent reports." See Exhibit 6 (Dunn Aff.) at ¶7.

[9] For several years, Plaintiff worked from home two days per week as a result of a medical accommodation. See Exhibit 3 (Sewell Aff.) at ¶ 14.

9

(Sewell Aff.) at ¶ 14.

Plaintiff memorialized her decision and reasons for retiring in a memorandum to Ms.

Dunn. See Exhibit 11 (June 8, 2005 Memorandum). In response, Ms. Dunn sent Plaintiff an

email addressing Plaintiff's concerns regarding training for the Space Rent Report and the

assignment of the budget table.[10]  See Exhibit 10 (Dunn - June 10, 2005 email). In addition, Ms.

Dunn informed Plaintiff that she expected her to "continue to perform [her] duties as assigned,

until [she] is no longer employed by the Employment Standards Administration." See id. Ms.

Dunn gave Plaintiff "a deadline of June 15, to complete the May Space Rent Report." See id.

She also expected Plaintiff to complete the June, July, and August reports, and for them to be

"provided to the programs by the end of each month." See id. Lastly, Ms. Dunn informed

Plaintiff that "[f]ailure to complete this assignment will be interpreted as insubordination, and

*may* result in further action." See id. (emphasis added).

Despite the efforts of Ms. Dunn, Larry Jarl (Chief, Accounting Branch), Plaintiff, and

Vincente Sanabria, the training Plaintiff believed was necessary to complete the Space Rent

Report did not occur. See Exhibit 3 (Sewell Aff.) at ¶¶ 17-18; Exhibit 6 (Dunn Aff.) at ¶ 9;

Exhibit 13 (June 10, 2005 emails). On June 13, 2005, when Plaintiff learned that the self-

described "emergency training" she had scheduled for that morning with Mr. Sanabria had been

cancelled by Ms. Dunn and rescheduled for June 15, 2005, see Exhibit 13; Exhibit 6 (Dunn Aff.)

at ¶ 9; Exhibit 3 (Sewell Aff.) at ¶ 18, Plaintiff "went to Personnel and told them [she] would

retire at the end of the pay period." See Exhibit 3 (Sewell Aff.) at ¶ 18. Plaintiff took sick leave

---

[10] "The assignment was a source table. It required going to three DOL programs, obtaining data, and imputing the data into the table. It was not hard to do." See Exhibit 6 (Dunn Aff.) at ¶ 10.

10

for two hours on June 13, 2005, and for all of June 14, 2005.  See Exhibit 14 (June 13, 2005

email); Exhibit 3 (Sewell Aff.) at ¶ 18.  Plaintiff voluntarily submitted her retirement paperwork

to Personnel on June 25, 2005.  See  Exhibit 17 (Application for Immediate Retirement).

 Plaintiff's deposition testimony reveals that she voluntarily retired because she believed

that if she did not retire, she would be fired and lose her pension.  When asked about the

conditions that compelled her to retire, Plaintiff testified as follows:

> . . . Ms. Dunn was just doing what she was told to do.  But caught between the
> devil and the blue deep sea, that if you don't have the report by the 15th, it could
> be conceived as insubordination and further action could be taken. . . . What I was
> suppose to do?  Wait?  Let me see.  No, I had no choice.  I'm getting to be an old
> woman.  I could not afford to let them have me out on the street as a homeless
> person because without a retirement pension and no job at my age . . . where was I
> going?  I had no choice but to retire, no choice at all."

See Exhibit 2 (Sewell Dep.) at 139:1-13.  Clearly, Plaintiff's voluntary decision to retire was

based upon what she feared *may* happen in the future if she failed to complete the Space Rent

Report by June 15th.  Even if Ms. Dunn had initiated Plaintiff's removal for conduct, there are

regulations controlling such procedures which afford Plaintiff the opportunity to participate and

to appeal.  See Exhibit 22 (Declaration of Thomas Z. Scales) ("Scales Decl.").  Furthermore,

even if Plaintiff had been removed for conduct, she would not have lost her contributions to her

retirement fund.  See id. at ¶¶ 15-16.  In any event, "[w]here the proposed discipline is removal,

it is always the unwritten practice of the Agency to allow a person to retire or resign in lieu of

removal."  See id. at ¶ 12.

### E. Plaintiff's Purported Evidence Of Disparate Treatment

 Plaintiff alleges that she was treated differently from Kimberly Bassett (age 30) regarding

the issue of training.  See Complaint at ¶¶ 12, 18, 29-33.  Ms. Bassett was hired "as the new

senior budget analyst in OMAP's Division of Financial Management, Budget Branch" on March 31, 2005.  <u>See</u> Exhibit 19 (March 31, 2005 email).  Ms. Bassett was hired at a GS-14 grade level. <u>See</u> Exhibit 4 (Bridges Dep.) at 74:6-10.  Prior to joining DFM, Ms. Bassett "served as a team leader for both execution and formulation at FAA, and has experience in the full range of execution and formulation activities, from apportionments, to MAX, to performance budgeting, Passback and preparation of the Congressional Justification."  <u>See</u> Exhibit 19 (March 31, 2005 email).  Moreover, she  "has a BS in Economics, and a MBA from the University of Maryland. <u>See</u> <u>id.</u>  Plaintiff, on the other hand, graduated from high school, attended Johnson's Business School in Washington, D.C. (now defunct), and took several accounting and information technology courses through the Civil Service Administration and the Department of Labor.  <u>See</u> Exhibit 2 (Sewell Dep.) at 7:18 - 10:4.

Because Ms. Bassett was hired to lead the budget team, Ms. Dunn "set up a schedule for her to sit down and meet with each budget analyst so that they could explain their programs and responsibilities."  <u>See</u> Exhibit 6 ((Dunn Aff.) at ¶ 15; Exhibit 20 (April 4, 2005 email).  Ms. Bassett spent two to three days shadowing each budget analyst during the month of April.  <u>See</u> Exhibit 20.  Ms. Dunn did not consider this training as "Ms. Bassett had been a budget analyst for twelve years, and did not need to be 'trained.'"  <u>See</u> Exhibit 6 (Dunn Aff.) at ¶ 15.  Plaintiff admits that she "didn't expect [management] to give [her] an elaborate training schedule like they gave [Bassett]."  <u>See</u> Exhibit 2 (Sewell Dep.) at 87:20-22.

Regarding training for the Space Rent Report, DFM "needed to have back up, have others cross trained in case the person responsible for the task was not available to do it."  <u>See</u> Exhibit 6

(Dunn Aff.) at ¶ 13.[11]  As such, "Ms. Bassett was being cross trained so that in the future if [Plaintiff] could not do the rent report, somebody else would be available to do it."  See id.  On one occasion, June 13, 2005, training for the Space Rent Report was cancelled and rescheduled for June 15, 2005, "because Ms. Bassett could not attend the training on June 13."  See id.

### F.    Plaintiff's Purported Evidence Of A Hostile Work Environment

The facts upon which Plaintiff relies to support her claim, even if true, do not rise to the level of an actionable hostile work environment.  Plaintiff essentially complains about her rocky working relationship with Patricia Vastano and Anne Baird-Bridges, rather than about severe or pervasive discrimination based upon age.

For instance, when asked about her professional contact with Ms. Vastano when she first joined the Agency "around 1997 or '98," Plaintiff responded that "[i]t was terrible.  She came to the Agency for some reason with a terrible dislike for me, it appeared to me."  See Exhibit 2 (Sewell Dep.) at 33:3-6, 16-21.  On one occasion early in Ms. Vastano's tenure, Plaintiff suggested to Ms. Vastano that she contact employees responsible for setting up computers if she wanted her computer moved off the floor.  See id. at 36:5-16.  Plaintiff testified that Ms. Vastano "asked [her] why couldn't [Plaintiff] get down there and do that, and [Plaintiff] told her [she] wasn't getting on the floor and crawling around moving [Vastano's] computer."  See Exhibit 2 (Sewell Dep.) at 36:17-20.  With respect to ordering desk top supplies, Plaintiff gave Ms. Vastano "a form and a GSA catalog and told her to write it on there and [Plaintiff] would order them for her, so she handed [Plaintiff] back the form, [and asked] why can't you order it?"  See

---

[11]  Ms. Dunn's affidavit (Exhibit 6) is mis-numbered, such that there are two paragraphs labeled number 13.  The paragraph 13 cited above appears between paragraphs 9 and 10.

13

id. at 37:3-5.  When Plaintiff explained to Ms. Vastano that she was "very, very busy . . . trying to do accounting work . . . and clerical work,  . . . [Ms. Vastano] stood there, looked at [Plaintiff], said your kind shouldn't be in any position[,] after [Plaintiff] went through all this trying to be nice, to explain to her."  See id. at 37:16-18.  Plaintiff then told Ms. Vastano the following: "tell you what, don't say nothing else to me, just leave me alone, okay."  See id. 37:19-20.  Plaintiff complained about Ms. Vastano's harassment to their supervisor at the time, Cecily Rayburn (Director, DFM), who told Plaintiff that she instructed Ms. Vastano to leave her alone.  See id. at 37:21 - 38:8.

On yet another occasion, when specifically asked about the nature of Ms. Vastano's alleged discrimination, Plaintiff testified as follow:

> Because the way she treated me.  She had been treating me like starting - - it was during her tenure under Gary Thayer [Director, DFM after Cecily Rayburn].  She again started harassing me by saying things to me like you ain't nothing.  You know what I'm saying?  She wanted me to move my desk so they could expand her space and I refused, and that got on her nerves, and so then she started with her insults, and so I went to Gary Thayer because I wasn't going to go through the hassle no more, and he told her to stop and that was the end of that.  Each time someone told her to stop, she stopped.

See id. at 41:14-25.

When Gary Thayer left the Agency in May 2002, and Ms. Vastano then briefly served as the Acting Deputy of DFM, Plaintiff alleges that Ms. Vastano made comments to her which constitute evidence of a "systematic pattern of harassment."  See Complaint at ¶ 7.  For example, Plaintiff alleges that Ms. Vastano

> came down the hall one day and said oh, you're having trouble walking today?  You may have thought that she might have been concerned.  At times I had trouble walking.  And she said why don't you just retire?  Well, at first I didn't pay it any attention.  Then I think she said - - during that period of time she *may*

14

> *have* said oh, you might want to just retire, you know, because I have arthritis, and
> I do have problems walking at times, especially in the wintertime.

See Exhibit 2 (Sewell Dep.) at 44:9-17 (emphasis added).  However, Plaintiff admits that Ms.

Vastano "stopped now during a period of time . . . [from] January 2003 to 2004 when Yoko

[Arymerek] was there.  See id. 42:6-8; 39:25 - 40:6.  Plaintiff admits that she had minimal

contact with Ms. Vastano, and that she "ignored [Vastano] when she made her little remarks in

the hall, are you still here, huh, you haven't retired yet, you know, making her little remarks.

[Plaintiff] completely ignored that woman because she wasn't over [her]."  See id. at 42:7-12.

Thereafter, when Janet Hogler replaced Ms. Arymerek as the DFM Director, Plaintiff admits that

she "was not harassed."  See id. at 42:17-21.  Indeed, Plaintiff "remember[s] it being pretty good

days."  See id. at 42:22-23.

Regarding Ms. Baird-Bridges, Plaintiff's notion of a *hostile* work environment relates to

the work assignments she received, and her perception that Ms. Baird-Bridges exhibited general

*hostility* towards her, not discriminatory animus based upon age.  For example, Plaintiff recounts

an occasion when Ms. Baird-Bridges " was on her harassment kick . . . harassment with work,

[Plaintiff] called it, harassment with work.  Like she assigned . . . about 600 audits to 4 or 5

different people, accountants or whatever."  See id. at 58:15-20.  Plaintiff alleges that "all of a

sudden all of these people was [sic] pulled off the audits except [her]," . . . requiring Plaintiff to

do "at least 10 to 15 at home . . . [and] at least five and 6 a day, plus [her] regular work."  See id.

at 59:4-14.

On another occasion, relating to the Detail Fund Report assigned to Plaintiff in March

2005, Plaintiff alleges that Ms. Baird-Bridges required her to do more than the contractor who

had previously completed the report. See id. 69:6 - 71:25. Specifically, Ms. Baird-Bridges asked

Plaintiff to "manually type up every accounting entry." See id. at 71:21-23. According to

Plaintiff, Ms. Baird-Bridges "was using work as a harassment tool." See id. at 72:1-2. When

asked what she meant by "a harassment tool," Plaintiff testified as follows:

> A:   She give you a project and then throw up any barrier she can to make sure
>      you don't get it done, or she would give you a project - - give you work
>      that she know that you cannot do so you could fail and not do it.
> Q:   But with respect to the Detailed Fund Report, that you could do?
> A:   She didn't know that.
> Q:   Well, I'm asking you, though, you could do it?
> A:   Yes, I could.

See id. at 72:7-15.

    With respect to the alleged hostility between Plaintiff and Ms. Baird-Bridges, Plaintiff

points to an occasion in November 2004 when she received an assignment to do a study

regarding commitment accounting. See id. at 89:12-20. When Plaintiff went to Ms. Baird-

Bridges's door to ask her a question, Ms. Baird-Bridges "was standing at her desk with her back

to [Plaintiff] when [she] approached the door, and she turned with her fists at her side and just

glared at [Plaintiff] and [Plaintiff] started to ask her a question." See id. at 92:16-19. Plaintiff

"stopped in the middle of what [she] was asking her and apologized and, yes, she frightened

[Plaintiff]." See id. at 21-22. Plaintiff complains that her fear was compounded by an alleged

altercation which she overheard, but did not witness, between Ms. Baird-Bridges and another

employee (Charlotte Jenkins). See id. at 88:19 - 89:7.

    Another example which Plaintiff purports created a "hostile" work environment occurred

on April 8, 2005. Notably, the events of that day form the entire basis of Plaintiff Formal EEO

Complaint, which she filed on May 23, 2005.  <u>See</u> Exhibit 23 (Formal Complaint).[12]  On that

date, Ms. Baird-Bridges "sent an email to [Plaintiff] and a number of other DFM staff members

regarding a meeting [she] was setting up."  <u>See</u> Exhibit 5 (Bridges Aff.) at ¶ 5.  The OMAP

"email system allow for what amounts to a return receipt to come back to the sender of the email

showing that the recipient had received the email and opened it."  <u>See id.</u>  When Ms. Baird-

Bridges "did not receive a return receipt from [Plaintiff], [she] went to [Plaintiffs] desk to find

out if she received [the] email."  <u>See id.</u>  Plaintiff alleges that Ms. Baird-Bridges acted in an

inappropriate manner, by threatening and yelling at her, and shaking her finger in Plaintiff's face.

<u>See id.</u>; Exhibit 2 (Sewell Dep.) at 93:18 - 94:21.

When specifically asked what forms the basis for claiming that her work environment is

*hostile*, Plaintiff testified as follows:

> beginning with that attack on Charlotte Jenkins where I was a little jittery to start
> with, and then she stands up there looking at me like a crazy person, and then
> come over there screaming and hollering, shaking her finger in my face like that, .
> . . [n]ot knowing what's going to happen next because of me using - - which I
> particularly went to that EEO office and asked them to please get somebody in the
> Department to come and investigate this matter about using work as a harassment
> tool. . . . The verbal abuse and the threat of physical intimidation and damned if
> you do, damned if you don't, but they didn't understand - - it didn't matter.  If I
> did a bad one, it's what they were looking for, so it was a hostile work
> environment.

<u>See</u> Exhibit 2 (Sewell Dep.) at 130:3 - 131:5.  Plaintiff admits that Ms. Baird-Bridges "never

herself asked [Plaintiff] to retire, and the only thing she said to [her] about age is - - well,

---

[12]  In a letter dated August 18, 2005, Plaintiff's attorney challenged the Administrative
Review Board's finding that Plaintiff had failed to show how the events of April 8, 2005,
adversely affected the terms and conditions of her employment.  <u>See</u> Exhibit 24 (August 18, 2005
letter).  It appears that the Administrative Review Board subsequently treated the letter as an
amendment to Plaintiff's May 23, 2005 Formal Complaint.  <u>See</u> Exhibit 25 (Final Agency
Decision).

[Plaintiff] was the only one that wore [her] glasses - - around [her] neck. [Plaintiff doesn't] think [Ms. Baird-Bridges] liked the style." See id. at 131:17 - 132:5.  Significantly, Plaintiff's performance appraisals which cover the rating periods from July 2000 through September 2004, reflect that she received either an Outstanding Performance or a Highly Effective Performance. See Exhibit 26 (Performance Appraisals).  The "higher level reviewer" for three of the four appraisals was Ms. Baird-Bridges, and for the remaining one was Ms. Vastano.  See id.[13]

### G.    Plaintiff's Purported Evidence Of Retaliation

Plaintiff alleges that she was retaliated against when, as a result of filing a union grievance for age discrimination against Ms. Patricia Vastano (Deputy Director, OMAP) on December 17, 2004, she was assigned the Detail Fund Report and the Space Rent Report on March 14, 2005, by Ms. Baird-Bridges.  See Complaint at ¶¶ 8-10.[14]  As noted above, Plaintiff admitted that she did not need any training to complete the Detail Fund Report, see Exhibit 2 (Sewell Dep.) at 64:16-21, and "the GSA rent program is the first major duty listed in her position description and has been there since 1999."  See Exhibit 5 (Bridges Dep.) at ¶ 9; Exhibit 1 (Position Description).

Plaintiff also seems to be alleging that in retaliation for either her December 2004 union grievance and/or her Friday, April 15, 2005, 3:00 p.m. meeting with an EEO counselor, Ms.

---

[13]  Plaintiff's performance appraisal for the period ending on September 30, 2005, was never completed because Plaintiff voluntarily retired on June 25, 2005.  See Exhibit 27; Exhibit 17 (Application for Immediate Retirement).

[14]  Plaintiff also filed a union grievance against Ms. Baird-Bridges on December 20, 2004, alleging age discrimination, see Complaint at ¶ 9, however, Ms. Baird-Bridges was not aware of that grievance.  See Exhibit 5 (Bridges Dep.) at ¶ 4.  Moreover, she does not recall whether Plaintiff's grievance against Ms. Vastano alleged discrimination.  See id.

Baird-Bridges reassigned Plaintiff's position from DFM's Office of the Director to DFM's Budget Branch. See Complaint at ¶¶ 14-16. As an initial matter, on Sunday, April 17, 2005, Ms. Baird-Bridges sent an email to Plaintiff, Vicente Sanabria, and Bettye Keller informing them of the Monday, April 18, 2005 meeting, wherein they learned of the reassignments. See Exhibit 21 (April 17, 2005 email); Exhibit 7 (April 18, 2005 Memorandum). There is no evidence that Ms. Baird-Bridges became aware of Plaintiff's EEO activity during the late afternoon of Friday, April 15, 2005.

Moreover, the reassignment to the Budget Branch is not an adverse employment action as it "did not change the duties in [Plaintiff's] position description nor did it change her pay or grade." See Exhibit 5 (Bridges Aff.) at ¶ 6. In addition, prior to any potential discipline or adverse action being imposed on Plaintiff for failing to timely complete the Space Rent Report, she elected to voluntarily retire. See Exhibit 2 (Sewell Dep.) at 139:1-13; Exhibit 17 (Application for Immediate Retirement). Lastly, as noted above, "there was promotion potential" for Plaintiff in the Budget Branch. See Exhibit 6 (Dunn) Aff.) at ¶ 6.

### H.    Plaintiff's Purported Evidence Of A Privacy Act Violation

Plaintiff alleges that the events surrounding her request for sick leave prior to her voluntary retirement constitute a violation of the Privacy Act of 1974. See Complaint at ¶¶ 26-27, 48-51. Specifically, on June 15, 2005, Plaintiff gave Ms. Dunn's secretary, Bettye Keller, a disability certificate and a request for sick leave extending from June 15 to June 24, 2005. See Exhibit 15 (Request for Leave); Exhibit 16 (Disability Certificate); Exhibit 6 (Dunn Aff.) at ¶ 16. "Shortly after [Ms. Dunn] received the note, [she] instructed [her] secretary Bettye Keller to call [Plaintiff] and let her know that [she] was having difficulty approving the leave, based upon the

19

information given to [her], and [she] asked her to submit additional information to [her]." <u>See</u>
Exhibit 6 (Dunn Aff.) at ¶ 16.  Specifically, Ms. Dunn asked Ms. Keller to let Plaintiff know that
before she can approve the leave request, she needs (1) "a doctor's note which says more than
just the words 'blood pressure' with no indication of what is wrong with her blood pressure, and
(2) [the doctor's] note does not match the dates requested for leave on her leave slip.  According
to his note, she can expect to return to work on July 5, but her leave slip only says June 15 - June
24." <u>See</u> Exhibit (June 15, 2005 emails).  Through a union representative, Ms. Dunn informed
Plaintiff "that she would be on Leave Without Pay until [she] received either a call from her
and/or the requested documentation."  <u>See</u> Exhibit 6 (Dunn Aff.) at ¶ 16.

## II.    LEGAL STANDARDS

Under Fed. R. Civ. P. 56(c), summary judgment is appropriate when the record shows
that there is no genuine issue as to any material fact and that the moving party is entitled to
judgment as a matter of law.  <u>Anderson v. Liberty Lobby, Inc</u>., 477 U.S. 242, 248 (1986);
<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986); <u>Matsushita Elec. Indus. Co. v. Zenith Radio
Corp</u>., 475 U.S. 574, 587 (1986).  In determining whether there exists a genuine issue of material
fact, the Court must view all facts, and reasonable inferences to be drawn from them, in a light
most favorable to the non-moving party.  <u>Anderson</u>, 477 U.S. at 255.  If the evidence favoring the
non-moving party is "merely colorable, or is not significantly probative, summary judgment may
be granted."  <u>Id</u>. at 249-50.

Before turning to the merits, a brief word is in order concerning the scope of review in
employment discrimination cases.  Though Plaintiff might wish it otherwise, the employment
discrimination statutes did not transform federal courts into review boards for local employment

20

decisions. See Barbour v. Browner, 181 F.3d 1342, 1346 (D.C. Cir. 1999). To the contrary, a court "may not 'second-guess an employer's personnel decision absent demonstrably discriminatory motive.'" Fischbach v. District of Columbia Dep't of Corrections, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (quoting Milton v. Weinberger, 696 F.2d 94, 100 (D.C. Cir. 1982)).

Where, as here, a plaintiff offers no direct evidence of discrimination, employment discrimination claims are governed by the familiar framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 803-805 (1973). Under this test, Plaintiff has the initial burden of proving by a preponderance of the evidence a *prima facie* case of discrimination. Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 252-53 (1981). If Plaintiff is able to establish a *prima facie* case, then given Defendant's legitimate, nondiscriminatory reason, Plaintiff must present evidence that the stated reason merely was a pretext for discrimination. Id. Of course, at all times, Plaintiff retains the ultimate burden of persuasion to demonstrate that he was in fact the victim of intentional discrimination. Burdine, 450 U.S. at 252-53.

## III.   ARGUMENT

### A.   Plaintiff Fails To Establish A *Prima Facie* Case Of Age Discrimination Or Retaliation

Under the ADEA, the plaintiff must establish at least a *prima facie* case by proving: (1) that she is a member of the ADEA's protected class of persons over forty years of age; (2) that she suffered an adverse employment action; and (3) that the unfavorable action gives rise to an inference of discrimination. Alexander v. Tomlinson, --- F.Supp.2d ---, 2007 WL 2331976 *4 (D.D.C. Aug. 15, 2007) (Huvelle, J.) (citing Chappell-Johnson v. Powell, 440 F.3d 484 (D.C. Cir. 2006); As noted above, if Plaintiff is able to establish a *prima facie* case, then given

21

Defendant's legitimate, nondiscriminatory reason, Plaintiff must present evidence that the stated reason merely was a pretext for discrimination.  Id. at *5.

Plaintiff maintains that Defendant discriminated against her on the basis of age in three ways: (1) by deciding to assign her duties which were already included in her position description; (2) by deciding to reassign her to the Budget Branch; and (3) by deciding not to schedule formal training for the Space Rent Report.  Defendant concedes that Plaintiff, who is over the age of forty, see Complaint at ¶ 4, is a member of a protected class for purposes of the ADEA.  However, Plaintiff has failed to establish that she suffered an adverse employment action or an inference of discrimination.

> 1.    Assignment of New Duties and Lateral Transfer to Budget Branch Do Not Constitute Adverse Employment Actions

"In determining whether a challenged action constitutes an adverse employment action, a court should focus on 'ultimate employment decisions' such as 'hiring, granting leave, discharging, promoting, and compensating,' not intermediate decisions.'"  Lester v. Natsios, 290 F.Supp.2d 11, 28 (D.D.C. 2003) (quoting Taylor v. FDIC, 132 F.3d 753, 764 (D.C. Cir. 1997).  While "[e]mployer actions short of outright firing or non-selection for promotion can be adverse, . . . not all lesser actions count for purposes of [ADEA] liability."  Lester v. Natsios, 290 F.Supp.2d at 28 (citation omitted).  Therefore, "to establish an adverse personnel action in the absence of diminution in pay or benefits, plaintiff must show an action with materially adverse consequences affecting the terms, conditions, or privileges of employment."  See id. (internal quotation and citations omitted); see also Inc. v. Ellerth, 524 U.S. 742 (1998) ("A tangible employment action constitutes a significant change in employment status, such as hiring, firing,

failing to promote, reassignment with *significantly* different responsibilities, or a decision

causing significant change in benefits.") (emphasis added).

Moreover, "[c]hanges in assignments or work-related duties do not ordinarily constitute

adverse employment actions if 'unaccompanied by a decrease in salary or work hour changes.'"

Lester v. Natsios, 290 F.Supp.2d at 28 (quoting Mungin v. Katten Muchin & Zavis, 116 F.3d

1549, 1556-57 (D.C. Cir. 1997). Furthermore, "[p]urely subjective injuries, such as

dissatisfaction with reassignment, public humiliation or loss of reputation, or unhappiness over

assigned duties are not adverse actions. . . . Rather, there must be a significant change in job

responsibilities." See id. (citation omitted).

 In this case, when Ms. Baird-Bridges assigned Plaintiff the Detail Fund Report and the

Space Report, it was "unaccompanied by a decrease in salary or work hour changes." Mungin v.

Katten Muchin & Zavis, 116 F.3d 1549. Further, completing the new reports is clearly not "a

significant change in job responsibilities," considering the financial and analytical duties for

which Plaintiff was already responsible. See id. For example, these duties included (1)

performing analysis of the Working Capital Fund, see Exhibit 2 (Sewell Dep.) at 13:14-23; (2)

using spreadsheets to keep track of funds collected nationwide as civil money penalties for

violations of the Fair Labor Standards Act, a duty she took over from an accountant, see Exhibit

2 (Sewell Dep. at 17:14-25, 19:21-24; (3) accounting for the Object Class Status of Funds

Reports, which required Plaintiff to set up 10 to 12 spreadsheets, see id. at 21:6-9; and (4)

preparing the Permanent Change of Station Report, as well as reports that kept track of cash

awards given to employees, see id. at 24:3-12. Indeed, Plaintiff admits that she "could have done

the Detail Fund Report without even [being trained] . . . because years ago [she] had worked . . .

23

at Salary and Expense Accounting . . . so she was familiar with the accounting runs." <u>See</u> <u>id.</u> at 64:16-21.

Similarly, regarding the Space Rent Report, that responsibility "is the first major duty listed in [Plaintiff's] position description and has been there since 1999." <u>See</u> Exhibit 5 (Bridges Aff.) at ¶ 9; Exhibit 1 (Position Description). Specifically, Plaintiff's position description states in pertinent part the following:

> The incumbent monitors the GSA RENT program. When monthly Rent bills are received, he/she checks for billing accuracy to insure that ESA is not paying for some other Federal agency's space, both in the District as well as the regions. Contacts GSA Rental Agent to correct mistakes when they occur. Also, works with the budget staff to insure that RENT records are accurately recorded in DOLAR$.

<u>See</u> Exhibit 1 (Position Description). To complete the Space Rent Report, all that is required is "to go to the GSA web site, download their program, and input data into it." <u>See</u> Exhibit 6 (Dunn Aff.) at ¶ 7. Completing the report is considered "a lower level task" <u>see</u> <u>id.</u>, that Plaintiff "should have been capable of doing . . . without the need for a substantial amount of training." <u>See</u> Exhibit 5 (Bridges Aff.) at ¶ 9.

Equally without merit is Plaintiff's claim that her reassignment to the Budget Branch constituted an adverse employment action. "In this circuit, a lateral transfer or the denial thereof can constitute an adverse employment action, but only when accompanied by some other materially adverse consequences affecting the terms, conditions, or privileges of the employee's employment or her future employment opportunities such that a reasonable trier of fact could conclude that the plaintiff has suffered objectively tangible harm." <u>Alexander v. Tomlinson</u>, <u>supra</u>, at *6 (internal quotation and citation omitted). For example, "a reassignment with

24

*significantly different* responsibilities" can constitute an adverse employment action.  See id.

(citing Czekalski v. Peters, 475 F.3d 360, 364 (D.C. Cir. 2007) (emphasis added).

    Here, Plaintiff's reassignment to the Budget Branch changed neither the duties in her

position description nor her pay or grade.  See Exhibit 5 (Bridges Aff.) at ¶ 6.  In fact, the Major

Duties and Responsibilities portion of Plaintiff's position description clearly includes budget

responsibilities.  See id.  It provides in pertinent part as follows:

> Performs routine *budget* analysis functions and special projects anywhere within
> ESA.  Work may be performed in any segment of the normal range of *budget*
> administration work performed by DFM including budget formulation,
> presentation, and implementation.
>
> Duties include assisting in the preparation of *budget* estimates; justification;
> interpreting OMB directives and circulars; providing information and advice to
> program managers; reviewing bureau and office *budget* submissions for
> reasonableness, accuracy, and conformance with procedures and guidelines;
> *budget* monitoring, and recommending reprogramming of funds as needed.

See Exhibit 1 (Position Description).  In light of the foregoing, Plaintiff being assigned both the

Space Rent Report and a table for inclusion in the Departmental budget, can hardly be described

as "significantly different responsibilities."  See Alexander v. Tomlinson, supra, at *6; Exhibit 5

(Bridges Aff.) at ¶ 6; Exhibit 6 (Dunn Aff.) at ¶ 10.  Moreover, with respect to future

employment opportunities, "there was promotion potential for" Plaintiff in the Budget Branch.

See Exhibit 6 (Dunn Aff.) at ¶ 6.  "In Accounting, it was only possible to move up if you had an

accounting degree," and Plaintiff "does not have an accounting degree."  See id.

    In sum, Plaintiff cannot demonstrate that her lateral transfer to the Budget Branch had

"materially adverse job-related consequences to qualify as an adverse action, for 'purely

subjective injuries ... are not adverse action.'"  Alexander v. Tomlinson, supra at *6 (quoting

Forkkio v. Powell, 306 F.3d 1127, 1130-31 (D.C. Cir. 2002).

       2.     Plaintiff's Comparator is Not Similarly Situated

"In addition to not being able to satisfy the second prong of a prima facie case, [P]laintiff cannot establish the third prong. One way a plaintiff can satisfy this element is by demonstrating that she was treated differently from similarly situated employees who are not part of the protected class." Alexander v. Tomlinson, supra, at *7 (quotation and citation omitted). Under this theory, Plaintiff is required to show that all of the relevant aspects of her employment situation are "nearly identical" to the identified comparators. Neuron v. Adduci, Mastriani, Meeks & Schill, 43 F.3d 1507, 1514 (D.C. Cir. 1995). "Although this is not the only way a plaintiff can show that the allegedly adverse employment action gives rise to an inference of discrimination, this is the method that [P]laintiff relies on here." Alexander v. Tomlinson, supra, at *7 (citation omitted).

Plaintiff alleges that she was treated differently from Kimberly Bassett (age 30) regarding training. See Complaint at ¶¶ 12, 18, 29-33. Ms. Bassett was hired "as the new senior budget analyst in OMAP's Division of Financial Management, Budget Branch" on March 31, 2005. See Exhibit 19 (March 31, 2005 email). This is a GS-14 grade level position. See Exhibit 4 (Bridges Dep.) at 74:6-10. Prior to joining DFM, Ms. Bassett "served as a team leader for both execution and formulation at FAA, and has experience in the full range of execution and formulation activities, from apportionments, to MAX, to performance budgeting, Passback and preparation of the Congressional Justification." See Exhibit 19 (March 31, 2005 email). Moreover, Ms. Bassett "has a BS in Economics, and a MBA from the University of Maryland. See id. Plaintiff, on the other hand, graduated from high school, attended Johnson's Business School in Washington,

D.C. (now defunct), and took several accounting and information technology courses through the Civil Service Administration and the Department of Labor.  <u>See</u> Exhibit 2 (Sewell Dep.) at 7:18 - 10:4.

Because Ms. Bassett was hired to lead the budget team, Ms. Dunn "set up a schedule for her to sit down and meet with each budget analyst so that they could explain their programs and responsibilities."  <u>See</u> Exhibit 6 ((Dunn Aff.) at ¶ 15; Exhibit 20 (April 4, 2005 email).  Ms. Bassett spent two to three days shadowing each budget analyst during the month of April.  <u>See</u> Exhibit 20.  Ms. Dunn did not consider this training as "Ms. Bassett had been a budget analyst for twelve years, and did not need to be 'trained.'"  <u>See</u> Exhibit 6 (Dunn Aff.) at ¶ 15.  Plaintiff admits that she "didn't expect [management] to give [her] an elaborate training schedule like they gave [Bassett]."  <u>See</u> Exhibit 2 (Sewell Dep.) at 87:20-22.

In sum, because Plaintiff cannot show that all of the relevant aspects of her employment situation are "nearly identical" to the identified comparators, she fails to establish a *prima facie* case of discrimination based on a comparator theory under the ADEA.  <u>See</u> <u>Neuron v. Adduci, Mastriani, Meeks & Schill</u>, 43 F.3d at 1514; <u>Barbour v. Browner</u>, 181 F.3d 1342 (D.C. Cir. 1999).

"Even if the denial of training alleged by [P]laintiff could rise to the level of an adverse employment action, moreover, it is still [P]laintiff's burden to show that she was treated differently than her peers, and that such disparate treatment was based on her [age]."  <u>Lester v. Natsios</u>, 290 F.Supp.2d at 29.  <u>See also</u> <u>Richard v. Bell Atlantic Corp.</u>, 209 F.Supp.2d 23, 35 (D.D.C. 2002) (claim for discrimination in training failed where plaintiff did not establish the existence of similarly situated white employees given training in lieu of her); <u>Richard v. Bell</u>

27

Atlantic Corp., 167 F.Supp.2d 34, 41 (D.D.C. 2001) (plaintiff failed to make out a *prima facie*

discriminatory denial-of-training claim where she did not identify an similarly situated

employees of other races who were treated more favorably with regard to training).

Here, specifically regarding training for the Space Rent Report, DFM "needed to have

back up, have others cross trained in case the person responsible for the task was not available to

do it." See Exhibit 6 (Dunn Aff.) at ¶ 13.[15]  As such, "Ms. Bassett was being cross trained so that

in the future if [Plaintiff] could not do the rent report, somebody else would be available to do

it." See id.  On one occasion, June 13, 2005, training for the Space Rent Report was cancelled

and rescheduled for June 15, 2005, "because Ms. Bassett could not attend the training on June

13." See id.  Thus, as of the date Plaintiff went on extended sick leave (June 13, 2005), see

Exhibit 14 (June 13, 2005 email); Exhibit 3 (Sewell Aff.) at ¶ 18, Ms. Bassett had not received

training for the Space Rent Report.

> 3. Plaintiff Fails To Show That Defendant Took Action Against Her With Material Consequences

A *prima facie* case alleging retaliation or reprisal is established when the plaintiff

demonstrates that (1) she engaged in protected behavior; (2) the employer took an action against

plaintiff with material consequences such that it would dissuade a reasonable worker from

making or supporting a charge of discrimination; and (3) there is a causal link between the action

and the protected activity.  Rochon v. Gonzales, 438 F.3d 1211, 1219-20 (D.C. Cir. 2006);

Stone-Clark v. Blackhawk, Inc., 460 F. Supp. 2d 91 (D.D.C. 2006); Edwards v. United States

EPA, 456 F. Supp. 2d 72, 82 (D.D.C. 2006).  See also Burlington Northern & Santa Fe Ry. Co.

---

[15]  Ms. Dunn's affidavit (Exhibit 6) is mis-numbered, such that there are two paragraphs
labeled number 13.  The paragraph 13 cited above appears between paragraphs 9 and 10.

v. White, 126 S. Ct. 2405, 2414-15 (2006) ("We agree with the formulation set forth by the . . .

District of Columbia Circuit[] [in Rochon].").  Relevant here, the alleged adverse action must be

material, i.e., the alleged retaliatory act must cause injury or harm to a plaintiff such that a

reasonable worker would be dissuaded from making a charge of discrimination.  Burlington

Northern, 126 S.Ct. at 2414-15 ("The anti-retaliation provision protects an individual not from

all retaliation, but from retaliation that produces an injury or harm.").  If the plaintiff is able to

establish a *prima facie* case of retaliation, the analysis then follows as that for a discrimination

claim, i.e., plaintiff has the burden of proving that defendant's actions were not taken for the

reasons offered, but instead, for a retaliatory purpose.  See, e.g., Freedman v. MCI

Telecommunications Corp., 255 F.3d 840, 844-845 (D.C. Cir. 2001); Carter v. George Wash.

Univ., 387 F.3d 872, 878 (D.C. Cir. 2004) (McDonnell Douglas framework applies to Title VII

and ADEA claims.).  In this case, Plaintiff cannot establish a *prima facie* case of retaliation under

the ADEA, because there is no evidence that Defendant took an action against her causing injury

or harm such that a reasonable worker would be dissuaded from making a charge of

discrimination.  Burlington Northern, 126 S.Ct. at 2414-15.

Defendant concedes that Plaintiff can establish the first prong.  It is undisputed that she

filed union grievances alleging harassment and discrimination on December 17, 2004 (against

Ms. Vastano) and on December 20, 2004 (against Ms Baird-Bridges).  See Complaint at ¶¶ 8-9.

However, Plaintiff fails to show that Ms. Vastano, Ms. Baird-Bridges, or Ms. Dunn took action

against her with material consequences such that it would dissuade a reasonable worker from

making or supporting a charge of discrimination.  Rochon v. Gonzales, 438 F.3d at 1219-20.

As discussed at length in this brief, Plaintiff's claims revolve around her assignment of

29

the Detail Fund Report, the Space Rent Report, lack of training, and being reassigned from the DFM Director's Office to DFM's Budget Branch. As noted above, the GSA RENT program "is the first major duty listed in [Plaintiff's] position description and has been there since 1999." See Exhibit 5 (Bridges Aff.) at ¶ 9; Exhibit 1 (Position Description). Moreover, Plaintiff's reassignment to the Budget Branch changed neither the duties in her position description nor her pay or grade. See Exhibit 5 (Bridges Aff.) at ¶ 6. Indeed, the Major Duties and Responsibilities portion of Plaintiff's position description clearly includes budget responsibilities. See id.

In light of the foregoing, Plaintiff cannot demonstrate how Defendant's decisions resulted in an injury or harm. In fact, being reassigned to the Budget Branch afforded Plaintiff promotion potential. See Exhibit 6 (Dunn Aff.) at ¶ 6. Moreover, receiving the Detail Fund Report and the Space Rent Report on March 14, 2005, did not dissuade Plaintiff from contacting an EEO counselor on April 8, 2005, and from filing a formal complaint of discrimination against Ms. Baird-Bridges on May 23, 2005. See Complaint ¶ 14; Exhibit 23 (Formal Complaint). Regarding Plaintiff's claim that the Defendant denied her training, Plaintiff took sick leave and then chose to voluntarily retire before any potential adverse action could be pursued. See Exhibit 15 (Request for Leave); Exhibit 16 ((Disability Certificate); Exhibit 17 (Application for Immediate Retirement).

In addition, with respect to the third prong, Plaintiff relies entirely upon the proximity in time for the causal link, but the actions taken by Defendant are, without more, simply not probative of retaliation. Although the Supreme Court in Clark Cty. School Dist. v. Breeden, 532 U.S. 268, 273-74 (2001), acknowledged that three months between the protected activity and the challenged action can give rise to an inference of causation, it did not hold that proximity in time

alone entitles plaintiffs to judgment in their favor.  There is absolutely no evidence, save for Plaintiff's speculation, that her protected activity played a role in Defendant's business decisions.

**B.    Plaintiff Was Not Subjected to the Type of "Intolerable" Working Conditions Needed to Support a Constructive Discharge Claim.**

There is not an independent cause of action for "constructive discharge."  See Russ v. Van Scoyoc Associates, Inc., 122 F. Supp.2d 29, 36 (D.D.C. 2000).  Rather, a claim of constructive discharge is a component of an employment discrimination claim; it is a means of satisfying the "adverse employment action" element of a *prima facie* case of discrimination.  See id. at 35 (citing Mungin v. Katten Muchin & Zavis, 116 F.3d at 1558).  To make a claim of constructive discharge requires that the employer "deliberately made . . . working conditions intolerable and drove (the employee) into an 'involuntary quit.'"  Clark v. Marsh, 665 F.2d 1168, 1173 (D.C. Cir. 1981) (citations omitted).  A plaintiff who advances a constructive discharge claim "must show working conditions so intolerable that a reasonable person would have felt compelled to resign."  Pennsylvania State Police v. Suders, 124 S. Ct. 2342, 2354 (2004); Sisay v. Greyhound Lines, Inc., 34 F. Supp.2d 59, 65 (D.D.C. 1998).  An actionable claim of constructive discharge requires a showing that (1) intentional discrimination existed, (2) the employer deliberately made working conditions intolerable, and (3) aggravating factors justified the plaintiff's conclusion that she had no option but to end her employment.  See Sisay, 34 F. Supp.2d 59, 65 (D.D.C. 1998) (citing Villines v. United Brotherhood of Carpenters and Joiners of America, 999 F. Supp. 97, 104-05 (D.D.C. 1998)); see also Bishopp v. District of Columbia, 788 F.2d 781, 790 (D.C. Cir. 1986)).

In this case, Plaintiff's decision to retire was based upon her belief that if she did not

finish the Space Rent Report by June 15th, she would be fired and lose her pension.  This belief

stems from an email she received from Ms. Dunn, informing her that failure to complete the

Space Rent Report "will be interpreted as insubordination, and may result in further action."  See

Exhibit 10 (Dunn - June 10, 1005 email).   When Plaintiff's self-described "emergency training"

for the Space Rent Report was cancelled by Ms. Dunn and rescheduled for June 15, 2005, see

Exhibit 13; Exhibit 6 (Dunn Aff.) at ¶ 9; Exhibit 3 (Sewell Aff.) at ¶ 18, Plaintiff "went to

Personnel and told them [she] would retire at the end of the pay period."  See Exhibit 3 (Sewell

Aff.) at ¶ 18.  Thereafter, Plaintiff took extended sick leave for approximately two weeks, and

then voluntarily submitted her retirement paperwork to Personnel.  See Exhibit 3 (Sewell Aff.) at

¶ 18; Exhibit 17 (Application for Immediate Retirement).

When specifically asked about the conditions which compelled her to retire, Plaintiff

testified as follows:

> But caught between the devil and the blue deep sea, that if you don't have the
> report by the 15th, it could be conceived as insubordination and further action
> could be taken. . . . What was I suppose to do?  Wait?  Let me see.  No, I had no
> choice.  I'm getting to be an old woman.  I could not afford to let them have me
> out on the street as a homeless person because without a retirement pension and
> no job at my age . . . where was I going?  I had no choice but to retire, no choice at
> all."

See Exhibit 2 (Sewell Dep.) at 139:1-13.  Clearly, Plaintiff's voluntary decision to retire was

based upon her fear of what *may* happen in the future, rather than the result of Defendant's

actions. [16]

---

[16]  Even if Ms. Dunn had initiated Plaintiff's removal for conduct, there are regulations
controlling such procedures which afford Plaintiff the opportunity to participate and to appeal.
See Exhibit 22 (Scales Decl.).  Furthermore, even if Plaintiff had been removed for conduct, she
would not have lost her contributions to her retirement fun.  See id. at ¶¶ 15-16.  In any event,
"[w]here the proposed discipline is removal, it is always the unwritten practice of the Agency to

As the D.C. Circuit has stated: "[S]ociety and the policies underlying [the ADEA] will best be served if, whenever possible, unlawful discrimination is attacked within the context of existing employment relationships." Clark v. Marsh, 665 F.2d at 1173 (quoting Bourque v. Powell Electrical Manufacturing Co., 617 F.2d 61 (5th Cir. 1980)).  An [ADEA] plaintiff must, therefore, "mitigate damages by remaining on the job" unless that job presents such an aggravated situation that a reasonable employee would be forced to resign." Id.  Not only is Plaintiff's reason for retiring unrelated to intolerable age discrimination, but also Plaintiff did not mitigate her damages by remaining on the job; thus, there is no basis to conclude that the job presented such an aggravated situation that a reasonable employee would be forced to resign.

Even assuming arguendo that Plaintiff could form the predicate for a constructive discharge claim, the undisputed facts here do not come close to meeting the considerable threshold for such a claim.  "The kinds of situations where courts have upheld constructive-discharge findings tend to involve extreme mistreatment or thinly veiled (or even overt) threats of termination." Kalinoski v. Guitierrez, 435 F. Supp. 55, 78 (D.D.C. 2006).  Contrastly, "courts ordinarily regard as voluntary an employee's decision to quit out of concern for [his] health." See id. (citation omitted) (emphasis in original).  Moreover, "a single instance of workplace 'rejection' - e.g., the denial of a promotion or a lateral transfer - if not 'career ending,' will not constitute a constructive discharge." See id.

Here, Plaintiff fails to satisfy any of the necessary elements for a constructive discharge claim.  As to the first element, as illustrated supra, Plaintiff has not shown that any intentional discrimination existed.  Specifically, she has not proven that assignment of new duties, transfer

---

allow a person to retire or resign in lieu of removal." See id. at ¶ 12.

to the Budget Branch, and a lack of formal training for the Space Rent Report were the result of discrimination based on age.

As to the second element, the employer never had the opportunity to make the working conditions intolerable. Plaintiff took extended sick leave and retired before Ms. Dunn instituted any disciplinary action against her. Moreover, Plaintiff can produce no evidence that the two people responsible for her position, duties, and training, i.e., Ms. Baird-Bridges and Ms. Dunn, made any remarks about her age. See Exhibit 2 (Sewell Dep.) at 131:17 - 132:5; 135:20-22; see generally Exhibit 3 (Sewell Aff.). Finally, as discussed below, Pat Vastano's comments regarding Plaintiff's retirement do not even satisfy the requirements of a hostile work environment, much less constitute intolerable working conditions which would drive Plaintiff into an "involuntary quit." Clark v. Marsh, 665 F.2d at 1173.

As to the final element, no aggravating factors exist to support the conclusion that Plaintiff had no options. As noted above, to support her claim Plaintiff refers only to Ms. Dunn's statement regarding insubordination and the possibility of taking further action. See Exhibit 10 (Dunn - June 10, 1005 email). Beyond that, Plaintiff has only her speculation and fear that "further action" means termination. See Exhibit 2 (Sewell Dep.) at 139:1-13.

Clearly, the foregoing does not amount to the sort of aggravating circumstances contemplated by the courts. "For example, the Seventh Circuit, in an opinion authored by Judge Posner in a race-discrimination case, said that '[a] person who is told repeatedly that he is not wanted, has no future, and can't count on ever getting another raise would not be acting unreasonably if he decided that to remain with his employer would necessarily be inconsistent with even a minimal sense of self-respect, and therefore intolerable.'" See Kalinoski, 435 F.

34

Supp. at 78 (quoting <u>Hunt v. City of Markham, Ill.</u>, 219 F.3d 649, 655 (7th Cir. 2000).  No such

evidence is present in this case; therefore, this Court should grant judgment for Defendant.

**C.    The Conduct Alleged By Supervisors, Even If True, Does Not Rise to Level of an Actionable Hostile Work Environment**

In order to establish a *prima facie* case of a hostile work environment, a plaintiff must

offer evidence that "the workplace is permeated with *discriminatory* intimidation, ridicule, and

insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment

and create an abusive working environment."  <u>Harris v. Forklift Systems, Inc</u>., 510 U.S. 17, 21

(1993) (emphasis added); <u>Alexander v. Tomlinson</u>, <u>supra</u>, at *14.  The Supreme Court

reemphasized in <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 788 (1998), that the standards for

finding a hostile work environment are "sufficiently demanding to ensure that Title VII does not

become a 'general civility code'" and that the conduct must be so extreme as to amount to a *change

in the terms and conditions* of employment.  The Supreme Court directed the lower courts to

determine whether an environment was sufficiently hostile or abusive by looking at all the

circumstances, including the "frequency of the discriminatory conduct; its severity; whether it is

physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably

interferes with an employee's work performance."  <u>Faragher</u>, 524 U.S. at 787-788 (quoting <u>Harris</u>,

510 U.S. at 23).  <u>See</u> <u>Singh v. House of Representatives, Comm. On Ways and Means</u>, 300

F.Supp.2d 48 (2004) (RMC) (finding that a rocky working relationship, being kept from

important meetings, being humiliated, supervisor raising voice and being constantly hostile and

hypercritical were ordinary tribulations of the workplace and not hostile work environment).

> Moreover, it must be clear that the hostile work environment was the result of
> discrimination based on a protected status.  As the Second Circuit has explained:
> Everyone can be characterized by sex, race, ethnicity, or (real or perceived)

> disability; and many bosses are harsh, unjust, and rude.  It is therefore important in
> hostile work environment cases to exclude from consideration personnel decisions
> that lack a linkage or correlation to the claimed ground of discrimination.
> Otherwise, the federal courts will become a court of personnel appeals.

Silver v. Leavitt, 2006 WL 626928 (D.D.C. March 13, 2006) at *11 (unreported) (citing Alfano v.

Costello, 294 F.3d 365, 377 (2d Cir. 2002).

Under the standards established by the Supreme Court, Plaintiff cannot establish a claim of

hostile work environment.  Plaintiff's purported evidence amounts to some retirement-related

comments by Ms. Vastano, and a generally rocky relationship with Ms. Vastano and Ms. Baird-

Bridges.  For instance, regarding retirement-related comments, Plaintiff alleges that Ms. Vastano

> came down the hall one day and said oh, you're having trouble walking today?
> You may have thought that she might have concerned.  At times I had trouble
> walking.  And she said why don't you just retire?  Well, at first I didn't pay it any
> attention.  Then I think she said - - during that period of time she may have said
> oh, you might want to just retire, you know, because I have arthritis, and I do have
> problems walking at times, especially in the wintertime.

See id. at 44:9-17.  However, Plaintiff admits that Ms. Vastano "stopped now during a period of

time . . . [from] January 2003 to 2004 when Yoko [Arymerek] was there.  See id. 42:6-8; 39:25 -

40:6.  Plaintiff admits that she had minimal contact with Ms. Vastano, and that she "ignored

[Vastano] when she made her little remarks in the hall, are you still here, huh, you haven't retired

yet, you know, making her little remarks. [Plaintiff] completely ignored that woman because she

wasn't over [her]."  See id. at 42:7-12.  Thereafter, when Janet Hogler replaced Ms. Arymerek as

the DFM Director, Plaintiff admits that she "was not harassed."  See id. at 42:17-21.  Indeed,

Plaintiff "remember[s] it being pretty good days."  See id. at 42:22-23.

It is clear, however, that evidence of discrimination "does not include stray remarks in the

workplace, particularly those made by nondecision-makers or statements made by decision

36

makers unrelated to the decisional process itself." Kalekiristos v. CTF Hotel Management Corp., 958 F. Supp. 641, 665 (D D.C. 1997) (citations and internal quotations omitted).  While a stray remark may be "probative of discrimination, there must be a nexus between the stray remark and the adverse employment decision." Id. (citation omitted); see also Garrett v. Lujan, 799 F. Supp. 198, 200 (D.D.C. 1992) (granting summary judgment to employer on discrimination claim; holding that "stray remarks by persons not involved in the employment decision-making process are not material to a finding of discrimination unless those remarks are made to the decision-makers and have some impact on the selection process"); Bolton v. Scrivner, Inc., 36 F.3d 939, 944 (10th Cir. 1994) (finding that supervisor's comment that the worker was an "old fart" did not demonstrate a nexus between that comment and management's ultimate decision not to rehire the plaintiff); and Simms v. U. S. Government Printing Office, et. al., 87 F. Supp. 2d 7 at 9, n. 2 (D. D.C. 2000) (stray remarks, even those made by a supervisor, are insufficient to create a triable issue of discrimination where, as here, they are unrelated to an employment decision involving the plaintiff) (citations and internal quotations omitted).

   Here, Plaintiff not only fails to demonstrate an adverse employment decision, see supra, at 22-25, but also fails to demonstrate a nexus between Ms. Vastano's remarks and Ms. Baird-Bridges's and Ms. Dunn's decisions vis-a-vis Plaintiff.  While longevity of employment is a factor that has a strong correlation with age, . . . mere correlation - - however strong - - is insufficient if the employer's decision was wholly motivated by factors unrelated to age." Silver v. Leavitt, supra, at *14 (quotation and citations omitted).[17]

_____

   [17]  Plaintiff admits that Ms. Baird-Bridges "has never herself asked [Plaintiff] to retire, and the only thing she said to [her] about age is - - well, [Plaintiff] was the only one that wore [her] glasses - - around [her] neck. [Plaintiff doesn't] think [Ms. Baird-Bridges] liked the style."

Regarding Ms. Baird-Bridges, Plaintiff's notion of a hostile work environment relates to the work assignments she received, and her perception that Ms. Baird-Bridges exhibited *hostility* towards her, not discriminatory animus based upon age.  For example, Plaintiff recounts an occasion when Ms. Baird-Bridges " was on her harassment kick . . . harassment with work, [Plaintiff] called it, harassment with work.  Like she assigned . . . about 600 audits to 4 or 5 different people, accountants or whatever."  See id. at 58:15-20.  Plaintiff alleges that "all of a sudden all of these people was [sic] pulled off the audits except [her]," . . . requiring Plaintiff to do "at least 10 to 15 at home . . . [and] at least five and 6 a day, plus [her] regular work."  See id. at 59:4-14.  When asked in connection with the Detail Fund Report assignment what she meant by "a harassment tool," Plaintiff testified that it meant that Ms. Baird-Bridges would "give you a project and then throw up any barrier she can to make sure you don't get it done . . ."  See id. at 72:7-15.

Regarding the alleged hostility between Plaintiff and Ms. Baird-Bridges, Plaintiff points to an occasion in November 2004 when she received an assignment to do a study about commitment accounting.  See id. at 89:12-20.  When Plaintiff went to Ms. Baird-Bridges's door to ask her a question, Ms. Baird-Bridges "was standing at her desk with her back to [Plaintiff] when [she] approached the door, and she turned with her fists at her side and just glared at [Plaintiff] and [Plaintiff] started to ask her a question."  See id. at 92:16-19.  Plaintiff complains that her fear from this incident was compounded by an alleged altercation which she overheard, but did not see, between Ms. Baird-Bridges and another employee (Charlotte Jenkins).  See id. at 88:19 - 89:7.

---

See id. at 131:17 - 132:5.

Another example which Plaintiff purports created a "hostile" work environment occurred on April 8, 2005.  Notably, the events of that day form the entire basis of Plaintiff Formal EEO Complaint, which she filed on May 23, 2005.  See Exhibit 23 (Formal Complaint).  On that date, Ms. Baird-Bridges "sent an email to [Plaintiff] and a number of other DFM staff members regarding a meeting [she] was setting up."  See Exhibit 5 (Bridges Aff.) at ¶ 5.  The OMAP "email system allows for what amounts to a return receipt to come back to the sender of the email showing that the recipient had received the email and opened it."  See id.  When Ms. Baird-Bridges "did not receive a return receipt from [Plaintiff], [she] went to [Plaintiffs] desk to find out if she received [the] email."  See id.  Plaintiff alleges that Ms. Baird-Bridges acted in an inappropriate manner, by threatening and yelling at her, and shaking her finger in Plaintiff's face.  See id.; Exhibit 2 (Sewell Dep.) at 93:18 - 94:21.

Significantly, when asked the basis for claiming that her work environment is *hostile*, Plaintiff testified about verbal abuse and physical intimidation, completely unrelated to her age.  See Exhibit 2 (Sewell Dep.) at 130:3 - 131:5.  Lastly, Plaintiff's performance appraisals which cover the rating periods from July 2000 through September 2004, reflect that she received either an Outstanding Performance or a Highly Effective Performance.  See Exhibit 26 (Performance Appraisals).

In sum, none of Plaintiff's purported evidence shows that the Defendant subjected her to *discriminatory* intimidation, ridicule, and insult of such severity or pervasiveness as to alter the conditions of her employment and create an abusive working environment."  Alexander v. Tomlinson, supra, at *14 (internal quotations and citations omitted) (emphasis added).  Thus, this Court should reject Plaintiff's hostile work environment claim.

**D.    In The Alternative, Defendant Has Articulated Legitimate, Non-Discriminary And Non-Retaliatory Reasons For All Decisions Affecting Plaintiff**

In an employment case, a plaintiff may demonstrate that "by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." Burdine, 450 U.S. at 253.  Although under the McDonnell Douglas framework the "intermediate evidentiary burdens shift back and forth…, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Reeves, 530 U.S. at 143 (quoting Burdine, 450 U.S. at 253).

In this case, Ms. Baird-Bridges explained that the decision to reassign Plaintiff (and others) was based on several factors affecting DFM.  At the time, Ms. Baird-Bridges was serving as both the Acting Director of DFM, as well as the Director of OMAP.  See Exhibit 8 (Organizational Chart).  As a manager, Ms. Baird-Bridges looked "to see how work has shifted over time, where we might have shortages, and then make assignments as they best meet the current needs."  See Exhibit 5 (Bridges Aff.) at ¶ 6.  Notably, DFM had undergone a number of changes during the preceding year.  See Exhibit 9 (Bridges talking points - April 18, 2005 Meeting).  There were a number of staff retirements, as well as staff departures for other organizations.  See id.  Moreover, there were a number of new initiatives and increasing demands on DFM.  See id.  In addition, while Ms. Baird-Bridges had filled several key managerial positions, including the Budget Branch Chief, the Accounting Branch Chief, and the Senior Budget Analyst position, the DFM Director position was still vacant.  See id.

In light of the foregoing, Ms. Baird-Bridges "pulled [Plaintiff's] position description and

40

upon reviewing it realized that the duties clearly included budget responsibilities." See Exhibit 5 (Bridges Aff.) at ¶ 6; Exhibit 1 (Position Description). Because Plaintiff's duties clearly included budget responsibilities, Ms. Baird-Bridges believed that Plaintiff "could better contribute to the Division of Budget than in a position which reported to the vacant Director's position." See Exhibit 5 (Bridges Aff.) at ¶ 6; Exhibit 4 (Bridges Dep.) at 94:12-17. Ms. Baird-Bridges knew that Plaintiff had "analytical skills and [had] proved herself to be very capable in the past." See Exhibit 5 (Bridges Aff.) at ¶ 8. Moreover, Plaintiff "was available and capable and the reassignment required no alteration to her position description." See id. Ms. Baird-Bridges's decision to reassign Plaintiff was "a business decision." See Exhibit 5 (Bridges Aff.)

In sum, there is no evidence to suggest that age or prior EEO activity were factors that Ms. Baird-Bridges considered in her decisions. See Holcomb v. Powell, supra 433 F.3d at 897 (internal quotation marks and citation omitted) (The Court of Appeals recently reaffirmed that it has "consistently declined to serve as a super-personnel department that reexamines an entity's business decisions.").

### E.    Plaintiff Has Not Adduced Evidence Showing That Defendant's Legitimate Non-Discriminatory And Non-Retaliatory Reasons Are Pretextual.

Once the defendant has carried the burden of production, the McDonnell Douglas framework is no longer relevant, and "the presumption raised by the prima facie case is rebutted,' and 'drops from the case.'" St. Mary's Honor Center, 509 U.S. at 507 (quoting Burdine, 450 U.S. at 255 & n.10) (internal citations omitted). The burden then shifts back to the plaintiff to establish that the defendant's legitimate, non-discriminatory reasons were not its true reasons but rather were pretextual. See McDonnell Douglas, 411 U.S. at 802-04; Burdine, 450 U.S. at 252-

53. "[A] reason cannot be proved to be 'a pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason." St. Mary's Honor Center, 509 U.S. at 515 (emphasis in original). "It is not enough, in other words, to disbelieve the employer, the factfinder must believe the plaintiff's explanation of intentional discrimination." Id. at 519. "It is not enough for the plaintiff to show that a reason given for a job action is not just, or fair, or sensible. He must show that the explanation given is a phony reason." Pignato v. American Trans Air, 14 F.3d 342, 349 (7th Cir. 1994), quoted in Fischbach, 86 F.3d at 1183.

The Supreme Court has used words like "mendacity" and "dissembling" to describe pretext. See Reeves v. Sanderson Plumbing Products, Inc., 550 U.S. 133, 147 (2000); St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511 (1993). These words are indicative of deceit or a cover-up. Such "pretext" is not demonstrated by any facts in this case. Here, Plaintiff's reliance on speculation and guesswork is not enough to create a genuine dispute of material fact. See Schumann v. O'Keefe, 314 F.Supp.2d 515, 529 (D.Md. 2004) ("Schamann's own statements as to the duties he had accreted . . . are insufficient to create a material factual dispute").

## F.    Plaintiff's Privacy Act Claim Should Be Dismissed

Plaintiff's claim fails to allege an actionable disclosure of a record under the Privacy Act and to allege actual damages. The Privacy Act "safeguards the public from unwanted collection, maintenance, use and dissemination of personal information contained in agency records . . . by allowing an individual to participate in ensuring that the records are accurate and properly used." Henke v. Department of Commerce, 83 F.3d 1453, 1456 (D.C. Cir. 1996) (quoting Bartel v. FAA, 725 F.2d 1403, 1407 (D.C. Cir. 1984)). Each agency that maintains a "system of records" is subject to the Privacy Act requirements, subject to any applicable exemptions. See 5 U.S.C. §§

552a(e), 552a(j), 552a(k). As an Executive Department, the Department of Labor falls under the definition of an "agency" and thus is subject to the requirements of the Privacy Act. See 5 U.S.C. § 552a(a)(1) (citing 5 U.S.C. § 552(0(1)).  A "system of records" is defined as "a group of records under control of any agency from which information is retrieved by the name of the individual or by some identifying number, symbol, or other identifying particular assigned to the individual. See 5 U.S.C. § 552a(a)(5).

In Cacho v. Chertoff, 2006 WL 3422548 (D.D.C. Nov 28, 2006), the Court set forth the Plaintiff's burden of proof in a Privacy Act claim for monetary damages based on improper disclosure:

> The [Privacy] Act gives agencies detailed instructions for managing their records and provides for various sorts of civil relief to individuals aggrieved by failures on the Government's part to comply with the requirements." Doe v. Chao, [540 U.S. 614, 618] (2004). [*11]  "Subsection (g)(1) recognizes a civil action for agency misconduct fitting within any of four categories . . . and then makes separate provision for the redress of each." Id. A Privacy Act claim for monetary damages based on improper disclosure -- which arises under the fourth, "catchall" category codified at Section 552a(g)(1)(D) – has four elements: "1) the disclosed information is a 'record' contained within a 'system of records'; 2) the agency improperly disclosed the information; 3) the disclosure was willful or intentional; and 4) the disclosure adversely affected the plaintiff." Logan v. Dept. of Veterans Affairs, 357 F. Supp. 2d 149, 154 (D.D.C. 2004).  In addition, any plaintiff claiming an improper Privacy Act disclosure must allege actual damages. See, e.g., Doe, 540 U.S. at 618-27 (explaining the reasons for this rule). The burden of proof lies with the plaintiff. See Reuber v. United States, [829 F.2d 133, 141] (D.C. Cir. 1987) (explaining that "except when [a] plaintiff seeks disclosure of records, 'the ordinary rule imposing the burden of proof on the plaintiff should apply'" (quoting [*12]  Mervin v. FTC, [591 F.2d 821, 827] (D.C. Cir. 1978) (per curiam)).

Id. at *10-12.

As described above, Plaintiff's Privacy Act claim should be dismissed.  First, Ms. Dunn's instructions to Ms. Keller to get more information from Plaintiff about her "blood pressure" so

that Ms. Dunn could approve Plaintiff's sick leave request, is not a record contained within a system of records.  See 5 U.S.C. § 552a(a)(5);  See Exhibit 6 (Dunn Aff.) at ¶ 16.  Further, in order for Plaintiff to recover damages under section (g)(1)(D), the alleged violation must have an actual adverse impact on her.  Here, Plaintiff has *no* evidence of an adverse impact resulting from Ms. Dunn's instructions to Ms. Keller.  Moreover, speculation that an adverse effect could have occurred fails to set forth a basis for recovery under the Privacy Act.  Thompson v. Department of State, 400 F. Supp.2d 1, 13 (D.D.C. 2005).

Additionally, Plaintiff's claim evidences a fundamental misunderstanding of the Privacy Act.  Subsection (b) of the Privacy Act proscribes the disclosure of records contained within a system of records, subject to twelve enumerated conditions.  See 5 U.S.C. § 552a(b).  One of those conditions is where disclosure of the record is "to those officers and employees of the agency which maintains the record who have a need for the record in the performance of their duties." See 5 U.S.C. 552a(b)(1).  This provision, which is based on a "need to know" concept, authorizes the intra-agency disclosure of a record for necessary, official purposes.  See OMB Guidelines, 40 Fed. Reg. 28,948, 28,950-01, 28-954 (1975) ("[i]t is recognized that agency personnel require access to records to discharge their duties").  See e.g., Cacho v. Chertoff, 2006 WL 3422548 (D.D.C. Nov 28, 2006) (disclosure of medical records to officers with supervisory and disciplinary authority over plaintiff to assess trustworthiness and make related personnel decisions).  Ms. Dunn's request of her secretary, Ms. Keller,  to ask Plaintiff about providing additional documentation so that Ms. Dunn could grant Plaintiff's leave request, plainly falls within this need-to-know provision.  See, e.g. Hudson v. Reno, 130 F.3d 1193, 1206-07 (6th Cir. 1997) (disclosure of performance evaluation to clerical staff who typed it not a violation).

44

The standard for damage awards under the Act is far too high to be met in this case, even on the facts as alleged by Plaintiff. As an initial matter, "the plaintiff has the burden of proving that the government's actions, when considered in their context were intentional or willful." Laningham v. United States Navy, 813 F.2d 1236, 1242 (D.C. Cir. 1987) (per curiam) (internal quotation marks omitted); 5 U.S.C. § 552a(g)(4). In application, that standard requires that the violation must be so "patently egregious and unlawful that anyone undertaking the conduct should have known it unlawful." Id. at 1242-43 (internal quotation marks omitted); Albright v. United States, 732 F.2d 181, 189-90 (D.C. Cir. 1984). Even gross negligence on the part of the agency is insufficient to give rise to damages. See Rose v. United States, 905 F.2d 1257, 1260 (9th Cir. 1990). The conduct alleged by Plaintiff falls far short of this standard. See Doe v. Chao, 540 U.S. 614, 620 (2004) (a plaintiff must prove actual damages in order to qualify for the minimum award of $1,000). Regarding damages for emotional distress, the Fourth Circuit has held that the plaintiff must offer proof of emotional distress, not merely the assertion of distress. Doe v. Chao, 306 F.3d 170, 180 (4th Cir. 2002). Under their analysis, more than conclusory claims of harm are necessary. See Doe, 306 F.3d at 180 (citing Price v. City of Charlotte, 93 F.3d 1241, 1255 (4th Cir. 1996)). Here, Plaintiff has no evidence that she suffered distress, much less emotional distress, as a result of Ms. Dunn's conversation with Ms. Keller.

## VI.    CONCLUSION

For the foregoing reasons, Defendant respectfully requests that the Court grant summary judgment in its favor on all of Plaintiff's claims.

Respectfully submitted,


_____/s/_____
JEFFREY A. TAYLOR, DC Bar #498610
United States Attorney


_____/s/_____
RUDOLPH CONTRERAS, DC Bar #434122
Assistant United States Attorney


_____/s/_____
KAREN L. MELNIK DC BAR # 436452
Assistant United States Attorney
555 4TH Street, N.W. Rm. E-4112
Washington, D.C. 20530
(202) 307-0338