UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AUDREY L. SEWELL )<br><br>    Plaintiff, )<br>   v. )<br><br>ELAINE L. CHAO, )<br>Secretary, U.S. Dept. of Labor, )<br><br>    Defendant. ) | Civil Action No. 06-1534 (ESH) |

**STATEMENT OF MATERIAL FACTS NOT IN GENUINE DISPUTE**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, and Local Rule 7(h), Defendant respectfully submits this statement of material facts as to which it contends there is no genuine dispute.

**FACTUAL BACKGROUND**

1. Plaintiff Audrey Sewell began her employment with the United States Department of Labor ("DOL") in 1972. See Complaint at ¶ 6.

2. In 1997, she began working for the Division of Financial Management ("DFM"), Office of Administration and Planning ("OMAP"), Employment Standards Administration ("ESA"). See id.

3. On July 14, 1999, Plaintiff was promoted from a GS-9 to a GS-11 Financial Systems Specialist. See Exhibit 1 (Position Description); Exhibit 2 (Deposition of Audrey Sewell) ("Sewell Dep.") at 10:22-25; 11:1-7.

4. She retired from the DFM on June 24, 2005. See Complaint at ¶¶ 6, 24.

### A.     Plaintiff's Duties And Responsibilities

5.  From approximately 2000 to 2005, Plaintiff performed numerous financially analytical duties.  See Exhibit 2 (Sewell Dep.) at 13:20 - 29:8.

6.  She performed analysis of the Working Capital Fund.  See Complaint at ¶¶ 6, Exhibit 2 (Sewell Dep.) at 13:14-23, 14:4-11.

7.  Plaintiff also used spreadsheets to keep track of funds collected nationwide as civil money penalties for violations of the Fair Labor Standards Act.  See Complaint at ¶¶ 6, Exhibit 2 (Sewell Dep.) at 17:14-25, 17:19-24.  Plaintiff "took that over from an accountant.  See id. at 19:21-24.

8.  Plaintiff did the accounting for the Object Class Status of Funds Reports "for the agency nationwide, total agency and by program.  See id. at 20:18 - 21:3.  The OCSF Reports are financial reports which, in order to complete, required that Plaintiff set up 10 to 12 spreadsheets that she would "link" and "roll over."  See id. at 21:6-9.

9.  Plaintiff prepared the Permanent Change of Station Report as well as reports that kept track of cash awards that were given to employees.  See id. at 24:3-12.

10. Plaintiff "built a data base out of all the essential people that would need to come to work if we had to shut down due to - - for lack of funding, no appropriate [sic] and no continuing resolution - - the people that would have to work regardless, called essential personnel."  See id. at 26:24 - 27:5, 27:5-10.

11. As a special project, Plaintiff helped the Chief Financial Officer "do the financial reports for the Agency at the end of the year . . ."  See id. at 31:4-11.

### B. Plaintiff's Two New Assignments

12. On March 14, 2005, Anne Baird-Bridges, the Director of OMAP ESA, gave Plaintiff two new assignments: the Detailed Fund Report and the Space Rent Report. See Exhibit 2 (Sewell Dep.) at 62:7-16; Exhibit 3 (Affidavit of Audrey Sewell) ("Sewell Aff.") at ¶¶ 8-9.

13. Plaintiff received training for the Detailed Fund Report from George Bailey, a private contractor who had been hired to complete the reports. See Exhibit 2 (Sewell Dep.) at 63:3-9; 69:6 - 71:17.; Exhibit 3 (Sewell Aff.) at ¶ 8; Exhibit 4 (Deposition of Anne Baird-Bridges) ("Bridges Dep.") at 83:8-14.

14. Plaintiff admits that she "could have done the Detailed Fund Report without even talking to Bailey about it . . . because years ago [she] had worked . . . at Salary and Expense Accounting . . . so [she] was familiar with the accounting runs." See Exhibit 2 (Sewell Dep.) at 64:16-21.

15. Responsibility for the GSA rent programs is the first major duty listed in Plaintiff's position description and has been there since 1999. See Exhibit 5 (Affidavit of Anne Baird-Bridges) ("Bridges Aff.") at ¶ 9; Exhibit 1 (Position Description).

16. On the date Plaintiff received the Space Rent Report assignment, she met with Vicente Sanabria, who had been responsible for completing the Space Rent Report. See Exhibit 2 (Sewell Dep.) at 72:16 - 73:8.

17. During the weeks of March 21, March 28, and April 4, 2005, Plaintiff did not approach Mr. Sanabria about training for the Space Rent Report. See Exhibit 2 (Sewell Dep.) at 80:15 - 83:25.

18. Plaintiff did not alert Ms. Baird-Bridges that she remained untrained. See id.

    C. **Plaintiff's Reassignment To The Budget Branch**

19. On April 18, 2005, Plaintiff, Mr. Vicente Sanabria, and Ms. Bettye Keller attended a meeting called by Ms. Baird-Bridges. See Exhibit 2 (Sewell Dep.) at 99:16-25. Each received a memorandum stating that he/she will be reassigned to a different division effective May 1, 2005. See Exhibit 2 (Sewell Dep.) at 100:5 - 101:1; Exhibit 7 (April 18, 2005 Memorandum).

20. Plaintiff was reassigned from the Division of Financial Management Director's staff to the Division of Financial Management, Branch of Budget Formulation and Implementation ("Budget Branch"). See Exhibit 7.

21. This reassignment did not change the duties in [Plaintiff's] position description nor did it change her pay or grade. See Exhibit 5 (Bridges Aff.) at ¶ 6.

22. There was promotion potential for Plaintiff in the Budget Branch. See Exhibit 6 (Dunn Aff.) at ¶ 6.

23. At the time of Plaintiff's reassignment, Ms. Baird-Bridges was serving as both the Acting Director of DFM, as well as the Director of OMAP. See Exhibit 8 (Organizational Chart).

24. As a manager, Ms. Baird-Bridges looked "to see how work has shifted over time, where [DFM] might have shortages, and then make assignments as they best meet the current needs." See Exhibit 5 (Bridges Aff.) at ¶ 6.

25. Although Ms. Baird-Bridges had filled several key managerial positions, including the Budget Branch Chief, the Accounting Branch Chief, and the Senior Budget Analyst

position, the DFM Director position was still vacant. See Exhibit 9 (Bridges talking points - April 18, 2005

26. Plaintiff's position description included budget responsibilities." See Exhibit 5 (Bridges Aff.) at ¶ 6; Exhibit 1 (Position Description).

27. Ms. Baird-Bridges knew that Plaintiff had "analytical skills and [had] proved herself to be very capable in the past." See Exibit 5 (Bridges Aff.) at ¶ 8

   **D.   Constructive Discharge**

28. Although Plaintiff officially received responsibility for the Space Rent Report in March 2005, see Exhibit 2 (Sewell Dep.) at 62:7-16, it was not until her reassignment to the Budget Branch in May 2005, that efforts to train her commenced and deadlines set.

29. "Ms. Dunn told [Plaintiff] at the May 4, 2005, meeting to go to Mr. Sanabria, and tell him to stop whatever he was doing and to train [Plaintiff] in the space rent reporting." See Exhibit 3 (Sewell Aff.) at ¶ 12.

30. Plaintiff approached Mr. Sanabria about training, but he "was busy being trained for his new job by another accountant." See id.

31. The Space Rent Report for May was not timely completed. See Exhibit 6 (Dunn Aff.) at ¶¶ 7-9; Exhibit 3 (Sewell Aff.) at ¶¶ 12, 14-17; Exhibit 10 (Dunn - June 10, 2005 email).

32. On June 7, 2005, Ms. Dunn called Plaintiff at her "flexi place" to check on the status of the report.[1]  See Exhibit 3 (Sewell Aff.) at ¶ 14.

33. During that conversation, Plaintiff informed Ms. Dunn that she planned to retire, effective

---

[1] For several years, Plaintiff worked from home two days per week as a result of a medical accommodation. See Exhibit 3 (Sewell Aff.) at ¶ 14.

September 3, 2005, "because of [Ms. Dunn's] assignment to [her] of the budget table . . . [and] the space rent report," both of which Plaintiff stated she did not have the experience or training to complete.  See Exhibit 3 (Sewell Aff.) at ¶ 14; see also, Exhibit 11 (June 8, 2005 Memorandum).

34. Ms. Dunn gave Plaintiff "a deadline of June 15, to complete the May Space Rent Report." See id.  She also expected Plaintiff to complete the June, July, and August reports, and for them to be "provided to the programs by the end of each month."  See

35. Ms. Dunn informed Plaintiff that "[f]ailure to complete this assignment will be interpreted as insubordination, and *may* result in further action." See id. (emphasis added).

36. On June 13, 2005, when Plaintiff learned that the "emergency training" she had scheduled with Mr. Sanabria for that morning had been cancelled by Ms. Dunn and rescheduled for June 15, 2005, see Exhibit 13; Exhibit 6 (Dunn Aff.) at ¶ 9; Exhibit 3 (Sewell Aff.) at ¶ 18, Plaintiff "went to Personnel and told them [she] would retire at the end of the pay period." See Exhibit 3 (Sewell Dep.) at ¶ 18.

37. Plaintiff took sick leave for two hours on June 13, 2005, and for all of June 14, 2005. See Exhibit 14 (June 13, 2005 email); Exhibit 3 (Sewell Aff.) at ¶ 18.

38. Plaintiff submitted her retirement paperwork to Personnel on June 25, 2005. See Exhibit 17 (Application for Immediate Retirement).

39. Even if Ms. Dunn had initiated Plaintiff's removal for conduct, there are regulations controlling such procedures which afford Plaintiff the opportunity to participate and to appeal.  See Exhibit 22 (Declaration of Thomas Z. Scales) ("Scales Decl.").

40. Even if Plaintiff had been removed for conduct, she would not have lost her contributions to her retirement fund. See id. at ¶¶ 15-16.

41. "Where the proposed discipline is removal, it is always the unwritten practice of the Agency to allow a person to retire or resign in lieu of removal. See id. at ¶ 12.

  **E. Disparate Treatment**

42. Ms. Kimberly Bassett (age 30) was hired "as the new senior budget analyst in OMAP's Division of Financial Management, Budget Branch" on March 31, 2005. See Exhibit 19 (March 31, 2005 email); Complaint at ¶ 12..

43. Ms. Bassett was hired at a GS-14 grade level. See Exhibit 4 (Bridges Dep.) at 74:6-10.

44. Prior to joining DFM, Ms. Bassett "served as a team leader for both execution and formulation at FAA, and has experience in the full range of execution and formulation activities, from apportionments, to MAX, to performance budgeting, Passback and preparation of the Congressional Justification." See Exhibit 19 (March 31, 2005 email).

45. Ms. Basssett "has a BS in Economics, and a MBA from the University of Maryland. See id.

46. Plaintiff, on the other hand, had a high school diploma, attended Johnson's Business School in Washington, D.C. (now defunct), and took several accounting and information technology courses through the Civil Service Administration and the Department of Labor. See Exhibit 2 (Sewell Dep.) at 7:18 - 10:4.

47. Because Ms. Bassett was hired to lead the budget team, Ms. Dunn "set up a schedule for her to sit down and meet with each budget analyst so that they could explain their programs and responsibilities." See Exhibit 6 ((Dunn Aff.) at ¶ 15; Exhibit 20 (April 4,

2005 email). Ms. Bassett spent two to three days shadowing each budget analyst during the month of April. See Exhibit 20.

48. Plaintiff admits that she "didn't expect [management] to give [her] an elaborate training schedule like they gave [Bassett]." See Exhibit 2 (Sewell Dep.) at 87:20-22.

49. Regarding training for the Space Rent Report, DFM "needed to have back up, have others cross trained in case the person responsible for the task was not available to do it." See Exhibit 6 (Dunn Aff.) at ¶ 13.[2]

50. On one occasion, June 13, 2005, training for the Space Rent Report was cancelled and rescheduled for June 15, 2005." See id.

**E.    Hostile Work Environment**

51. Plaintiff had a rocky working relationship with Patricia Vastano. See Exhibit 2 (Sewell Dep.) at 33:3-6, 16-21, 36:5-16, 36:17-20, 37:3-5, 37:16-18, 37:19-20, 41:14-25.

52. Plaintiff complained about Ms. Vastano's harassment to their supervisor at the time, Cecily Rayburn (Director, DFM), who told Plaintiff that she instructed Ms. Vastano to leave her alone. See id. at 37:21 - 38:8.

55. Shortly after Gary Thayer left the Agency in May 2002, Ms. Vastano briefly served as the Acting Deputy of DFM. See Complaint at ¶ 7.

56. In 2002, Ms. Vastano made comments to Plaintiff about Plaintiff retiring. See Exhibit 2 (Sewell Dep.) at 44:9-17.

57. Plaintiff admits that Ms. Vastano stopped during a period of time from January 2003 to

---

[2] Ms. Dunn's affidavit (Exhibit 6) is mis-numbered, such that there are two paragraphs labeled number 13. The paragraph 13 cited above appears between paragraphs 9 and 10.

2004 when Yoko Arymerek was there. See id. 42:6-8; 39:25 - 40:6.

58. Plaintiff admits that she had minimal contact with Ms. Vastano, and that she ignored Ms. Vastano when she made remarks in the hall about Plaintiff retiring. See id. at 42:7-12.

59. When Janet Hogler replaced Ms. Arymerek as the DFM Director, Plaintiff admits that she "was not harassed." See id. at 42:17-21.

60. Plaintiff's basis for claiming that her work environment is hostile concerns "verbal abuse and the threat of physical intimidation . . ." See Exhibit 2 (Sewell Dep.) at 130:3 - 131:5.

61. Plaintiff admits that Ms. Baird-Bridges "has never herself asked [Plaintiff] to retire, and the only thing she said to [her] about age is - - well, [Plaintiff] was the only one that wore [her] glasses - - around [her] neck. [Plaintiff doesn't] think [Ms. Baird-Bridges] liked the style." See id. at 131:17 - 132:5.

62. Plaintiff's performance appraisals which cover the rating periods from July 2000 through September 2004, reflect that she received either an Outstanding Performance or a Highly Effective Performance. See Exhibit 26 (Performance Appraisals).

    **F.    Retaliation**

63. Plaintiff filed a union grievance for age discrimination against Ms. Patricia Vastano (Deputy Director, OMAP) on December 17, 2004. See Complaint at ¶¶ 8-10.

64. On Friday, April 15, 2005, at 3:00 p.m. Plaintiff met with an EEO counselor. See Complaint at ¶¶ 14-16.

65. On Sunday, April 17, 2005, Ms. Baird-Bridges sent an email to Plaintiff, Vicente Sanabria, and Bettye Keller informing them of the Monday, April 18, 2005 meeting, wherein they learned of the reassignments. See Exhibit 21 (April 17, 2005 email);

Exhibit 7 (April 18, 2005 Memorandum).

G.   **Privacy Act**

66. On June 15, 2005, Plaintiff gave Ms. Dunn's secretary, Bettye Keller, a disability certificate and a request for sick leave extending from June 15 to June 24, 2005. See Exhibit 15 (Request for Leave); Exhibit 16 (Disability Certificate); Exhibit 6 (Dunn Aff.) at ¶ 16.

67. Ms. Dunn asked Ms. Keller to let Plaintiff know that before she can approve the leave request, she needs (1) "a doctor's note which says more than just the words 'blood pressure' with no indication of what is wrong with her blood pressure, and (2) his note does not match the dates requested for leave on her leave slip." See Exhibit (June 15, 2005 emails).

Respectfully submitted,

/s/
JEFFREY A. TAYLOR, D.C. Bar #498610
United States Attorney


/s/
RUDOLPH CONTRERAS, D.C. Bar #434122
Assistant United States Attorney


/s/
KAREN L. MELNIK D.C. Bar #436452
Assistant United States Attorney
555 4th Street, N.W.
Washington, DC 20530
(202) 307-0338