# EXHIBIT 2

3

1   UNITED STATES DISTRICT COURT

2   FOR THE DISTRICT OF COLUMBIA

3   - - - - - - - - - - - - - - - x

5   AUDREY L. SEWELL          :

6   Plaintiff              :

7   vs.                    :   Case No. 1:06CV01534

8   ELAINE L. CHAO, SECRETARY   :

9   U.S. DEPARTMENT OF LABOR    :

10   Defendant              :

11   - - - - - - - - - - - - - - - x

13   Washington, D.C.

14   Thursday, July 26, 2007

17   Deposition of:

18   AUDREY LOUISE SEWELL

19   the Deponent, called for examination by counsel for the

20   Defendant, pursuant to notice and agreement as to time

21   and place, at 501 3rd Street, Washington, D.C., before

22   Heather Kilbourne, a Notary Public in and for the

23   District of Columbia.

FREE STATE REPORTING, INC.
Court Reporting Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

---

3

2   WITNESS:          EXAMINATION :          PAGE:

3   Audrey Sewell     Direct - Ms. Melnik          4

5           E X H I B I T S

6   EXHIBIT No:     DESCRIPTION:          PAGE:

7    1      Position Description          10

8    2      Position Description          11

9    3      (Not identified on the record)   86

10   4      Formal Complaint          96

11   5      Reassignment Memo          101

12   6      E-mail Exchange          112

13   7      Disability Certificate          141

Free State Reporting, Inc.
Court Reporting Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

---

2

1   APPEARANCES:

2   On Behalf of the Plaintiff:

3   LISA ALEXIS JONES, PLLC

4   1200 G Street, N.W.

5   Suite 800

6   Washington, D.C.  20005

7   (202) 434-4507

9   On Behalf of the Defendant:

10   KAREN MELNIK, ESQUIRE

11   Assistant United States Attorney

12   555 Fourth Street, N.W.

13   Washington, D.C.  20530

14   (202) 514-75669895

16   On Behalf of the Department of Labor:

17   TOYE OLARINDE, ESQUIRE

18   200 Constitution Avenue, N.W.

19   Washington, D.C.  20218

20   (202) 693-5421

Free State Reporting, Inc.
Court Reporting Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

---

4

1           P R O C E E D I N G S

2                              (10:23 a.m.)

3       BY MS. MELNIK:

4   Q.   Good morning.

5   A.   Good morning.

6   Q.   My name is Karen Melnik.  I am an Assistant

7   U.S. Attorney and I represent the Department of Labor in

8   this matter, and with me is Toye Olarinde from the

9   Department of Labor.

10       As you can see, we have a court reporter with

11   us this morning, and she'll be taking down or recording

12   everything that you say, and eventually a transcript will

13   be produced from this deposition and you'll have a chance

14   to review it and make any corrections or changes that you

15   need to make.

16       You were just placed under oath, so just like

17   in a courtroom, you're subject to the penalties of

18   perjury for not telling the truth.  Do you understand

19   that?

20   A.   Yes, I do.

21   Q.   During the course of the deposition your

22   attorney may make an objection.  Typically it's an

23   objection preserved for the record for perhaps a future

24   proceeding, but you'd still be directed to answer the

25   question unless it involves some sort of privilege and

Free State Reporting, Inc.
Court Reporting Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

**5**

1   your attorney directs you not to answer, and that's
2   something the lawyers will talk about. But, for the most
3   part, even if you hear your attorney say objection and
4   perhaps give a reason for it, you'll still be required to
5   answer the question. Do you understand that?
6       A.   Yes, I do.
7       Q.   If during the course of the deposition you
8   don't understand a question that I'm asking, please tell
9   me and I'll try and rephrase it or repeat it so that you
10  know what I'm asking so that we're on the same page. Do
11  you understand that?
12      A.   Yes, I do.
13      Q.   If you don't do that, I'll assume that you
14  understand the question that I've asked. Do you
15  understand that?
16      A.   Yes, I do.
17      Q.   I'm just going to ask you just to keep your
18  voice up and answer all questions verbally because the
19  court reporter can't take down a shaking of the head or,
20  you know, a uh-huh or um-um or something like that, so
21  just make sure your answers are verbal.
22      A.   Okay.
23      Q.   Are you taking any medication today or have you
24  taken any medication?
25      A.   No.

**6**

1       Q.   Okay. Is there any reason at all why you
2   aren't able to understand what's going on here today or
3   the questions that I'm asking or to testify truthfully
4   and accurately?
5       A.   No.
6       Q.   Can you please state your full name for the
7   record?
8       A.   Audrey Louise Sewell.
9       Q.   And your current address?
10      A.   1301 7th Street, Northwest, Apartment 315,
11  Washington, D.C. 20001.
12      Q.   Have you ever been deposed or testified
13  previously?
14      A.   No, I have not, not like this.
15      Q.   What do you mean not like this?
16      A.   Well, I assume you mean like a proceeding like
17  this that I brought?
18      Q.   Any proceeding at all where you've been placed
19  under oath.
20      A.   Well, one time somebody was killed in the
21  parking lot and they seemed to think the tenants saw
22  something, but I didn't see anything, so they subpoenaed
23  me to testify before a Grand Jury. That was it.
24      Q.   Okay. Have you previously filed any other --
25  other than the one that brings us here today, have you

**7**

1   previously filed any EEO complaints?
2       A.   No.
3       Q.   Did you prepare for the deposition today?
4       A.   Not really. I reviewed some stuff, but I know
5   I didn't go into any depth. I figured it was overkill.
6       Q.   Okay. What documents did you review?
7       A.   The answers to your interrogatories, I think.
8       Q.   And do you keep a diary?
9       A.   No.
10      Q.   Are you married?
11      A.   No.
12      Q.   Do you have any children?
13      A.   I have one.
14      Q.   And what's his or her name?
15      A.   Victor.
16      Q.   I'm sorry?
17      A.   Victor Sewell.
18      Q.   Now I want to go over your sort of educational
19  and work background. Where did you go to school?
20      A.   St. Mary's Briantown Elementary, and high
21  school I went to Pamonkey High School and Bel Alton High
22  School.
23      Q.   And where are those located?
24      A.   Charles County.
25      Q.   Did you receive any education, formal

**8**

1   education, after high school?
2       A.   I went to Johnson's Business School.
3       Q.   Where's that located?
4       A.   Washington, D.C. It's now defunct. That was
5   many years ago. Opportunity Industrial Center.
6       Q.   I'm sorry?
7       A.   And the Opportunity Industrial Center, and
8   Department of Agriculture Grad School, numerous courses
9   there, especially in information technology, and old
10  Civil Service Administration, not that one we have now.
11  I took Accounting I, II, III and Advanced Accounting.
12      Q.   Is this all for the Department of Agriculture?
13      A.   That was under the old Civil Service. That was
14  before Agriculture started offering the type of courses
15  that they offered in later years.
16      Q.   Okay.
17      A.   The Civil Service Administration used to, years
18  ago, offer a lot of upper mobility type courses and
19  especially in the area of accounting.
20      Q.   Do you recall approximately when that was?
21      A.   Oh, Lord, it was -- I'm sorry, but it was back
22  in the late '70s, late '70s or early '80s.
23      Q.   And then thereafter with the Department of
24  Agriculture you took some courses?
25      A.   Right. That was somewhere in the '90s, so that

9

1    is more, you know --

2        Q.    Recent?

3        A.    -- recent compared to the accounting classes

4    that I took years ago.

5        Q.    Want to put this over here?

6        A.    No, that's okay.  I got it.  Thanks.

7        Q.    Do you recall the subject matters of any of the

8    courses you took at Agriculture?

9        A.    Oh, Excel, Basic, Advance, you know, I, II and

10    II Advance, and Power Point.

11        Q.    Mostly IT stuff?

12        A.    Yeah.  When information technology came into

13    the work place and when I was moved into the training

14    position for which I finally ended up into, that's when I

15    got all this information technology training, plus I got

16    an analysis course, too.  And a lot of on

17    the job training.  We had accountants that worked with me

18    as far back as really the '90s.

19        Q.    And when you say analysis, do you mean like

20    analyzing like spreadsheets and stuff like that?

21        A.    Analyzing and solving problems, period.

22        Q.    And were the courses that you took through --

23    for the Department of Agriculture, were they paid for,

24    provided through the Department of Labor?

25        A.    Right.

11

1        A.    I'm sorry.

2        Q.    That's okay.  Take your time.

3        A.    Oh, Financial System Specialist.  It used to be

4    -- when I first got the job it was a Financial Management

5    Specialist, and then I knew they had changed it when it

6    went to the 11, I think it was, the Financial System

7    Specialist.

8        Q.    Well, let me just -- do you recognize what I've

9    shown you as Sewell Exhibit Number 1?

10        A.    Yes, I do.

11        Q.    Okay.  And do you recognize it as the position

12    description for the job that you held before you retired

13    from the Department of Labor?  Oh, I gave you my copy

14    there.  Let me take that back for one second.

15            MS. MELNIK:  Can we --

16            REPORTER:  Yes.

17            MS. MELNIK:  -- sort of remark this one.  I

18    ended up giving her one that I'd marked on, which was a

19    mistake.  Thank you.

20            REPORTER:  Sure.

21            MS. MELNIK:  Sorry about that.  And let me just

22    have this marked as Sewell Exhibit Number 2.  We'll try

23    to get it from this one.

24    (Whereupon, the document that was referred to as Sewell

25    Exhibit Number 2 was marked for identification.)

10

1        Q.    Was that true of the Civil Service

2    Administration, as well?

3        A.    Years ago, yes, that was also paid for by

4    Labor.

5            MS. JONES:  Ms. Sewell, I want to remind you to

6    let her finish her question and then answer after she's

7    totally finished.

8            WITNESS:  Okay, thanks.

9            BY MS. MELNIK:

10        Q.    Prior to leaving the Department of Labor, what

11    was your position, prior to leaving?

12        A.    Financial Manager.  I forget what the title

13    was.  Financial Management Assistant, something like

14    that.  I never really paid too much to the title.

15            MS. MELNIK:  If I can have you just mark this

16    as Sewell Exhibit 1.

17    (Whereupon, the document that was referred to as Sewell

18    Exhibit Number 1 was marked for identification.]

19            WITNESS:  Financial Management Specialist,

20    something to that effect.

21            BY MS. MELNIK:

22        Q.    Ms. Sewell, I'm showing you what's been marked

23    as Sewell Exhibit Number 1.  Do you recognize -- and you

24    can look through it.  Take your time.  It's a one, two,

25    three, four, five page exhibit.

12

1            BY MS. MELNIK:

2        Q.    Exhibit Number 2 is a four page document.  Do

3    you recognize that as the position description Financial

4    System Specialist as a GS-9 grade?  And, Ms. Sewell, if

5    you --

6        A.    Well, I really don't know whether it is or not

7    because it's been so long since I would have seen this.

8    Do you see what I'm saying?  I wouldn't know.

9        Q.    Well, why don't you --

10        A.    I'm sure that it is, but I really would not

11    know definitely because it would have been years since I

12    seen this.

13        Q.    Okay.

14        A.    I didn't sit there every day and read my job

15    description.

16        Q.    I wouldn't expect you to, Ms. Sewell.  Do you

17    see where it has Office Title, Position, Financial System

18    Specialist?  Do you see that on the front page?

19        A.    Um-hum.

20        Q.    Okay.  And where is has Pay Plan, GS, and

21    Grade, 09?

22        A.    Um-hum.

23        Q.    Is that a yes?

24        A.    Oh, yes, I do.

25        Q.    Okay.  And the year that it was dated is June

13

1  26 of 1998, there to the right on the top?

2  A.  I don't recall ever seeing that before.

3  Q.  Okay.  But you recall that you were a Financial

4  System Specialist now that you've seen or been -- your

5  memory's been refreshed?

6  A.  I know the title changed.  At one point it was

7  Financial Management Specialist or something, and then it

8  changed to the Financial System Specialist --

9  Q.  Okay.

10  A.  -- at one point.  I don't know when that was.

11  Q.  Okay.  And do you recall before you retired

12  from the Department of Labor what your salary was?

13  A.  62,000-something.

14  Q.  With respect to the position you held before

15  you retired, and if you need to look at the PD to refresh

16  your memory, that's fine, as well, but to your

17  recollection when you retired from the Department of

18  Labor, what do you recall as your duties, what were your

19  responsibilities?

20  A.  My duties that I was performing was analysis of

21  the Working Capital Fund, charges to the Agency monthly,

22  and doing a spreadsheet on that and projecting what the

23  end of year picture would look like.  I was --

24  Q.  Let me just interrupt you there.  Since I'm not

25  familiar with the details of the kind of work that you

Free State Reporting, Inc.
Court Reporting  Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

14

1  do, could you just break it down for me a little bit?

2  What was involved in doing that?  Literally what did you

3  have to do to do a spreadsheet and --

4  A.  I used Excel to do the spreadsheet.  I would

5  take and -- the actual data, the charges that would come

6  from the Department, and I would put them into my

7  spreadsheet, and for that month it kept a running CUME of

8  charges.  And then I had several spreadsheets with

9  formulas where it would be the calculation on what the

10  projected picture would look like at the end of the

11  fiscal year minus a seven percent cost overrun and what

12  the picture would look like at the end of the year

13  actual.  And the average monthly -- average monthly

14  spending trend that they were on, meaning, you know,

15  what they would need or whether there would be a deficit

16  or a plus at the end of the year or whether they needed

17  to allocate more money to cover what they already had on

18  the books, so I would have to know exactly what they had

19  in 2,500, and keep up with that.

20  Q.  And when you're referring to they, who is the

21  they when you say I need to now if they were running a

22  deficit or they need to obligate more money?

23  A.  Well, Accounting.

24  Q.  Pardon?

25  A.  Accounting would put the money on the books.

Free State Reporting, Inc.
Court Reporting  Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

15

1  Accounting would be the one put -- and then, plus

2  Accounting used it to do a spread among the programs

3  because all of the charges for the Working Capital Fund

4  was being paid out of one program, and it was -- it's by

5  component programs, and it was being paid out of one.

6  And they used it to split the cost into the Department's

7  accounting system so that one program wasn't taking up

8  all the costs for the entire agency.

9  And I think they split that out by FTE, full-

10  time -- number of full-time permanent employees.  And

11  this report was given -- used primarily by the Accounting

12  Branch Chief.  Of course, when they had Division

13  Director, of course.  They knew exactly what was

14  happening with the Working Capital Fund.  Usually to go

15  into meetings and it was given to two budget analysts and

16  whoever was head of Budget.  They got a copy, too, so I

17  assume they used it in planning, do the allotments and

18  what have you.

19  There were times where the Department's report

20  was good, but it was hard for the Agency to catch when

21  the Department suddenly increased their monthly charges,

22  when it come about and what was it for, so this was like

23  staying on top of it, you know, for the Agency.  It was a

24  report that was assigned to me by the former director of

25  the division.

Free State Reporting, Inc.
Court Reporting  Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

16

1  Q.  Who was that?

2  A.  Eleanor Smith.

3  Q.  Do you recall what year, what approximate year,

4  that would have been?

5  A.  It was sometime during the -- the permanent

6  duties that I had when I left Labor was assigned to me

7  during the transition from the clerical to the more

8  professional position.  They were just gradually worked

9  into the job.

10  Q.  So more less clerical and more of a Specialist

11  --

12  A.  I was put into --

13  Q.  Let me finish.

14  A.  -- something like a upward mobility position.

15  Q.  Okay.  And with that, the upward mobility, came

16  different kinds of duties?

17  A.  Right.

18  Q.  Less clerical.  Most people don't use the word

19  secretary anymore, but less secretarial and more

20  analytical?

21  A.  Right.  It appeared -- it was a -- the program

22  at that time was called -- it was a career enhancement

23  program.  I think that's what they call it now, but it

24  was another name they had for it.  I don't recall, been

25  so long, but it was similar to what they had, like a

Free State Reporting, Inc.
Court Reporting  Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

17

1  career enhancement program, and they did away with the
2  upward mobility and that replaced it where the people in
3  certain fields, especially the clerical field, that
4  showed an aptitude to do more and wanted to progress and
5  had shown that ability to do it, where the transition
6  gave more training and transition from the clerical field
7  into a professional field, as they -- you know. And then
8  they were given all this additional training or whatever
9  they needed, you know, to do the work.
10      Q.   Sure.  In addition -- we were sort of talking
11  about what you were doing before you left the Department
12  of Labor and you just explained the Working Capital Fund.
13      A.   Right.
14      Q.   What other duties or responsibilities did you
15  have before you left?
16      A.   Well, I did the -- I accounted for all the
17  funds collected nationwide under - the fines and the
18  penalties under the Fair Labor Standards Act for - which
19  is FLSA, for violations. I not only accounted for the
20  deposits that the region's -- well, the national office
21  I'm sure made, but I also accounted for the fees that
22  Treasury collected on the part of Labor as a debt
23  collector for people that did not pay their fines and
24  penalties, and they confiscated the funds, I'm sure. And
25  this I did also. These had to be broke out by region,

18

1  and I used the confirmed Certificates of Deposits from
2  Treasury to prepare the report, and then this was money
3  that Labor could use. It didn't go to the General Fund.
4  So it was split 25 percent, if I remember, to the
5  Solicitor's Office and 75 percent of the funds went to
6  Wage Hour, the Wage Hour office.
7          And so I maintained the account, you know,
8  which is document numbers and stuff that Treasury
9  required, CD number, amount, and then the split. The
10  monthly report, then the CUME, running report for the
11  year, the disbursements, money they either had, you know,
12  used during the year, and the balances, and the balance
13  forward at the end of the fiscal year because this was a
14  no ending type of account so the money just rolled over
15  fiscal year to fiscal year.
16         And I handled most of the problems associated
17  with that because I used to do the civil money penalties,
18  child labor civil money penalties. I was the one that
19  instituted a process of collecting and accounting for
20  those penalties, but somewhere along the line that was --
21  that went to someone else because it wasn't that heavy
22  because Labor could no longer use that money. It had to
23  go to the General Fund, so I no longer prepared the child
24  labor, only the FLSA.
25         And then I worked with the auditors at the end

19

1  of the year to balance with the system, you know,
2  whatever -- they had in the system or they kicked out and
3  was on the books and the auditors was -- and then I had
4  to keep documentation, of course, you know, backup
5  everything that went in to make up this report, you know.
6  Like they had a debit voucher. We had to check balance.
7  Well, of course, I made adjustments to the receipts. You
8  see what I'm saying? I had to make adjustments to the
9  receipts, so I had to have documentation to back up
10  everything that I performed. It was a report that was
11  distributed to Wage Hour, the Solicitor's office, the
12  Director's office, OMAP (phonetic sp.) and the Deputy
13  Director, the Budget Branch Chief, the Accounting Branch
14  Chief, and the Wage Hour budget analysts and the Back
15  Wage accounting person.
16         It was a reason why I was doing that. It was a
17  separation of duties which was required. Someone other
18  then the Back Wage accounting had to do the actual
19  reporting audit, you know, separation of duties.
20      Q.   Okay.
21      A.   And I took that over from an accountant. When
22  I got those duties, an accountant was doing what I was
23  doing. In fact, a GS-13 at one point did the accounting
24  for the FLSA. But once they moved me into the position,
25  from the clerical to the professional, well, I guess they

20

1  were looking for something to put into it, so they took
2  that from the accountant because they had gotten new
3  duties. The accountant had gotten new duties, so they
4  took that and gave it to me because I could do it because
5  I had did the child labor and it was almost on the same
6  track.
7      Q.   And just in terms of where your position was
8  within OMAP, it was under the -- within the Division of
9  Financial Management, DFM, under the Director, is that
10  right?
11      A.   Prior to May 1st, yes, it was. It had always
12  been under the Director. It was like --
13      Q.   I meant prior to May 1st.
14      A.   Yeah. Prior to May 1st of 2005 it was under the
15  Director. It was a support position type under the
16  support of the Director of the Division of Financial
17  Management.
18      Q.   And so in addition to the Working Capital Fund
19  and the FLSA that you just described all the duties, is
20  there another topic area, another set of -- another
21  report that you did or another --
22      A.   I did the accounting Object Class Summary
23  Reports for the Director prior to whatever.
24      Q.   Accounting summary? I'm sorry. I just didn't
25  catch that.

21

1    A.    The accounting Object Class Status of Funds
2    Reports for the Agency nationwide, total agency and by
3    program.
4    Q.    And what was involved in doing that, what did
5    you have to do?
6    A.    Well, you had to set up all of these
7    spreadsheets.  It was quite a few of them.  I'd say we
8    ended up with about 10 or 12 spreadsheets you set up and
9    you had to link them so they'd roll over.  For example,
10   Federal Employees Comp, Black Lung, Energy Program, the
11   Office of Workmen's Compensation, and they were set up to
12   roll into one main spreadsheet for total, plus the
13   individual.  That's just a -- that's an example.  And
14   then in the end Wage Hour, Office of Labor Management
15   Standards, OMAP, of course.
16   Q.    And OMAP stands for what?
17   A.    Office of Management, Administration and
18   Planning.  And the Office of Federal Contract Compliance
19   Programs.  When I say total Agency, I mean you had to
20   roll all of these spreadsheets into total Agency after
21   you completed each individual, which the formulas was
22   already set up.  I had set the formulas up and I linked
23   then, the sheets.
24   Q.    Okay.
25   A.    So this was financial reports.  So that the

22

1    Division Director -- the reason I inherited that,
2    because we had a Division Director, Nancy Ricker, as well
3    as Eleanor Smith.
4    Q.    Nancy, what was the name?
5    A.    Ricker, R-I-C-K-E-R, years ago.  She used to
6    spend years sitting there doing that herself.  They had a
7    budget forecast which the budget analysts did, but that
8    -- they needed more to see what their financial picture
9    was, to get a clear financial picture so they knew
10   exactly where the programs stood financially every month,
11   and especially at the end of the quarters, so that they
12   would not run into a deficit or overspend.
13       And they needed to know exactly more detail so
14   that they would, for example, go to the program and say
15   you're going to have to cut your spending by so much a
16   month in what object class they wanted them to cut it,
17   you know.  The last two quarters of the fiscal year they
18   may have had to slow down travel or they may have had to
19   move off their temporary workers or whatever to bring
20   their spending within line.  So the Division Director
21   used them as a guide, as well as the accounting person,
22   of course, wanted to know what -- the Accounting Branch
23   Chief to know what was going on also.  You see what I'm
24   saying?  So that's what those reports were made up of,
25   and that was taken directly from the accounting -- the

23

1    departments -- the accounting dollars, it used to be the
2    name of another system.  I forget what name.  That was
3    years ago.
4    Q.    And when you say dollars, is it an acronym for
5    something or is it --
6    A.    No.
7    Q.    -- spelled like D-O-L-A-R-S?
8    A.    D-O-L-A-R-S.  And then sometime they put a
9    dollar sign there.  I don't know what that means.  But
10   DOLARS is the departments -- I forget what the acronym
11   stands for, but they used to have a older accounting
12   system which I was even more familiar with, of course,
13   because that's what I was introduced to.
14   Q.    Sure.  The DOLARS -- let me just interrupt.
15   DOLARS --
16   A.    DOLARS.
17       MS. JONES:  Wait.  Let her finish.  Let her
18   finish.
19       BY MS. MELNIK:
20   Q.    DOLAR is D-O-L-A-R, perhaps sometimes with a
21   dollar sign.
22   A.    Right, uh-huh.
23   Q.    That's the accounting system or what is DOLARS?
24   A.    DOLARS is the accounting system.
25   Q.    Okay.

24

1    A.    The information that I used into these Object
2    Class Reports came directly from the runs from DOLARS.
3    Q.    Are there any other reports that you were
4    responsible for before you left the Department of Labor?
5    A.    Yes.  I prepared a Permanent Change of Station
6    Report by a program each month so they would know exactly
7    how much they were spending, and I prepared an report
8    that was a report of all of the cash awards they were
9    giving out.  That included instant job awards as well as
10   bonuses.  Like I said, the Travel Report was a like
11   permanent change of station, you know, people moving and
12   the government paying for it.  These reports --
13   Q.    Oh, I see.
14   A.    These reports now covered the entire Agency-
15   wide.  We're talking all over the United States now with
16   them.
17   Q.    So, I see.  If someone who was in the
18   Department of Labor, you know, had to move to another
19   state --
20   A.    Right.
21   Q.    -- and the Department paid for the moving
22   expenses.
23   A.    ESA is made up of five programs.  It's unique
24   compared to, say, Employment and Training Administration
25   and OSHA because the Employment Standards Administration

25

1  have five different programs, which is RADAR, Office of
2  Workmen's Compensation, Office of Federal Contract
3  Compliance Program, Office of Labor Management Standards
4  and Office of Management, Administration and Planning,
5  OMAP.  That's five.  And the kind of -- all of them have
6  program heads and they work kind of independently.  So
7  when you're pulling together any financial report, we are
8  pulling it together -- the job portion, the CPs portion,
9  and then you would do each of the -- and OWCP is very
10 complex because they --
11     Q.   What's OWCP?
12     A.   Office of Workmen's Compensation.  They got
13 Black Lung, they have Energy, they have Longshore, so --
14 Black Lung II, so it's complex.  So you're pulling
15 together a whole lot.  Then after they -- the new energy
16 they charged OWCP with paying the claims for people under
17 this energy type thing, so that was a new program I had
18 to add into my sheets.
19          Then they had the H1B funds that Wage Hour had
20 to account for or had something to do with.  So it was
21 not a little simply something to set down and do.  You
22 had to have thorough knowledge of the organization, plus
23 you had to have some accounting knowledge here, what is a
24 disbursement, what is a debit, what's a credit, what's
25 accounts payable, what is undelivered order.  You had to

26

1  have some kind of accounting background to work with any
2  of this part.
3          And then there was -- of course, I'm not going
4  over all of the duties that the position had held.  This
5  present position, that was a title change and work
6  change.  Some of it went out of the window with further
7  automation.  For example, I used to do a Immigration
8  Report on behalf of Wage and Hour and Office of Workmen's
9  Comp -- I mean not Office of Workmen's Comp, Office of
10 Federal Contract Compliance Program, OFCCP.
11          But with further -- which was very complex
12 because I had to gather all the immigration data, that
13 they had granted certain -- I don't know what they was
14 giving them.  You know what I'm saying?  I didn't get
15 into Wage Hour's portion.  All I did was analyze data and
16 report on it, which was a report that went to GAO and
17 somewhere up on the hill they told me.  I don't know.
18          But what happened was with fast automation,
19 Wage Hour system no longer was picking up that
20 information, so those reports that I was reporting on
21 dropped by the wayside.  They then included -- pulled in
22 something else to replace it, which was Shutdown.
23     Q.   Shutdown?
24     A.   In the event that if we had a government-wide
25 shutdown, I had built a data base out of all the

27

1  essential people that would need to come to work if we
2  had to shut down due to -- for a lack of funding, no
3  appropriate and no continuing resolution -- the people
4  that would have to work regardless, called essential
5  personnel.  I had created a data base that contained the
6  name, the title, the location, the national office, as
7  well as all over the United States and Guam, and
8  calculated to a T how many employees they had out there,
9  and subtotaled and grand totaled, prepared for the entire
10 Employment Standards Administration.  And I maintained
11 this.  I kept up with this through the years.  In the
12 event of a shutdown I was ready to go, really, and I
13 prepared all the paperwork that went with it that the
14 Department required.
15          Now I did not know -- I was never graded on it,
16 but I did not know what a Branch Chief was the one that
17 was being evaluated on it until she retired, and I kept
18 begging her tell me what portion do you do.  I thought
19 that what I did was nothing, that she was doing a bigger
20 portion over there, and I told her when she got ready to
21 retire, to give me her portion so that I had all of it.
22 And then she said I'm going to tell you the truth,
23 Audrey, you have always did it all.  That's when I found
24 out.
25     Q.   Did you put yourself on that essential list of

28

1  personnel that had to come in?
2     A.   Nope, but I did --
3     Q.   We can laugh.
4     A.   But, see, the problem was they knew exactly
5  what I did because in the past managers made it their
6  business to find out what that person did.  The last
7  group at Labor that I was working under, I don't think
8  had any idea of what I was over there actually doing.
9     Q.   Okay.  We'll get to that a little later in the
10 deposition.  Is there anything else that you can think of
11 as you sit here in addition --
12     A.   Well --
13     Q.   I know you've listed quite a bit, and that's
14 fine.
15     A.   Do you want me to go through all of it?  I'm
16 sure I can -- but we could go on.
17     Q.   And, again, I'm sort of limiting this - well,
18 you know, the last -- before -- you know, up to and
19 including May, May 1st, '05, and we're going to get into
20 the crux of this and the additional duties that you were
21 assigned, et cetera, but I sort of wanted to get a better
22 picture, as I'm getting, of sort of all the things you
23 were responsible for during the years.  And I know things
24 -- you know, automation changed things.
25     A.   Right, right.

---

29

1    Q.   And, you know, some duties might have come and

2  some duties might have gone but, you know, just to get

3  sort of a better picture.

4    A.   Of what I was actually doing when I left?

5    Q.   Yeah, and some of the years leading up, maybe

6  like, you know, 2000 to '05.

7    A.   Well, the duties that I just told you about

8  lead from 2000 up to 2005 --

9    Q.   Okay.

10   A.   -- except for the -- we're going to get into

11  the -- what was it, the -- help me out here now.

12       MS. OLARINDE:   Rent Space?

13       WITNESS:  Not the Rent Space.  What was the

14  one?

15       BY MS. MELNIK:

16   Q.   Detail Fund?

17   A.   Detailed Fund Report.  Let's go with that.

18   Q.   Wait.  Well, that came on in March of '05.

19  We'll get to that.  That I know about.  It's all the

20  other stuff I'm not very familiar with.

21   A.   Okay.

22   Q.   Other than the Space Rent Report and the

23  Detailed Fund Report, and I think there was one other

24  thing like an exhibit that you had to work on also or

25  something during the last couple months of your tenure at

---

30

1  Labor, any other sort of -- you know, like the things

2  you've been telling me about, any other reports or

3  responsibilities like you've been describing?

4    A.   Well, there were special projects.

5    Q.   Special projects?

6    A.   Yeah.

7    Q.   Who would assign -- what --

8    A.   The Division Director, but it was always

9  special projects that they knew that I had knowledge of

10  doing and that's why they would ask me to do it.  If I

11  didn't know, they would take and just -- take a pencil

12  and paper and just write on a piece of paper this is what

13  -- I would like for you to make me a spreadsheet with two

14  columns here and this one and put these headers on it,

15  and I want to put in this column this and I want to put

16  in that column that, like the inventory.  I didn't

17  mention that, but the inventory was something that I did

18  for the Agency also.  A report every year of what type of

19  -- they had the serial numbers, who was the custodian of

20  the -- you know.  I was doing that clear up until -- what

21  did we say, 2004 or '5, 2004, '5, 2004.  I didn't do it

22  in 2005.

23   Q.   Okay.

24   A.   Did the inventory.

25   Q.   Okay.

---

31

1    A.   For only the Division.

2    Q.   Any other special projects that sort of stick

3  out in your mind as you sit here that you were assigned?

4    A.   No.  I was just assigned different special

5  projects from time to time.  Sometimes they were one shot

6  deals, you know.  And I used to work -- in 2000 I used to

7  work directly with the -- we used to have a CFO doing

8  accounting, the head accountant, lead accountant for the

9  Agency, and I used to help to do the financial reports

10  for the Agency at the end of the year, actually assist

11  him.

12       Then the Department took and -- I think in 2000

13  -- maybe not -- they had something built into the system

14  to catch up all the -- catch the work that I was manually

15  doing, so it didn't -- no longer had to be done manual,

16  but when the financial reporting was implemented in the

17  Division, I was the only one that could work -- that

18  worked with him to prepare the financial reports.

19   Q.   In this case you've brought a claim of age

20  discrimination, correct?  You have to speak.

21   A.   Yes.  Sorry.

22   Q.   That's all right.  And just so there's no

23  confusion, you're not making any allegations of racial

24  discrimination, correct?

25   A.   No.

---

32

1    Q.   Or gender discrimination?

2    A.   I have no idea what it was, but I didn't make

3  that claim.

4    Q.   Okay.  Or national origin?

5    A.   I would not know.  I'll be frank and honest

6  with you, I don't know.  The only I -- it appeared to me

7  it was age.  It could have been race, too, at one point.

8  I don't know.

9    Q.   Okay.  But the only claim you're making in this

10  case is age?

11   A.   Is age, right.

12   Q.   Okay.  And I also understand from your counsel

13  that you're not making any claims of emotional distress

14  or pain and suffering, although I believe under the ADEA

15  there aren't any anyway, but just for the sake of

16  clarity, you're not making any emotional distress or pain

17  and suffering claim?

18   A.   No.

19   Q.   Okay.  Do you know someone by the name of

20  Patricia Vastano?

21   A.   Yes, I do.

22   Q.   Okay.  Who is she or who was she?  We know

23  she's still alive, but what position did she hold or who

24  was she?

25   A.   Pat Vastano when I left Labor was the Deputy

---

33

1  Director of Office Management, Administration and

2  Planning.

3      Q.   Do you know when she got that position?

4      A.   Somewhere around in -- she came into the Agency

5  somewhere around 1997 or '98 in the same capacity that I

6  was, which was under the Director.

7      Q.   Well, she was -- I understand you're saying she

8  was -- the position that she held was under the Director,

9  but was she doing the same job as you or she had some

10 other job?

11     A.   She had some other job.

12     Q.   And when she had this other job that was still

13 located under the Department -- I mean under the Division

14 Director --

15     A.   Right.

16     Q.   -- what was your -- what, if any, professional

17 contact was there between you and she at that time when

18 she had that other job?

19     A.   It was terrible.  She came in the Agency for

20 some reason with a terrible dislike for me, it appeared

21 to me.  I had never heard of her before she came except

22 on the telephone.  I had never saw her before in my life.

23 I knew completely nothing at all about this woman.

24          But two weeks before she came on board, she was

25 calling the Division Director, Cecily Rayburn, at least

---

34

1  -- back in those days we had not transitioned to voice

2  mail, it was slow getting there, so I was wearing two

3  hats.  I was in transition from the clerical field into

4  the professional field, which was the trainee position,

5  taking on the new duties and the training and what have

6  you that I just spoke about, and I didn't mind because

7  they were good people.  Somebody had to do it.  I didn't

8  mind at all.

9          Pat Vastano called on that phone at least 10 to

10 15 times a day, and I would take the messages and give

11 them to Cecily Rayburn and lay them on her desk right in

12 front of her.  I mean I didn't grab her hand.  And then

13 when she kept calling so much I would verbally tell

14 Cecily, this woman, Pat Vastano, keeps leaving

15 this message, because she'd give me her name and

16 telephone number, wants you to call her, and she said

17 thank you.  I would continue to pile more messages.

18      So Pat Vastano would call every 10, 15, 20 minutes

19 sometime.  This is Pat Vastano she said.  She hadn't

20 called me back.  I said well, I'm sorry, but I gave her

21 your message, you know.  I don't believe you're giving

22 her the message.  This was a voice on the phone.  I

23 didn't know who -- the face it belonged to, the body,

24 nothing.  I said well, look, I'm sorry, but I cannot make

25 her call you.

---

35

1      So finally it got so bad I had to go in and

2  tell Cecily, Cecily, you need to respond to some of these

3  messages.  Cecily took all of the messages and - this had

4  gone on for weeks daily.

5      Q.   This is before Ms. Vastano came on board?

6      A.   Yeah.

7      Q.   Okay.

8      A.   So she was desperate to get there for some

9  reason.  So Cecily would go back there to see her

10 superior who was the Director of Office Management,

11 Administration at the time, Donna Copson.  She would just

12 leave and go back there.  She didn't discuss with me what

13 it was about and it really wasn't none of my business.

14 My job was if her phone rang and she did not answer it,

15 she was too busy or she wasn't at her desk, to take a

16 message.  That was it.  You know what I'm saying?

17      So about two or three weeks after this started

18 -- I mean this had been going on, suddenly Pat Vastano

19 just appeared at the Agency and they had took a job from

20 GPRA or something, from another branch, and gave it to

21 her and said that she was going to be the GPRA person.

22 And they introduced her and I said glad to meet you, you

23 know, like everybody else in the Division.  And her desk

24 was sitting about ten feet from mine because she fell

25 right under the Director's office like I did, and she

---

36

1  started right in.  If it wasn't one thing, it was

2  another, and I had never in my life had to ask a

3  supervisor to tell an employee to get off my back

4  before in my life.

5      But this woman, she said -- one time

6  specifically she didn't like her computer down on the

7  floor.  It was on the floor.  That's the way it was set

8  up.  We had an office that came down to set up computers

9  when a new person come in or if a person just wanted

10 something moved around.  They had an office up in --

11 under the Office of Management, Administration and

12 Planning where men would come down, you know, and hook

13 the computers up, or if there was a problem with it,

14 they'd try to fix it and it moved your equipment around.

15      And I gave her a telephone number and told her

16 to call that office and have them to come down and move

17 her computer to where she want it to be moved, and she

18 asked me why couldn't I get down there and do that, and I

19 told her I wasn't getting on the floor and crawling

20 around moving her computer.

21      Then when it came to supplies, desk top

22 supplies.  Remember, I was wearing two hats, the clerical

23 as well as the other.  Well, we had a supply cabinet.  I

24 told her to look in there, see what -- was there anything

25 in there that, you know, she could use, was there

37

1  anything that she wanted.  And I told her -- the
2  supplies in there that she wanted, particularly her desk
3  top supplies, I gave her a form and GSA catalog and told
4  her to write it on there and I'd order them for her, so
5  she handed me back the form, why can't you order it?
6  Well, I was very, very busy trying to do the new budget
7  work -- I mean the accounting work that the, you know,
8  Director had assigned me, plus do clerical work, too.
9  That means a lot of correspondence coming in and mailing
10 it, but I didn't have -- I couldn't do that.
11     So I said Pat -- I said let me explain to you
12 just what my job is, you know.  Then I explained to her
13 that I was doing two jobs and I went through all of this
14 and that I was in training to be a financial management
15 something or other at that time.
16 And she stood there, looked at me, said your kind
17 shouldn't be in any position after I went through all
18 this trying to be nice, to explain to her.  I said I'll
19 tell you what, don't say nothing else to me, just leave
20 me alone, okay?
21     So finally I went to Cecily and told her that
22 this woman was, you know, over there harassing me, and
23 she was, because you couldn't satisfy, her, nothing I
24 did.  If I gave her supplies, this is not what I asked
25 for.  Couldn't satisfy nothing you did, you know.  Why

38

1  can't you do that, you know, everything -- she didn't
2  want to do anything.
3     Q.  Did there come a time --
4     A.  And so Cecily went to her and told her to leave
5  me alone, and she came to me -- Cecily then came to me
6  and told me I told Pat Vastano to leave you alone and
7  that anything further she needed to communicate with you
8  is to come through her.
9     Q.  Okay.  Did there come a time when Ms. Vastano
10 transitioned or sort of left the GPRA duties that she had
11 and then became a supervisor in the office?  Was there a
12 time when that happened?
13     A.  When Cecily left and went to -- went somewhere,
14 and Gary Thayer became her supervisor in the same
15 capacity that she was at the GPRA.
16     Q.  And Gary Thayer, his position was what?
17     A.  He became the new Division Director.  I was
18 directly under him and so was Pat Vastano directly under
19 him.  It was during that tenure that she was under Gary
20 Thayer -- well, one position, the GPRA thing, they
21 promoted her and made her a division with one person.
22     Q.  What do you mean?
23     A.  It was a division.  They made her a Division
24 Director and they gave her one employer.
25     Q.  Okay

39

1     A.  Then she came from under Gary Thayer.
2     Q.  Did there come a time when she was in your
3  chain of -- what's the word, management chain?  Did there
4  come a time when she was either a direct line supervisor
5  of yours ever or a second line supervisor?
6     A.  Only after Gary Thayer left, Ann Baird-Bridges
7  appointed her Acting director for the Division.
8     Q.  And do you recall when that was when she became
9  Acting Director?
10     A.  Oh, it was the latter of 2002.  It was about --
11 Gary Thayer left May 5th, 2002, and someone else sat there
12 for about a month or so.  But somewhere -- I think for a
13 couple months, from the Bureau of Statistics, and then
14 Pat Vastano became Acting somewhere in July of 2002,
15 somewhere around that time.
16     Q.  And as Acting Division Director, was she your
17 direct line supervisor?
18     A.  Then she became my direct line supervisor.
19     Q.  And during the remainder of year 2002, you
20 didn't file any EEO or grievances in 2002, is that right?
21     A.  No.
22     Q.  And in 2003, Ms. Vastano, she was still your or
23 she was still your direct line supervisor at that point,
24 is that correct, 2003?
25     A.  2003 to 2004, Yoko Arymerek (phonetic sp.)

40

1  because the Division Director.
2     Q.  Who?
3     A.  Yoko Arymerek.
4     Q.  Any idea how to spell that?
5     A.  A-R-Y-M-E-R-E-K or something like that, Yoko
6  Arymerek.  I forgot how to spell her name.
7     Q.  Do you know where Ms. Vastano went in '03?
8     A.  Ms. Vastano was still there as Deputy Director
9  of Office Management, Administration.  She never went
10 anywhere.  It was one like open space type thing.  You
11 could walk from the Division of Finance and Management
12 here on the side of the door, and then on the other side
13 of the door was the main office.  Then on the other side
14 there may be another division.  So Pat Vastano was there
15 still as the Deputy Director of OMAP.
16     Q.  Is that something different from the Division
17 Director?  You said she was Acting Division Director.
18     A.  She was Acting Division Director for the
19 Division of Financial Management.  After Gary Thayer
20 retired in 2002 and the man from BLS left after but a
21 couple of months, she was appointed Acting Division
22 Director for the Division of Financial Management, as
23 well as she still was the Deputy Director for Ann Baird-
24 Bridges for Office of Management, Administration and
25 Planning.

41

1  Q.  Okay.  And in 2003 did you file any EEO
2  complaints or grievances against Ms. Vastano?
3  A.  No.
4  Q.  Now in December 2004, you did file a grievance
5  against Ms. Vastano protesting a letter of reprimand that
6  you had received, is that correct?
7  A.  That's correct.
8  Q.  And in that same — hang on one second.  In
9  that same grievance you also alleged discrimination, is
10  that correct?
11  A.  That's correct.
12  Q.  Okay.  And what sort of discrimination were you
13  alleging against Ms. Vastano back in December of '04?
14  A.  Because the way she treated me.  She had been
15  treating me like that starting — it was during her
16  tenure under Gary Thayer.  She again started harassing me
17  by saying things to me like you ain't nothing.  You know
18  what I'm saying?  She wanted me one time to move my desk
19  so they could expand her space and I refused, and that
20  got on her nerves, and so then she started with her
21  insults, and so I went to Gary Thayer because I wasn't
22  going to go through the hassle no more, and he told her
23  to stop and that was the end of that.
24    Each time someone told her to stop, she
25  stopped.  It wasn't until she became Ann Baird-Bridges'

42

1  deputy somewhere the latter part of 2001, 2002.  And
2  then after the Director left she started within days — I
3  would say five days after he left.  I would say by May
4  10th — he left May 5th, 2002 — she started up somewhere
5  by May 10th or May 11th, 2002, and it went on, on, on, on.
6    But she stopped now during a period of time,
7  the period of time of 2003.  January 2003 to 2004 when
8  Yoko was the there I had very minimal, but I ignored her
9  when she made her little remarks in the hall, are you
10  still here, huh, you haven't retired yet, you know,
11  making her little remarks.  I completely ignored that
12  woman because she wasn't over me.  Yoko was over me, so I
13  completely ignored her.  That was January —
14  Q.  '3, did you say?
15  A.  2003 to somewhere about 2004 because then they
16  hired — Yoko left and went to the Department.  From what
17  I gather, she's still with the Department, Labor.  Then
18  they brought in someone from Philadelphia named Janet
19  Hogler, and she came in somewhere about the last of
20  January.  I don't think anybody was Acting that month of
21  January.  I'm not sure.  I know I was not harassed.  I
22  know I wasn't.  I remember it being pretty good days.
23  There were good days.  And Janet came in, and she was
24  there for about six months at the most and she was the
25  Director.  I don't know whether — I don't think she was

43

1  there a good six months.
2  Q.  With respect to Ms. Vastano, with respect to
3  the grievance that you filed, other than the things
4  you've related to us so far with respect to some of —
5  you know, your opinion about that nature of the requests
6  that she would make of you that you didn't think were
7  appropriate like moving furniture or, you know, the
8  computer, you know, getting on your hands and knees and
9  moving things for her or ordering supplies, the things
10  you sort of already described for us here, was there any
11  other — let me find the word — actions or — that you
12  based your grievance on in terms of discrimination?
13  A.  The racial part, is that what you're speaking
14  about?
15  Q.  Well, I don't know because I —
16  A.  Well, when she had made the remark that my kind
17  didn't belong in any position, I certainly didn't ask her
18  to elaborate because I figured it had gone far enough
19  right there.  That remark alone was enough for me because
20  I figure I was human kind [sic] the same as she was and
21  that was out of line.  And the remarks that she would
22  make, you ain't nothing, I didn't think that was in line
23  either.  So as far as I was concerned, that woman was a
24  racist.
25  Q.  Okay.  And other than the comments about —

44

1  words to the effect of oh, you're still here, you
2  haven't retired yet, was there anything else?
3  A.  She asked me directly to retire.  That woman
4  came to me one time when she was Acting — it started as
5  soon as Gary Thayer left.
6  Q.  Which was, again, in '02?
7  A.  May 2002.
8  Q.  Okay.
9  A.  She came down the hall one day and said oh,
10  you're having trouble walking today?  You may have
11  thought that she might have been concerned.  At times I
12  had trouble walking.  And she said why don't you just
13  retire?  Well, at first I didn't pay it any attention.
14  Then I think she said it — during that period of time
15  she may have said oh, you might want to just retire, you
16  know, because I have arthritis, and I do have problems
17  walking at times, especially in the wintertime.
18  Q.  Well, let me just interrupt you, I mean, and
19  was this back when Gary — shortly after Gary retired in
20  '02?
21  A.  Shortly after Gary retired in '02.
22  Q.  '02, okay.
23  A.  And specifically when she started Acting
24  somewhere about July of 2002 —
25  Q.  Okay.

45

1    A. -- she started that, but then she had made the
2  remark prior to that, but she didn't say it as, you know,
3  she wanted me to retire and I didn't pay it any attention
4  at first. I would say about -- sometime I would say in
5  May of 2002 she suggested that I retired. She said have
6  you ever thought of just retiring? Well --
7    Q. You know, let me just interrupt you one moment
8  just, you know, even in the way -- in your reflection in
9  your voice, the way you just said that, I mean, you --
10 and let me ask you, did you -- were you eligible to
11 retire at that time in '02? I mean did you have enough
12 -- I don't know what the calculations are in terms of how
13 many years and age and all that, but did you know what
14 year you were -- because most folks look forward to that
15 in government service. I hear people who are always
16 saying, I got, you know, seven years, three months and
17 two weeks and two days and six hours to go, you know,
18 stuff like that. Did you know when you were eligible to
19 retire, you know, your 20 years or your 25 years? I'm
20 not sure what --
21   A. I never thought of my retirement like that. I
22 knew when I was going to retire.
23   Q. When were you going to retire?
24   A. 2007.
25   Q. Okay.

46

1    A. I'd already based on my own calculations when
2  I was going to retire. And, like I said, originally when
3  she said that, I didn't pay it any -- no attention until
4  she started playing around with the performance
5  appraisal that Mr. Thayer had did for me for the period
6  ending April 30th in 2002.
7    Q. So this day do you not know -- I mean how many
8  years of government -- when did you start in the
9  government? Let's just go backwards.
10   A. 1972.
11   Q. So as of '02 you had 30 years of experience --
12 I mean 30 years of government service?
13   A. Right.
14   Q. So certainly you were eligible to retire by
15 then?
16   A. I never knew it was a mandatory time for people
17 to retire, to tell you the truth. As far as I knew there
18 was no mandatory.
19   Q. Oh, no, I'm not talking about mandatory. I'm
20 not saying that you had to retire. I'm just saying if
21 there's a time at which in government service that you
22 can receive, you know, the most amount of benefits you're
23 going to receive if you retire at that time.
24   A. The most amount of benefits a person receive,
25 they would have to work 40 years and 11 months to get 80

47

1  percent under the Civil Service System.
2    Q. Our old system. Okay. So switching gears a
3  little bit now, when Ms. Baird-Bridges came to the
4  Agency, she became the Director of the Division of
5  Financial Management, is that --
6    A. No.
7    Q. That's wrong. What position did Ann Baird-
8  Bridges get hired for?
9    A. She got hired as the Director of Office
10 Management, Administration and Planning, OMAP, in a
11 trainee position. I don't know whether it was a trainee
12 position or not. All I know, that she had to have --
13 each Division Director set with her for a month when she
14 came on board to train her for her position, so I don't
15 know whether it was a trainee position or not. All I
16 knew, that the Assistant Secretary at that time sent out
17 a memo to everyone outlining the training that she was
18 going to get when she first came on, and that he wanted
19 every individual --
20   Q. Yeah. Careful not to --
21   A. I'm sorry.
22   Q. That's okay. Just the banging the table --
23      MS. JONES: Don't mess with the microphone.
24      WITNESS: I'm sorry.
25      BY MS. MELNIK:

48

1    Q. That's okay.
2    A. I didn't know.
3    Q. That's all right. That's all right. I know.
4    A. So I really don't know, but eventually that's
5  the position she occupied, the program head position, at
6  the top.
7    Q. Okay. And at that time -- that was in '02?
8    A. It was either the end of -- the latter part of
9  2001, early '02, but I think it was the latter part of
10 2001. I'm not exactly sure, but I'm sure it is somewhere
11 around that time.
12   Q. Okay.
13   A. You know, like somewhere about -- after the
14 November elections, within a couple months there, so it
15 may have been in 2002.
16   Q. Okay. And when she got that position what was
17 your sort of chain of command for you?
18   A. The Division Director, who would have been my
19 supervisor, who at that time was Gary Thayer, he fell
20 under her because he was the Division Director. She was
21 the Director of -- the program head of the Office of
22 Management, Administration and Planning, and my position
23 fell directly under Gary Thayer.
24   Q. Okay. But Gary left in May of '02.
25   A. May 2002.

49

1    Q.   Right.  So he was -- was he gone by the time
2  Ms. Baird-Bridges came to her job?
3    A.   No.
4    Q.   Okay.
5    A.   She came in there somewhere in 2001.
6    Q.   Oh, 2001.
7    A.   Right.  So she had been there for about -- I
8  would say -- it may have been the middle of 2001.  I
9  really don't remember exactly.  But she had been there
10  for about almost a year or more before he left.  She had
11  rotated all of the Division Directors into the Deputy
12  position spot who was supposed to have been training her,
13  and the last one she rotated into that position was Pat
14  Vastano, the division of one, one person.  All the rest
15  had big divisions, actual divisions and branches under
16  that all except Pat Vastano.  She didn't have any
17  branches or anything.  She just had one person in the
18  division.  And so then she selected Pat Vastano out of
19  all of the Division Directors as her deputy.
20    Q.   When Mr. Thayer left in May of '02, did anyone
21  during the rest of 2002 take his place or no for that
22  job?
23    A.   When he retired in 2002 they brought in a
24  temporary person from the Bureau of Agency Statistics who
25  stayed there for two months, and then Pat Vastano was

50

1  appointed Acting Director for the Division.  She wore
2  two hats at the time, but she really was over the
3  Division from the day he walked out the door, really.
4    Q.   Because she was Ann Baird-Bridges' deputy?  Is
5  that what you say that or -- because you said she was --
6  Ms. Vastano was there --
7    A.   Well, when he walked out of the door he had
8  already prepared my appraisal for the period ending April
9  30th.  Everybody was supposed to have their appraisal
10  during that appraisal time by May 30th.  Ann Baird-Bridges
11  had put out a OMAP notice saying that the people that
12  didn't have their appraisal by June the 15th of that year
13  would not be considered for no bonus if the appraisal
14  wasn't in.  That was the latest.
15        So as late as the first week in June of 2002
16  when I was forced to acquire about my appraisal, I was
17  told Pat Vastano was up there doing my appraisal,
18  although she had never supervised me a day in her life,
19  had never discussed my duties.  And I know for a fact
20  that Gary Thayer had did the appraisal and he needed the
21  second level sign off -- and he had submitted it to them
22  because I seen him do it, and I had a e-mail from him
23  clarifying that he had prepared it.  Pat Vastano was up
24  there --
25    Q.   Okay.  Let me interrupt you because you were

51

1  getting off my question a little bit.
2    A.   I was saying -- you asked me if she -- who was
3  Acting during this period after Gary Thayer left.  I was
4  telling you that actually, although the man from BLS was
5  setting for two months, Pat Vastano really was running
6  the show because she was the one that was over there
7  playing with the appraisal.
8    Q.   Okay.  And that was for the remainder of 2002?
9    A.   Right.
10    Q.   What about in 2003, was there someone in that
11  position of --
12    A.   2003 to 2004 it was Yoko Arymerek.
13    Q.   And so she was your direct line supervisor?
14    A.   Right.
15    Q.   And then once she left was it filled
16  thereafter?
17    A.   For 30 days it was vacant and then it was
18  filled with Janet Hogler.
19    Q.   How was your relationship with Mr. Thayer?
20    A.   I've always got along with every supervisor I
21  have ever had in my entire life.
22    Q.   So I assume that your relationship with Mr.
23  Thayer was a good one?
24    A.   Thayer and all before him in private industry
25  as well as in government.  My son's godmother is a former

52

1  supervisor from private industry over 40 years ago and
2  we still keep in touch.  I never had a problem with a
3  supervisor before.  Before 2000 --
4    Q.   I've got to interrupt you because I just asked
5  about Mr. Thayer, so -- when you were working for Mr. --
6  well, let me back up a little.  When did your -- in terms
7  of working -- have a flexi place to work from home, I
8  understand that you did that two days a week, is that
9  right?
10    A.   Right.  My doctor --
11    Q.   When did --
12         MS. JONES:  Let her finish.
13         BY MS. MELNIK:
14    Q.   When did that begin when you were working two
15  days from home and three days in the office?  When did
16  that start?
17    A.   I think in 1999.
18    Q.   Okay.  And what was your tour of duty when you
19  were in the office?  You worked from when to when?
20    A.   Under the old flex time schedule it was 10 to
21  6:30 or 9:45 to 6:15 or 7:00, 7:15, 7:15 at the latest.
22  We had flex time.
23    Q.   When you were in the office, is that --
24    A.   Right.  You mean my tour of duty at home?  7 to
25  3:30.

53

Q. So I guess my question is though -- but when you were in the office working, did that -- did your hours change when you were working in the office from day to day or from week to week or year to year or --

A. The core hours remained the same, but on the flex time a person had an option. They had a spread of time that they could come in, anytime between 6 a.m., I think it was at that time in '01, to 10 a.m. They could come in at any time. The core hours were from 10, I think, to 3, so they only had to cover the core hours, and they could work as late under the old schedule as 8 p.m., and that's the way I worked flex time -- a hundred percent until everybody else left.

Q. And what were the days that you were working in the office, what days of the week?

A. Monday, Wednesday and Friday.

Q. And was that consistent from 1999 through 2005?

A. Right.

Q. And did you have a computer at home?

A. Right. I had a loaner that I got in 1999 that was a rebuilt one from Labor and I was going to bring it back in 2001 because it was not feasible to use. My son had brought a brand new one, Gateway, and I was using his, but then after 9/11 it became hard to get equipment through the door, so it had been just getting home in

54

storage, and I delivered that back to Labor somewhere, I think, in April of 2005, the old one which was a piece of junk.

Q. Well, after 2001, September 11th or there abouts, did you -- what did you do to get an updated computer?

A. I used my son's.

Q. Did you tell your supervisor that you were using your son's and not using the Labor computer --

A. Well, they already --

Q. Wait, let me finish. That the Labor computer was not -- no longer usable, for lack of a better term, because of encryption problems and updates in technology, et cetera?

A. Well, they should have -- no, not really because they knew because they had moved to Office 98. Then they we to XP, and no one gave me a upgraded computer. I didn't know whether they were supposed to, you know, loan me a better computer or what because the original one I got was not brand new. It was a rebuilt one.

Q. So you didn't put in like a requisition or --

A. Oh, no.

Q. Let me finish. A requisition with your IT people to get a computer that would allow you to better

55

communicate with the Department say after 2001, after September 11th, 2001?

A. No. That wasn't the way it worked around there. Usually a manger would -- if they got in new computers, they would use the older ones that they had in there for people that was working at home, the older ones they was getting rid of. And, of course, they would be the most updated ones. And after 2002 no one never offered me a new one, but I'm sure -- like I said, no one never offered me a new one and I never asked. They got rid of better computers than I had at home, but no one never offered me one and I never asked for one. The employee cold not have went and just ordered theirself [sic] a computer no way. A supervisor would have had to initiate that action.

Q. Right. So you would have to tell a supervisor --

A. Right, and the supervisor would have to agree yes, you need a new one or a more up to date one, and then the supervisor would, you know, decide whether they're going to give you one that's in-house already, you know, that's up -- pretty up to standard or whatever, so --

Q. So with using your son's computer, did you have e-mail capability to communicate with your supervisors?

56

A. I did not have Internet. It was a stand-alone at the time. He's since bought a new one, but it was a stand-alone at the time and he used it mostly for like his music, stuff he had on it, but it had Excel and Word which is all I needed.

Q. So say on Tuesdays and Thursday when you were home, did you have a cell phone that your supervisors kept in touch with you?

A. My supervisors kept in touch with my telephone if they needed me, but most of my -- the majority of my work was portable. And then the original flex time that was assigned, these are the rules from OPM, it was mandatory that I had Internet access either. As long as the person -- if the work was portable and they had the equipment there to do it at the home, any communication device at that time -- it was spelled out in writing that the person could do telephone, you know.

Q. Careful.

A. I'm sorry. The supervisor had to determine who was eligible for flex time and if this worked, that they did -- and most of my work would be downloaded to a disk. All of it could be downloaded to a disk and taken home, and the hard copy of the computer run, which I used -- hard copies are CDs which I used. All of it could be done at home as long as I -- when I came back to work I

57

1  had my work with me.

2     Q.    Moving on now again.  In December of '04,

3  specifically 20th, I believe, of '04, you filed a

4  grievance against Ms. Baird-Bridges alleging age

5  discrimination.  Do you recall that?

6     A.    Yes, I do.

7     Q.    Okay.  And for what -- on what basis did you

8  file an age discrimination claim in December of '04?

9     A.    Because her deputy had been constantly asking

10 me to retire.  She had came over there one time to return

11 a leave slip that she had held forever and held it like

12 to her just like this and said don't you have your time

13 in, why are you still here, why don't you just retire?

14 That's when it came to a head.  She had been hinting

15 around, hinting around and hinting around, talking about

16 it, are you still here, why don't you retire, you can

17 always retire, you know, and then she said why don't you

18 retire, and I told her I'll retire when I get good and

19 ready.

20        I spoke -- Ann Baird-Bridges came there one

21 time to get something notarized.  I had to get my notary,

22 too.  And I tried talking to her about it to explain to

23 her that I was tired of Pat asking me to retire, and than

24 at that time I told Ann that I planned to retire in 2007

25 anyway.  I thought that that would back them off.  Ann

59

1  couldn't work under either of them women.

2     Q.    Who's the she?

3     A.    Janet Hogler.  She had put all these people on

4  these audits, and all of a sudden all of these people was

5  pulled off the audits except me, hundreds.  So I was -- I

6  was taking -- I would print out all this paper and take

7  home.  I was doing at least 10 to 15 at home.  I'd sit at

8  the table just doing audits because you could download

9  them.  You could download the information you needed on a

10 disk, the format to do the audit.  It was still manual

11 audits really, is what we were still doing there.

12        And I'm trying to knock down as many as I can.

13 When I was at work I was knocking out at least five and 6

14 a day, plus my regular work.  So finally I asked -- I

15 said is anybody else working on these audits?  One

16 accountant that was assigned, she told me they hadn't

17 gave her not one.  And so I asked Janet Hogler.  I says

18 why isn't anybody else working on these audits besides

19 me, helping the payroll clerk, and she looked down and

20 she said well, because you're the only one doing it

21 correctly, and then she got very quiet and this was

22 around that time she told me she was leaving, she had to

23 leave, she couldn't stay there no longer.  And I worked

24 on the audits, you know, and did the best I could.  It

25 was ridiculous and I'm sure we never got them all

58

1  Baird-Bridges got what she wanted notarized, walked off

2  and didn't say anything and completely ignored it.

3        There was a time back in November of 2004 that

4  I told Ann Baird-Bridges that I was tired of Pat Vestano

5  harassing me, not only but to retire, but treating me in

6  a degrading manner.

7     Q.    Have you finished your answer?

8     A.    Want me to wait?

9        REPORTER:  Uh-uh.

10        BY MS. MELNIK:

11    Q.    They have a back up.

12    A.    But Ann Baird-Bridges stood right there and

13 watched Pat Vastano.

14    Q.    What do you mean watched her?

15    A.    You know, they called me in the office.  Ann

16 Baird-Bridges was on her harassment kick back at that

17 time, too, harassment with work, I called it, harassment

18 with work.  Like she assigned Janet Hogler -- when Janet

19 Hogler was there she assigned about 600 audits to 4 or 5

20 different people, accountants and whatever.  They had to

21 get this project done a short period of time.  Well, then

22 Janet Hogler was under Ann Baird-Bridges and it was a

23 terrible situation, and Pat Vastano, who the Deputy was.

24        All of a sudden she became quiet, withdrawn.

25 She said she couldn't work there no longer.  She said she

60

1  correct, with the payroll clerk.  The payroll clerk told

2  me -- said, you know, they didn't give me but $125, $150,

3  something or other she was saying, for all that work that

4  we did.  Now how much did you get?  Not a thing.  All

5  this was spearheaded under Ann Baird-Bridges, you know.

6        So at the time her deputy was the one doing

7  most of the harassing and --

8     Q.    Wait a second.  Let me just interrupt.  Are you

9  referring to Ms. Vastano when you say her deputy?

10    A.    Pat Vastano, yes.

11    Q.    Okay.  Ann Baird-Bridges took over the Acting

12 Director duties after Janet Hogler left somewhere around

13 July of 2004.  During that period of time from 2004 I

14 ignored Pat Vastano because, like I said -- was it 2004?

15 Yeah, it was 2004.  I ignored her, but Ann kept trying to

16 throw her together with me in some form or fashion.

17 Every time she wanted to see me, she have Pat

18 Vastano there, you know, and we had been through the

19 degrading treatment and all of that from Pat Vastano

20 which she knowed [sic] of because I complained to her

21 about it.  She never said one word.

22        And, like I said, at the time she was standing

23 in front of her, it was -- it had to do with -- what was

24 it?  It was -- that as probably in 2003, not 2004,

25 because Ann Baird-Bridges had took over -- that was '3,

61

1 that was 2003, when the -- she got in front of Ann

2 Baird-Bridges one time. That's is the only time I

3 remember she did it right in front of her. And I asked

4 Pat about a leave slip that I had gave her about some use

5 or lose leave, and she said it was on her desk. She said

6 --

7    Q.   Is this in '03 or '04?

8    A.   I think that's -- I'm sure it was in '03. It

9 was '03 or late '02, one or the other.

10    Q.   Okay.

11    A.   Pat Vastano was Acting.

12    Q.   Okay.

13    A.   Because there came a period of time when she

14 was Acting that I had to take the leave slips and route

15 them to her through Ann Baird-Bridges and I rarely ever

16 got them back.

17        MS. JONES:  Have you finished your answer?

18        WITNESS:  Well, I don't know.

19        MS. JONES:  Can we take -- if you've finished

20 your answer, can we take a very brief break?

21        MS. MELNIK:  Oh, sure.  Do you want to take --

22 and then I another --

23        MS. JONES:  Five minutes.

24        MS. MELNIK:  Yeah, we'll take five and then --

25 I have to use the bathroom, too, and then I figured we'd

62

1 break maybe around 12:45, 1:00 for lunch, and then

2 finish up after that.

3        MS. JONES:  Okay.

4              [OFF THE RECORD]

5              (ON THE RECORD)

6        BY MS. MELNIK:

7    Q.   Now moving again in time -- I'm trying to do

8 this sort of somewhat chronologically just to keep it

9 straight for everybody.  I believe on March 14th of 2005

10 you had a meeting with Ms. Baird-Bridges.  Do you recall

11 a meeting on March 14th, '05 where I believe you were

12 assigned two new duties.

13    A.   Yes.

14    Q.   Okay.  And what were the two new duties that

15 you were assigned?

16    A.   Space Rent and the Detailed Fund Report.

17    Q.   And were there any other duties on that date

18 other than the Detail Run and the Space Rent that you

19 were assigned?

20    A.   I was not assigned any more duties that day.  I

21 was to keep the duties that I was presently already doing

22 also.

23    Q.   When you were assigned those duties on March

24 14th, at that time, either that week or the remainder of

25 the month of March, did you file a grievance or an EEO

63

1 complaint during the month of March of '05?

2    A.   No, I did not.

3    Q.   With respect to the Detailed Fund Report, did

4 you receive training with respect to that report?

5    A.   Yes.

6    Q.   And who trained you?

7    A.   George Bailey trained me for about ten minutes.

8    Q.   And who was George Bailey?

9    A.   A contractor.

10    Q.   And had you been previously working with him on

11 anything?

12    A.   No -- yes. I worked with him on a booklet.

13    Q.   What kind of booklet or what was the booklet.

14    A.   The booklet was a first for the Agency.  It was

15 a combination of opticias (phonetic sp.) code, cost

16 center, direction on how to use the accounting code

17 structure which I prepared back in December 2005, which

18 prompted - forget it.

19    Q.   I just -- because of the year because you went

20 -- you said December 2005 and you --

21    A.   I worked with George Bailey then.

22        MS. MELNIK:  Okay.  Well, that would have been

23 after she retired.

24        WITNESS:  I mean 2004.

25        MS. MELNIK:

64

1    Q.   That's all right.

2    A.   I'm sorry.

3    Q.   Okay.

4    A.   2004.

5    Q.   Okay.  And -

6    A.   But, quite frankly, I'm getting tired.

7    Q.   Oh, you mean --

8    A.   Yeah.  I'm getting tired.

9    Q.   Okay.  That's okay.  I mean we'll break for

10 lunch soon.

11    A.   Okay.

12    Q.   How's that?

13    A.   Um-hum.

14    Q.   Okay.  Were you able to do the Detailed Fund

15 Report after having spoken to Mr. Bailey about it?

16    A.   I could have done the Detailed Fund Report

17 without even talking to Bailey about it.

18    Q.   Why is that?

19    A.   Because years ago I had worked under the - at

20 the Salary and Expense Accounting assisting her off of

21 the record, so I was familiar with the accounting runs.

22 The new DOLAR system wasn't that far off to me, but

23 according to the contractor, I was the only one within

24 the Division, including the accountants, that could read

25 the report, so I had -- all I needed from George was to

65

1 tell me what is it that you want for me to do?  What

2 specific obligations and information do you want me to

3 pick up?  Do you want me to pick up duplicated entries?

4 Do you want me to pick up standing entries?  Do you want

5 me -- I mean the obligation's been on the book and just

6 being put on it every month and nothing was being paid

7 against the obligation.  I needed to know exactly what

8 accounting entries did he want me to point out for the

9 Accounting Branch Chief to take action on to correct.

10 And George was a very good -- he was a prior manager at

11 the Labor Department years ago, retired manager, so

12 George was very good at telling me what he wanted done.

13       Now they had hired him to do it because since

14 around about '97 or '98 no one had did it prior to my

15 picking it up.  And for the February report in 2005,

16 which I picked up in March, he went back and gave me

17 February, what he was doing.

18    Q.    I see.  So once Mr. Bailey sort of told you

19 specifically the kind of information --

20    A.    Right.

21       MS. JONES:  Let her finish.

22       BY MS. MELNIK:

23    Q.    -- that needed to be picked up or accounted for

24 -- I hate to use the word accounting when we're talking

25 about accounting, but once you knew that information, you

Free State Reporting, Inc.
Court Reporting Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

66

1 could complete the report because of the prior knowledge

2 that you had.

3    A.    Right.

4    Q.    Okay.

5    A.    Knowledge off of the record.  I'm sorry.  This

6 is not -- no one knew that I knew how to do it prior to

7 my doing it.  When I say knowledge off the record, I mean

8 in the old days people did work that they did not get

9 recognized for, and a supervisor may not have known the

10 person even knew how to do it because they would ask the

11 person that needed the help when they had free time can I

12 learn how to help you, and if the person needed their

13 help, they would train the person to do what they needed

14 help, the help in, and the person would just do it for their

15 own self-development.  So no one know - really, a manager

16 had no way of knowing that the person was capable of

17 doing that.

18    Q.    And Mr. Bailey was available to you, though, at

19 that time if -- you said, you know, the managers might

20 not have known, but Mr. Bailey knew that you knew?

21    A.    No.  He had no way of knowing.  He'd never

22 worked with me before.  He was surprised that I caught on

23 so fast.  He said my God, you caught on fast.  I didn't

24 catch on fast.  I knew what he was doing anyway.

25    Q.    I see.  I see.  So than completing the report,

Free State Reporting, Inc.
Court Reporting Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

67

1 that was not a problem for you?

2    A.    Not really.

3    Q.    Okay.

4    A.    But the -- that she expanded it from what he

5 did was the problem.

6    Q.    Okay.  What are you referring to then?

7    A.    We're talking about over five feet of computer

8 runs here, almost.  You stacked it up, it was as tall as

9 I am.  It came in in boxes, about a hundred pound boxes,

10 on doilies [sic].  The movers brought it in.  Movers --

11    Q.    Right.

12    A.    -- brought these boxes in.

13    Q.    To your work station?

14    A.    No, about 20 feet away.

15    Q.    Okay.

16    A.    Under the table on the floor and on top of a

17 table they stacked them.  And Ann Baird-Bridges came

18 through there one day.  As soon as she gave -- she didn't

19 know I could do it.  As soon as she gave me that

20 assignment -- she came through there in March because

21 George just gave me the broken down reports that he had

22 did.  She came through there and said there's your boxes.

23 The movers had just bought the stuff in.  There's your

24 boxes, go get your boxes.  I never said anything because

25 I could not lift those boxes.  Fortunately, a couple of

Free State Reporting, Inc.
Court Reporting Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

68

1 men in the office, budget analysts, Juan Vicente helped.

2 They moved him to Accounting.  Then Todd helped.

3    Q.    And Vicente is V-I-C-E-N-T-E?

4    A.    Uh-huh.  He would empty the box for me.  He

5 would bring the box over there, lift it up, although it

6 was too heavy for him because he was not that large.  It

7 was too heavy for Todd also, but they knew that I could

8 not lift it.

9    Q.    So they would bring it to your work station?

10    A.    Yes, and then Todd would cut the tops off and

11 empty them out on the counter, and then I would work with

12 the great big stacks like that and break them all down.

13 And this was very time consuming and tedious and hard,

14 just to break down that amount.  This -- before I started

15 doing the report, the Detailed Fund Report, she hired a

16 contractor to do it because it was not being done in the

17 agency.  The reason none of the accountants knew how --

18 did not know how to read that Detailed Fund Report,

19 because they never had to in the past.  All the old

20 accountants that used to work under the old accounting

21 system were gone.

22       So the reason they didn't do it, because it was

23 such a heavy and tedious job, but it was something I

24 agreed that needed to be done.  That's why she hired the

25 contractor.  I did not mind doing it and I enjoyed doing

Free State Reporting, Inc.
Court Reporting Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

69

1    it. It's just that I needed time to do it. To do it
2    properly, I really needed to devote the kind of time to
3    it. You couldn't just keep breaking a ten down, that
4    kind of paper, constantly because you would injure
5    yourself.
6            And then I didn't mind doing what George was
7    doing because he was writing in red on the hard copy what
8    correction needed to be done since sometime there could
9    be a double entry of a travel voucher. They put it on.
10   They obligated it. And then when they paid it --
11   accounts payable, when they went to pay it, they
12   obligated it again. Do you see what I'm saying?
13       Q.   Yes.
14       A.   And then they would pay against that second
15   obligation and the first obligation is still on the
16   books, which would stay there. At the end of the year
17   that money would lapse unless someone pointed it out into
18   the Detailed Fund Report that you need to go and
19   deobligate these parts, and that money could go back in
20   the appropriation and the Agency would be able to use
21   that money rather than lose that money. See, they had
22   money. It's just they got to clean up the system, you
23   see what I'm saying, to get the money.
24       Q.   To know how much is -- between how much is
25   obligated and how much of that money is actually spend?

Free State Reporting, Inc.
Court Reporting Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

70

1        A.   Right, right.
2        Q.   Okay.
3        A.   Do you see what I'm saying? Because it's
4    duplicated entries on there, and then they had running
5    obligations. For example, if you had a cell phone and
6    you worked for the government, and we were paying for
7    your cell phone bill, we would obligate money, a document
8    number and the amount saying it's going to be $600 a year
9    estimate, and we'd put it on the book, that obligation.
10   That's the obligation. That money's set aside to pay
11   your cell phone bill that you use for government
12   business.
13           But now suppose you gave up that -- and so then
14   I could leave that a running obligation. You just put
15   this money on $30 or 60, whatever, a month. Just
16   obligate this amount every month, standing entry. Just
17   put it on every month because we know you're going to
18   have a cell phone bill at least 50 or $60.
19           Suppose you change from Sprint and you went
20   with Verizon? Okay. We're going to obligate again on
21   Verizon because we're paying Verizon. Now if nobody went
22   back and took that -- the running obligation off for
23   Sprint, that money would still go on and on and on and
24   we'll never have nothing to pay -- we would never pay
25   against it, so that's called a standing entry.

Free State Reporting, Inc.
Court Reporting Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

71

1        So someone would need to catch things like
2    that and make a correction and deobligate all of that
3    money and go back to appropriations. This is what I was
4    doing. I was analyzing the Detailed Fund Report, and you
5    could really just do that on the hard copy, you know, in
6    red, and break out the different sections, the Wage Hour
7    Section or the CCP Section of whatever.
8        Q.   The different programs?
9        A.   Right. And give it to the Accounting Branch
10   Chief, which she probably would give to the program
11   administrative person to review, shouldn't this happen,
12   or maybe they could it themselves, or he may want to take
13   the liberty and go ahead and just deobligate stuff
14   himself. You know, we getting near to the end of the
15   fiscal year, the close out. He may just want to go on
16   and do it himself to speed it up, you know. But this is
17   what George was doing. It was a necessary function.
18           Ann Baird-Bridges took it to a step -- level --
19   another step is when she come over there with -- or
20   anything whooping and hollering and shaking her finger in
21   my face, but at that meeting is when she decided I'm
22   going to sit there and manually type up every accounting
23   entry. I did that, too. But she didn't require that of
24   the -- I think he wasn't there long after that. She
25   didn't require that of the contractor. She said she

Free State Reporting, Inc.
Court Reporting Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

72

1    wanted me to type it up, too. She was using work as a
2    harassment tool. While I was typing up the stuff I could
3    have had did a more in-depth analysis of the report.
4        Q.   And when you say work as a harassment tool, in
5    your mind what do you mean by that? What does that mean
6    to you?
7        A.   She give you a project and then throw up any
8    barrier she can to make sure you don't get it done, or
9    she would give you a project -- give you work that she
10   know that you cannot do so you could fail and not do it.
11       Q.   But with respect to the Detailed Fund Report,
12   that you could do?
13       A.   She didn't know that.
14       Q.   Well, I'm asking you, though, you could do it?
15       A.   Yes, I could.
16       Q.   Okay. With respect to the Space Rent Report,
17   prior to you being assigned that in March of '05, who was
18   previously doing that?
19       A.   Vicente Sabotini [sic]?
20       Q    Isn't it Sanabria, S-A-N --
21       A.   Sanabria. I don't know, Sanabria or however
22   you want to pronounce it.
23       Q.   It's S-A-N-A-B-R-I-A, but Sabotini's close.
24   Once you received -- after that meeting with Ms. Braid-
25   Bridges on the March date, March 14th, 2005 when you were

Free State Reporting, Inc.
Court Reporting Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

73

1  told about, you know, doing the Space Rent Report, when
2  did you speak to Mr. Sanabria -- I'm going to just say
3  Sanabria.
4      A.  We can just say Vicente.
5      Q.  We can say Vicente, too.  That's his first
6  name.  When did you first speak to Vicente about the
7  Space Rent Report?
8      A.  Same day.
9      Q.  And at that time, and this is now March of '05,
10  the setup, for lack of a better word, where you were
11  working, it was sort of a large open space that was
12  broken down by cubicles, is that right?
13      A.  Right.
14      Q.  Okay.  And if you come into that area, that
15  work space, and you're towards the front of it where I
16  guess Ms. Dunn ended up, at least that's sort of my
17  reference point.  I know there were other folks -- women
18  that occupied that spot -- were you like two cubicles
19  down or so from that front?
20      A.  About two -- I say about five feet and then
21  another cubicle down.
22      Q.  Okay.
23      A.  So a total I'm willing to say almost a space
24  for two cubicles --
25      Q.  Okay.

Free State Reporting, Inc.
Court Reporting Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

74

1      A.  -- from Dunn's door.
2      Q.  And still we're in March of '05, and at that
3  time Vicente was sort of two rows over?
4      A.  Right.
5      Q.  Okay.  Sort of in line with you almost, but two
6  rows over?
7      A.  Right.
8      Q.  Okay.  And I know as of March 15th, 2005 -- 14th,
9  sorry, March 14th, 2005, what, if any - well, what was
10  your understanding -- as of that date, March 14th, 2005,
11  what was your understanding of what the Space Rent Report
12  was?
13      A.  I did not know.
14      Q.  Had you ever heard of it?
15      A.  Yes.
16      Q.  Okay.  So in what context had you heard of it?
17      A.  From the former budget analyst that was there
18  that did it before Vicente got it.  Fred -- did a lot of
19  talking about Space Rent, you know, but when he did it,
20  it was a manual process.  It was a little accounting
21  paper.  It was in writing and management typed it.
22      Q.  Okay.
23      A.  It was not automated.
24      Q.  Okay, not automated at that time.  Okay.
25      A.  And I assisted him.

Free State Reporting, Inc.
Court Reporting Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

75

1      Q.  And with respect to sort of -- you've talked a
2  lot today about the kinds of reports that you were
3  responsible for in terms of -- and you kind of just gave
4  us a nice example with the cell phone where, you know,
5  things are obligated and whether or not they're spent
6  and, you know, that sort of responsibility in a broad
7  sense.  What was your understanding of -- in terms of
8  Space Rent -- sort of named so it connotes rents on space
9  used by government.  I mean what was your understanding
10  of what it accounted for at that time?
11      A.  What the Agency paid to GSA, I assumed, for
12  Space Rent.  The calculation on how the cost was
13  determined, I did not know.  I know it was by square
14  feet.  And my input into Space Rent was -- pre-Vicente
15  coming on board, was to call up the regions, the
16  administrative offices in the regions, to check if they
17  were still in the space, had they given up any space, did
18  we have the correct contact person.  Sometimes they had
19  given up the space, but GSA continued to bill for the
20  space.  We got billed through the mail for the space.
21      Q.  Sure.
22      A.  But GSA continued to bill for the space,
23  although we no longer had the space.  Sometimes they had
24  joint space, you know, like in the Wage Hour field
25  office, in the OFCC field office.  The person may have --

Free State Reporting, Inc.
Court Reporting Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

76

1  they either may have gotten rid of some staff or they
2  downsizing, so they were sharing the same space in small
3  field offices.  In New York I think they gave up a lot of
4  space and consolidated in New York.
5      So this was the type of thing I was doing, --
6  that space, but the cost of the space or how you reported
7  on it, I never did that, and this information never even
8  went from me to the budget analyst.  It went to the
9  Division Director who was Gary Thayer.  So I would give
10  him that information and he would give it to Fred and, of
11  course, Fred knew me well, so if he had a problem with
12  any of it, he wouldn't go back to Fred, he would come to
13  me, you know.
14      But then somewhere around about 2000, I think
15  it was because I was doing it for a long time anyway,
16  long before I even was -- knew anything about Space Rent.
17  It was just one of the extra duties that was assigned.
18  They assigned it to a GS-8 to do that portion that I was
19  doing to assist Fred, although she said she never did any
20  of it.  I think what happened was the Department had
21  automated it to a point that it was almost correct where
22  in the field they could make the changes themselves.
23      Q.  You mean they could instead of having to call
24  the people --
25      A.  Right.

Free State Reporting, Inc.
Court Reporting Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

77

Q.   Instead of saying are you still in that space
and how much space and have you consolidated, the regions
could enter into a computer that they're taking up this
space and whatever other information that is required.
That became automated?

A.   Very highly automated.

Q.   Okay.

A.   Very highly automated, from what I gather.  So
the portion that I was doing was really no longer a
necessity.  Fred, being an old budget analyst, but a good
one, of course, was very good with Space Rent.  Vicente
was better.  Vicente had worked at the departmental level
with the Space Rent.  When they hired him back in the
Agency as a budget analyst, he developed this new -- the
new spreadsheets at the new system of how the Agency was
going to report on Space Rent, and it was entirely
something that he instituted himself, which he gave the
more detailed Space Rent information than what they had
been getting previously under Fred, so he took it to a
much higher level.  He was an expert at what he did
because he came from the Department, and anybody that had
worked at the Department at that level in Space Rent and
then came down to an agency with Space Rent, of course,
would bring a lot of knowledge with them.  Plus, he had
very good information technology skills, too, so he could

78

develop -- he carried it to another level.  I personally
had never seen a Space Rent Report, not one to date.

Q.   Okay.  So just so I can -- is it correct to
then say that you understood the purpose of it --

A.   Right.

Q.   -- but you hadn't worked with the spreadsheet
that, say, Vicente had developed in order to plug the
numbers in and then make an analysis of it?

A.   Oh, exactly what information that they -- he
was doing to -- from what I gathered, it was 10 to 12
different reports.  I can understand -- what was all
these reports for?  I would have to see it --

Q.   Sure.

A.   -- but I never saw it.

Q.   So March 14th, 2005, just for reference, was a
Monday.  Did you set up a time to meet with Mr. -- did
you set up a time to meet with him during that week to
get trained on the Space Rent Report?

A.   You said March what?

Q.   The week of March 14th.  You got assigned the
new duties on a Monday, which was March 14th, 2005.  And
so my question is did you -- once you let him know hey,
I'm going to be, you know, taking over this --

A.   No.  I didn't.

MS. JONES:  Let her finish.

79

Q.   Once you let Mr. Sanabria know that hey, I'm
going to be the one who's going to be responsible for
this report now, did you set up a time to meet with him
that week?

A.   I'm not that type of person.  I don't go around
into the office -- people about hey, I'm going to take
over your duties, let's set a time for me to do so.  It's
up to the supervisor to tell the employee to transport
their duty to another employee.  I just mentioned to him.
I said Vicente, have you been told that I am to start
doing the Space Rent what you done, and he said no.  I
said oh.  He said that's my duty, that's my job.  I said
oh, that's right.  I thought that at the time maybe they
had jumped the gun and told me and never told him.  That
was one of his main job functions.  With the A-76 flying
around --

Q.   With the what?  I'm sorry.

A.   A-76 flying around, getting rid of people.

Q.   I don't know what an A-76 is.  I'm sorry.

A.   Well, that was going on at Labor at the time
also where they were getting rid of different jobs.
People were very touchy if you're talking about taking
their duties because they want what they have, you know.
Maybe you abolishing their job or something.

80

Q.   So was there --

A.   I wouldn't say that that's what he thought.  I
never asked him.  All he said is that's my job and no one
had said anything to him about it.  No, I did not go over
there and say Vicente, I'm taking over your job and you
train me.  No, that didn't happen.  Nor did I say to
George I'm taking over your job and you train me.  George
already knew.  George came to me.  He already knew.
Someone had already talked to George and told him to give
it so me, so when I approached George and said you want
to see me, he said yeah, go to your area and I'll be
right over there to bring it to you, so he already knew.
Someone had already talked to him.  Nobody talked to
Vicente and told him to give me anything or train me.

Q.   Okay.  So then for the week of -- the following
week would be March 21st.  Did you follow up at all with
Mr. Sanabria and say, you know, words to the effect of,
you know, I was assigned this to do, I should probably,
you know, learn how to do it?  Did you have any
discussion with him during the following week about, you
know?

A.   No, I did not because she never said it was
being assigned to me.  She said you're going to get Space
Rent.  And when I told her, I said well, are you talking
about what Vicente does because she could about doing

81

1 something entirely different with Space Rent. I had no
2 way of knowing that unless she made it clear. And she
3 said yes, what Vicente does. I said well, I do not know
4 how to do what Vicente does with Space Rent. Is Vicente
5 going to train me? Yes, he's going to train you.
6    Q.   Okay.
7    A.   That's what she said.
8    Q.   That's what Ms. Baird-Bridges said?
9    A.   The same thing about the Detailed Fund Report,
10 I did not know exactly what they wanted done with it at
11 first. I had never seen the Detailed Fund Report that
12 was being produced by DOLAR. I had only seen Detailed
13 Fund Reports produced by the old accounting system.
14    Q.   Right. Okay, we went over -- I guess I don't
15 want to backtrack just because we have a lot to cover and
16 don't want to go over --
17    A.   But I'm saying I had never been trained in
18 either of the duties.
19    Q.   I understand. So then can I assume for the
20 week of March 28th you didn't call from home or set up a
21 time there in the office where you could -- with Vicente
22 and have him train you on the Space Rent Report say
23 during the week of March 28th, 2005?
24    A.   Vicente was not -- I was not Vicente's
25 supervisor.

82

1    Q.   I understand that, but my question is did you
2 walk over to his cubicle, which I understand was about
3 two rows away, and say anything -- words to the effect
4 of, you know, Ms. Baird-Bridges said I'm going to be
5 doing this and I need to get trained, can you take some
6 time out -- can we pick a time that's convenient for both
7 of us and that can happen?
8    A.   No, because Vicente told me that was his job.
9    Q.   Okay.
10    A.   When I told him that I was told that I was
11 going to get that duty, he said that's my job. I am not
12 the type of person to go around no office starting a
13 whole lot of stuff over who's this, who's that. That's
14 the supervisor's job to figure out who's going to do what
15 and arrange for training, not the employees. You ain't
16 supposed to be over there fighting with each other.
17    Q.   Okay. So then can I assume for the week of
18 April 4th that you never spoke to Mr. Sanabria about
19 learning how to do the Space Rent Report or talking to
20 him about it at all?
21    A.   He approached me one day and he said have they
22 said anything more to you about the Space Rent? I said
23 no. I said have they told you yet to train me? Nope.
24    Q.   And what date was that?
25    A.   Well, I don't know what day it was. It was

83

1 just one day passing through the office. He said have
2 they said any more to you? I said no, she hasn't. I
3 said has she said anything to you about training me? He
4 said no, nobody said nothing to him. He said I don't
5 understand what's going on. He said that's my job. He
6 said I don't know why. I said well, I'll tell you what,
7 just forget it. I didn't want him upsetting himself. I
8 just said forget it.
9    Q.   Up until - I guess I'm up to the week of April
10 4th, had you -- you know, in light of what you're
11 describing, the fact that you were told you were going to
12 be taking this duty and hearing from Mr. Sanabria --
13    A.   Now I don't --
14    Q.   But let me finish my question, please. That
15 you hadn't heard about it, did you contact either your
16 direct line supervisor or Ann Baird-Bridges, your second
17 line supervisor, about this, follow-up with them
18 regarding this?
19    A.   Ann Baird-Bridges was harassing the heck out of
20 me. During that period of time that woman -- I was
21 scared to death of that woman in the office in the first
22 place. That woman had come over there in April --
23    Q.   Okay. I'm not at April 8th yet, okay?
24    A.   I did not bother her no more then I had to and
25 there was no way I was going to let her isolate me.

84

1    Q.   Okay. So my question is did you talk to
2 either your direct line supervisor --
3    A.   I didn't have a direct line --
4    Q.   Let me finish. Okay. Because when I went
5 through before about who your supervisors were and told
6 you the direct line supervisor, it didn't sound like
7 there was ever much of a time when there was no one. And
8 so now you're saying in April or end of March, April 2005
9 you didn't have a direct line supervisor?
10    A.   Ann Baird-Bridges was the direct line
11 supervisor.
12    Q.   Oh, she was acting in that position, as well?
13    A.   Right.
14    Q.   Okay.
15    A.   She took over somewhere around about - when
16 Janet Hogler left she took over as Acting.
17    Q.   Okay. So did you inquire any further of her
18 regarding -- you know, she told you you were assigned
19 this duty, and with respect to training from the person
20 who previously had the Space Rent Report duty, did you
21 follow up with her on that at all, send her an e-mail,
22 while you were in the office about it or just go to her
23 door and ask her and say anything to the effect of hey,
24 you know, you assigned this duty to me March 14th, you
25 know, Mr. Sanabria doesn't seem to be aware that I'm

85

1 taking over that duty, you know, what's going on?

2    A.   No, I never did anything.  I was too scared of

3 that woman.  No, I didn't.

4    Q.   Okay.

5         MS. MELNIK:  This is probably a good time to

6 break, I think.

7         MS. JONES:  Yeah.

8         MS. MELNIK:  Why don't we go off the record for

9 lunch.

10                [OFF THE RECORD]

11                [ON THE RECORD]

12        BY MS. MELNIK:

13    Q.   Good afternoon.

14    A.   Hello.

15    Q.   Sort of sticking to our chronological -- my

16 chronological way of doing this, you're aware that on

17 March 31st, 2005 Ms. Kim Bassett joined the Department of

18 Labor?

19    A.   Yes.

20    Q.   And what position did Ms. Bassett occupy?

21    A.   She took Vicente's job.

22    Q.   And what position is that?

23    A.   He was a budget analyst.

24    Q.   Was she hired as a Senior Budget Analyst?

25    A.   I think so.

87

1    Q.   Okay.  And when she joined the office, there

2 was some sort of written directive or e-mail or memo,

3 excuse me, that sort of outlined or provided for training

4 for Ms. Bassett when she joined the office, the

5 Department, is that correct?

6    A.   The Agency, ESA, the Budget Office.  They

7 outlined about a month of training for her.  Vicente was

8 the first on the list.  He had the longest training

9 schedule, and after the month of training end, he still

10 continued training her up until the day that I left.

11    Q.   And is it part of your allegations that, excuse

12 me, that it was discrimination that you didn't receive a

13 written training schedule?

14    A.   It was discrimination that I was not -- my

15 training was not taken seriously enough to even give me

16 any kind of schedule.  I didn't have to have an elaborate

17 training schedule like she did, but I would appreciate

18 like putting aside of his time somebody working with his

19 supervisor and my supervisor and him and block out like

20 even a half-a-day of training just devoted to me.  No, I

21 didn't expect them to give me an elaborate training

22 schedule like they gave her.

23    Q.   Did you ask Ms. Baird-Bridges or --

24    A.   Ask Ms. Dunn.

25        MS. JONES:  Let her finish.

86

1        MS. MELNIK:  Can I get this marked as Sewell

2 Exhibit 3?

3 (Whereupon, the document that was referred to as Exhibit

4 Number 3 was marked for identification.)

5        BY MS. MELNIK:

6    Q.   I'm showing you what's been marked as Sewell

7 Exhibit 3.

8    A.   Um-hum.

9    Q.   So was Kimberly Bassett hired as a Senior

10 Budget Analyst?

11    A.   Yes.

12    Q.   Okay.  And do you know what the difference is

13 between a Budget Analyst and a Senior Budget Analyst?

14    A.   No, not really.  They did not have any prior,

15 so --

16    Q.   Who's the -- they didn't have any what?

17    A.   Senior Budget Analysts.  They just had Budget

18 Analysts.

19    Q.   Okay.  So you weren't aware of what the

20 differences were, as you said, between a Budget Analyst

21 and what a Senior Budget Analyst might do?

22    A.   No.  I'm sorry.

23    Q.   Okay.  And as far as you know, Ms. Bassett was

24 new to the Department of Labor?

25    A.   Right.

89

1        BY MS. MELNIK:

2    Q.   Did you ask Ms. Baird-Bridges for just what you

3 said, for a time, say a half-a-day or whatever it would

4 have been, an hour, a couple of hours, for training with

5 Mr. Sanabria?

6    A.   I never asked Ms. Ann Bridges anything.  I

7 avoided her because I was afraid of her.

8    Q.   Well -- so were you afraid to e-mail her and

9 ask her for -- to set up training for yourself with Mr.

10 Sanabria?

11    A.   No, I was not afraid to e-mail her, but I did

12 not want to do anything to set her off either.  I mean it

13 got to the point you didn't know what would and what

14 would not set her off.

15    Q.   Now you say you're afraid of her.  Now first I

16 just want to go before April 8th and then after April 8th.

17 So before April 8th, 2005 why were you afraid of Ms.

18 Bridges?

19    A.   I was afraid of her because she attacked

20 another coworker in the office.

21    Q.   Did you witness that attack?

22    A.   I was two rows over, heard the whole thing.  I

23 did not see it.  I heard the whole thing, the woman

24 screaming for her to let go of her arm.  She's screaming

25 no, you're going to do what I say, you're going to go

89

1  somewhere, and I got so upset I got up and left the
2  office.
3      Q.   Is that the sum of what you heard when you were
4  there during that incident?
5      A.   The screaming and hollering and let go of my
6  arm, you're hurting my arm and stuff like that, and she's
7  screaming and hollering back.
8      Q.   So based on that you were afraid to --
9      A.   And then --
10         MS. JONES:   Let her finish.
11         BY MS. MELNIK:
12      Q.   -- you were afraid to send Ms. Baird-Bridges an
13  e-mail about getting training from Mr. Sanabria?
14      A.   Well, I went to her door one day.  She gave us
15  a project.
16      Q.   What day are we talking about, what's the date,
17  the day, date?
18      A.   It was somewhere around in November of 2004,
19  long before the -- incident.  It was somewhere in
20  November.  And she said she wanted me to -- she called me
21  to the office.  The thing was I wasn't scared of her
22  exactly after that.  I was cautious, but I wasn't exactly
23  scared.  But she called me to the office and said she
24  wanted to me with me.  Soon as I got there, here come Pat
25  Vastano.  She blocked the door, and then she said she

90

1  wanted me to do a study on the -- what was it, a -- I
2  forget now, to tell you the truth.  What was it?  Some
3  kind of accounting.  But, anyway, we had had a training
4  course about six months earlier when Janet Hogler was
5  there, the entire division, everyone, all the
6  accountants, branch chiefs, even Ann Baird-Bridges and
7  her deputy, the entire division plus the OMAP Director
8  and Deputy Director, a refresher like accounting course
9  -- oh, commitment accounting.  I got it.
10         And in that training course, the instructor
11  brought up commitment accounting.  The Agency -- I mean
12  the ESA had never used commitment accounting, none of the
13  accountants.  Then she called me in her office in
14  November and said that she wanted me to do a study on the
15  use of commitment accounting within the Agency.  I
16  thought it was a challenging project.
17         I said I'll get right on it.  I said I'm going
18  to get with the Accounting Branch Chief and schedule a
19  time with all of the accountants.  She said he doesn't
20  know anything about commitment accounting.  I said okay.
21  I said well, I will meet with all of the accountants and
22  see whether they could use that into their, you know,
23  area.  They don't know nothing either.  They don't all
24  use it.  I said I don't think so, you know, because I
25  knew that the program did the obligations for like the

91

1  black lung account and they put on the beneficiaries to
2  go pay and whatever expense they had so they would be
3  obligating that.  I think that was done, too, from the
4  Department, you know, level at the time.
5         No, she didn't want me to get with the
6  accountants.  She didn't want me to get with the Branch
7  Chief, but she wanted me to do the study.  I contacted
8  someone into the Department that knew about it, right,
9  and asked him about it.  He said I don't know why she
10  asking you that.  He said he had already talked to her
11  about it and told her that it wasn't feasible to use
12  commitment accounting within ESA, and said that the
13  booklet that I had did back -- that I did in December,
14  finally.  She had discussed that with him, revising the
15  accounting code system.  That's what the booklet that I
16  did, finally in December did, it was a complete revision
17  of the accounting code system consolidating different,
18  you know, object classes and consolidating -- not object
19  classes.  I mean cost centers because they could not
20  change the object class because that's at the
21  Departmental level to change.
22         But I went back there and attempted to do the
23  study, you know, and I tried to get the Accounting Branch
24  Chief, Larry Jarl, to contact the person in ETA --
25         MS. MELNIK:  Jarl is J-A-R-L.

92

1         WITNESS:  -- that did use it.  The Employment
2  Training Administration, from what I gathered, was the
3  only component of Labor that used it.  Now maybe someone
4  else could have.  I don't know.  It's similar like a
5  obligation.  Now an obligation is like you commit this
6  money to be spent for this particular purpose.
7      Q.   Let me just interrupt you because I think we
8  got a little off track.  I mean we were talking about why
9  you were scared of Ms. Bridges, and --
10      A.   Right.  Yeah, I --
11      Q.   -- and I just wondered if we could get to why
12  you were scared of her.
13      A.   I went to her door to ask her a question on
14  that study --
15      Q.   Okay.
16      A.   -- and there she was standing at her desk with
17  her back to me when I approached the door, and she turned
18  with her fists at her side and just glared at me and I
19  started to ask her a question.  I don't even -- I think
20  it had something to do with what I just talked about.
21  And I stopped in the middle of what I was asking her and
22  apologized and, yes, she frightened me.  And compounded
23  with the attacking of the woman and the way she acted
24  that day, I never went back to her door.  That was the
25  last time I went back to her door in my life.

93

1    Q.   Did you speak to her when you came back -- I

2    mean did she speak to you when you came back to her door?

3    A.   No.  She just stared at me with her fists at

4    her side while I was talking, and then she just -- like

5    that, and I took and said excuse me, I'm sorry, I

6    bothered you and I walked off, and she never said

7    anything to me about it.  Then after the April 8th

8    incident where they were screaming and hollering, yeah, I

9    was scared of her.

10    Q.   Okay.  And when did Ms. Dunn become your first

11    line supervisors?

12    A.   Ann Baird-Bridges transferred me there at a

13    April 18th meeting.  April 18th, 2005 meeting.

14    Q.   I see, and that's when -- I understand.  Okay.

15    And that's when Ms. Dunn became your direct line?

16    A.   Effective May 4th.  The first meeting with her

17    was May 4th or 5th or something like that.

18    Q.   Now the April 8th incident that we've been

19    referring to, that's when Ms. Baird-Bridges -- there was

20    some confrontation, according to you, regarding an e-mail

21    that you had -- you hadn't received it or you hadn't

22    replied to it or something like that.  There wasn't a

23    pop-up about it.  Am I -- is that the general --

24    Q.   She came over there yelling about a pop-up.

25    She said when you looked at that pop-up on your machine,

94

1    you were to click on it and send me a received receipt.

2    I said I don't know what you're talking about.  She said

3    I received a read receipt that I read the e-mail.  She

4    received a read receipt, but she didn't receive a

5    received receipt.  And I said wait a minute, I don't know

6    what you're talking about, and I didn't.  I had never

7    seen a pop-up box on my machine, on the machine assigned

8    to me.  And I didn't -- when I was at people's desk, if

9    they had something up on the machine, I didn't stay at

10    their machine because I didn't want them to think I was

11    reading.  You know, the mail's personal on there.

12         So I didn't know what she was talking about.

13    There was no pop-up on the machine, and even after all of

14    this was over, she was standing there screaming and

15    hollering, talking about you shut up and listen to me,

16    Missy.  She called me Missy.  When I send you something,

17    you are to click on that pop box and send me a received

18    receipt.  I didn't know what in the world she was talking

19    about, and I didn't know then and I don't know now

20    because when I left there in June, it still was no pop-up

21    box on the machine.

22    Q.   Well, did an IT come and turn that feature back

23    on?

24    A.   It still wasn't no pop-up box on the machine.

25    He said he come in there and that the received receipt

95

1    feature program that they set when they set it up had

2    been turned off or never was turned on.  I never set the

3    machine up.  The computer people come and sets up the

4    machine and everything and you go in there, you just

5    signs in your ID and went on in there.  I never set up

6    the machine, so I had nothing to do with that.  But it

7    seemed to me -- it's reason if you received a red

8    receipt that the person read it, didn't they receive it

9    to read it?

10    Q.   Now based on that incident, you met with an EEO

11    counselor on or about April 15th, 2005, which was a

12    Friday.  Do you recall?

13    A.   Right.

14    Q.   Okay.  And do you recall what time of day --

15    A.   I got out of the meeting about 3:00 -- I mean

16    3:15 to 3:30 in the day.

17    Q.   With the EEO counselor?

18    A.   Right.

19    Q.   And in connection with that incident, you also

20    filed a formal complaint, is that right?

21    A.   A preliminary and a formal, yes.  I think the

22    formal was filed in May, I think.

23    Q.   Yeah, I think that was May 23rd.  I'm going to

24    show you something.

25         MS. MELNIK:  This is Sewell Exhibit 4.

96

1    (Whereupon, the document that was referred to as Exhibit

2    Number 4 was marked for identification.)

3         BY MS. MELNIK:

4    Q.   So do you recognize Exhibit 4 --

5    A.   Um-hum.

6    Q.   -- as your formal complaint in this matter?

7    A.   Right.

8    Q.   Okay.  And in Attachment 1 where it says --

9    this is in box 6 on the front page.  It says specify the

10    action or actions that gave rise to this complaint.

11    Please use the back of this page if needed.  And your

12    specific action states April 8th, 2005, see Attachment

13    Number 1.  And then on the second page you have Formal

14    Complaint - Attachment 1.  And does Attachment 1 in more

15    detail explain the events of April 8th that you've just

16    explained here today?

17    A.   Right, yes, it does.

18    Q.   Okay.  And then the very last sentence of

19    Attachment 1, it says I do believe that I am being

20    targeted because of my age.

21    A.   That's right.

22    Q.   What do you base that claim upon?

23    A.   I based it because that's how the whole thing

24    got started after Gary Thayer left.  It seemed to me that

25    they were doing everything that they could, the two of

97

1 them, to get me to retire. I mean if you give me a job
2 and then you make it as hard as you can for me to do it
3 so you can write me up on something, I mean you don't
4 have to be a genius to know somebody wants you out of the
5 door one way or the other, and especially when you had
6 one asking me to retire. When I tried to talk to Ann
7 Baird-Bridges about it not once, but twice, that woman
8 turned her back on me both times. The second time she
9 turned her back on me and pretended that she was working
10 on her credenza and I was sitting there talking to her
11 behind just as well as I was talking to her face. And
12 the first time I tried to talk to her about it, she just
13 waited until I notarized her stuff and just got up and
14 just walked on out.
15    Q.   Okay. So based on the occasions when you --
16 I'm confused. Are you saying you believe it was based
17 upon your age because you felt that as of April 8th, 2005
18 that you had been given assignments that you couldn't do?
19    A.   It wasn't an assignment there that I could not
20 do with the proper training.
21    Q.   Okay.
22    A.   I don't think it was any that I could not have
23 done that if I got the proper training to go with it, as
24 with any other employee there, if they got the proper
25 training, they probably could do it.

98

1    Q.   Okay. So I guess my question then is as of
2 April 8th, 2005 where you wrote I do believe that I'm
3 being targeted because of my age, what about this
4 incident regarding the pop-up on the computer do you
5 believe is discrimination --
6    A.   No. I --
7         MS. JONES: Let her finish. Let her finish.
8         BY MS. MELNIK:
9    Q.   -- is discrimination based upon age?
10    A.   No. I think she had more in her mind. I think
11 she was going to slap my face. That's what I think, but
12 she turned around and seen somebody to her left standing
13 there when she was doing like that and just pointing her
14 finger almost directly in my -- because I wore my glasses
15 like this all the time.
16    Q.   And when you say -- you kind of stopped
17 talking. You said finger in my --
18    A.   Eye.
19    Q.   Okay. And you say wear my glasses like this.
20    A.   All of the time, and I was sitting and she was
21 pointing just like this across my head like that.
22         MS. MELNIK: And let the record show that Ms.
23 Sewell's glasses are being held around her neck --
24         MS. JONES: Let her say it. Let her say it.
25         MS. MELNIK: -- are being held around her neck

99

1 by like a string or a cord.
2         WITNESS: But if I'm not reading something, I'm
3 not wearing glasses. I don't -- this is for reading
4 only.
5         BY MS. MELNIK:
6    Q.   Okay.
7    A.   These are reading glasses.
8    Q.   Okay.
9    A.   So I was sitting there with my glasses hanging
10 down just like I have them now and she was standing there
11 pointing her finger almost directly in my eye. I'll
12 never forget what she was wearing. I think she was
13 wearing a red suit. And I think she had more in mind. I
14 think that woman had plans to come over there and slap my
15 face.
16    Q.   Okay. Now with respect to -- there was a
17 meeting on April 18th, 2005, which was a Monday, and do
18 you recall what time of day on Monday that was?
19    A.   10 a.m.
20    Q.   And who was present at that meeting?
21    A.   Me, Vicente Sabrino [sic]. I might not be
22 pronouncing that correctly. Vicente Sabrino and Betty
23 Keller, K-E-L-L-E-R, Betty Keller, and Pat Vastano and
24 Charlene Dunn, I'm sorry, and Ann Baird-Bridges who
25 called it that Sunday, April 17th.

100

1    Q.   I can't find what I'm looking for, but in any
2 event while I try to find what I'm looking for, at that
3 meeting you received a memo?
4    A.   Right.
5    Q.   Okay. And the memo -- and I'll get exact
6 wording when we find it, but essentially that your
7 position was going to be moved from underneath the
8 Division Director --
9    A.   Right.
10    Q.   -- to the Office of -- branch of Budget
11 Formulation and Implementation?
12    A.   Correct.
13    Q.   And Ms. Dunn was at that time the Branch Chief
14 of that branch?
15    A.   Right.
16    Q.   And who else got a similar memo on that date?
17    A.   Betty Keller.
18    Q.   And Betty Keller was -- what kind of position
19 had she occupied or where was her position located?
20    A.   In Accounting.
21    Q.   And do you know to where she was being moved?
22    A.   To Budget under Charlene Dunn.
23    Q.   And what about Vicente Sanabria, was he being
24 moved, as well?
25    A.   Essentially told him he was no good and he was

101

1  going to be sent to Accounting from Budget.
2       MS. MELNIK:  Can I have this marked as Sewell
3  Exhibit 5?
4       (Whereupon, the document that was referred to as Exhibit
5  Number 5 was marked for identification.)
6       MS. JONES:  Is this what you were looking for?
7  Oh, okay.
8       BY MS. MELNIK:
9    Q.  And, Ms. Sewell, I've handed you what's been
10 marked as Sewell Exhibit 5.  Is that the memo that you
11 received on April 18th about the reassignment?
12   A.  Right.
13   Q.  Okay.  Now as a result of the memo, was your
14 actual work station moved at all or did you stay in the
15 same place?
16   A.  Same work space.
17   Q.  Okay.  And at that time, April 18th, 2005, you
18 didn't receive any additional duties at that time, is
19 that correct?
20   A.  I don't remember.  I'm sure I got something.  I
21 don't know so, but -- I was busy with the Detailed Fund
22 Report --
23   Q.  Okay.
24   A.  -- and the regular duties.
25   Q.  Okay.  That's what was occupying your day?

102

1    A.  Right.
2    Q.  Okay.  Now are you familiar with the term an
3  all hands meeting?
4    A.  Um-hum.
5    Q.  Was that a yes?
6    A.  Yes.
7    Q.  Okay.
8    A.  Sorry.
9    Q.  That's okay.  What's an all hands meeting?
10   A.  All employees.
11   Q.  Okay.  And are employees required to attend?
12   A.  I wouldn't know.
13   Q.  Okay.  Have you attended all hands meetings?
14   A.  Oh, yes.
15   Q.  Okay.  And are the all hands meetings on --
16 prior to April 18th, 2005, had you attended all hands
17 meetings where management folks even above your immediate
18 -- OMAP, higher up than that, had explained the
19 changes that were occurring in not just the Department of
20 Labor, but throughout government in terms of shrinking
21 budget and less employees available, you know, not
22 filling FDEs, you know, that sort of -- I'm sort of
23 brushing broad strokes here but, you know, things to that
24 effect in the years say from like '01 to '05?
25   A.  I don't recall attending one.

103

1    Q.  You never attended one meeting?
2    A.  I said I never recall attending a meeting like
3  that --
4    Q.  Okay.
5    A.  -- talking about shrinking budgets.  I never
6  recall attending one.
7    Q.  Okay.  Did you ever attend a meeting that maybe
8  was not all hands, but one that's a smaller group, you
9  know, whether it be just OMAP or the division where
10 information regarding - essentially how there would be
11 less people available to do the same amount of work if
12 not more work?  Were you familiar that that was happening
13 in the government at that time?
14   A.  I was familiar that it was happening in the
15 government at that time, but I don't recall going to a
16 meeting --
17   Q.  And hearing it?
18   A.  -- where it was discussed.  We went to meetings
19 where they said they want you to write down all your
20 duties, how you do it and what kind of equipment you use,
21 and flow chart it and all that kind of stuff, but they
22 weren't saying why they were asking for that.
23   Q.  Now although your work station didn't change,
24 Mr. Sanabria, as of May 1st when this switch --
25 reassignment became effective, he moved back a few

104

1  cubicles down his same row, sort of back and to the
2  right.
3    A.  Not exactly May 1st because his area, they had
4  not come down.  Like I said, we had computer people who
5  moved the stuff.  The employees didn't hook up.
6    Q.  Sure.
7    A.  So no one came down to hook his stuff up --
8    Q.  Okay.
9    A.  -- and move his stuff up, whatever they were
10 doing, so he was about ten days, somewhere around about
11 May 10th or something like that, before he really moved
12 back in Accounting.
13   Q.  Okay.
14   A.  He was still over there in Budget, setting in
15 Budget, in his space training Kim.
16   Q.  Okay.  And when he did move, it was sort of
17 back a few rows, cubicles, towards the back of the
18 office?
19   A.  It was quite a distance where he moved because
20 he moved on -- to view it, you would say he moved on the
21 other half of the room --
22   Q.  Well --
23   A.  -- because Accounting and Budget was separated
24 with a pretty large aisle and tables, and then Budget --
25 see, the reason I was sitting where I was sitting, it

105

1  looked like it was in Budget, but Charlene Dunn's
2  office, although she was a Branch Chief, was formerly the
3  Director's office. That's where Gary Thayer sat. That's
4  where the Director of the division set, into that office.
5      Q.  Okay, but when he moved in relation to you, he
6  essentially moved, you know, as we've described, sort of
7  like a couple -- like two cubicles back from the front of
8  the room. If had walked -- sort of kept walking sort of
9  toward the back of your space, you would have hit, you
10 know, one cubicle, maybe then gone to the left --
11     A.  Right.
12     Q.  -- the space of another cubicle, and he --
13     A.  Right.
14     Q.  -- and then he was right there on the right.
15     A.  Right, make another right and then he's right
16 there.
17     Q.  Right.
18     A.  You couldn't yell across the aisle at him or
19 nothing.
20     Q.  Well, if both of you stood up, you were maybe
21 25 feet away from each other approximately.
22     A.  There was poles between us, a lot of file
23 cabinets, and he was not that all --
24     Q.  Okay.
25     A.  -- that if I stood up then I would be seeing

Free State Reporting, Inc.
Court Reporting  Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

106

1  him over there, and neither was I when it came to the
2  partitions. I'm 5'2".
3      Q.  Okay. But you weren't more than, say, 25 feet
4  from each other if you took a tape measure between the
5  two distances here?
6      A.  I would not know.
7      Q.  Okay. Now during the remainder of -- the
8  meeting was Monday, April 18th, that we've just been
9  talking about. The remainder of that week, did you talk
10 to Mr. Sanabria about training on the Space Rent Report?
11     A.  April 18th?
12     Q.  Right, during that week.
13     A.  No.
14     Q.  Did you talk to Ms. Dunn that week about --
15     A.  No.
16     MS. JONES:  Let her finish.
17     BY MS. MELNIK:
18     Q.  -- about getting training on the Space Rent
19 Report?
20     A.  What week?
21     Q.  The week of April 18th. That was a Monday. The
22 remainder of that week did you talk to anyone about that?
23     A.  No one said nothing to me and I didn't talk to
24 no one else about it.
25     Q.  Okay. How about the week of April 25th, the

Free State Reporting, Inc.
Court Reporting  Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

107

1  week that began with Monday, April 25th, did you talk to
2  Mr. Sanabria about being trained on the Space Rent
3  Report?
4      A.  No. Mr. Sanbrino [sic] was a very upset man
5  over there by this time. I don't think nobody would have
6  spoke to him about anything. It was a shock that he was
7  losing his job as a Budget Analyst and going to
8  Accounting.
9      Q.  Well, as far as you know, he wasn't being
10 demoted in any way, correct? He didn't lose his grade?
11     A.  He looked like he was being harassed to me.
12     Q.  Okay. But as far as you know, he wasn't losing
13 his grade or --
14     A.  I had --
15     MS. JONES:  Let her finish.
16     BY MS. MELNIK:
17     Q.  -- his grade or his benefits or anything of
18 that sort?
19     A.  I had no way of knowing that. I never asked.
20     Q.  Okay. So then your answer to my question of
21 whether or not you spoke to Mr. Sanabria about this Space
22 Rent Report during the week of April 25th, your answer is?
23     A.  No.
24     Q.  Did you talk to Ms. Dunn or Ms. Baird-Bridges
25 about the fact that, you know, you wanted some

Free State Reporting, Inc.
Court Reporting  Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

108

1  clarification or training --
2      A.  You mean from March?
3      Q.  From the Space -- about the Space Rent Report
4  because that was one thing you said that you, you know,
5  hadn't been trained on yet on how to do it, so I'm just
6  asking if you followed up with either Ms. Dunn now that
7  she's your direct line supervisor or Mr. --
8      A.  Ms. Dunn became the supervisor effective May --
9      Q.  May 1st. Okay, you're right. So the week of
10 April 25th she wasn't your direct line yet. So did you
11 again follow up with Ms. Baird-Bridges or Mr. Sanabria
12 the week of April 25th about the Space Rent?
13     A.  No, I did not. Ms. Baird-Bridges never
14 followed up with me on Mr. Sanabria either since back in
15 March.
16     Q.  Okay.
17     A.  And when she said it at the meeting with --
18 because I didn't meet with her. I was scared of her.
19 I didn't meet with her by myself. She said you are going
20 to get the Space Rent. I'm going to give you the Space
21 Rent. She never said one word to Mr. Sanabria about I
22 was getting the Space Rent.
23     Q.  I understand that. Now on May 4th, 2005 you had
24 a meeting with who was now your direct line supervisor,
25 Ms. Charlene Dunn?

Free State Reporting, Inc.
Court Reporting  Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

109

1    A.   Right.

2    Q.   Okay.  And did the subject of the Space Rent

3  Report come up at that time?

4    A.   Oh, yeah.

5    Q.   Do you recall who brought it up first?

6    A.   Charlene Dunn.

7    Q.   Okay.  And what did she instruct you with

8  respect to getting training from Mr. Sanabria?

9    A.   She told me to go back there and tell him to

10 stop what he was doing and to train me into the Space

11 Rent.

12   Q.   Okay.  And did you go over to him and tell Mr.

13 Sanabria that you need to -- now I have this report that

14 I'm responsible for that you used to do --

15   A.   Right.

16   Q.   -- you're the man to talk to, can you help me?

17 Did you do that?

18   A.   Right, I did.  He was sitting there about that

19 time.  He said that he was busy with his training at the

20 time.  I asked him when he got time would he train me?

21 He said he was busy at the time getting his training, and

22 at the time I was speaking to him, the FICA accountant

23 was standing in there with him all loaded down with

24 paper, but he said he would train me when he got time,

25 and I thanked him and that was it.

Free State Reporting, Inc.
Court Reporting  Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

110

1    Q.   Give me just one second.  Do you recall giving

2  a affidavit in this matter in the administrative --

3  during the administrative investigation of the case?

4    A.   Um-hum.

5    Q.   Is that a yes?

6    A.   Yes.

7    Q.   And do you recall that when you were giving

8  information about the May 4th meeting that we've just been

9  talking about you said -- you say that the following week

10 I met with Mr. Sanabria and asked him if he would train

11 me in the Space Rent Report, so May 4th was a Wednesday.

12   A.   Right.

13   Q.   So you didn't talk to him that day following

14 your meeting with Ms. Dunn?

15   A.   Nine chances out of ten, knowing me, I probably

16 did --

17   Q.   Okay.

18   A.   -- but I followed up.  I was at him actually,

19 you know, that next week, a couple days later, when you

20 think you're going to get time, you know, casual.

21   Q.   Okay.

22   A.   I appreciate it, you know.  I said you're busy,

23 but whenever you get time, I'd appreciate it if you would

24 -- I wasn't there writing down every time I went back

25 there now.  And then most times when I went back there, I

Free State Reporting, Inc.
Court Reporting  Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

111

1  had to go back three and four times during the day

2  because every time I went back there Kim was setting

3  there, and if she wasn't setting there, then Dan was

4  standing there training him because he had a big job

5  coming down the line that he had to learn in a very short

6  time.

7    Q.   Well, did you -- you know, while you were at

8  work where you had access to e-mail, did you e-mail him

9  --

10   A.   Um-hum.

11   Q.   -- and set up a time?  Did you try and set up a

12 time with him?

13   A.   Yeah, but he kept changing the time --

14   Q.   Okay.  Well --

15   A.   -- because he would get busy or somebody else

16 would be back there, and then I kept asking him please,

17 and then I got to the point that I felt I was being a

18 pain in the neck, and I was overdoing the begging.

19        Finally -- he didn't want to come right out and

20 tell me that he didn't have time, so finally he just sent

21 me a e-mail and told me Audrey, I would prefer that your

22 supervisor work out a training schedule or something or

23 another or work out the training with his supervisor

24 because he felt that training me would, I think, take

25 away from his work or something like that or take his

Free State Reporting, Inc.
Court Reporting  Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

112

1  time.  I don't remember his exact words, but it was

2  something to that effect.  And about this time, I think

3  that was something like May 18th or something another.

4    Q.   Let me interrupt you just one moment.  Give me

5  just one second.

6        MS. MELNIK:  If I could have this marked as

7  Sewell Exhibit 6.

8  (Whereupon, the document that was referred to as Exhibit

9  Number 6 was marked for identification.)

10       BY MS. MELNIK:

11   Q.   Ms. Sewell, do you recognize Exhibit 6 as an e-

12 mail exchange between yourself and Mr. Sanabria regarding

13 training in the Space Rent?

14   A.   Um-hum.

15   Q.   Is that a yes?

16   A.   Yes, I do, uh-huh.

17   Q.   Okay.  So now this e-mail exchange occurred

18 May 16th --

19   A.   Right.

20   Q.   -- into May 17th and then May 18th?

21   A.   Right.

22   Q.   Okay.  So my question is you had this meeting

23 on May 4th with Ms. Dunn and like did you speak to Mr.

24 Sanabria during the remaining week of May 4th, which would

25 have been -- the 5th, I suspect, was a Thursday.  You

Free State Reporting, Inc.
Court Reporting  Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

113

1  would have been home.  And then Friday, the 6th, you
2  would have been back at work.  Did you set up a time to
3  meet with him during that week?
4      A.  No, I did not because he was still setting in
5  Budget and Kim was, every time you turned around, was
6  setting in his cubicle and he had nothing but budget up
7  there, that he was training her.
8      Q.  Okay.
9      A.  I didn't really approach him until around about
10 -- the first time I think I met him in the aisle and I
11 asked him, you know.  I said, you know, I'm getting the
12 Space Rent now.  I said when you get time, I said would
13 you train me, please, something to that effect, and he
14 said well, he was busy right now because Larry had
15 started feeding him work and he was still over there in
16 Budget with Kim, and he said yes, he would when he get
17 time, and I said okay, and I think it was just a passing
18 thing.  I don't remember the exact date, but I think I
19 approached him as soon as he left Budget and was in
20 Accounting.  See, because I wasn't sure at that time what
21 he was supposed to be up there doing, was he still doing
22 Budget, was he in Accounting?
23     Q.  But you didn't express any urgency?
24     A.  No.  I didn't express the urgency until around
25 about May 10th or somewhere, May 8th or 9th or 10th,

114

1  something like that.  And then at that time I went back
2  to Charlene Dunn and told her that I had spoke to him and
3  that he said soon as he gets settled in, that he'd see
4  what he could do, I told her, but he looked like he was
5  very busy back there getting his training to do the
6  charge back billing.  And she told me that he will do as
7  he is told, to go and tell him to stop what he's doing
8  and to train me.
9      Q.  And I understand from your affidavit that, as
10 you've said, when you went back there he appeared very
11 busy.
12     A.  All the time.
13     Q.  Okay.
14     A.  He was working late.
15     Q.  Did you report back to Ms. Dunn?
16     A.  Yes, I did.
17     Q.  Well, I see that you went back -- just one
18 moment.  You said that at one point he did take a little
19 bit of time out to give you an overview of the reports.
20     A.  Yes.  About five minutes he stopped one day.
21 Dan -- I asked Dan, the accountant that was training him,
22 if he mind if he just stopped for about five or ten
23 minutes and just give me a quick overview so I had some
24 idea of what I was going to be learning when he got
25 around to it, and Dan stepped away and was setting at his

115

1  desk still holding papers and stuff, waiting for Vicente
2  to show me, and Vicente just talked.  And I really wanted
3  to get some in-depth knowledge of what it was that I was
4  going to be learning to do, and he was telling me how he
5  got the figures from here, say, and the Department was
6  giving him the same thing.  I never did understand
7  exactly what he was talking about because if the
8  Department was giving him the same thing he was getting
9  from GSA, what was the point?  Why couldn't we use the
10 Department's figures?  I never got to ask that question
11 because then I excused myself and told Dan I was sorry,
12 and they went back to their training.  And at that time
13 Kim was back again.  She wanted to see him, too.
14     Q.  Is it -- you knew you had to get because you
15 ultimately did get a GSA ID, is that right?
16     A.  Right.
17     Q.  Okay.
18     A.  That was the first step.  He gave me, I think,
19 that form that day.
20     Q.  To get a GSA ID?
21     A.  Right.
22     Q.  Okay.  And going back to Exhibit 6, the e-mail
23 that's in front of you, where he, Mr. Sanabria, tells you
24 that he'd feel comfortable with this training request
25 goes, you know, from your supervisor to his supervisor

116

1  about the Space Rent training, and that you said you
2  would forward the message to Charlene.
3      A.  Um-hum.
4      Q.  Is that a yes?
5      A.  Right.
6      Q.  Okay.  Do you have in your materials -- I was
7  given this through the discovery process in this case --
8  the e-mail that you say you sent to Ms. Dunn?
9      A.  This was cc'd to Charlene Dunn.
10     Q.  Oh, okay.  So you just cc'd it?
11     A.  Right.
12     Q.  When you replied to Mr. Sanabria, you cc'd her?
13     A.  To Sanabria.  I let him know that was sending
14 it to her because I had talked to him verbally and told
15 him how important it was -- I had already told him it was
16 in my standards.
17          Now we was in the middle of the second part of
18 the rating period.  People was having mid-term reviews
19 and I was just getting the standards, and I told him in
20 September I was going to be rated on this, and how was I
21 going to be rated on it if I hadn't learned to do it?  I
22 was trying to -- and I knew he didn't have any control
23 over what he was doing, too.  He had to learn how to do
24 the charge backs.  I knew that.  He didn't seem to be
25 able to say no to this Kim.  That would have freed up

117

1  some time if we could have got rid of her.  You know
2  what I'm saying?
3       And it was just a bad situation.  The man
4  started losing weight.  He looked like he had got sick to
5  me and it was just a bad situation, you know.  The only
6  way it could have been worked out was both supervisors
7  and both employees involved come together and talk about
8  it and, you know, come up with a schedule, a time frame
9  that this could be done.  It was the only way.  It could
10 not have been worked out no other way, the way I see it.
11 Somebody had to come together and communicate about
12 something.
13      And this thing, if I go back there, tell him
14 that, to stop what he's doing and train me, well, that
15 wasn't going to happen.  I don't harass fellow coworkers.
16 I can't do something to help them, I ain't going to do
17 nothing to harass them.  I'll tell you that.  So that
18 wasn't me to start with.
19      And Mr. -- this is a nice man, believe it or
20 not.  He would help you with anything.  So would I.  All
21 the workers in there were like chet.  How do you think I
22 learned so much?  These people would stay after work and
23 help me to learn something.  I would do the same thing.
24 This was a good man.  It's just that he had never done
25 charge backs and he had to get all the billing for the

Free State Reporting, Inc.
Court Reporting  Depositions
D.C. Area (301) 261-1302
Balt. & Annap. (410) 974-0947

118

1  whole Agency out by a Congress mandated deadline.  It
2  was August the 12th.  He had never done it before.  This
3  Langshore accountant had his work to do, too.  Then he
4  said Larry Jarl was getting his special project.  The man
5  really did not have time once he got to Accounting.
6       And then with Kim, the Budget Analyst, which he
7  should have been able to tell her look, I do not have
8  time to train you any more, he wouldn't tell her and it
9  was nothing nobody could do.
10     Q.   So once you sent this e-mail, the May 18th, 2005
11 e-mail where you cc'd Ms. Dunn about -- I assume that the
12 preceding one all got attached.
13     A.   Right.
14     Q    So -- where Mr. Sanabria is asking you for it
15 to go through the supervisors.
16     A.   Right.
17     Q.   Once you sent that to Ms. Dunn, you didn't
18 inquire of Mr. Sanabria after that?
19     A.   No.  It ceased after that.  He came to me the
20 next time.
21     Q.   When was that?
22     A.   He came to me somewhere around about the 8th or
23 something - the 7th or 8th, I don't know, somewhere in
24 there.
25     Q.   In June or --

Free State Reporting, Inc.
Court Reporting  Depositions
D.C. Area (301) 261-1302
Balt. & Annap. (410) 974-0947

119

1  A.   I don't know exact -- in June.
2  Q.   Oh, in June?
3  A.   Yeah, but I don't know the exact date.  But I
4  do remember we had arranged to have training.  He was
5  going to train me that Friday, I think it was --
6  Q.   Hold on one second.
7  A.   -- on the 10th, I think it was.
8  Q.   Yeah, that was actually -- we're jumping ahead.
9  I'm going to get to that in a second.  You had a June 10th
10 meeting in Mr. Jarl's office.
11 A.   No.  Vicente and me had already -- before any
12 of that arose, we already had made plans to meet.  You
13 know, he and me.  He said he was going to take the time
14 that Friday.
15 Q.   Okay.  Does that come up in a telephone
16 conversation that you had with Ms. Dunn on June 7th when
17 she called you at home?
18 A.   She called me at home on June the 7th.  I think
19 it was on a Thursday, if I'm not mistaken.
20 Q.   June 7th was actually a Wednesday, which is --
21 no, it's a Tuesday.
22 A.   A Tuesday, okay.
23 Q.   Tuesday.  It's a Tuesday, yes.
24 A.   All right.  She called me at home on June the
25 7th.  That Friday I think was the 10th, right?

Free State Reporting, Inc.
Court Reporting  Depositions
D.C. Area (301) 261-1302
Balt. & Annap. (410) 974-0947

120

1  Q.   That coming Friday was the 10th.
2  A.   That was when me and Vicente had already that
3  week before, somewhere I guess, you know, had -- I don't
4  know the exact date he came to me, but he said can we get
5  together one day next week?  He said how about next
6  Friday?  He says and we'll get you that Space Rent,
7  trained in Space Rent.  I said that will be fine.  What
8  time?  What time you come in, you know, and we start
9  around 9 or something like that.  That was about all was
10 said.  I wasn't sitting there note for note.  But she
11 called me on the 7th and said --
12 Q.   How was that when she called you on the 7th?
13 Was that -- how did you react to that?
14 A.   I reacted fine.  There was no problem on that
15 phone on the 7th.
16 Q.   Okay.  And --
17 A.   She lied in her deposition --
18 Q.   OH.
19 A.   -- about I said she was invading my privacy.
20 That's insane.  I was on duty, although I was working at
21 home.  Why would I say you invading my privacy?  I
22 haven't lost my mind.  I never said that.
23 Q.   Okay.
24 A.   But everything went fine on the phone.  The
25 only thing she asked me -- she said Audrey, I've got Kim

Free State Reporting, Inc.
Court Reporting  Depositions
D.C. Area (301) 261-1302
Balt. & Annap. (410) 974-0947

121

1   here. I don't know what that meant. And our programs
2   are looking for the Space Rent. Where is the Space Rent
3   Reports? I said Charlene, I have not been trained, as
4   you know, I said in the preparation of these Space Rent
5   Reports. I said you know that e-mail I sent you on the
6   18th, May 18th, I said you did not respond to anyone. I
7   said and the last that I talked to you about it, I said
8   you were still telling me to tell Vicente to stop what he
9   was doing. I said Charlene, I said I couldn't do nothing
10  like that. I said I don't go around harassing my fellow
11  employees.
12          I said I -- and I felt that they were harassing
13  him, and I said look, I am not going to participate
14  directly or indirectly into the harassment of that man.
15  I thought that her and Kim were. The man's jittery.
16  He's completely changed, nervous as a cat. He's losing
17  weight and he wasn't big as a minute to start with.
18          And I was not going to jump into this mess,
19  whatever they had going, Kim coming from one door and
20  going around the other, then Charlene's back and they're
21  all on top of Vicente like white on rice. There was no
22  way I was jumping into what was happening to him. I
23  sympathized with him, but I had problems of my own, so I
24  never discussed -- I'm sorry. I never discussed it with
25  him. It wasn't that I didn't care. It's just that I had

122

1   problems of my own. I told her I was not going to
2   participate in the harassment of that man.
3           I told her that me and Vicente had planned to
4   get together that Friday, the 10th. I told her -- but
5   given the work climate there, I told her -- which was not
6   going to change -- I thought it was wrong to hold me
7   responsible for the Space Rent before I was trained to do
8   it in the first place. I told her I didn't blame her.
9           I said Charlene, I'm going to tell the truth.
10  I said I'm going to just go ahead and retire effective --
11  I think it was September the 3rd, which would have been a
12  Monday or something. The 1st and 2nd would have been a
13  Saturday and Sunday. So she said well, it's no use then
14  in his training you if you ain't going to work here, you're
15  going to be gone in September. She said you ain't going
16  to be here no more than two, three more months. And she
17  said no use in him training you. That would be a waste
18  of time. She said well, I'll tell you I appreciate your
19  honesty. There's my -- I wouldn't sit here and lie to
20  you. That's what she told me, and that conversation
21  ended fine.
22          When I got back to work, I told Vicente, but
23  when I got there -- I told him that before I opened the
24  e-mails. Then when I opened the e-mail and saw the e-
25  mail message or something or another -- I don't remember

123

1   the exact date, but I know that Charlene had changed
2   from what she was on the telephone. You still have this,
3   you will meet with Larry and Kim, and --
4       Q.  Let me just interrupt you. That is -- does
5   that refer to the June 10th meeting in Mr. Jarl's office?
6       A.  It wasn't in Mr. Jarl's office, the June the
7   10th meeting.
8       Q.  Well, give me one second. In your affidavit in
9   the administrative process you say that on June 10th, 2005
10  I received an e-mail from Mr. Jarl, having sent at 7:20
11  p.m. the previous night. The e-mail was sent to me and
12  Mr. Sanabria and Ms. Bassett informing us that we were to
13  meet with Mr. Jarl at 10:30 that morning on the Space
14  Rent Reports. So --
15      A.  With a string of e-mails from Charlene Dunn
16  first directing me to attend that meeting.
17      Q.  Right.
18      A.  So he had e-mails going and she had e-mails
19  going. Both were sending e-mails.
20      Q.  Right, but you did ultimately have a meeting in
21  his office, correct?
22      A.  No.
23      Q.  Well, in your affidavit you said I asked him if
24  the meeting was still on. He waved me to come with him
25  to his office.

124

1       A.  He brought --
2       Q.  We then went into the meeting.
3       A.  I encountered him, was looking for him that
4   morning for the meeting. I encountered him leaving Ann
5   Baird-Bridges' office. He then said Audrey come here for
6   a minute. He led me to his office --
7       Q.  Right.
8       A.  -- and he said Audrey, try to understand what
9   kind of position I am in here. I already knew what kind
10  of position he was in. I said Larry, I said forget the
11  whole thing. I said you've got to be a team player,
12  forget the whole thing. I said how much longer you
13  planning to work here? He said two years. I said I
14  understand. I said let's go. I said Larry, but before
15  we go, let me tell you I'm leaving September. Larry said
16  well, that's a waste of time. I don't want Vicente over
17  there wasting his time training you and you're not going to
18  be -- I said Larry, the meeting -- I'm just going to get
19  out of here. So we went next door to a meeting, not in
20  Larry's office, next door for a meeting.
21      Q.  Okay.
22      A.  He only called me in there to tell me please to
23  try to understand what kind of position he was in. I
24  didn't want Larry to jeopardize his career for me, you
25  know, by wanting me to understand what he was doing. I

125

1  just didn't want nobody else involved into the mess.  So
2  I just said I understand, forget it, and went on into the
3  meeting.
4      Q.    Now during this time, just sort of going back a
5  little bit, from say March when Ms. Baird-Bridges first
6  told you you were getting those two reports, the Detailed
7  Fund, which you said you did, and the Rent Space, but in
8  March, April, May.  I think we're into June now.  But
9  your other responsibilities, were you able to take care
10 of those?  I mean were you on top of your other duties?
11     A.    No.  The Detailed Fund Report, once I had to
12 start typing it, you know, I was stretched.  I was
13 stretched.  I stayed on top of it.  It was -- I had to
14 put a lot of over [sic] in it, you know.  I really did.
15 It was getting to be too much for me, you know, because
16 she'd stretch it.  And she was mad because I could do the
17 Detailed Fund Report, you know, so I think that's what
18 set her off originally in the first place --
19     Q.    The fact that you were able to handle the
20 Detailed Fund Report?
21     A.    Yeah, and that made her mad, and then that's
22 when she took it to another level.  They had to come up
23 with things that I could not do.  I gave them the out to
24 do that.  I was sitting there blind like a fool hoping
25 they going to get it right, and said, you know, I don't how

Free State Reporting, Inc.
Court Reporting  Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

126

1  to do this Space Rent Report and Vicente's -- I'd never
2  seen that before, and I had never worked on any budget
3  formulation or anything like that.  Oh, my God, I gave
4  them the key to the kingdom.  Then I had to tell them.
5  They had to stop guessing because they had to get me on
6  performance which was the only way to bring me down
7  because they didn't really know what I did, so to get
8  something legit they had to get me on performance so they
9  had to give me things that they knew I couldn't do -- and
10 I was accomplishing everything they could give me.  Oh,
11 my God, the best work I ever received in my life.  My,
12 God, that was too much for her.  What can't she do?
13 Can't do budget formulation?  Fine, give it - that's the
14 way it worked.  I know it's -- this is not a professional
15 way I'm sitting here talking, but it was the way things
16 went.  I mean -- you know what I mean?  I couldn't have
17 survived 33 years being thin-skinned.  I could take a
18 lot, but it got to the point I was caught between the
19 devil and the deep blue sea and it was nothing else to do
20 really.  I mean it was -- I got caught in a whirlpool.
21 There was nothing else to do.  As I just told my
22 attorney, I know this is out of line.  You really
23 shouldn't be here.  This thing should have been settled
24 in the Agency.  They should have had an avenue for people
25 like me, but they didn't.

Free State Reporting, Inc.
Court Reporting  Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

127

1      Q.    Okay.  Do you want to take a break?
2      A.    Could we have five minutes?
3      Q.    Yes, of course.
4      A.    I'm sorry.
5      Q.    No, no, no, don't apologize.  Okay.  We'll go
6  off the record.
7                  (OFF THE RECORD)
8                  (ON THE RECORD)
9          BY MS. MELNIK:
10     Q.    I want to go over - this is sort of like an
11 ending sort of to sum up.
12     A.    I'm sorry.
13     Q.    You're a little tired.
14     A.    I'm sorry.
15     Q.    That's okay.  You know, it's 3:00.  We've been
16 going at it for awhile.
17     A.    I'm getting a headache.
18     Q.    I'm sorry?
19     A.    I'm getting a headache.
20     Q.    Oh, okay.  Well, we're going to sum up.  We're
21 almost there.
22     A.    Okay, thank you.
23     Q.    Okay.  You've made - there are five -- they're
24 sort of subset claims, some of them, but you have sort of
25 five basic claims in your case, one of which we haven't

Free State Reporting, Inc.
Court Reporting  Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

128

1  gone over yet and it's your Privacy Act claim.  I'm just
2  going to put that aside for a second, so we're just going
3  to focus on the first four.  And your first cause of
4  action in your complaint that you filed in District Court
5  is disparate treatment discrimination based upon age, and
6  you allege that Ms. Baird-Bridges discriminated against
7  you based upon your age.  And, although we've gone over a
8  lot of events here today, I just want you to focus and
9  tell me what your basis is for believing that Baird-
10 Bridges discriminated against you because of your age.
11     A.    Well, one was the cash award thing for the
12 audits.  We've already been over that.  She gave the
13 younger woman the cash award for -- compatible, or I
14 probably did more.  I don't know whether she did or
15 didn't, but I surely did at least equal.  I didn't get a
16 cash award.
17         I feel that she allowed the abuse, especially
18 the request for leave and stuff, for her deputy to treat
19 me in a disparative manner such as what are you going to
20 the doctor for, what kind of doctor you going to see,
21 what kind of test you going to take, you know, and
22 knowing that her deputy had been asking me to retire.  I
23 even sent her an e-mail one time and asked her to
24 investigate it -- and she didn't do it, so as far as I
25 was concerned she supported it.

Free State Reporting, Inc.
Court Reporting  Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

129

1  And the type of abusive treatment, the things
2  that that deputy would say, shut up, you know, you ain't
3  doing nothing there no way or -- the duties you were
4  told, I feel like I was a little child.  I figured that
5  if she did not support that kind of treatment, that she
6  must be supporting it for a reason, that she had to be --
7  by her not doing anything about the kind of treatment
8  that I was receiving, I assumed that she was doing it to
9  get me -- she never wanted to discuss the subject.  She
10  would never discuss it.  She -- that was my
11  contention, the reason I base this on.  And then after
12  Pat Vastano just suddenly stopped after I filed a
13  grievance against her in December of 2004 and then she
14  just took it up full force herself.
15  Q.  What causes you to believe that it was based on
16  your age rather than something else?
17  A.  Well, it was her reaction when I first brought
18  it to her attention.  I said, you know, I wish your
19  deputy -- you'd speak with your deputy and have her to
20  stop asking me to retire.  I said Ann, I plan to retire
21  in 2007, if you really want to know when I'm going.  I
22  said I didn't want to stay here forever, you know, and it
23  was her attitude that day.  She stood there just as --
24  and waited me to notarize her stuff and just walked off
25  and didn't say a word.  That sits in the back of your

Free State Reporting, Inc.
Court Reporting  Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

130

1  mind right there, and then everything that happens,
2  after that -- need to get out of the door.
3  Q.  Your next cause of action, as laid out in your
4  complaint, is hostile work environment, age.  What causes
5  you to or what's the basis for saying that your work
6  environment was a hostile work environment?
7  A.  It was hell.
8  Q.  Okay.
9  A.  If we could rid of the hostile, it might have
10  been nice because of the way that her deputy treated me,
11  and then constantly after that living in - after --
12  beginning with that attack on Charlotte Jenkins where I
13  was a little jittery to start with, and then she stands
14  up there looking at me like a crazy person, and then come
15  over there screaming and hollering, shaking her finger in
16  my face like that, you got -- were you scared?  Not
17  knowing what's going to happen next because of me using
18  -- which I particularly went to that EEO office and asked
19  them to please get somebody in the Department to come and
20  investigate this matter about using work as a harassment
21  tool.  Nobody never talked to me.
22  I was a person that loved working, and to see
23  somebody to misuse taxpayers' money -- I'm getting paid
24  to work here now, and you're doing everything you can to
25  make sure that I don't, that's a hostile work environment

Free State Reporting, Inc.
Court Reporting  Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

131

1  right there.  The verbal abuse and the threat of
2  physical intimidation and damned if you do, damned if you
3  don't, but they didn't understand -- it didn't matter.
4  If I did a bad one, it's what they were looking for, so
5  it was a hostile work environment.  My coworkers told me
6  when they leave at the end of the day because they wanted
7  to make sure I wasn't caught in there when she was in
8  there by myself.  Soon as the last person left -- I
9  usually pulled a late shift -- I signed out, I signed
10  out, too.  But then I heard in the garage that they
11  screened everybody's car for weapons, so then I wasn't as
12  scared of her as I was at first.  I thought maybe she'd
13  come in there with a gun.  I didn't know whether the
14  woman was loose -- had a loose screw or not.  So I had a
15  problem there.  I was scared of her.  I was afraid of
16  that woman, and I don't think I was the only one.
17  Q.  Did Ms. Baird-Bridges ever herself say anything
18  to you about your age herself?
19  A.  She has never herself asked me to retire, and
20  the only thing she said to me about age is -- well, I was
21  the only one that wore my glasses --
22  Q.  I'm sorry.  I didn't understand what you just
23  said.
24  A.  I was the only one that wore my glasses like
25  this because I don't want to break them.  They cost too

Free State Reporting, Inc.
Court Reporting  Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

132

1  much money.
2  Q.  And when you say like this, you mean around
3  your neck?
4  A.  Right, around my neck.  I don't think she liked
5  the style.  I don't know what her problem was.  What you
6  wearing them glasses like that because you can't see a
7  thing?
8  REPORTER:  What was that?
9  BY MS. MELNIK:
10  Q.  Wait, wait.  She won't be able to get that
11  down.
12  A.  I said Ann Baird-Bridges would say something
13  like that.
14  Q.  Like what?  We didn't hear it.  We didn't
15  understand what you said.
16  A.  What you wearing them glasses like that for
17  because you can't see a thing?  I ain't the only one who
18  couldn't see.
19  REPORTER:  I got it.
20  MS. MELNIK:  Oh, you did?
21  REPORTER:  Yeah.
22  MS. MELNIK:  Oh, all right.
23  MS. JONES:  I didn't.
24  MS. MELNIK:  Me neither.
25  WITNESS:  She would say -- that's the way she

Free State Reporting, Inc.
Court Reporting  Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

133

1  talked, real fast. Normally she's kind of low key until
2  she go off and then the whole world can hear her. But
3  she might have said something like that, but otherwise --
4  I'm going to be truthful, she has never herself directly
5  asked me to retire. But she knew about it because I sat
6  there one time right in front of her. I said I am sick
7  and tired of your deputy trying to force me to retire.
8  Her hind parts talked to me just as fast as her face did.
9  She turned her back on me. She herself has never asked
10 me to retire nor has she said anything about what her
11 deputy said, ain't you got your time in -- excuse me.
12 I'm sorry.
13        BY MS. MELNIK:
14     Q.   The next -- it's called a cause of action.
15 Your next claim is retaliation, and so I guess my first
16 question is what is it that you did that you feel you
17 were retaliated against for doing?  Do you understand my
18 question?  Okay.  What is it that you did that you think
19 you were retaliated against for?
20     A.   One of the things was the EEO thing, going to
21 speak to the EEO counselor, from one never knew. It
22 could have been filing a grievance against her for all I
23 know. I had no idea. It could have been a number of
24 things. I know one was the EEO thing, going to see an
25 EEO counselor, but it was odd. She retaliated for being

Free State Reporting, Inc.
Court Reporting  Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

134

1  odd. The whole bottom line was them people wanted me
2  out of there, and it didn't stop until I stopped. If you
3  look at the bottom line in her affidavit, she said I
4  didn't sign the leave. They either approve it or don't
5  approve it. But she over there I signed the leave -- I
6  could care less who signed it. I couldn't care less if
7  they didn't sign it at all. It wouldn't have mattered to
8  me.
9      Q.   What's the -- now you say that you were being
10 -- again, you make a claim of retaliation. What is the
11 retaliatory behavior that you're alleging in this case?
12 What's the retaliation?
13     A.   Assigning work that she knew that I could not
14 do, looking for things to, say, set me up to fail or
15 something or other, and it was twice as hard to
16 accomplish something if somebody trying to sabotage you
17 all the time, you know. And she mentioned into this
18 March-something meeting. She said she had the philosophy
19 of this. It does not matter what a manager does to a
20 subordinate. The subordinate is not to reciprocate
21 [sic]. I reciprocated. So I was taking action by going
22 to the union. I was taking action by objecting to the
23 way I was being treated and that was not her philosophy,
24 so she was going to retaliate to get me for defending
25 that.

Free State Reporting, Inc.
Court Reporting  Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

135

1      Q.   And it's the -- essentially your belief that
2  you were being set up to fail with respect to -- the
3  Space Rent Report is retaliation --
4          MS. JONES: Let her finish.
5          BY MS. MELNIK:
6      Q.   Is the retaliation for having either filed a
7  grievance or gone to EEO?
8      A.   Yeah, I think for all of it, but I think the
9  specific one that probably bothered her the most was
10 going to EEO.
11     Q.   I understand. And the retaliation for you
12 going to EEO is the idea that she -- Ms. Baird-Bridges is
13 who we're talking about, I assume.
14     A.   Right.
15     Q.   Setting you up to fail, is that the --
16     A.   She was transferring me to Budget because under
17 newly hired person she had a willing partner. That woman
18 couldn't even look me in my face. I never had no words
19 with Charlene Dunn, but I guess --
20     Q.   Are you alleging that Charlene Dunn
21 discriminated against you because of your age?
22     A.   No. I think she went along with whatever her
23 superior asked her to do.
24     Q.   Ms. Baird-Bridges?
25     A.   And Pat Vastano. Both of them were her

Free State Reporting, Inc.
Court Reporting  Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

136

1  supervisors. You didn't see one without the other.
2      Q.   Okay.
3      A.   But Baird-Bridges had the power to stop it
4  because she's sitting at the top. She was the -- she
5  could have stopped any of it at any time. She could have
6  stopped anybody because she was sitting at the top.
7      Q.   So she's ultimately responsible?
8      A.   Right, and she know about it and deny it.
9      Q.   Okay. I know some of this might seem
10 repetitive but, you know, that's legalese. Your next
11 claim, the fourth of this sort of grouping before we get
12 on to the other one that we haven't even talked about
13 yet, but that won't take long, is constructive discharge.
14 What were the conditions that you believed compelled you
15 to retire?
16     A.   The conditions was hell if there ever was hell
17 on earth because in all of my years I had never
18 encountered a situation that I could not have
19 emotionally handled because if things get too bad, you
20 normally just back off. She they put -- illegal letter
21 of reprimand that Pat Vastano had issued back there in
22 December. I did an outstanding job. She was the one --
23 and Baird-Bridges supported her. In that letter she had
24 something or other to the effect -- I don't know word for
25 word.

Free State Reporting, Inc.
Court Reporting  Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

137

1    Q.   This was the reprimand you're talking about?

2    A.   Right.

3    Q.   Okay.  Any further something or other, a

4  complaint or something or other -- they never had a

5  complaint nowhere on me in the whole 32 years, 33 years,

6  I want to say 33 years, until then.  They couldn't find

7  nothing in my personal file.  I had never filed a

8  grievance in my whole life until 2004, and I didn't even

9  know a thing about the EEO process at all, never even --

10 I didn't even know anybody personally who filed a EEO.

11 That's why I didn't want to go into it, don't recommend

12 it for nobody either, but I was caught between the evil

13 and the deep blue sea.  And then Charlene Dunn sending

14 these e-mails, talking about if I didn't have the Space

15 Rent by that Wednesday, although she knew I was in

16 capital training from that Monday for me to get the Space

17 Rent --

18    Q.   That would be June 15th.

19    A.   Yeah.  She told me to do that the same day as

20 the training because -- I blind man could see the setup.

21 I couldn't possible get it done.  And -- you would have

22 to go up there and see it.  I think it's 60 square feet

23 per cubicle for an employee.  By the time you get some

24 furniture and all that stuff in there and a chair, you're

25 left with about 4 or 5 square feet.  Now I'm sitting

138

1  there -- not skinny at all.  This Kim sitting there is

2  not skinny, no.  And there's the -- secretary and all of

3  us -- and I was supposed to learn something when I didn't

4  even know what I'm looking at.  No, it wasn't meant for

5  me to get the Space Rent -- the reports was -- and this

6  man had agreed to -- I'm going to help you.  I'm going to

7  stop everything I'm doing Monday and we're going to do

8  it.  I'm a person who learn by doing.  I don't want

9  nobody to do it for me.  Let me do it.  You don't want me

10 to do it, you won't let me do it?  No, you got to wait

11 for Kim.  Well, I already said Kim ain't going to do

12 nothing.  Kim ain't responsible for it.  I knew then who

13 wrote that for Charlene Dunn.  Pat Vastano wrote that.  I

14 always wondered what upset her about my December --

15    Q.   What's the that?  You said she wrote that.

16 What's that that you're referring to?

17    A.   Those e-mails that I received from Charlene

18 Dunn.  I don't believe but one of them was wrote by her.

19 I believe they were done in a Word document by Pat

20 Vastano.  It sound like her to me.  I'm familiar with her

21 writing.  And it was in a Word document sent to her and

22 she cut it out and put it into the e-mail and sent it to

23 me.  Ms. Dunn didn't write that.  If somebody was writing

24 it, didn't know what in the world they were talking

25 about.  Number one, because she got so many

139

1  inconsistencies there.  Ms. Dunn was just doing what she

2  was told to do.  But caught between the devil and the

3  blue deep sea, that if you don't have the report by the

4  15th, it could be conceived as insubordination and further

5  action could be taken.  Pat Vastano already said in hers

6  another complaint of insubordination, further action can

7  be taken, including dismissal from service.  What was I

8  supposed to do?  Wait?  Let me see.  No, I had no choice.

9  I'm getting to be a old woman.  I could not afford to let

10 them to have me out on the street as a homeless person

11 because without a retirement pension and no job at my age

12 and black, where was I going?  I had no choice but to

13 retire, no choice at all.

14       But, you know, what really upset me is that

15 somebody would do that.  I would never do that in any

16 circumstances to nobody after all those years.  I had won

17 one of the most prestigious awards that Labor had given

18 out, a Career Service.  I worked hard for Labor.  I

19 worked very hard.  Many hours I put in that I never got

20 paid for.

21    Q.   Give me one second.  Okay.  Last but not least,

22 you last claim is a little different from all the rest.

23 It's under the Privacy Act and you -- what do you allege

24 is a violation of the Privacy Act?

25    A.   Well, I just feel -- quite frankly, either one

140

1  of the two.  I didn't realize that she had violated the

2  Privacy Act.  Now the union person that she was having

3  the e-mail fight with brought it up, I said -- you know,

4  Ms. Dunn being a professional now, you don't go out and

5  tell nobody nothing about nobody's health problems,

6  getting your toes operated on.  She shouldn't have told

7  Ms. Keller that she ain't got her blood pressure on her

8  medical slip and it's not enough information.  That's

9  none of Ms. Keller's business.

10    Q.   Okay.  What was Ms. Keller's position at that

11 time?

12    A.   Ms. Keller was an administrative person,

13 something or other.  I don't think Ms. Keller understood

14 exactly what her position was to start with.

15    Q.   Okay.  As far as you know, were you aware of

16 whether or not she was responsible for time and

17 attendance?

18    A.   Well, a lot of people in there were responsible

19 for time and attendance, including myself, but I had

20 never in my entire life -- because we didn't have that

21 many people that knew about time and attendance so, of

22 course, I handled time and attendance, too.  It was extra

23 duties on the side.  And the point is she --

24    Q.   Well, let me interrupt you, let me interrupt

25 you.

141

1    A.   I don't --

2    Q.   Let me interrupt you.  Let me interrupt you.

3    A.   You know what --

4    Q.   Let me interrupt you.  You got to answer my

5   question.  I know you want to talk and I know you're

6   probably getting tired, but were you aware of whether or

7   not Ms. Keller at this time was doing time and

8   attendance?

9    A.   Yes.  So was I.

10    Q.   Okay.  And the day that you came into the

11   office and dropped off -- in fact, I have it, so let's

12   just --

13    A.   The medical form.

14    Q.   Let me just get my hands on it.

15         MS. MELNIK:  If I could have this marked Sewell

16   Exhibit 7.

17   (Whereupon, the document that was referred to as Exhibit

18   Number 7 was marked for identification.)

19         BY MS. MELNIK:

20    Q.   Oh, you put your glasses away.

21    A.   Yeah, I know, but I know what's on there,

22   though.

23    Q.   Okay.  Okay.  You can see that?

24    A.   Uh-huh.

25    Q.   Okay.  Thanks.  So on June 15th, which was a

Free State Reporting, Inc.
Court Reporting  Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

142

1   Wednesday --

2    A.   Right.

3    Q.   -- you went to your doctor first that day?

4    A.   Right.  I had an emergency appointment.

5    Q.   Okay.  And then after you went to the doctor,

6   where did you go from there?

7    A.   Directly to Labor and carried the medical slip.

8    Q.   And what?  I'm sorry.

9    A.   Directly to Labor and carried the medical slip.

10    Q.   Okay.  And what happened when you got to Labor?

11   Did you speak to anyone or what did you do when you got

12   to Labor on the 15th?

13    A.   I may have spoken to somebody if they spoke.

14    Q.   Okay.

15    A.   But I went into the office and I saw Betty.

16    Q.   Betty Keller?

17    A.   Right.

18    Q.   Okay.

19    A.   And I said Betty -- I said I'm not staying.  I

20   said is Charlene in today and she said yes, but her

21   door's closed.  Ms. Dunn was the type of person didn't

22   want to be disturbed if her door was closed.  She

23   wouldn't even answer for people that was out there

24   knocking, you know, so --

25    Q.   Sorry.

Free State Reporting, Inc.
Court Reporting  Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

143

1    A.   So I brought up the machine like -- and I was

2   filling out my own time sheet.  People did their own

3   leave.

4    Q.   Okay.

5    A.   They put it down.

6    Q.   All right.

7    A.   So I completed mine for that pay period and

8   closed it.  Then I sent Charlene Dunn a e-mail because I

9   was suffering from not only -- I was suffering from

10   chronic diarrhea.  The doctor had gave me a prescription

11   to stop that --

12    Q.   Okay.

13    A.   -- so that's why I put in there you don't went

14   me to stay because I would have an accident in the floor.

15    Q.   All right.

16    A.   And when I got to the doctor, the doctor said

17   my blood pressure was high.  I hadn't ate really since

18   that Monday I opened that e-mail, so really I hadn't ate

19   since that Sunday night because I didn't eat breakfast.

20   And when I got to work that Monday and opened that e-mail

21   and saw it, I took sick.

22    Q.   Which e-mail are you referring to?

23    A.   When she cancelled the training.

24    Q.   Oh, okay.

25    A.   They told me I couldn't do it.  I took sick

Free State Reporting, Inc.
Court Reporting  Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

144

1   right then, took sick right then.

2    Q.   That was when you got an e-mail that cancelled

3   your June 13th training?

4    A.   Oh, yeah, because I was there early that

5   morning just for that.  I came in early --

6    Q.   Okay.

7    A.   -- because Vicente said we could start around

8   9, so I got there about 8:25, and normally I didn't get

9   to work until 9:30, but I got there at 8:25 ready for the

10   training.  So Ms. Dunn, she said good morning and walked

11   out because she couldn't look me in the eye.  I said good

12   morning.  That was the last time I ever seen her from

13   that day to this.  I opened that e-mail and took sick.  I

14   really did.  I took sick.  I didn't even respond to it.

15   And you can see from all this writing that I was a person

16   that would respond.  I never responded to it.  I knew it

17   was in line now.

18    Q.   So --

19    A.   So I went to Personnel, move it up --

20    Q.   But on June 15th when you went in and you

21   dropped off the disability certificate --

22    A.   Betty --

23         MS. JONES:  Let her finish.

24         BY MS. MELNIK:

25    Q.   -- did you hand this to someone?

Free State Reporting, Inc.
Court Reporting  Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

145

1   A.   No. I asked Betty for an envelope to put it in

2   --

3   Q.   Okay.

4   A.   -- to put the leave slip in, and they had a

5   leave slip -- a leave slip is this size.

6   Q.   9-1/2 x 11?

7   A.   Yeah. The leave slip, the 171 or whatever it

8   is. I forgot. It's been so many years since I had to

9   fill one out to request leave.

10  Q.   Right.

11  A.   And then I attached this to it.

12  Q.   This meaning Exhibit 7?

13  A.   This medical slip --

14  Q.   Okay.

15  A.   -- to the leave slip.

16  Q.   Right.

17  A.   And filled out the time, then enclosed it.

18  Q.   And then the leave --

19  A.   And then I asked Betty for an envelope.

20  Q.   Okay. And what did you do with the envelope?

21  A.   And then she told me to look over there on my

22  own desk and I looked over on my desk and got a brown

23  envelope, the legal size. I think I was looking for a

24  letter.

25  Q.   Okay.

146

1   A.   But I got the legal one and I put it in there

2   and I give it to Betty, said Betty, would you see that

3   Charlene get this? Betty said I don't want nothing to do

4   with this. I tell you what. I want you to watch me. Now

5   I'm sticking it right up under this door.

6   Q.   Did you do that?

7   A.   Yes, I did.

8   Q.   Okay. And in the -- did your leave slip -- the

9   disability certificate says from June 15th, '05, which is

10  the day we're talking about, to July 5th, '05.

11  A.   Right.

12  Q.   Okay. Did your leave slip cover that period of

13  time or did you just make it until -- because I think

14  somewhere - the end of the pay period was June 24th or

15  something, and --

16  A.   You --

17  Q.   Just answer the question. What was your -- I

18  see what the disability certificate dates are.

19  A.   Um-hum.

20  Q.   Do you recall what your leave slip dates were?

21  A.   I don't think it covered that long a period of

22  time because, number one, I was hoping that I could call

23  her and then we could work out some way for me to get the

24  training and do the reports and at least be allowed to

25  work --

147

1   Q.   But the leave slip was -- I think -- I don't

2   know where I saw it. I think it was June 24th --

3   A.   Right. That was the end of the pay period.

4   But, see, the leave slip - see, because I thought that I

5   could get back, you know, even through the doctor had put

6   me -- he said, you know, I think you should be off work

7   two weeks, you know, or whatever, I was thinking hey, I

8   feel better now. I mean just because the doctor said

9   that don't mean I have to do it. If you feel better, you

10  know, you should go back to work.

11  Q.   So just to sort of move things along a bit, are

12  you saying that when Ms. Dunn asked Ms. Keller to follow

13  up with you regarding blood pressure, which is written on

14  the certificate, that is -- that was a violation of your

15  privacy, that she asked Ms. Keller to follow up on blood

16  pressure?

17  A.   That's right. Ms. Dunn could have disapproved

18  it or approved it one way or the other. No other person

19  into that office was treated in that way. They did not

20  have to go into their medical business. All they would

21  say -- all their medical slips is this person is under my

22  care. They were never required to go into medical detail

23  about their medical.

24  Q.   As far as you know?

25  A.   I've asked two or three and most of them asked

148

1   me exactly what I was asking them that for. No one else

2   was required to do that but me. In fact, Ms. Dunn still

3   never finished -- what do you want, the numbers? She

4   could have said well, give me the numbers. This is the

5   reason I told Ms. Keller to tell Ms. Dunn to go to the

6   Health Unit because in the Health Unit they have

7   professionals that could have advised her on what medical

8   information she needed from me, or she could tell them

9   and maybe they, you know, could advise her exactly what

10  she need for me to give her. Ms. Dunn never did say what

11  she wanted, I just want more. More what?

12  Q.   As a result of Ms. Dunn inquiring of Ms. Keller

13  to follow up with you about blood pressure, in what way

14  were you damaged?

15  A.   It was the one thing to do, but I wouldn't say

16  that, you know, it rocked my world, you know. It

17  wouldn't have -- I don't like -- I didn't like that I

18  didn't - gathering health information -- some days they

19  needed all this medical information on people -- but they

20  ain't in the medical collecting business. That whole

21  practice has bothered me, what you going to do the

22  doctors for? I mean --

23  Q.   Well, let's just concentrate on this.

24  A.   But do you see what I'm saying? They shouldn't

25  be -- supervisors, in my opinion, should -- I didn't ask

149

1  you for any leave.  It's my leave.  You know, it's not
2  like I was asking to borrow something.  Even - doesn't do
3  that.  When they go -- they do not name names because
4  it's nobody's business.  It's nobody's business.  So to
5  be honest, no, it didn't exactly rock my world, but I
6  realized it was wrong.
7       Q.   Okay.
8       A.   No, it didn't rock my world.  What rocked my
9  world was the threat of going to be fired and cheated out
10  of my retirement.  Now that rocked my world.  That's what
11  sent me in a spiral.  After 33 years, that's wrong.  It's
12  wrong.  And you yourself know and Ann Baird-Bridges know
13  that up until -- all she could find was outstanding
14  appraisals all the way down the line going back many
15  years.
16       Q.   Well, let me --
17            MS. MELNIK:  Actually, could we go off the
18  record?
19            (OFF THE RECORD)
20            (ON THE RECORD)
21            REPORTER:  Back on the record at 3:50 p.m.
22  Does the Defendant wish to waive signature?
23            MS. JONES:  Yes.
24            REPORTER:  Okay.  Going off the record at 3:51
25  p.m.

151

1            C E R T I F I C A T E
2       I, HEATHER KILBOURNE, a Shorthand Reporter and a
3  Notary Public, do hereby certify that the foregoing
4  witness, AUDREY L. SEWELL, was duly sworn on the date
5  indicated, and that the foregoing is a true and accurate
6  transcription of my stenographic notes and is a true
7  record of the testimony given by the foregoing witness.
8  I further certify that I am not employed by or related to
9  any party to this action by blood or marriage and that I
10  am in no way interested in the outcome of this matter.
11  In witness whereof I have hereunto set my hand this 14th
12  day of August, 2007.
13
14
15
16            /S/
17            _____
18            HEATHER KILBOURNE
19            Notary Public in and for the
20            District of Columbia
21
22  My Commission Expires:
23  February 28, 2011

150

1       (Reading and signature waived.)
2       (Whereupon, at 3:51 p.m., on Thursday, July 26,
3  2007, the deposition was concluded.)