# EXHIBIT 3

## AFFIDAVIT

DISTRICT OF COLUMBIA:

I, Audrey L. Sewell, make the following statement freely and voluntarily to Jeffrey Juster, who has identified himself to me as a Contract EEO Investigator for the U.S. Department of Labor (DOL) investigating a complaint of discrimination I filed, knowing that this statement may be used in evidence. I understand that this statement is not confidential and may be shown to the interested parties (those with a legal right to know). I hereby solemnly swear or affirm:

1.      I understand that the issue accepted for investigation is:

Whether, because of your age and in reprisal for fling a discrimination complaint, your supervisor retaliated against you by transferring you on April 18, 2005, assigning you work for which you were not trained, and forcing you to retire.

2.      I worked for DOL, Employment Standards Administration (ESA), Office of Management

Administration and Planning (OMAP), Division of Financial Management (DFM), for thirty-

three years until my retirement in June 2005. At the time of my retirement, I was a Financial

Management Specialist, GS-11. I had been promoted to that position in about 1997. For the

time period relevant to this complaint, Anne Baird-Bridges was the OMAP Director and the

acting Director of DFM.

3.      I believe I was discriminated against because of my age. My date of birth is October 6,

1941.

4.      I believe I was retaliated against because of my prior EEO activity. That activity

consisted of two union grievances I filed in December 2004 and an informal EEO complaint

(which led to the complaint presently being investigated) I filed in April 2005. In each of the

union grievances I claimed I had been discriminated against. One, relating to a letter of

reprimand I had received from Patricia Vastano, Ms. Baird-Bridges' Deputy, was filed on

December 17, 2004. On its face, the grievance stated I believed I had been discriminated against

because of race and age. The other grievance, alleging I had been subjected to a hostile work environment because of age by Ms. Baird-Bridges, was filed on December 20, 2004. Ms. Baird-Bridges, who I believe to be the principal management official who has discriminated against me either directly or by supporting and condoning subordinate manager's efforts, should have been aware of both of these grievances and their discrimination claims. For the grievance filed December 17, 2004, regarding the letter of reprimand, Ms. Baird-Bridges was the Deciding Official. She rendered a step two decision on March 17, 2005. She did not meet with me to hear my side of the story. That decision has been appealed for arbitration. Regarding the second grievance which related to Ms. Baird-Bridges treatment of me, nothing has happened since I filed it.

5.      In Attachment 1 to my formal complaint dated May 23, 2005, I describe an incident that occurred between Ms. Baird-Bridges and me on April 8, 2005, which I believed constituted discriminatory and retaliatory harassment. I incorporate Attachment 1 by reference into this affidavit. I understand that this incident was not accepted by the agency as an issue for investigation. My attorney has asked the agency to reconsider this decision. I believe that whether this issue has been accepted or not, it provides background to the events that immediately followed it which are the subject of this investigation. These events, my reassignment to another position and assignment of duties without training, led to my retirement in June 2005. I believe the retirement amounted to a constructive discharge.

6.      The incident with Ms. Baird-Bridges occurred on April 8, 2005. I spoke to a union representative. Since the grievance I had filed in December 2004 against Ms. Baird-Bridges appeared to have gone nowhere, I was advised to contact EEO. I was reluctant but contacted the EEO office and met with an EEO Counselor on April 15, 2005, a Friday, until about 3:00 p.m.

F2-2921       Initials _____

When I arrived at my desk on April 18, 2005, the following Monday, I found an email from Ms. Baird-Bridges dated April 17, 2005, a Sunday, directing me, Betty Keller (who worked in the DFM Director's Office), and Vicente Sanabria (who worked as a Budget Analyst in the Budget Branch) to meet with her that morning. Also, Linda Copening, ESA, Local 12, Agency Vice President called me into her office to listen to a voice mail message that Ms. Baird-Bridges had left for her on Sunday, April 17, about this meeting. Ms. Copening explained that she could not be present at the meeting because of a prior appointment, and that if we felt that someone from the Union should be there to ask Anne Baird-Bridges for a delay and call the Union Office.

I believe that someone from the Office of Civil Rights' EEO office contacted Ms. Baird-Bridges after I spoke with the EEO counselor on April 15, 2005, which prompted Ms. Baird-Bridges to rescind her March 16, 2005, decision not to change the chain of command in which I was to report to her and retaliated against me for contacted the EEO office by transferring my position to the Budget Branch Chief and not to the Accounting Branch, although 99 Percent of my duties were Accounting related.

7.    I went to the meeting along with Ms. Keller and Mr. Sanabria. Before the meeting got started, we all asked for a short delay until we could get union representation but Ms. Baird-Bridges denied our requests. Also present at the meeting were Charlene Dunn, who had been hired as Budget Branch Chief in January 2005, and Ms. Vastano. Ms. Baird-Bridges handed Ms. Keller, Mr. Sanabria and me a memo. My memo informed me that I was being transferred to the Budget Branch effective May 1, 2005, and that my duties would remain the same, and that Ms. Dunn would be my supervisor. Ms. Keller, who like myself had been working for the Director's Office doing primarily tasks, supporting Accounting, had also been transferred to Budget, and Mr. Sanabria, who had been working in Budget, had been transferred to Accounting. Almost

F2-3972

Initials N/S

everything I had been doing was directly related to and supported the Branch of **Accounting, not** the Branch of Budget. This included the accounting and reporting on Fair **Labor Standards Act** (FLSA) fines and penalty receipts; Treasury FLSA debt collections and inter-**agency transfers of** FLSA Fund Collections; maintain the proper records of FLSA Fund Activity for **DOL Auditors** for the year-end Financial Statements; Working Capital Fund (WCF) analysis **report; Object** Class reports on Agency monthly financial activity; PCS Moves; Agency Awards **disbursements** Financial Reports, as well as the newly acquired Analysis and Reporting on **the Agency's Detail** Fund Report of Obligations and Accounts Payable. These were strictly accounting **functions. At** the April 18, 2005, meeting Ms. Baird-Bridges told Mr. Sanabria that he had **not been doing a** good job as a Budget Analyst so she was transferring him to Accounting. He became very **upset.** I suggested to Ms. Baird-Bridges that perhaps it would have been better to discuss **the potential** reassignment with an employee first to get the employee's view before making the **decision to** reassign. Ms. Baird-Bridges replied that it would not have mattered, the employee's **input would** not have affected the outcome, and therefore, she saw no need for discussion.

8.    The assignments of the space rent reports and detail fund report had come up **the prior** month at a March 14, 2005, meeting, which Ms. Anne Baird-Bridges had requested **via e-mail** on March 10, 2005, one day after she had concluded the Step 2, meeting that she **held on March** 9, 2005, concerning the Pat Vastano grievance. In that e-mail, Ms. Anne Baird-Bridges **stated** that she was drafting my October 2004 – September 2005, Performance Standards **and that she** wanted me to bring her up to date on my specific job responsibilities so that she **could ensure** that my standards are accurate. I was afraid to be alone with Ms. Baird-Bridges, so, I asked **the** Agency Local 12 Vice President to accompany me to the meeting and she did. At **the meeting,** Ms. Baird-Bridges discussed very little of my than current duties, and did not appear **to be aware**

of very little of what I did. At one point, she pulled my latest report of obligations provided her (Object Class Reports) and was referring to it as a Budget Forecast report that a Budget Analyst prepared. At this March 14, 2005 meeting, she told me that she was assigning me two new duties; the Detail Fund Reporting that the private contractor, Mr. George Bailey, a retired former Labor Department Manager was hired to perform, and the Budget Projection Space Rent reporting that Mr. Sanabria had been doing. He had come to DFM from the office that handled space rent at the Departmental level. He had developed spread sheets and documents that I knew nothing about nor have I ever seen to this day. From about 1997 to 2000, I had assisted the previous Budget Analyst who was responsible for the preparation and gathering of the calculations and figures for the Budget on the space rent reporting but I had had nothing to do with it since that time. All that I did back then was to make phone calls to the field offices, checking with Administrative Officers to determine if they were still occupying the same office space as in the prior month, if they were not, finding out what space did they have, what space had been vacated and what Program personnel were occupying what space. Any change in this information was then passed on through the supervisor to the Budget Analyst who formulated the budget figures for the space rent reporting. This was totally a manual process at that period in time. The space rent process was not automated until Mr. Sanabria came on-board in Budget.

9.    At the March 14, 2005, meeting, when I was informed that I was getting these two new assignments, I asked Ms. Anne Baird-Bridges who would train me on the space rent and detail fund reports. She told me Mr. Bailey would train me on the detail fund report and Mr. Sanabria would train me on the space rent report. Immediately after the March 14, 2005, meeting, I met Mr. Sanabria and asked him if he had been told to turn the Space Rent function over to me and to train me, and he looked surprised, and said, no one had said anything to him, and that the

Space Rent function was his job. The contractor, Mr. George Baily met with me the same day, or sometime that week, and gave me a short training session of how to perform the analyses of the Detail Fund Report. He was in the mist of doing February 2005 reports, which he handed over to me to complete. After I received this function, Ms. Anne Baird-Bridges expanded the reporting on the detail fund reporting to after my annotating the hard copy of the reports, I was ordered to prepare a detailed typed report on my findings. The analyzing of this task consisted of the reviewing of computer runs (page by page) when stacked was almost five feet high (4 boxes of computer runs, weight, well over 100 lbs.) which had to be lifted out of the boxes, and put into my work space so that I could work with it, by either Mr. Sanabria, or Mr. Todd Jennings another budget analyst. I could not lift those boxes.

10.     Once we were reassigned to Budget, Ms. Keller and I first met with Ms. Dunn on May 4, 2005. Ms. Dunn had sent us an e-mail asking us to bring a list of our current duties. The e-mail stated that she would be giving us our performance standards at the meeting. As soon as we entered Ms. Dunn's office for the meeting, she called Ms. Baird-Bridges who then came to the meeting. Ms. Baird-Bridges told us that our duties would remain the same in line with our current position descriptions. After she gave a speech to the stand in union steward, Mr. Baird-Bridges left.   At the May 4, 2005, meeting, Ms. Dunn never discussed the lists of duties that Ms. Keller and I had brought. Ms. Dunn handed me my performance standards. The only thing on the performance standards I could understand that I was going to be rated on was the space rent, a responsibility that I had never performed nor been trained in. Ms. Anne Baird-Bridges had it listed as "Analyzes GSA Rent bills" and method of measurement "Accuracy of GSA rent bills", all of this information was information that Mr. Sanabria stated that he accessed through the GSA database. The rest of the standards were not specific. It was impossible to understand

F2- 6 0? 2?L                          Initials $\mathscr{D/S}$

what I would be rated on. When I was asked to sign the standards, I signed the standards and included written comments, indicating that I had never done the space rent task before, nor had I been trained to do this task, and requested that Ms. Dunn take that into consideration when rating me. I never did receive the interim Performance Appraisal that I was due for the seven (7) month period out of the twelve (12) month rating period when I listed as under Ms. Anne Baird-Bridges supervision.

11.    Ms. Kim Bassett was brought in to replace Mr. Sanabria in Budget. I was under the impression she was a very close friend or relation of Ms. Dunn. Ms. Bassett trained with each of the Budget Analysts, which was ordered by Ms. Dunn, and planned in writing over a course of a month. I did not receive similar consideration in training for the newly assigned Space Rent function.

12.    Ms. Dunn told me at the May 4, 2005, meeting to go to Mr. Sanabria, and tell him to stop whatever he was doing and to train me in the space rent reporting. However, Mr. Sanabria was busy being trained for his new job by another accountant. I told Ms. Dunn that I was sure Mr. Sanabria would train me but that he was very busy at the time. Ms. Dunn told me that if Mr. Sanabria did not stop whatever he was doing and train me, to come back and tell her. The following week I met with Mr. Sanabria and asked him if he would train me in the space rent reporting and he said yes, but, that he was busy at the time receiving his training. I told him when he got time, I would appreciate the training. Every time I went back over to meet with Mr. Sanabria, to see if he had the time, he was being trained in his new job or Ms. Bassett was in his cubicle getting budget training. He did take the time once to give me a brief verbal overview of these reports (the accountant that was training him agreed to leave for a few minutes). I told Ms. Dunn about this meeting, and also told her that Mr. Sanabria was still being trained. Mr.

F2-7 0χ2κ      Initials ✗/S

Sanabria had told me he had developed and implemented the automation of the reports and forms on his own and they were not based on the Departmental standards, but was his own internal creation. He also told me I needed to obtain an ID from GSA in order to access the GSA database to get the information needed in order to do the reports. Mr. Sanabria gave me a form to fill out to obtain a GSA ID. I signed it and gave it to Ms. Dunn who also signed it. I faxed it to GSA. Several weeks later, on about May 20 or 21, 2005, GSA emailed me my ID. In the meantime, on May 17, 2005, Mr. Sanabria sent me an e-mail and informed me that since his training me might take away from his training and new duties that he would prefer that the request for training would come from my supervisor, Ms. Dunn, to his supervisor, Larry Jarl. On May 18, 2005, I forwarded Mr. Sanabria's e-mail, request to Ms. Dunn. I never received any response from that e-mail, and did not hear anything more about the space rent reports until June 7, 2005.

13.    On May 9, 2005, Ms. Dunn gave me an assignment relating to the Formulation of the Congressional budget. I had never before worked on Budget Formulation nor had I ever had any Budget Formulation training. There was no prior discussion with me before assigning me the total Agency Object Class Request Budget Exhibit. The first I knew of this assignment was via e-mail when Ms. Dunn was assigning Budget Formulation assignments to the Budget Analysts. The exhibit that I was assigned, was a table of columns of information, all of ESA, which consists of all five ESA programs. In order to have performed this assignment, I would have to have been provided by Ms. Dunn, an exhibit for each of the Programs to consolidate/roll-up into the exhibit for the ESA Total Agency Exhibit. When I asked Ms. Dunn where I would get the information to use in the exhibit, and that should I not have an exhibit for each program; Ms. Dunn told me that sometimes the programs don't prepare their exhibits, and that we have to

FZ- 8 0×27

Initials

prepare the exhibits for them. She them said that I could read each of the Program's Draft

Budget Submission Requests and figure out where to pick up the figures from. She also gave me

a three to four inch thick briefing book of the prior years' Congressional budget and told me to

read it and figure out how to prepare the exhibit. I asked Ms. Dunn at this point did she not

think that I should have had a Budget Formulation course in order to do this work. She agreed

but told me that we didn't have time for me to take a course. I spent days reading all the

materials that I had been given but none of it made any sense to me, I still could not figure out

where to pick up the figures for the exhibit from. I went to the WH Budget Analyst, Elaine

Stone, and told her that I had the Total Agency Budget Exhibit that I had been assigned and was

due within days, and that I did not know what to do with it. She stated that she knew that I did

not know what to do with it, and that everyone was surprised when they saw that she had

assigned it to me because they knew I had never done one before. In a June 10, 2005, e-mail,

Ms. Dunn wrote that she had assigned a senior budget analyst to help me with the exhibit, this

was totally untrue. Ms. Dunn never gave me a name, nor, did anyone come to me to tell me that

they had been assigned to help me with the exhibit. After days of trying to get the information

from Ms. Dunn to do the exhibit, but, to no avail, I believed I was being set up to fail. I also

wondered why Ms. Dunn was participating in Ms. Baird-Bridges campaign of harassment against

me, because I had never had any words with Ms. Dunn, and I had tried to be as helpful as I could

in the short period of time (days) that I had been under her supervision.

I had planned to retire in 2007 but faced with these circumstances at work I went to

Personnel and put in my papers indicating I tentatively planned to retire in September 2005.

14.    On June 7, 2005, I was working at home (for several years I had been working at home 2

days each week on a medical accommodations request from my doctor, which had been

F2-9 ☓2↑    Initials ☓/β

approved before Ms. Baird-Bridges or Ms. Dunn's tenures). Ms. Dunn called me at flexi place asking where the space rent reports for May were. I told her that I forwarded to her Mr. Sanabria's email on May 18, 2005, regarding his request that she arrange the space rent training through his supervisor, Mr. Jarl. She said that she had told me that I was to come and tell her if Mr. Sanabria did not stop what he was doing and train me. I told her that I felt that he was doing the best that he could and that I was not going to participate in the harassment of him. She said that if I had come and told her like she told me to, that I would not have been harassing him, that she would be harassing him. I told her that I was not going to participate directly or in-directly in the harassment of Mr. Sanabria. It seemed to me that management was putting a lot of pressure on Mr. Sanabria and I was not going to allow them to use me to increase that pressure. Mr. Sanabria had confided in me that he was actively looking for another job.

I pointed out to Ms. Dunn during that telephone conversation that she had put in writing the need for Budget Staffs to train Ms. Bassett and that I would have appreciated it if she had made the same arrangements for my training. I told her that Mr. Sanabria was doing the best that he could and that he had agreed tentatively to meet with me on Friday, June 10th to start the training. I told Ms. Dunn that due to the circumstances at work, I planned to retire effective September 3, 2005. I told her that I had decided to retire because of her assignment to me of the budget table which I did not know how to do and for which she did not provide me any training. I pointed out that the space rent report was another assignment that I did not know how to do and that I had not been provided training on. She than said "well, since you are retiring, perhaps she should assign the Space Rent Reporting task to someone else." Ms. Dunn told me she appreciated my honesty and the conversation ended. On June 8, 2005, when I returned to the

FZ- 1Φ 0X2⊥

Initials,

office, I sent her an email regarding this conversation and to confirm the September 3, 2005, retirement date.

15.    On June 10, 2005, I received an email from Mr. Jarl. It had been sent at 7:20pm the previous night. The email was sent to me, Mr. Sanabria, and Ms. Bassett, informing us that we were to meet with Mr. Jarl at 10:30 that morning on the space rent reports (this was the first contact that I had with Mr. Jarl concerning the space rent training). I also received an email from Ms. Dunn on June 10, 2005, also sent the previous evening, telling me that since I still had the space rent assignment she appreciated it if I would attend Mr. Jarl's meeting. I emailed her back that I would attend the meeting. When it was time for the 10:30am meeting, I went to the conference room where it was to be held. Mr. Jarl was not there. I went looking for him in his office and he was not there, I than started to walk around in the office looking for him and I encountered him leaving Ms. Baird-Bridges' office. I asked him if the meeting was still on. He waved me to come with him to his office. Mr. Jarl told me to try to understand the position he was in. I told him I understood that he had to be a team player and do as he was told, be it right or wrong. We then went into the meeting. At the meeting, Mr. Sanabria gave a complete history of the space rent reporting. He explained that when he replaced Fred Poist, the Office of Workers' Compensation Programs (OWCP), Budget Analyst, he took over the Space Rent Reporting from him in 2000 when Mr. Posit retired. After he inherited it, Mr. Sanabria explained that he had automated, designed, and developed his own space rent reporting formats and procedures. He went over how he retrieved the information from the GSA database and how he put together the reports, but he didn't say anything in depth that I could understand what the reports figures consisted of. I later learned that Ms. Bassett had all of the data for the reports. Ms. Anne Baird-Bridges had all of Mr. Sanabria's work downloaded from his hard drive to Ms.

F2-11 9x21

Initials _A/S_

Bassett's hard drive the weekend of April 16-17, 2005, unknown at that time to Mr. Sanabria until her April 18, emergency meeting. So Ms. Bassett had everything that Mr. Sanabria had previously concerning space rent. Ms. Bassett told Mr. Sanabria that the instructions he had given her on the preparation of the space rent reports were not accurate. Mr. Sanabria told her that he had made changes to the process since those instructions were written. I don't know because I never saw the instructions. Mr. Sanabria told us he was in the process of updating the instructions. Mr. Jarl said that he didn't want Mr. Sanabria to have to spend time training different people in the space rent reports. He felt that since I had announced my retirement date of September 3, maybe Mr. Sanabria should train Ms. Bassett since she had replaced him in Budget. I said that I still wanted to learn how to prepare the reports in order to help out as much as I could for the less than 90 days that I would be working there. We all agreed that training for Ms. Bassett and me would take place on Wednesday, June the 15th.

16.    The meeting was over about 12:15 p.m. About 5 Min. after the meeting, I went to Mr. Jarl's office to ask him how did he think the meeting went. He was not there again, so, I walked around to check on my incoming mail, and met him again coming back from Ms. Baird-Bridges' office. Mr. Jarl met with Ms. Baird-Bridges directly before the 10:30am meeting, which did not start until about 10:50am, and he met with Ms. Baird-Bridges directly after the meeting. When I met him leaving Anne Baird-Bridges' office, I asked him how did he feel the meeting went, and he said that he felt the meeting had gone very well. I went back to my work space where I found an email from Ms. Dunn which had been sent that day at 12:19 p.m. within 4 min. after the meeting had ended. The email stated that I was responsible for the completion of the space rent reports for May, June, July and August and if I had followed instructions she would have had the May reports. She stated that, for my not following her instructions, by reporting back to her that

FZ-12 of 21    Initials _____

Mr. Sanabria did not stop whatever he was doing and train me, it was insubordination, and that if I did not have the May space rent reports to her by Wednesday, June 15, (the date of the training set up in the meeting), that further action could be taken against me. Now everyone knows that a charge of insubordination is grounds for firing. I had not been insubordinate. Ms. Dunn could have arranged my training with Mr. Jarl, Mr. Sanabria's supervisor per Mr. Sanabria's written request of May 17. She had failed to make sure I had received training. The training depended on Mr. Jarl and Mr. Sanabria. I felt then, and I feel now, that it was wrong for Ms. Dunn to put me into the position of ordering me to report anything to her concerning Mr. Sanabria. I am not the type of person that will do anything to hurt, upset or contribute to any misery of any human being even if ordered to do so. I felt that Ms. Dunn could have handled my needed training professionally, the same way that she had handled Ms. Bassett's training. I also felt that since Ms. Anne Baird-Bridges assigned me the Space Rent Reporting responsibility way back on March 14, 2005, if she really meant for me to get the training to perform the new task, she should have had Mr. Sanabria start training me at that time she decided to transfer the Space Rent Budget Reporting function to me.

Mr. Sanabria did not find out until the April 18, 2005, emergency meeting ordered by Ms. Baird-Bridges that he was being replaced by Ms. Bassett, and then they had him spend all of his time, after that April 18th meeting, either training Ms. Bassett, and beginning May 1, start receiving his own training from Mr. Coulopoulos, rather than have him train me for the space rent function.

I forwarded the June 10, in-subordination e-mail to Mr. Jarl, Mr. Sanabria and Local 12 Union Officials. With that e-mail, I asked Mr. Sanabria for emergency training on the space rent report function as I had only a few days to get trained and to produce the May reports or I would

be cited for insubordination.   Mr. Sanabria responded that he would train me **the following**

Monday morning June 13, 2005, and he told me that together we would work to **get the reports**

completed by the June 15, 2005, deadline.  E-mails that day flew back and forth.  **At times it**

appeared that although the e-mails were originating from Ms. Dunn, I got **the feeling that I was**

receiving communications from two different persons.

17.    Since I had received the GSA ID, in anticipation of the training, I had **tried to access the**

data needed for the reports.  I did not know that the GSA ID was very case **sensitive.  I tried to**

sign in several times and was not allowed into the system.  After someone tries **to sign in on an**

ID unsuccessfully several times, that ID is no longer any good.  This meant that **I had to submit**

another form to receive another ID which would take several weeks to obtain.  I did **not have**

time to do this.  Mr. Sanabria agreed to let me work under his ID (of course only **he was going to**

access the GSA database using his ID, and he was going to monitor my work closely **working**

under his ID).  Ms. Dunn was aware that I did not have an ID to access the needed **GSA**

database.

18.    I arrived at the office on Monday, June 13, 2005, at 8:25 am ready for **the space rent**

training.  I usually arrived at work under the new Bargaining Agreement flextime **hours at 9:25**

to 9:30am (under the old hours, I use to arrive by 9:45 am).   Upon my arrival, that **Monday, June**

13, 2005, to work with Mr. Sanabria to get out the May space rent reports, I found **an email from**

Ms. Dunn canceling the training with Mr. Sanabria the mourning of June 13, 2005, **sent 6:55pm,**

Friday June 10th, after I had left for the day.  In that e-mail, Ms. Dunn clearly stated that **Ms.**

Bassett was not going to prepare any reports.  I did not understand why the training was being

cancelled until June 15, 2005; the day of the deadline that Ms. Dunn had set for receipt of **the**

reports.  Also, in that e-mail Ms. Dunn stated that she saw no need for any emergency training;

F2- 14 9x21

Initials _A/S_

also, a meeting had been scheduled at my request, primarily to have Mr. Sanabria and his supervisor Mr. Jarl to explain to Ms. Dunn why I had not been trained prior to June 13 (I had assumed that I was going to be trained that day), but, in the e-mail she stated that she did not want Mr. Jarl or Mr. Sanabria in that meeting because she did not want them involved. As far as I was concerned, they were involved.

I also received an email from Mr. Jarl on the mourning of June 13, sent on Friday June 10, at 7:32 pm, after I had left for the day, also stating that the training was being cancelled (he had agreed with the emergency training session earlier on that Friday the 10th). He stated that the training was being canceled so that Ms. Bassett could attend and ask the appropriate questions. Ms. Bassett would not be available until Wednesday, June 15th; the deadline for the reports and the date the insubordination charge was to kick in and further action could be taken. I did not understand any of this. In the e-mail, the training was cancelled on Ms. Bassett's behalf yet I was still supposed to complete the report by Wednesday or be charged with insubordination and could be fired. This was clearly a set up. As I sat at my desk, and thought about what was being done to me at the end of a successful 33-year career with the Department, I became physically ill. I had always been rated outstanding by all past supervisors prior to Ms. Baird-Bridges' tenure. I am a workaholic and have a lot of nervous energy so I loved to take on new projects and I enjoyed learning new tasks. I am a perfectionist and have always presented my financial reports accurately. After producing my financial reports, I would also, use a calculator to make sure the reports that I produced were accurate. During my last few weeks within DFM, I found myself beginning to make mistakes, which I always caught, before releasing my reports, but, I felt that it was not like me to make so many mistakes to catch in the first place. I knew something was wrong. I was under tremendous pressure due to the work environment. After

FZ-15 X2L

Initials $\mathcal{N/S}$

reading that e-mail on the mourning of June 13, I felt that I had no where to turn. **I went to** Personnel and told them I would retire at the end of the pay period. I felt very **sick and had to be** helped home. I was sick the next day, Tuesday, June 14, (I called Ms. Dunn **and left her a voice** mail message), I than called my doctor for an emergency appointment. **An appointment was** made for the next day the mourning of Wednesday, June 15. I went to the **doctor and the doctor** found my blood pressure was high. After I told the doctor of the stress that I **was encountering** on the job, he felt that perhaps the stress was causing the rise in blood pressure **and felt that I** should be removed from the workplace because I had also developed other **stress related medical** problems to see if this would control the blood pressure. The medical certificate **that he gave me** stated that I would be totally incapacitated and would be under his professional **care from June** 15, 2005, until July 5, 2005, and could return to work on July 6, 2005. I was **so weak and sick** that day, that I forgot that I had tentatively changed my retirement date, so, **the doctor did not** know that I was considering retiring June 24, and I was not thinking about it at that **time. I was** concerned about my health at this point.

19.    On June 15, 2005, I was so sick that my son had to take off from work and **drive me to** the doctor's office, and when I left, he drove me to DOL to take the medical certificate **although** the doctor did not think it was a good idea for me to hand carry the medical certificate to **the** office. When I arrived at the office, Ms. Dunn's door was closed so I gave the medical **certificate** and a SF 71 leave request to Ms. Keller and asked her to give it to Ms. Dunn. Ms. Keller **slipped** it under Ms. Dunn's door. I filled out my time and attendance report and sent Ms. **Dunn an e-**mail telling her that I left for her the medical certificate, and telling her that my blood **pressure** was high, among other health problems that I was experiencing. I was in the office **no more than** 7 min. at the highest. My son drove me back home. Later, I received a call from Ms. **Keller.**

F2-16 0X21    Initials

She told me that about an hour after I had left, Ms. Dunn came out of her office with the medical

certificate and leave request in her hand and asked Ms. Keller if I was still there.   Ms. Keller

said she told her that I was there over an hour ago.  Ms. Keller said Ms. Dunn than told her that

she needed more medical  information than what the doctor had on the medical certificate, and

than Ms. Dunn went to see Ms. Anne Baird-Bridges, and than came back and sent her an e-mail

which stated that the doctor had on my medical certificate that he was treating me for Blood

Pressure, and that she needed to know what was wrong with the Blood pressure before she could

approve my earned sick leave that I had requested for the period June 15, 2005, through June 24,

2005.  Ms. Dunn also stated in that e-mail to Ms. Keller to have me send/call her with the status

of the Space Rent Reports, although Ms. Dunn was fully aware that she had cancelled the

training for the production of the Space Rent reports until that day, June 15.   It was a violation

of the privacy act for Ms. Dunn to have told Ms. Keller the details of my medical condition.  Ms.

Keller was very confused as to why Ms. Dunn was contacting her concerning my medical

problems and she did not know what to think about Ms. Dunn asking about a space rent report

when she knew she had cancelled the training until that day.  Ms. Dunn was fully aware of what

was wrong with my Blood Pressure from my e-mail that I had sent her when I left the Medical

Certificate on June 15.  I asked Ms. Keller to forward the e-mails that she was getting from Ms.

Dunn, to the Head Steward, Ms. Eleanor Lauderdale, because I was to sick to deal with Ms.

Dunn, plus, I had taken medication.

Ms. Dunn went back and forth with an e-mail fight with the Local 12 head steward with

what one could only describe untrue.  Among the untrue's stated was that I had walked around in

the office that mourning of June 15, for over an hour discussing my medical condition with co-

workers, which was totally untrue.  After speaking to Ms. Lauderdale by phone; early June 16th, I

Page 17 of 21          FZ- 17 0X21          Initials _A/S_

prepare a memorandum to Ms. Dunn, to be transmitted through Local 12, specifically notifying her that I was retiring at the end of the pay period because she had sent the head steward a e-mail stating that if I did not bring her more medical information, she was going to put me on Leave Without Pay (I never requested it).  To date, neither the Head Steward nor I even knew what other medical information Ms. Dunn wanted.  Somehow, Linda Copening, the ESA Vice President seem to find out about the mess and called me at home.  After I told her what had been going on, and that I had sent a memorandum to Ms. Dunn through Ms. Eleanor Lauderdale, informing her that I was retiring within days, she said she was calling Ms. Baird-Bridges.  According to her, after she told Ms. Baird-Bridges that I had sent a package to Ms. Dunn through the union office, Ms. Baird-Bridges said that she would call her back after she received the package notifying them that I was retiring at the end of the pay period.  After Ms. Anne Baird-Bridges confirmed that the package had been delivered to Ms. Dunn, according to Ms. Copening, she called her back and told her the leave will be approved.

20.    On July 6, 2005, I returned to work to clean out my desk, but, Ms. Keller could not get the key which I had turned in on June 16th for me to open the cabinets, so, I could only clean off the top of the desk.  I saw Mr. Jarl on July 6, (I never saw Ms. Dunn) and I spoke with the Back Wage Accountant.  Mr. Jarl wanted to know where was the automated accounting booklet that I had prepared for the previous Fiscal Year and was published by the Agency; the Back Wage Accountant wanted to know where my FLSA work was because she felt that the reporting on the FLSA activity was going to be turned over to her.  I was surprise that they did not have the work because I would thought that Ms. Baird-Bridges would have had the Hard Drive downloaded.  I told Mr. Jarl not to worry; that I had everything backed up on disk, and would see that he gets it when I return to the office after Ms. Keller got the keys to the desk from Ms. Dunn.

This is further proof that all of the work that I had been doing was related **to Accounting** not to Budget as it was Mr. Jarl's branch that needed access to my work, not the **budget branch.** I returned to the office on July 15, 2005, at which time I left 5 disks with a **transmitting memo** for Mr. Jarl with Ms. Keller transferring my work products to him for distribution. **I checked** back later with the Back Wage Accountant to see if she had received the **FLSA Activity that she** needed and she said yes Mr. Jarl had transmitted it to her, and she had got out **June's reports** because the Solicitor's office were asking for the reports.

I called Mr. Sanabria on June 23, 2005, to apologize for not being there **for the June 15,** training, and to thank him for agreeing to give me the emergency training on **June 13, 2005.** During that telephone conversation, Mr. Sanabria told me that they had him **preparing the May** space rent reports that day. I than stated that I was not going to hold him up **because Ms. Bassett** was probably there with him, and he said no she was not there with him while **he was preparing** the reports. I was surprised to hear this since I could not take the space rent training **until she** was available, and here he was preparing the reports, and she was not there. **I don't think it was** ever meant for me to get trained to prepare the space rent reports.

21. I request as a remedy:

1. Front pay, back pay, and lost benefits and value of retirement for **my constructive** termination;

2. Compensatory damages for defendant's violation of my federally protected **rights.**

I have read this statement, consisting of 21 pages and a privacy act notice, and it is true, complete, and correct to the best of my knowledge and belief.

F2-19 0722

Initials

_(signature)_

Signature

1/13/06

Date

Signed and sworn to before me
on this _____ day of _____, _____,
at _____.

_Edna M. Reeves_

Neutral witness, notary, or Investigator

F2-20072

Initials _JS_

## PRIVACY ACT NOTICE TO COMPLAINANT
## FOR DISCRIMINATION COMPLAINT INVESTIGATION INTERVIEW

### GENERAL

This information is provided pursuant to Public Law 93-579 (Privacy Act of 1974), December 31, 1974, for individuals supplying information for inclusion in a system of records.

### AUTHORITY

The authority to collect the information requested by this interview is derived from one or more of the following:

Title 5, Code of Federal Regulations, Sections 5.2 and 5.3; Title 29, Code of Federal Regulations, Section 1613/1614; Title 5, United States Code, Sections 1303 and 1304; Title 42, United States Code, Section 2000e-16; and Executive Order 11478, as amended.

### PURPOSES AND USES

The information you supply will be used along with data you supplied previously and information developed by investigation to resolve your equal employment opportunity discrimination complaint. This information may be furnished to designated officers and employees of agencies and departments of the Federal Government in order to resolve your equal employment opportunity discrimination complaint. The information may also be disclosed to any agency of the Federal Government having a working relationship with regard to Equal Employment Opportunity Commission activities, or to others for uses as published in the Federal Register.

### EFFECTS OF NON-DISCLOSURE

Disclosure of the information sought is voluntary. However, failure to furnish the information will result in your complaint being returned without action and being recommended for cancellation for failure to prosecute.

_____          _____
Signature of Interviewer                          Signature of Complainant

                                                          _District of Columbia_

_____          _____
Date                                                     Place

Page 21 of 21                        F2- 21 OX21                    Initials _N/S_