# EXHIBIT 6

## AFFIDAVIT

DISTRICT OF COLUMBIA:

I, Charlene Dunn, make the following statement freely and voluntarily to Jeffrey Juster, who has identified him/herself to me as a Contract EEO Investigator for the U.S. Department of Labor, investigating a complaint of discrimination filed by Audrey Sewell, knowing that this statement may be used in evidence. I understand that this statement is not confidential and may be shown to the interested parties (those with a legal right to know). I hereby solemnly swear or affirm:

1. I have been informed that the issue accepted for investigation is

Whether, because of her age and in reprisal for filing a discrimination complaint, Ms. Sewell's supervisor retaliated against her by transferring her on April 18, 2005, assigning her work for which she was not trained, and forcing her to retire.

2. I became Chief, GS-15, Budget Integration Branch (Budget), Division of Financial Management (DFM), Office of Management Administration and Planning (OMAP), in January 2005. I had been working previously for another Federal agency. On May 1, 2005, Ms. Sewell was reassigned to Budget and I became her first-line supervisor. In June 2005, Ms. Sewell retired. Subsequently, I have been named DFM Director, GS-15. I report to Anne Baird-Bridges, Director of OMAP.

3. I am 45 years old. I was not aware of Ms. Sewell's age. I never asked her what her age was. I did not care how old she was. In a meeting that we had in April 2005 to inform Ms. Sewell and two other employees that they would be reassigned, Ms. Sewell stated she had filed grievances claiming discrimination. That was the first I had learned of these grievances. I understand from the EEO Investigator that these were filed in December 2004. I was not working for DOL at that time, and would have no knowledge of the actions that Ms. Sewell claimed were discriminatory. I know that Ms. Sewell claimed to be concerned about a

Page 1 of 11                                               Initials C.D.

F4 1 9X11

conversation she had with Ms. Baird-Bridges sometime in April 2005, because **Ms. Sewell mentioned it to me on a number of occasions.** She repeatedly told me that she **had been attacked** at work or that she was afraid she would be attacked at work. I did not witness **what went on** between the two of them, there was no one who witnessed the alleged "attack," **and it occurred** prior to her being reassigned to my branch. I was never contacted by anyone from **the EEO** office regarding any claim Ms. Sewell may have made about this incident. **I took no action as a** supervisor based on Ms. Sewell's age or any EEO activity she may have engaged **in. I treat all** employees the same.

4.   For approximately 18 months, Ms. Baird-Bridges served as acting **DFM Director as well** as OMAP Director. Ms. Sewell and Bettye Keller had been assigned for many years to work for the DFM Director. I understood that before I was hired to be Budget Chief, **Ms. Baird-Bridges** had advertised to fill the DFM Director position but was unable to find a candidate qualified to do the job. Ms. Baird-Bridges told me that since the DFM Director's position **might not be filled** for a period of time she had decided to reassign Ms. Sewell and Ms. Keller to Budget **as they** were not being fully utilized where they in DFM. Budget was in need of clerical support which Ms. Keller could provide. Ms. Sewell's position description included tasks relating **to both** Accounting and Budget. Her major duties were to run a number of different financial reports. There is no difference in the skills required to run reports for Accounting and Budget. Since Budget needed more support, it made sense to assign Ms. Sewell to my Branch. **At the same** time, Vincente Sanabria who was in Budget was reassigned to the Accounting Branch. **Mr.** Sanabria is an accountant. He had been having difficulty in Budget so it made sense to reassign him to Accounting where he could better use his knowledge and skills, and where additional staff where needed.

5. Ms. Baird-Bridges and I met with Ms. Sewell, Ms. Keller, and Mr. Sanabria to inform them of their respective reassignments. All three of them were upset. Ms. Sewell was the most vocal. She stated she didn't have problems with me but didn't want to be in Budget. I explained to her that Budget needed more support and her skills were commensurate with the Branch's needs. Ms. Sewell claimed her expertise was related to Accounting not Budget. I explained that this was not true. Her duties were primarily to run reports requiring that she put accounting and budgeting codes into the system. This was the same for Budget as it was for Accounting. Ms. Sewell wanted to work for Accounting because she had developed a relationship with Mr. Jarl the Accounting Branch Chief. She felt comfortable with him and felt he would allow her to continue working in the same manner as she had been previously.

6. Ms. Sewell had been a productive employee up until when she came to Budget. She was so opposed to the move, so resistant, that her performance on the tasks she had been doing all along began to fall off and she was highly resistant to learning anything new. I spoke to her about this. I told her she was bright and that none of the new tasks she was being given should be difficult for her to understand. I explained that she was much better off in Budget where there was promotion potential for her. In Accounting, it was only possible to move up if you had an accounting degree. Ms. Sewell does not have an accounting degree. I tried to explain it was to her benefit to move to Budget and learn new things that could lead to promotion. I have never managed another employee who was as hostile and resistant as Ms. Sewell was to anything that was new.

7. When he worked in Budget, one of Mr. Sanabria's duties was to complete the monthly rent reports. I was familiar with the rent reports from my prior agency. They are required for every Federal agency. The format of these reports is mandated by GSA. There are the same

requirements for every agency. At my former agency, these reports were done by a GS-7 administrative assistant. You don't need any Budget or Accounting knowledge to be able to understand them. It is a lower level task and there was no reason why Mr. Sanabria, a GS-13, should have been doing it. All that it required was to go to the GSA web site, download their program, and input data into it. This generated figures that allowed each office within ESA to make sure it was allocating sufficient money to cover rent. In doing the rent repots, Mr. Sanabria had embellished the amount of effort needed to complete the report. I believed the rent report was an appropriate assignment for Ms. Sewell, it was already in her position description, and Mr. Sanabria was no longer working for Budget, so it was not appropriate for him to continue generating the rent reports. Ms. Sewell was fully capable of doing the work. Some of her prior duties involved the WEBPARS System (which tracked Personnel actions) and had been transferred to Madeline Nelson so Ms. Sewell should have had the time to do the rent reports. I told Mr. Sanabria and Ms. Sewell that she would be taking on the rent reports. I said that Mr. Sanabria should show her how to do the report and then the next month she could do it on her own. I have a series of emails which I will provide to the EEO Investigator demonstrating Ms. Sewell's resistance to taking on this assignment. She argued that this was the task of a GS-13. I explained that although it had been done by a GS-13 it was not work that required the abilities of a GS-13 and should not have been assigned to a GS-13. Ms. Sewell attempted through her actions, to show me what tasks she was going to do and what she would not do. In an email I told her that I was the supervisor and would allocate her assignments. She claimed that she was not a budget analyst and that this was a budget task. I explained that it was not a budget task and she was fully capable of learning to do it. She claimed I was trying to force her to do something that was not in her position description. I looked in her position description as a GS-11, as well as in her

position description as a GS-9 which she had in 1998, and found that her duties included assisting in the preparation of budget estimates and submissions. This was exactly what I was asking her to do. Her most recent position description, which she had been on since 1999, had the space rent assignment in it. It was in her position description, had been there for years, and I had every right as a supervisor to ask her to do it. Further, it was a task she was fully capable of learning and performing well.

8. Ms. Sewell kept making excuse after excuse as to why she had not met with Mr. Sanabria and learned how to do the rent report. I had spoken with her and sent her emails regarding this report. Finally, I sent her an email indicating that she had to complete the June report by June 15 (since she had not completed May's report). We needed the report by mid-month to send it on to the various ESA programs for use in their monthly budgets. In that email I told her that should she fail to follow my instructions, it would be interpreted as insubordination, and could result in further action. She had had more than sufficient time, at least five weeks, to follow my instructions. This was not the first email where I had told her I needed the rent report by the middle of June. Ms. Sewell kept procrastinating and tried to give the duty to others. Her response was clearly inappropriate.

9. I had at least two discussions with Mr. Jarl and Mr. Sanabria about Mr. Sanabria's providing training to Ms. Sewell on the rent report. Mr. Jarl was aware Mr. Sanabria would need to spend some time with Ms. Sewell on this. He did not voice any objections to this. The problem was that Ms. Sewell failed to set up meetings with Mr. Sanabria for weeks so that when the June 15 deadline neared Mr. Sanabria had new assignments he had to get out. Ms. Sewell was the cause of this problem. If she had not procrastinated, there had been plenty of opportunities for Mr. Sanabria to provide the training. The EEO Investigator informs me Ms.

Sewell states in her affidavit she was informed of training scheduled for June 13, 2005. It was cancelled and moved to June 15, 2005, because Ms. Bassett could not attend the training on June 13. Previously Mr. Sanabria was the only one who knew how to do the rent report. This did not make sense to me. We needed to have back up, have others cross trained in case the person responsible for the task was not available to do it. Ms. Bassett was being cross trained so that in the future if Ms. Sewell could not do the rent report, somebody else would be available to do it. Again, Ms. Sewell had had plenty of time to meet with Mr. Sanabria and learn to do the report. If the training was shifted and that caused problems for Ms. Sewell getting the report done on time, it was the result of her own failure to meet with Mr. Sanabria in the many weeks she had been given the opportunity to do so.

10. I gave Ms. Sewell an assignment of producing a table for inclusion in the Departmental, not Congressional, budget. I met with her on this assignment, explaining that it was an opportunity for her to learn budget. At first Ms. Sewell was responsive and told me she wanted to learn. But as she began to work at the assignment, she exhibited an irrational fear about the work. I did not understand where this was coming from. The task I had assigned her was very easy. Ms. Sewell clearly had the capabilities to do it. Yet she kept discrediting her own abilities. The assignment was a source table. It required going to three DOL programs, obtaining data, and inputting the data into the table. It was not hard to do. Like the rent report, which in my prior agency was done by a GS-7, it was not a complicated task.

11. It was my impression that for a number of years Ms. Sewell had been allowed to do only what she wanted to do at work. She had no strong manager telling her what to do. I believe she objected to her assignment to Budget because she knew that employees in Budget worked hard

and that I had the reputation of being a strong manager who expected my employees to produce work..

12. The rent report was an important assignment, an integral part of budget forecasting. If the rent report is not done by the middle of each month, it reflects badly on the Budget Branch and since I ran Budget it reflects badly on me. The rent report was not an assignment given to Ms. Sewell so that she would fail. On the contrary, it was given to her because it was something she was fully capable of learning and doing successfully. I was not trying to get her to retire. Ms. Baird-Bridges never said anything to me or in my presence which either directly or implicitly suggested she wanted Ms. Sewell to retire. I know from things Ms. Sewell said to me that Ms. Sewell had a belief that managers were conspiring against her. This was not true. We were simply trying to get her to work and to fully utilize her capabilities, the same expectation we had for every other employee.

13. Several years ago Ms. Sewell entered into a work-at-home agreement with the agency. She worked two days each week at home. I do not object to this type of agreement and did not object to hers. However, it is standard practice in these agreements that an employee working at home have a computer with a modem that allows them to access email. This ensures communication between the employee and the office. Ms. Sewell did not have a computer with a modem and therefore did not have access to email. Therefore, when I needed to contact her while she was working at home I called her. Ms. Sewell strongly objected to my calls. She claimed that I was invading her privacy and had no right to call her at home. As her supervisor I had every right to call her at home on days when she was working at home especially since email was not available.

14. In my observation, Ms. Sewell was bright and quite capable. However, she seemed to short-change herself and her abilities. She had an irrational fear of doing something new and when presented with a new task, like the rent report, became adamant that she would not do it. She had the capacity to succeed but did not want to exert any effort to do so. I had hoped she would become a productive member of the Budget Branch and that we would be able to utilize her capabilities in the future. I felt she was fully capable of excelling at the work and even being promoted. I did not want her to retire and did not give her any assignment that should have caused her to retire. She was provided with ample opportunity to be trained in the rent report. It was because of her own failure that she did not receive training from Mr. Sanabria. He was willing to train her; she was not willing to receive it.

15. As to her assertion that Kimberly Bassett, the lead budget analyst had a training schedule, but she did not, is a completely false accusation. As the lead budget analyst, Ms. Bassett was responsible for leading the budget team. She came to work for me in April 2005. I set up a schedule for her to sit down and meet with each budget analyst so that they could explain their programs and responsibilities. This was not training; Ms. Bassett had been a budget analyst for twelve years, and did not need to be "trained."

16. On June 15, Ms. Sewell put in an unsealed envelope a doctor's note, indicating that she should be out for the next few weeks, and she had Ms. Keller place it under my door. Ms. Sewell had seen me several times that day, and never said that she was ill, nor that she needed to request extensive medical leave. I never approved the leave, as it was not requested properly, and Ms. Sewell left the office before receiving my approval. Shortly after I received her note, I instructed my secretary Bettye Keller to call Ms. Sewell and let her know that I was having difficulty approving the leave, based upon the information given to me, and I asked her to submit

additional information to me. Ms. Sewell told Ms. Keller to tell me that I could call her doctor's office to get the information that I needed; even though she knew that he would not release the information to me. I continued to ask that she provide the information to me, or call me to discuss. She chose to do neither. The only other communications that I received where from her union representative accusing me of breaching her privacy rights, and demanding that I call Ms. Sewell to receive her information, rather than her following leave procedures, or following the union contract which says: "It is the responsibility of the employee to keep supervisors advised regarding a continuing absence on sick leave." Ms. Sewell refused to do so; she was not incapacitated or unable to follow the appropriate procedures for requesting leave; nor did she request additional time to compile the documentation. Through her union representative, I informed Ms. Sewell that she would be on Leave Without Pay until I received either a call from her/and or the requested documentation. Again, she refused to do so and officially retired the next day. Again, I did not ask her to retire, I asked for documentation. Her retirement was her own decision.

I have read this statement, consisting of 11 pages, and it is true, complete, and correct to the best of my knowledge and belief.

_Charlene Dunn_
Signature

_1/15/06_
Date

Signed and sworn to before me on this _15th_ day of _January_, _2006_ at _5:52 pm_.

_Kimberly L Bassett_
Neutral witness, notary, or Investigator

*PRIVACY ACT NOTICE TO EEO COMPLAINT INTERVIEW WITNESSES (OTHER THAN COMPLAINANT)*
*FOR DISCRIMINATION COMPLAINT INVESTIGATION INTERVIEW*

### GENERAL

This information is provided pursuant to Public Law 93-579 (Privacy Act of 1974), December 31, 1974, for individuals supplying information for inclusion in a system of records.

### AUTHORITY

The authority to collect the information requested by affidavit, statement or other type of testimony is derived from one or more of the following:

Title 5, Code of Federal Regulations, Sections 5.2 and 5.3; Title 29, Code of Federal Regulations, Section 1613/1614; Title 5, United States Code, Sections 1303 and 1304; Title 42, United States Code, Section 2000e-16; and Executive Order 11478, as amended.

### PURPOSES AND USES

The information you supply will be used along with data developed to resolve or otherwise determine the merits of the equal employment opportunity (EEO) complaint of discrimination and/or reprisal. This information may be furnished to designated officers and employees of agencies and departments of the Federal Government in order to resolve or otherwise determine the merits of the EEO complaint of discrimination and/or reprisal. The information may also be disclosed to any agency of the Federal Government having a working relationship with regard to Equal Employment Opportunity Commission activities, or to others for uses as published in the Federal Register.

### EFFECTS OF NON-DISCLOSURE

Disclosure of the information sought is voluntary; however, failure to furnish the information will result in a direction by the head of the agency, or his/her designated representative, to produce or provide such information as is available. Failure to provide the information at that time may result in the initiation of disciplinary proceedings against you up to and including removal. Applicants in such cases may be refused employment.

Disclosure of information by present or prospective Government contractors is also voluntary, although failure to furnish the above requested information where the contract so provides may result in administrative sanctions, including disqualification to enter into a contract or termination of an existing contract.

_____        _Charlene Dunn_____
Signature of Interviewer                              Signature of Affiant

_1/15/06_____                  _200 Constitution Avenue, NW_
Date                                                            Place
                                                             _Washington, DC_

Page 11 of 11                    F4-11?11                          Initials CS