## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AUDREY L. SEWELL | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 06 CV 1534 (ESH) |
| | ) |
| ELAINE L. CHAO | ) |
| | ) |
| Defendant. | ) |
| _____ | ) |

### MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

COMES NOW, Audrey Sewell, by and through her undersigned counsel, and hereby respectfully submits this opposition to defendant's Motion for Summary Judgment.

### INTRODUCTION

Audrey L. Sewell filed suit against defendant, her employer for 33 years, for its willful and malicious discriminatory acts against her on the basis of her age and in retaliation for engaging in protected activity.  Ms. Sewell submits that defendant violated the Age Discrimination in Employment Act when it reassigned her to significantly different job duties and intentionally denied her training to perform those duties.  Additionally, Ms. Sewell submits that defendant created an impermissibly hostile and abusive environment because of her age and in retaliation under circumstances which raise an inference of unlawful employment discrimination.  In short, defendant's motion for summary judgment is baseless.

## FACTS

Audrey L. Sewell ("Ms. Sewell"), an African-American woman, was born in 1941 and grew up in Charles County, Maryland. Defendant's Exhibit 2, incorporated herein at 7-8; EEO Affidavit of Audrey Sewell at 1, incorporated herein as Plaintiff's Exhibit "A." After graduating from high school, Ms. Sewell migrated to Washington, D.C. and attended Johnson's Business School. She began her federal service in 1972 at the Department of Labor under the "old" civil service administration and took various courses offered by the Opportunity Industrial Center and the Department of Agriculture in information technology and accounting through the early 1980's. Ex. 2 at 8-10. For 30 years and up until about 2002, Ms. Sewell had consistently maintained positive professional relationships with her supervisors and work colleagues. Ex. 2 at 51-52.

By 1997, Ms. Sewell had begun working for the Division of Financial Management ("DFM"), Office of Administration and Planning ("OMAP"), and in 1999, Ms. Sewell was promoted to a GS-11 Financial Systems Specialist. Ex. 2 at 10-11.

Patricia Vastano, a Caucasian woman, began working at the Department of Labor in about 1997 as the Director of the Strategic Planning Division. Ex. 2 at 33. Almost immediately, Vastano's enmity toward Ms. Sewell surfaced. Vastano consistently spoke to Ms. Sewell in a condescending and belittling tone. Ex. 2 at 38. Once, Vastano told Ms. Sewell that "your kind shouldn't be in any position." Ms. Sewell recalled at the time:

> I certainly didn't ask her to elaborate because I figured it had gone far enough right there. That remark alone was enough for me because I figure I was human kind the same as she was and that was out of line." Ex. 2 at 43.

Ms. Sewell politely instructed Vastano to refrain from speaking to her. Ex. 2 at 37, 43. Eventually, Ms. Sewell complained to her then supervisor, Cecily Rayburn, and Vastano was

counseled and instructed by Rayburn to only communicate with Ms. Sewell through her. Ex. 2 at 36-38.  When Rayburn left DFM and was replaced by Gary Thayer, Vastano's harassment continued.  According to Ms. Sewell, Vastano would make comments such as "you're nothing" and other insults. Ex. 2 at 41.  Once again, Ms. Sewell complained to her supervisor, Thayer, and the harassment ceased. Ex. 2 at 41.

In early 2000, Anne Baird-Bridges, an African-American woman in her 50s, came aboard DOL as OMAP's director under the Government's Senior Executive Services program. Ex. 2 at 48-49; Deposition Transcript of Anne Baird-Bridges at 19-20, incorporated herein as Plaintiff's Exhibit "B."  Soon, Vastano became Baird-Bridges's deputy director for OMAP, as well as the acting director for DFM in Thayer's place. Ex. 2 at 39-40, 48-50.  Vastano became Ms, Sewell's direct supervisor. Ex. 2 at 39; EEO Affidavit of Anne Baird-Bridges at p. 1, incorporated herein as Plaintiff's Exhibit "C."  Within days, the prior comments and insults toward Ms. Sewell by Vastano began to rear their heads. Ex. 2 at 41-42.  On just one of many occasions, Vastano observed Ms. Sewell having trouble walking because of her arthritis.  Vastano "came down the hall … and said oh, you're having trouble walking today?  Why don't you just retire?" Ex. 2 at 44.

Prior to Thayer's leaving DFM, he had fully prepared Ms. Sewell's performance rating for the prior rating period ending April 30, 2002. Ex. 2 at 50.  Baird-Bridges had issued a directive that OMAP employees were required to have their appraisals completed by June 15 in order to be considered for a bonus. Ex. 2 at 50.  Ms. Sewell had heard nothing about her appraisal and began to inquire during the first week of June.  Ms. Sewell was told that Vastano was "doing [Ms. Sewell's] appraisal," although she had never supervised her or discussed her duties.  Further, Ms. Sewell knew that Thayer had completed her appraisal before he had left. Ex.

2 at 50.  On June 5, 2002, Ms. Sewell sent Vastano and Baird-Bridges and email expressing

concern that Vastano was improperly and without any basis revising the appraisal completed by

Gary Thayer. Email from Audrey Sewell to Anne Baird-Bridges and Pat Vastano, dated June 5,

2002, incorporated herein as Plaintiff's Exhibit "D."  In that email, Ms. Sewell protested:

> If this is a Age Discrimination tactic, to pressure me into retiring, it is not going to
> work. . . . I have never had to file a grievance or a discrimination complaint, but, I
> will if I have to."  Ex. D.

Indeed, Ms. Sewell had no plans to retire until 2007. Ex. 2 at 45-46.

On another occasion, Vastano refused to timely approve a vacation leave slip submitted

by Ms. Sewell, causing her to eventually cancel her travel plans.  When Vastano finally came to

Ms. Sewell's desk to return the approved leave slip, she once again offered her opinion that it

was time for Ms. Sewell to retire.  This time, Vastano's comment was made in front of their

supervisor, Baird-Bridges. Ex. 2 at 57, 60-61.

In 2003, Yoko Albarak was hired as director of DFM, replacing Vastano in her acting

capacity. Ex. 2 at 39-40, 51.  Although Vastano continued her snide hallway remarks such as

"are you still, you haven't retired yet," Ms. Sewell resolved to ignore her.  Ex. 2 at 42.  By

January 2004, Janet Hogler had become the director of DFM.  Hogler left six months later. Ex. 2

at 42-43, 51, 60.[1]

After hiring three DFM directors in two years, Baird-Bridges decided to take over as

acting director of DFM and for the first time became Ms. Sewell's direct supervisor. Ex. 2 at 84;

Ex. B at 24-25, 35, 81-82.  According to Baird-Bridges, Ms. Sewell had had good ratings from

her former supervisors, and there were no concerns about her work performance. Ex. B at 27.

In August 2004, Baird-Bridges had a confrontation with a subordinate, Charlotte Jenkins,

in which she was accused of physically attacking and yelling at Jenkins. Ex. 2 at 88-89; Ex. B at 36-40.[2] Ms. Sewell was two rows over when the confrontation occurred and "heard the whole thing." Ex. 2 at 88-89. Ms. Sewell got so upset that she left the office, and was physically intimidated by Baird-Bridges ever since. Ex. 2 at 83, 85, 88-89, 92-93, 108, 131.

Meanwhile, the comments and insults by Vastano continued, and in November 2004, Ms. Sewell again complained to Baird-Bridges about Vastano's "degrading" treatment of her. Ex. 2 at 57-60, 97, 133. Ms. Sewell received absolutely no response from Baird-Bridges. Ex. 2 at 57, 60, 97, 133.

On December 17, 2004, Vastano, while acting as OMAP director during a brief absence by Baird-Bridge, issued a letter of reprimand against Ms. Sewell citing her for "insubordination" for a series of emails between the two of them in which Ms. Sewell accused Vastano of engaging in a pattern of harassment. Letter of Reprimand, dated December 17, 2004, incorporated herein as Plaintiff's Exhibit "E." In one of the emails sent by Ms. Sewell to Vastano which formed the basis of the reprimand, Ms. Sewell stated:

> I never in all my days have met any one who bends the truth the way that you does [sic]. I don't know what this is about no, but, I feel it is harassment; for what reason, I don't know. While you use to harass me some time back, I don't know why you have started up again! If you continue these variable attacks, I am filing a compliant [sic]. What you don't understand or don't want to understand is, Afro American's have a brain also.

Email from Audrey Sewell to Pat Vastano, dated December 7, 2004, incorporated herein as Plaintiff's Exhibit "F." In her written reprimand, Vastano specifically complained about Ms. Sewell's accusing Vastano of "lying, harassment and racism." Finding that Ms. Sewell words were "insubordination," Vastano concluded that:

---

[1] Janet Hogler left OMAP after only 6 months complaining about the work environment generally and Vastano specifically. Ex. B at 34-35.

> Failure to correct such inappropriate behavior and instances of repeated outbursts
> will result in disciplinary action up to and including dismissal."

Ex. E at 2. For good measure, Vastano repeated the warning of termination in the next paragraph

of the reprimand letter;

> This reprimand not only outlines the intolerable behavior, but also serves as a
> warning to you that any repeat of similar outbursts and insubordination will result
> in disciplinary action up to and including removal.

Ex. E at 2; Ex. 2 at 41.

Ms. Sewell, having never received any reprimands or warnings in her 32 years of federal

service, protested the adverse action, and on December 17, 2004, filed a union grievance against

Vastano. Ex. 2 at 41; Ex. B at 45; Ex. C at 2. In that grievance, Ms. Sewell alleged that she had

been the victim of illegal age discrimination. Ex. 2 at 41. DOL/Local 12 Standard Grievance

Form, dated December 17, 2004, incorporated herein as Plaintiff's Exhibit "G." Specifically,

Ms. Sewell complained that the reprimand letter was "blatantly discriminatory and part of a

pattern of harassment toward [Ms. Sewell]." Ex. G. Anne Baird-Bridges, of course, was the

reviewing official for the grievance. Ex. B at 57.

On December 20, 2004, Ms. Sewell filed a grievance against Baird-Bridges, as well. Ex.

2 at 57. By that complaint, Ms. Sewell alleged that Baird-Bridges had "fostered a hostile work

environment against [Ms. Sewell] and" discriminated against [Ms. Sewell] on the basis of her

age. DOL/Local 12 Standard Grievance Form, dated December 20, 2004, incorporated herein as

Plaintiff's Exhibit "H."

Although Ms. Sewell's complaint about Vastano had been documented in the supporting

materials to the grievance and the emails which were the subject of the letter of reprimand,

Baird-Bridges claimed that the first time she had ever heard about complaints about Vastano by

---

[2] Jenkins filed an EEO claim against Baird-Bridges for the incident. Ex. B 73-74.

Sewell was during a grievance meeting in January 2005 with Ms. Sewell, Vastano, and Local 12 of the American Federation of Government Employees union representative Linda Copening. According to Baird-Bridges, after the meeting she asked Vastano if she knew what Ms. Sewell had been talking about.  Vastano, according to Baird-Bridges, said she did not know. Ex. B at 29, 36, 57-59, 61, 63.  That was the extent of Baird-Bridges's efforts to investigate and remedy Ms. Sewell's claims of workplace harassment.

In January 2005, Charlene Dunn was hired as OMAP's Director of Budget Formulation and Implementation ("Budget"). Baird-Bridges, however, remained acting director of DFM. Ex. B at 91-92.

On March 9, 2005, a second step-2 grievance hearing was held by Baird-Bridges with Ms. Sewell and Copening, the union representative.  Pat Vastano was not present.  Once again, Ms. Sewell reiterated her claims of discrimination by Vastano. Ex. A at 4; Ex. C at 2.  The next day, Baird-Bridges sent Ms. Sewell an email stating that she was drafting Ms. Sewell's fiscal year 2004-2005 performance standards.  Although the fiscal year was almost half over, Baird-Bridges claimed that she wanted to bring Ms. Sewell "up to date" on her specific job responsibilities and to ensure that her standards were accurate. Ex. A at 4.  Sewell asked for the presence of union representation at the meeting Baird-Bridges's had set up for March 14, 2005. Ex. A at 4-5.[3]

On March 14, 2005, Baird-Bridges held a meeting with Ms. Sewell and, once again, Copening.  There, instead of discussing her current duties, Baird-Bridges assigned Ms. Sewell two new responsibilities, the Detail Fund Report and the Space Rent Report. Ex. 2 at 62, 80-81; Ex. A at 4-5.  At the meeting, Baird-Bridges also informed Ms. Sewell that she would be getting

---

[3] Meanwhile, no action had been taken on Ms. Sewell's grievance against Baird-Bridges.

new or different performance standards. Ex. B at 77-78.  Baird-Bridges did not mention or intimate that an organizational restructuring was being contemplated.

Unbeknownst to Baird-Bridges, Ms. Sewell already knew how to do the detail fund report, having learned and assisted in its preparation prior to Baird-Bridges's arrival at DOL. Ex. 2 at 64-67, 72.  On the day of the meeting, or soon thereafter, Ms. Sewell went over the detail fund report with George Baily, the contractor who had been previously engaged to complete the report. Ex. 2 at 63-66; Ex. A at 6.  Although the work was tedious, Ms. Sewell did not mind and enjoyed preparing the report. Ex. 2 at 68.  Indeed, Baird-Bridges admitted that Ms. Sewell had no problem completing the assignment. Ex. B at 85.  According to Ms. Sewell, once Baird-Bridges realized that Ms. Sewell could complete the report without any difficulties, however, Baird-Bridges made the task more tedious by insisting that Ms. Sewell manually type every account entry, a task that the contractor did not do. Ex. 2 at 71, 72; Ex. A at 5; Email from Anne Baird-Bridges to Audrey Sewell, dated March 30, 2005, incorporated herein as Plaintiff's Exhibit "I."

> The Detail Fund Report, once I had to start typing it, you know, I was stretched.  I was stretched.  I stayed on top of it. . . . [But] it was getting to be too much for me, you know, because she would stretch it.  And she was mad because I could do the Detailed Fund Report. . . . [T]hen that's when she took it to another level. They had to come up with things I could not do. Ex. 2 at 125.

The space rent report was another matter.  From about 1997 to 2000, Ms. Sewell had assisted in compiling information for inclusion on the report until the system for compiling the information became automated, and Ms. Sewell stopped working on it as a result. Ex. 2 at 74-77; Ex. A at 5; Email from Audrey Sewell to Charlene Dunn, dated June 8, 2005).  During the March 14 meeting, Ms. Sewell specifically told Baird-Bridges that she did not know what the report was or how to do the report.  Ex. 2 at 74, 81, 125-126.  Baird–Bridges told Ms. Sewell that Vicente

Sanabria, a GS-13 budget analyst who had been preparing the reports, would train her. Ex. 2 at 72, 81; Ex. A at 5. Indeed, according to Larry Jarl, the Director of the Accounting Division ("Accounting") the space rent:

> report itself was not straight forward and required whoever did it to make changes at the accounting code level. Once someone learned to do the space rent report it was not complicated. However, to someone who had never done the report before, it would have looked complicated. EEO Affidavit of Larry Jarl at 1, incorporated herein as Plaintiff's Exhibit "J."

According to Ms. Sewell, however, she "gave them the out" to set her up for failure when she admitted that she did not how to do the space rent report:

> I was sitting there blind like a fool hoping they going to act right, and said, you know, I don't know how to do the Space Rent Report. . . . Oh my God, I gave them the key to the Kingdom. Then I had to tell them. They had to stop guessing because they had to get me on performance which was the only way to bring me down. . . . they had to get me on performance so they had to give me things that they knew I couldn't do. . . . What can't she do? Can't do budget formulation? Fine, give it [to her] – that's the way it worked. Ex. 2 at 125-126.

Immediately after the meeting on March 14, 2005, Ms. Sewell approached Sanabria about the new assignment and training. Ex. 2 at 73, 78-79; Ex. A at 5. Although the space rent report was one of Sanabria's main job functions [Ex. 2 at 79; Ex. J at 1; EEO Affidavit of Vicente Sanabria at 1, incorporated herein as Plaintiff's Exhibit "K"], he had not been told about the reassignment. "That's my job," a perplexed Sanabria told Ms. Sewell. Ex. 2 at 79, 82; Ex. A at 5-6. Ms. Sewell assumed then that her supervisor, Baird-Bridges, and Sanabria's, Charlene Dunn, would coordinate a training schedule. Ex. 2 at 79-82.

On or about March 16, 2005, Baird-Bridges issued a step 2 ruling upholding the December Letter of Reprimand. Step 2 Decision, incorporated herein as Plaintiff's Exhibit "L." Baird-Bridges acknowledged that Ms. Sewell's complaint alleged discrimination and harassment toward her, but found that Ms. Sewell had "failed to demonstrate discrimination or harassment."

Ex. L at 2.  Further, Baird-Bridges denied Ms. Sewell's request that any contact with Vastano be "eliminated" and ordered that no change in the "organizational structure to eliminate the grievant from having contact with the existing chain of command." Ex. B at 66-67, 72; Ex. L at 2.

Meanwhile, by the week of April 4, 2005, no supervisor had spoken to Sanabria about the reassignment or training for Ms. Sewell.[4]  "I don't understand what's going on.  That's my job," complained Sanabria. Ex. 2 at 82-83, 87.

On April 7, 2005, Local 12 invoked arbitration on Ms. Sewell's reprimand grievance. Letter from Alex Bastani to Sandy Keppley, dated April 7, 2005, incorporated herein as Plaintiff's Ex. "M."  On April 8, 2005, Baird-Bridges approached Ms. Sewell complaining about her supposed failure to send a "return receipt" email regarding an upcoming meeting to discuss the detail fund report:

> So I didn't know what she was talking about.  There was no pop-up on the machine, and even after all of this was over, she was standing there screaming and hollering, talking about you shut up and listen to me, Missy.  She called me Missy. Ex. 2 at 93-94, 98-99.

At one point during the altercation, Ms. Sewell believed that Baird-Bridges was going to slap her in the face. Ex. 2 at 98-99; Ex. B at 51, 67-68; Ex. C at 2.

For her part, during her deposition testimony, Baird-Bridges denied yelling at Ms. Sewell, and protested that any person who said that she had was lying. Ex. 2 at 90-91; Email from Audrey Sewell to Anne Baird-Bridges, dated April 8, 2005, incorporated herein as Plaintiff's Exhibit "N"; Letters, incorporated herein as Plaintiff's Exhibit "O."

On late Friday afternoon, April 15, 2005, Ms. Sewell met with Lillian Winstead, EEO

---

[4] In the meantime, Dunn had hired Kimberly Bassett on March 31, 2005, a 30 year old woman, to be the senior budget analyst in Budget. Ex. 2 at 85-86.  Dunn circulated an email outlining a month of training to be provided to Bassett.   Much of the training was to be conducted by

Coordinator of Counselors in the Civil Rights Center about the incident between her and Baird-Bridges. The meeting lasted until about 3:00 that afternoon. Ex. 2 at 15; Ex. A at 2; EEO Counselor's Report at 1, incorporated herein as Plaintiff's Exhibit "Q." The director of the Civil Rights Center at that time was Annabelle Lockhart, a very good personal friend and fellow book club member of Baird-Bridges's. Ex. B at 100.

From that Friday to Sunday, Baird-Bridges was a busy supervisor. At some point that weekend, OMAP management surreptiously copied from Sanabria's computer hard drive his space rent report information and placed it on Bassett's computer. Ex. A at 11-12; Ex. K at EEO Affidavit of Audrey Sewell, Sanabria v. Chao, at 8, incorporated herein as Plaintiff's Exhibit "R." No such information, which would have assisted Ms. Sewell in completing the space rent report, was given to Ms. Sewell. On Sunday, April 17, 2005, Baird-Bridges disseminated an email from her home computer scheduling a Monday morning meeting with Ms. Sewell, Sanabria, Dunn and DFM clerk Bettye Keller. Ex. 2 at 96-97. Email from Ann Baird-Bridges, dated April 17, 2005, incorporated herein as Plaintiff's Exhibit "S." Copening, the employees' union representative was sent a copy of the email. Ex. 2 at 99; Ex. S. Baird-Bridges even telephoned Copening at home that Sunday and left a voice mail message about the upcoming meeting. Ex. A at 3; Ex. B at 128.

On Monday, April 18, 2005, Ms. Sewell arrived at work as usual and reviewed Baird-Bridges's email about the 10:00 a.m. meeting. Ex. 2 at 99. Prior to going into the meeting, however, Ms. Sewell filed her written informal complaint of discrimination against Baird-Bridges for the April 8th incident. By that Complaint, Ms. Sewell indicated that she previously filed an age discrimination complaint with her union. Informal Complaint of Discrimination,

---

Sanabria. Ex. 2 at 87; Ex. A at 7; Email from Charlene Dunn, dated April 4, 2005, incorporated

dated April 18, 2005, incorporated herein as Plaintiff's Exhibit "T."

At the meeting, Keller, Vastano (then Dunn's supervisor [Ex. 2 at 135-136]), Dunn, Sanabria, Baird-Bridges and Ms. Sewell were present. Ex. 2 at 99.  Larry Jarl was not.  Ms. Sewell, Sanabria and Keller each requested union representation.  Despite her efforts to ensure that Copening had been informed, even calling her at home, Baird-Bridges pronounced that the presence of union representation was unnecessary since "it was not an 'adverse action'" and refused their requests. Ex. B at 101.

Baird-Bridges then handed Ms. Sewell, Keller and Sanabria a memo.  Keller and Ms. Sewell were to be transferred to Budget under Dunn while Sanabria would be transferred to accounting under Larry Jarl. Ex. 2 at 100, 101, 107.  In her memo, Baird-Bridges specifically wrote that the "reassignments [were] not adverse actions since they are at the same grade level." Meeting Notes, incorporated herein as Plaintiff's Exhibit "V."  Baird-Bridges further stated that there would be "no change in position description except location." Ex. A at 3; Ex. V; Memo from Anne Baird-Bridges to Audrey Sewell, dated April 18, 2005, incorporated herein as Plaintiff's Exhibit "W."  Finally, though Baird-Bridges had insisted on meeting on an expedited basis, the transfers were to become effective May 1, 2005, almost two weeks later. Ex. B at 96. Each of the employees protested the transfers and again requested union representation. Ex. B at 101-102; EEO Affidavit of Charlene Dunn at 3, incorporated herein as Plaintiff's Exhibit "X." Baird-Bridges also discussed transfer of space rent assignment to Ms. Sewell. Ex. K at 1. Further, Dunn recalled that Ms. Sewell brought up previous "discrimination grievances" she had filed. Ex. X at 1.

Still, no one approached Ms. Sewell about space rent training during the week of April

herein as Plaintiff's Exhibit "P."

18th. Ex. 2 at 106.  By the end of the next week, April 25th, Ms. Sewell had received no direction from Baird-Bridges, who continued to be her supervisor, or Dunn, and management had still not clarified with Sanabria about the transfer of his space rent duties. Ex. 2 at 107-108.

On May 3, 2005, Baird-Bridges was interviewed by EEO Counselor Jose Figueroa and told the counselor that the April 8th incident "did not happen," but claimed that Ms. Sewell had an "attitude" problem. Ex. Q at 3.

On May 4, 2005, Ms. Sewell had her first meeting with Dunn as her direct report. Ex. at 2 at 108-109.  Dunn had requested that Ms. Sewell bring with her a list of her current duties and told her that she would be giving performance standards. Ex. A at 6. When Ms. Sewell arrived, Dunn telephoned Baird-Bridges who came into the meeting. Ex. A at 6.  Baird-Bridges clarified her previous April 18th memo, stating that Ms. Sewell's duties would "remain the same in line with our current positions descriptions." Baird-Bridges then left the meeting. Ex. A at 6; Email from Audrey Sewell to Charlene Dunn, June 8, 2005, at 2, incorporated herein as Plaintiff's Exhibit "Y."[5]  Without discussing the list of her current duties, Dunn handed Ms. Sewell her performance standards.  The sole specific item on the standard was the space rent report.  The remainder of the standards, according to Sewell, was unspecific and vague. Ex. A at 6-7; Memorandum to Charlene Dunn from Audrey Sewell, incorporated herein as Plaintiff's Exhibit "GG."  Ms. Sewell once again informed Dunn that she had not been trained in completing the report, and Dunn instructed Ms. Sewell to "tell [Sanabria] to stop what he was doing and train [Ms. Sewell]," although Dunn was no longer Sanabria's supervisor. Ex. 2 at 109; Ex. A at 7.

Ms. Sewell went immediately to Sanabria about scheduling training sessions. Ex. 2 at 109-113; Ex. A at 7.  Sanabria informed Ms. Sewell that he was extremely busy due to his

---

[5] There had been no changes in Ms. Sewell's Position Description since 1999. Ex. Y at 2.

transfer, his own training of his new duties and training Bassett. Ex. 2 at 109, 111, 113, 117-118; Ex. A at 7; Ex. K at 1-2.  Ms. Sewell nonetheless asked Sanabria to make time for her training. Ex. 2 at 109.  During this period, Ms. Sewell approached Sanabria in person repeatedly to get on his schedule and sent numerous emails "begging" Sanabria for training time. Ex. 2 at 110-111, 113.  Ms. Sewell told Sanabria that it was an urgent matter since the task was now in her "standards" for which she would be rated. Ex. 2 at 116.  Sanabria continuously needed to change training time that had been scheduled between them because of his schedule. Ex. 2 at 111, 114; Ex. K at 2.  Indeed, Sanabria's schedule was so packed that he agreed to give a pestering Ms. Sewell a five minute overview while he was in the middle of a training session with another employee. Ex. 2 at 114-115; Ex. A at 7; Ex. K at 2.

Still, according to Jarl, "Sanabria was a GS-13 and had done the report for a number of years." Ex. J at 2.  Ms. Sewell, by contrast, "had never done it and was not at the same grade level or in a professional series.  It was clear that it would take [Ms. Sewell] time to master the new task." Ex. J at 2; Ex. K at 2; Ex. Y at 2.[6]

On May 9, 2005, Dunn gave Ms. Sewell a new assignment, formulating the Agency Object Class Request Budget Exhibit for the congressional budget.  Ms. Sewell had never worked on budget formulation nor had had any training. Ex. A at 8-9; Ex. X at 6; Ex. Y at 2; Email from Audrey Sewell to Linda Copening, dated May 2, 2005, incorporated herein as Plaintiff's Exhibit "Z."  In lieu of training, Dunn gave Ms. Sewell a four inch thick briefing book and told her to "figure out" how to prepare the exhibit.  Ms. Sewell inquired whether it would be more beneficial for her to take a budget formulation course in order to do the work.  Dunn "agreed but told me that we didn't have time for me to take a course." Ex. A at 9.   Without any

---

[6] According to Larry Jarl, Sewell was always willing to take on new tasks. Ex. J at 2.

direction or training, Ms. Sewell could not "figure out" how to prepare the exhibit and confided in a colleague, Elaine Stone, that "she did not know what to do with it."  Stone, a GS-13 budget analyst, told Ms. Sewell that she knew Ms. Sewell would have difficulty with it, "and that everyone was surprised when they saw that [Dunn] had assigned it to me because I had never done it before." Affidavit at 9.

By May 13, 2005, Jose Figueroa, the EEO Counselor, had completed his summary report. Ex. Q.

On May 17, 2005, Sanabria emailed Ms. Sewell and requested that her supervisor coordinate training with his supervisor. Ex. 2 at 111-112, 118; Ex. A at 8; Email from Vicente Sanabria to Audrey Sewell, dated May 17, 2005, incorporated herein as Plaintiff's Exhibit "AA." Ms. Sewell immediately forwarded his request by email to Dunn. Ex. 2 at 116-118; Ex. A at 8; Ex. AA.  Although Ms. Sewell agreed that the situation needed resolution by both supervisors (Ex. 2 at 117), Ms. Sewell received absolutely no response from Dunn. Ex. 2 at 118, 121; Ex. A at 8.

On May 23, 2005, Ms. Sewell filed a Formal Complaint of Discrimination protesting the incident on April 8, 2005. Ex. 2 at 95-97; Formal Complaint of Discrimination, incorporated herein as Plaintiff's Exhibit "BB."  In her attachment to her complaint, Ms. Sewell alleged that the April 8th incident "was just one of the cumulating of intimidating and harassing tactics of Ms. Anne Baird-Bridges, used and supported over the course of the last two years in her effort to force me to retire for Federal Service." Ex. BB.  At the end of her attachment, Ms. Sewell noted that another co-worker's "pop-up" email did not work properly either, and Baird-Bridges had not spoken to that employee in the manner in which she had spoken to Ms. Sewell.  Finally, Ms. Sewell noted that she was the "oldest member of the Division of Financial Management."

On June 1, 2005, Winstead forwarded to Naomi Barry-Perez, Office of Enforcement for Civil Rights Center, the two union grievances Ms. Sewell had previously filed. Handwritten Note from Lillian Winstead to Naomi Barry-Perez, dated June 1, 2005, incorporated herein as Plaintiff's Exhibit "CC."

In June 2, 2005, Barry-Perez sent Ms. Sewell a confirmation of receipt of her formal EEO complaint. Letter from Naomi Barry-Perez to Audrey Sewell, dated June 2, 2005, incorporated herein as Plaintiff's Exhibit "DD." By that letter, Ms. Sewell was advised that the "Director of the Civil Rights Center" would make a determination whether to amend a previous complaint, and the CRC would determine whether the "complaint should be accepted for processing." Ex. DD at 1.

On June 6th, Ms. Sewell and Sanabria resolved to meet on June 10th for training. Ex. 2 at 118-120. On June 7, 2005, Ms. Sewell received a call at home from Dunn on her "flex" day. Ex. 2 at 119-121; Ex. A at 9-10. For some inexplicable reason, Kimberly Bassett was listening via the speaker phone. Ex. Y. Dunn asked Ms. Sewell about the status of the space rent report. Ex. 2 at 120-121; Ex. A at 10. Ms. Sewell reminded Dunn that she had not been trained and that Dunn had not responded to Sanabria's May 16th email regarding her coordination of the training with his supervisor. Ex. A at 10. Ms. Sewell further told Dunn that she and Sanabria had resolved to hold the training on June 10th. Ex. 2 at 121-122. Ms. Sewell further protested that it was inappropriate to hold her accountable for the space rent report when she had not been properly trained. Ex. 2 at 122. Finally, Ms. Sewell confided to Dunn that she was planning to retire on September 3, 2005, instead of waiting until 2007. Ex. 2 at 122; Ex. A at 10. Ms. Sewell told Dunn that she had decided to retire early:

> because of her assignment to me of the budget table which I did not know how to do and for which she did not provide me any training. I pointed out that the space

rent report was another assignment that I did not know how to do and that I had
not been provided training on. Ex. A at 10; Ex. Y.

Dunn thanked Ms. Sewell for her candor and responded that there would be no need to train Ms.

Sewell if she was leaving within three months. Ex. 2 at 122; Ex. A at 10.

The following day, Wednesday, June 8th, Ms. Sewell returned to work and opened an

email from Dunn. Ex. 2 at 122-123. Dunn directed Ms. Sewell to meet with Jarl, Bassett, and

Sanabria on June 10th, the day Ms. Sewell had told Dunn that she and Sanabria had previously

planned to complete her training. Ex. 2 at 122-123. At 10:30 that Friday morning, Ms. Sewell

went into the conference room where the meeting was to be held and saw no one. In the

hallway, Ms. Sewell saw Jarl leaving Baird-Bridges's office and asked him if the meeting was

still being held. Ex. 2 at 123-124. Jarl asked Ms. Sewell into his office and told Ms. Sewell,

"Try to understand what kind of position I am in here." Ex. 2 at 124. Ms. Sewell said she

understood. Ms. Sewell also confided in Jarl that she had planned to retire in September. Ex. 2 at

124; Ex. A at 11. Jarl agreed that her training would be a waste of time, and they both went next

door into the meeting. Ex. 2 at 124-125. In the meeting it was agreed that Sanabria would

complete the May space rent report with Bassett and Ms. Sewell watching and observing on June

15, 2005. Ex. A at 12. Immediately after the meeting, Ms. Sewell observed Jarl return to Baird-

Bridges's office. Ex. A at 12.

By the time Ms. Sewell returned to her desk following the meeting, she had in her in-box

an email from Dunn. Ex. A at 12-13. In that email, Dunn suddenly admonished Ms. Sewell for

"refusing to do assignments." "I expect that you will continue to perform your duties as

assigned, until you are no longer employed by the Employment Standards Administration. As

such, I am giving you a deadline of June 15, to complete the May Space Rent report. . . . Failure

to complete this assignment will be interpreted as insubordination, and may result in further

action." Ex. 2 at 137-139; Ex. A at 12-13; Ex. X at 5; Email from Charlene Dunn to Audrey Sewell, dated June 10, 2005, incorporated herein as Plaintiff's Exhibit "EE."

Recalling the letter of reprimand from Vastano six months earlier, Ms. Sewell thought the tone and phrasing of Dunn's email was eerily familiar. Ex. 2 at 139. Indeed, Ms. Sewell firmly believed that Vastano, not Dunn, had written the email:

> I don't believe but one of them was wrote by her. I believe they were done in a Word document by Pat Vastano. It sound like her to me. I'm familiar with her writing. Ex .2 at 138.

Ms. Sewell took Dunn's threat seriously, and in response asked Sanabria to conduct an emergency training in order to meet the June 15th deadline. Ex. A at 13-14. Sanabria agreed to train Ms. Sewell on Monday, June 13th and promised to work with her to get the report completed by the 15th. Ex. A at 14; Ex. K at 2.

On Monday, June 13th, Ms. Sewell arrived for work at 8:25 a.m. for the 9:00 a.m. training with Sanabria. Ex. 2 at 144; Ex. A at 14. Ms. Sewell saw Dunn early that morning. Dunn said good morning, and nothing else. Ex. 2 at 144. When Ms. Sewell got to her desk, she opened an email from Dunn sent after the work week had ended at on Friday, June 10th canceling the training until June 15th, the day of Dunn's imposed deadline. Notwithstanding Dunn's clear directive that Bassett was not to prepare the report, Dunn canceled the training because Bassett was purportedly unable to attend. Ex. 2 at 144; Ex. A at 14; Ex. X at 6.

Smelling a "set up" Ms. Sewell, a 63 year old veteran of service to the United States, sat at her desk and became physically ill. Ex. A at 15. According to Ms. Sewell:

> The conditions was hell if there ever was hell on earth because in all of my years I had never encountered a situation that I could not have emotionally handled because if things get too bad, you normally just back off. She they put – illegal letter of reprimand that Pat Vastano had issued back there in December. I did an outstanding job. She was the one—and Baird-Bridges supported her. . . . And then Charlene sending those e-mails, talking about if I didn't have the Space Rent

> by that Wednesday, although she know I was in capital training from that Monday for me to get the Space Rent -- . . . . She told me that the same day as the training because – a blind man could see the setup.  I couldn't possibly get it done.  No, it wasn't meant for me to get the Space Rent [done]. Ex. 2 at 136-138.

Moreover:

> After reading that e-mail on the morning of June 13, I felt that I had no where to turn.  I went to Personnel and told them I would retire at the end of the pay period.  I felt very sick and had to be helped home.  I was sick the next day, Tuesday, June 14. Ex. A at 15-16; Ex. 2 at 144.

Ms. Sewell then left the Agency headquarters on Constitution Avenue and went to see her doctor. Ex. 2 at 141-144; Ex. A at 16.

On June 15, 2005, Linda Copening received a telephone call at home from Baird-Bridges concerning Ms. Sewell's medical certificate and request for leave. Declaration of Audrey Sewell, incorporated herein as Plaintiff's Exhibit "U."  Copening returned Baird-Bridges's call after conferring with Ms. Sewell.  Copening informed Baird-Bridges that Ms. Sewell was retiring immediately.  According to Copening, Baird-Bridges then told Copening that she would approve the sick leave.  Baird-Bridges also relayed a message to Ms. Sewell that she would withdraw the letter of reprimand if Ms. Sewell withdrew her EEO complaint against Baird-Bridges. Ex. U.

On June 23, 2005, Ms. Sewell called Sanabria to thank him for his assistance.  Sanabria told Ms. Sewell that he prepared the space rent report without Bassett. Ex. A at 19.  Ms. Sewell officially retired on June 25, 2005.  When Ms. Sewell returned to clean out her desk on July 6, 2005, Ms. Sewell spoke to Jarl at length about her on-going work projects and submitted a transmitting memo to Jarl since they consisted of primarily accounting related work. Ex. A at 18-19.

On August 1, 2005, Baird-Bridges's close personal friend. Lockhart, sent Ms. Sewell a letter via federal express. Letter from Annabelle Lockhart to Audrey Sewell, dated August 1,

2005, incorporated herein as Plaintiff's Exhibit "FF."  By that letter, Ms. Sewell was advised that the CRC had transferred her EEO complaint to the Chairperson of the Department of Labor's Administrative Review Board (ARB) due to a "potential conflict of interest."

In August 2005, Charlene Dunn was promoted to Director of DFM. Ex. B at 25.  To date, nothing has happened to Ms. Sewell's December 2004 grievance against Baird-Bridges. Ex. A at 2.  In September 2005, Sanabria left the DOL for a position at another federal agency.[7] Ex. K at 1.

---

[7] Vicente Sanabria filed an EEO complaint against Baird-Bridges in 2005 for race discrimination and failure to promote him to the GS-14 position filled by Kimberly Bassett. Ex. B at 73-74.  At some point, Bettye Keller filed a union grievance against Dunn protesting her performance appraisal. Ex. B at 74.

## ARGUMENT

### I.    Summary Judgment Standards.

Rule 56 of the Federal Rules of Civil Procedure allows a trial court to render summary judgment for a moving party only where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." Fed. R. Civ. P. 56(c); Aka v. Washington Hosp. Ctr., 156 F.3d 1284, 1288 (D.C. Cir. 1998). In its initial review of the evidence submitted in support and opposition to summary judgment, the trial court may not make credibility determinations or weigh the evidence, which are jury functions, not those of the judge. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254-255 (1982). Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe. Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 151 (2000).

It is equally well-settled that the moving party bears the burden of showing that there is no genuine issue of material fact or that the opposing party has failed to make a showing sufficient to establish the existence of an element essential to that party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  In short, summary judgment is appropriate only when there are no triable issues of fact, and if the opposing papers reveal even one issue of disputed material fact, summary judgment must be denied.  And, when, as here, the validity of a complaint turns on questions of defendant's motive and intent, the Court must be especially cautious in granting summary judgment. Lipsett v. U. of Puerto Rico, 864 F.2d 881, 895 (1st Cir. 1988); Lewis v. AT&T Technologies, Inc., 691 F. Supp. 915, 918 (D. Md. 1988)(citing Morrison v. Nissan Co., Ltd., 601 F.2d 139, 141 (4th Cir. 1979)). Summary judgment, to be sure, is an

extreme remedy and should be invoked with "special caution," particularly in, as here, discrimination cases. Richards v. Nat'l Rifle Assoc., 871 F. Supp. 499, 501 (D.C. Cir. 1994).

Rule 56 of the Federal Rules of Civil Procedure allows the Court to render summary judgment for a moving party only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." Fed. R. Civ. P. 56(c); Barwick v. Celotex Corp., 736 F.2d 946, 958 (4th Cir. 1984). Summary judgment is an extreme remedy and should be invoked with "special caution," particularly in, as here, discrimination cases. Richards v. Nat'l Rifle Assoc., 871 F. Supp. 499, 501 (D.C. Cir. 1994). And, of course, in reviewing a motion for summary judgment, the Court must be extra-careful to view all the evidence in the light most favorable to the non-moving party, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986), according the non-moving party the benefit of all reasonable inferences.

Here, the evidence submitted by defendant does not remotely meet its initial burden of showing the absence of a genuine issue concerning any material fact. Ms. Sewell identifies numerous issues of fact that when viewed in the light most favorable to her will not allow the Court to enter summary judgment, much less summary judgment in defendant's favor. That these disputed facts, as outlined above, are material to the essence of Ms. Sewell's claims and defendant's defenses can hardly itself be disputed as they relate directly to matters of credibility and the ultimate issues in the case. In sum, to the extent defendant contends that there are no disputed facts in this matter and that they should prevail as a matter of law, its arguments are without any merit.

## II.    **Summary Judgment Is Inappropriate On Ms. Sewell's Claims of Intentional Discrimination under the Age Discrimination in Employment Act.**

By her Complaint, Ms. Sewell alleged that defendant violated the Age Discrimination in Employment Act, without basis or justification, when it transferred her and assigned her substantially different job duties, created and allowed the continuation of a hostile and abusive environment which made the working conditions wholly intolerable, and therefore, orchestrated her constructive termination, because of her age.  Ms. Sewell further alleged that defendant and its agents engaged in unlawful retaliation as a result of various complaints of discrimination she lodged against management of OMAP.  Plaintiff submits, therefore, that defendant denied to Ms. Sewell employment opportunities, perks and opportunities for advancement because of her age.

It is well-established that in order to prevail in an action under the Age Discrimination in Employment, plaintiff bears the burden of establishing by a preponderance of the evidence a prima facie case of discrimination. Texas Dep't. of Community Affairs v. Burdine, 450 U.S. 248, 277 (1981); McDonnell Douglas v. Green, 411 U.S. 792, 802-804 (1973). Such a prima facie case can be established under circumstances which give rise to an inference of unlawful discrimination. Texas Dep't. of Community Affairs v. Burdine, 450 U.S. at 253. "A plaintiff meets her initial burden of establishing a prima facie case by offering evidence adequate to create an inference that she was denied an opportunity on the basis of a discriminatory criterion." Id., at 254.

It is, of course, settled that a plaintiff bears the initial burden of establishing that:

1) she was a member of a protected class;
2) she suffered an adverse employment action; and
3) the unfavorable action gives rise to an inference of discrimination.

McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973); EEOC v. Sears Roebuck & Co., 243 F.3d 846 (4th Cir. 2001); Stella v. Mineta, 284 F.3d 135, 145 (D.C. Cir. 2002)(citing, Brown

v. Brody, 199 F.3d 446, 452 (D.C. Cir. 1999)).  For purposes of the ADEA, an employment decision rises to the level of an actionable adverse action where a tangible change in the duties or working conditions results in a material employment disadvantage. Walker v. WMATA, 102 F. Supp. 2d 24, 29 (D. D.C. 2000).  Of course, "no particular type of personnel action [is] automatically excluded from serving as the basis of a cause of action under" Title VII. Brown v. Brody, 199 F.3d at 454.  In Brody, the court of appeals went on to say that "[a] plaintiff who is made to undertake ... a lateral transfer" -- that is, a reassignment in which she suffers no diminution in pay or benefits -- *can* maintain a cause of action under Title VII if she has endured "materially adverse consequences affecting the terms, conditions, or privileges of her employment or her future employment opportunities such that a reasonable trier of fact could conclude that the plaintiff has suffered objectively tangible harm." Brown v. Brody, 199 F.3d at 457.  In Stewart v. Ashcroft, 352 F.3d 422, 427 (D.C. Cir. 2003), the D.C. Circuit reiterated the principle it had articulated in Brody: "[W]hile generally lateral transfers, or the denial of them, [will] not be considered adverse employment actions, there are circumstances where they [may] be." See also, Holcomb v. Powell, 433 F.3d 889, 902-03 (D.C. Cir. 2006).

It is true, that to maintain an action under these statutes, Ms. Sewell must prove discriminatory intent.  Ms. Sewell is not required, however, to establish the element of intent by direct evidence. Rather, circumstantial evidence is sufficient to establish discriminatory animus. See e.g., Martin v. Cavalier Hotel Corp., 48 F.3d 1343, 1356 (4th Cir. 1995); International Woodworkers v. Chesapeake Bay Plywood Corp., 659 F.2d 1259, 1271-72 (4th Cir. 1981)(plaintiff's testimony regarding incidents in which she felt she had been victim of unlawful discrimination sufficient evidence to withstand summary judgment motion).

Here, of course, defendant does not dispute that Ms. Sewell was over forty years old at the time of the employment actions by defendant. Rather, defendant complains that when her managers imposed additional duties without adequate training for the new tasks assigned, she was not the subject of adverse employment decisions. Defendant is wrong. Ms. Sewell has proffered facts establishing that she has suffered a "tangible change in the duties or working conditions constituting a material employment disadvantage." Stewart v. Evans, 275 F.3d 1126, 1134-1135 (D.C. Cir. 2002); see also Forkkio v. Powell, 306 F.3d 1130-1131 (D.C. Cir. 2002)(reassignment with significantly different responsibilities . . . generally indicates an adverse action). That the actions by the Government during the winter and early spring of 2005 had an immediate effect on Ms. Sewell's employment can hardly be disputed. Page v. Bolger, 645 F.2d 227, 233 (4th Cir. 1981)(en banc); Mungin v. Katten Muchin & Zavis, 116 F.3d 1549, 1555 (D.C. Cir. 1997). After all, Ms. Sewell has proffered facts that established that she was given additional and new duties, including the Detail Fund Report, the Space Rent Report and the Object Class Exhibit, for which she needed substantial training in order to successfully perform, and that her managers either flat out denied training or frustrated each of her efforts for training in order to construct barriers to her successful work performance. The Government's bald protests that these duties were not a significant change in job responsibility are simply wishful thinking.

Had Ms. Sewell's managers been consistent in ensuring that Ms. Sewell was performing duties within her job description *before* she began to exercise her federally protected rights, the Government's objections that these new and additional duties fell within Ms. Sewell's job description, and, thus, were not "adverse actions" might have a sliver of persuasion. After all, it is undisputed that Ms. Sewell had been working under this position description since at least

1997, and had not been assigned these tasks ever before. For the entire fours years she had been OMAP's director, Baird-Bridges demonstrated absolutely no proclivity to "aligning" her duties to the job description. That is, until ms. Sewell began to make a written record of her complaints of harassment and discrimination.

And, Charlene Dunn's self-serving characterization notwithstanding, the Government's attempt to downplay the complexity of the reassigned tasks must be rejected. Larry Jarl, who had no bone to pick in this fight, clearly assessed that Ms. Sewell would need significant training in order to complete the space rent report. And, despite Dunn's characterization that the space rent report was "a lower level task," even her GS-14 budget analyst, Kimberly Bassett, required substantial training in order to complete the report. Similarly, Dunn's assignment of the Object Class Report had been previously done by Elaine Stone, a GS-13 budget analyst. Despite Ms. Sewell's efforts to grasp how to complete the report, she could not without sufficient training. Even Stone was surprised that Ms. Sewell had been given the report to complete given Ms. Sewell's grade and lack of training. In short, that Ms. Sewell was the victim of a material change in employment duties which at every step affected her ability to perform can hardly be disputed. See Childers v. Slater, 44 F. Supp. 2d. 8, 20 (D.D.C. 1999).

Nor can the Government fairly argue that the material change in duties was adverse to Ms. Sewell merely because it was her personal desire to keep the same duties. Brown v. Brody at 457. On the contrary, the record firmly establishes that Ms. Sewell was ready and willing to tackle new assignments and "learn new things" during her 33 year career. Ms. Sewell was not opposed to the explosion of new assignments given to her in the winter and spring 2005, if she was provided with fair opportunities for training. Indeed, she enjoyed doing the Detail Fund Report. Nevertheless, the assignments were materially different in substance and complexity

from the assignments she had been doing since 1997 they could not be adequately performed by her without the training that her managers refused to provide.

Further, the Government provides no argument that its failure to provide training for the new assignments was not an adverse employment action. Nor can it, since the evidence of managements' frustration of Ms. Sewell's efforts to train can simply not be disputed.

Moreover, the Government's protest that no inference of discrimination can be inferred from the adverse employment assignments and failure to train actions is meritless. Here, Ms. Sewell has established that she had been the victim of a pattern of harassment because of her advancing age by Pat Vastano since as early as 2002. Baird-Bridges, by failing to reprimand or counsel Vastano in any manner, condoned the harassment and allowed a culture of discrimination to exist. As argued above, though Baird-Bridges had been the head of OMAP since 2001 and Ms. Sewell's direct supervisors since at least 2004, it was not until after Ms. Sewell had filed EEO complaints and invoked arbitration did Baird-Bridges deem the time right to reassess Ms. Sewell's standards and duties. Cast in this light, a reasonable jury could more than conclude that the eleventh hour realignment of Ms. Sewell's duties and the failure to train her so that she could perform those duties was for an impermissible purpose.

Though Ms. Sewell is not seeking to use Kimberly Bassett as a "comparator" to raise an inference of unlawful discrimination, the contrasting treatment toward Bassett and Ms. Sewell highlights the speciousness of the Government's claims. After all, Dunn claimed that the space rent report was properly the task of a "lower level" grade than Vicente Sanabria's GS-13. Yet, instead of cross-training another "lower level" budget analyst, Dunn insisted that training opportunities be provided to her newly acquired GS-14 Senior Budget Analyst. Indeed, OMAP management ensured that Bassett had been given Sanabria's space rent materials and access to

his computer files.  Ms. Sewell was never provided with such benefits,  notwithstanding the fact

that it was to be her primary responsibility.  Simply put, the record firmly establishes that the

additional tasks imposed on Ms. Sewell were complex and difficult to perform without proper

training.

In short, the Government's contention that Ms. Sewell's change in work assignment

without the benefit of adequate training did not effect her working conditions to her detriment is

just plain wrong.  The Government has utterly failed to show that there exists no issue of

material fact that Ms. Sewell has failed in her complaint to allege an adverse employment action

under circumstances giving rise to an inference of unlawful discrimination.

### III.    The Government Subjected Ms. Sewell To Disparate Treatment And Created An Abusive And Racially Hostile Environment In Retaliation For Her Asserting Her Federally Protected Rights

It is axiomatic that "it shall be an unlawful employment practice for an employer to

discriminate against any of his employees . . . because [the employee] has made a charge . . .

under this act." Section 704 of Title VII, 42 U.S.C. § 2000e-3 (1994).  Of course, in order to

establish a claim of retaliation, Ms. Sewell must establish that she:

1)    engaged in a protected activity;
2)    that her employers took an adverse employment action against her; and
3)    that a casual connection existed between the protected activity and the adverse action.

Rochon v. Gonzales, 438 F.3d 1211, 1219 (D.C. Cir. 2006); Cones v. Shalala, 199 F.3d 512, 521

(D.C. Cir. 2000); Forkkio v. Powell, 306 F.3d 1127, 1131 (D.C. Cir. 2002); Brown v. Brody, 199

F.3d 46, 452 (D.C. Cir. 1999).

As even the government concedes, Ms. Sewell engaged in "protected activity" when she

filed grievances alleging age discrimination against Vastano and Baird-Bridges in December

2004.   Ms. Sewell has also alleged facts establishing that her subsequent acts of invoking

arbitration in the grievance case against Vastano in early April 2005, her seeking EEO counseling on April 15, 2005, and the subsequent filing informal and formal complaints of discrimination against Baird-Bridges were protected activities under the statute. The Government contends, however, that the actions taken by her managers following the exercise of Ms. Sewell's federally protected rights would not have dissuaded a reasonable worker from making a charge of discrimination. The Government's postulation on this score is simply baseless.

To be sure, it is now well-settled that in a retaliation case, "adverse employment actions are not confined to hirings, firings, promotions, or other discrete incidents." Burlington N. & Santa Fe Ry. Co. v. White, 126 S.Ct. 2405 (2006); Holcomb v. Powell, 433 F.3d 889, 901-902 (D.C. Cir. 2006). Rather:

> a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, "which in this context means it well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'

Burlington N. & Santa Fe Ry. Co. v. White, 126 S.Ct. 2405 (2006)(citing, Rochan v. Gonzales, 438 F.3d 1211, 1219 (D.C. Cir. 2006). Whether a particular reassignment [of job duties] is materially adverse depends upon the circumstances of the particular case, and 'should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances.'" Burlington N. & Santa Fe Ry. Co. v. White, 126 S. Ct. at 2417 (quoting, Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998) The D.C. Circuit has "expressly recognized that 'reassignment with significantly different responsibilities . . . generally indicates an adverse action.'" Holcomb v. Powell, 433 F.3d at 902 (quoting, Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998)). Here, Ms. Sewell has proffered a plethora of evidence that the actions by Baird-Bridges and her confederates would have caused any person to think twice

about ever complaining about management at OMAP again.

The Government's contention that the adverse treatment by Ms. Sewell's managers did not dissuade *her* from exercising her EEO rights is, of course, of absolutely no moment. This is particularly true in light of the escalation of harassment undertaken by Ms. Sewell's supervisors with each invocation of her EEO rights. It is now clear that a significant change in an employee's work assignments is "a classic and widely recognized example of forbidden retaliation." Burlington No. & Santa Fe Ry. Co. v. White, 126 S. Ct. at 2416; Holcomb v. Powell, 433 F.3d at 902. To be sure, any reasonable employee in Ms. Sewell's position "might well have" have been "dissuaded" from continuing to press her EEO claims in light of the Government's parallel campaign to construct barriers to the successful performance of her job duties. See Browne v. Potomac Elec. Power Co., No. 05-1117, 2006 WL 1825796, at * 2 (D.D.C. July 3, 2006) (Insisting that an employee spend more time performing more arduous work would discourage a reasonable employee from bringing discrimination charges). Mindful that plaintiff's prima facie burden should not be onerous, Ms. Sewell has more than met her burden of establishing the existence of triable issues of fact as to whether her reassignments constituted materially adverse actions. Czekalski v. Peters, 475 F.3d 360, 364 (D.C. Cir. 2007) (explaining that "[w]hether a particular reassignment of duties constitutes an adverse action for purposes of Title VII is generally a jury question").

The Government's further conclusory protests that Ms. Sewell has failed to establish a causal connection between the filing of her charges of discrimination and the retaliatory conduct is devoid of merit. Of course, a plaintiff may establish the causal link element of her prima facie case by showing that her supervisors knew that she had engaged in protected activity, and that they took their adverse actions against her shortly thereafter. Holcomb v. Powell, 433 F.3d at

903.  A plaintiff, however, is may as well establish a causal link through direct evidence of retaliatory motive.  Timmons v, U.S. Capitol Police Bd., 407 F.Supp.2d 8, 12 (D.D.C. 2005).

Once again, after having headed the division for more than four years and supervised Ms. Sewell directly for one year, Ms. Sewell determined to "realign" her duties two months *after* she had filed grievances against her and her protégée Vastano alleging unlawful discrimination. Indeed, Baird-Bridges first approached Ms. Sewell about "bringing her standards up-to-date," the day after she had held a step 2 grievance meeting with Ms. Sewell about her allegations of discrimination by Vastano.  Further, on April 7, 2005, Local 12 invoked arbitration on Baird-Bridges Step 2 decision regarding the reprimand.  The next day, April 8, 2005, apparently unable to contain her rage at Ms. Sewell any longer, Baird-Bridges flew a flying fit at Ms. Sewell, physically intimidating her.

Moreover, a mere two days after Ms. Sewell conferred with the Civil Rights Center about filing an EEO complaint against Baird-Bridges, Baird-Bridges developed an eleventh hour scheme to marginalize Ms. Sewell away from her direct supervision and place her in an environment where Ms. Sewell could be "handled" without Baird-Bridges's seemingly direct involvement.  On these facts, that Baird-Bridges knew that Ms. Sewell had been at the civil rights center inquiring about filing an EEO complaint against her on Friday afternoon is hardly a matter of speculation.  After all, it was no secret that the center's director, Annabelle Lockhart, was a close social friend of Baird-Bridges, and it simply defies common sense to assert that Lockhart did not tell her close friend that Baird-Bridges's employee had just been in the civil rights center  lodging a complaint against her.  Moreover, the timing of Baird-Bridges calling of the meeting, on Sunday night for Monday morning, is more than suspicious.  And, significantly, though Baird-Bridges asserted that she had discussed the matter of the transfers with Dunn and

Jarl prior to the meeting, the Government has failed to produce one email, memo or note from the head of OMAP to these supervisors of her intent to reorganize their staff.

Finally, after Baird-Bridges was interviewed by the EEO counselor on May 3rd, the harassment of Ms. Sewell ratcheted up in earnest.  Dunn repeatedly and callously ignored Ms. Sewell's pleas for training and Sanabria's sensible request that Dunn arrange for the training with *his* supervisor.  Within the week, Dunn had assigned Ms. Sewell the additional task of formulating the budget exhibit, an assignment Dunn, Baird-Bridges and everyone else in the office knew she had not been trained in and were not interested in giving to her.  By June 2, Ms. Sewell was receiving her confirmation receipt of her formal EEO complaint from Lockhart's office.  Suddenly concerned about the space rent report, on June 7, 2005, Dunn called Ms. Sewell to inquire.  Three days later, Dunn was admonishing Ms. Sewell and threatening "further action" should she fail to complete the space rent report by June 15th.  Finally, Dunn canceled the training set by Ms. Sewell and Sanabria for June 13 for training to complete the report on or before the 15th.  Given this litany of protracted harassment by Ms. Sewell's supervisors a reasonable jury could *only* conclude that the pattern of harassment was motivated in retaliation for the ongoing assertion by Ms. Sewell of her federally protected rights. Holcomb v. Powell, 433 F.3d at 902; Singletary v. District of Columbia, 351 F.3d 519, 525 (D.C. Cir. 2003) (recognizing that "this circuit has held that a close temporal relationship may alone establish the required causal connection").

Significantly, Vastano's letter of reprimand, which was ultimately sustained by Baird-Bridges, could be no more probative of her managers' intent.  After all, Vastano issued the reprimand letter immediately after Ms. Sewell accused her of harassment and threatened to file an EEO complaint.  Shockingly, Vastano even *cited* Ms. Sewell's allegations of "harassment"

and "racism" as a basis for her conclusion that Ms. Sewell had been insubordinate in the letter of reprimand.

Finally, that Baird-Bridges was ultimately concerned with a written record of allegations involving discrimination can hardly be disputed. As an initial matter, no effort was ever made on her part to ensure that Ms. Sewell's December grievance against her ever saw the light of day, and a reasonable jury would be more than entitled to disbelieve Baird-Bridges's vague protests that she was alternately "confused" or "didn't know" that Ms. Sewell had lodged a complaint of workplace harassment against her. Moreover, a reasonable jury can certainly infer retaliatory motive given Baird-Bridges's post-retirement offer to Ms. Sewell to remove the letter of reprimand in exchange for her withdrawal of her EEO complaint. Cast in this light, the Government's specious complaints that its actions were not probative of retaliation must be summarily rejected.

In short, Ms. Sewell has satisfied her prima facie burden to show an adverse action, and the Government is not entitled to summary judgment on the issue of unlawful retaliation.

## IV.    The Government Has Failed To Establish That It Had Not Created An Abusive And Hostile Environment In Violation Of Title VII.

To survive summary judgment on her claims of a hostile work environment, Ms. Sewell must of course show that a reasonable jury could find that the Government's harassment was:

1) unwelcome;
2) based on age; and
3) sufficiently severe or persuasive to alter the conditions of employment and create an abusive atmosphere.

Harris v. Forklift Sys., Inc., 510 U.S. 17 (1993); Barbour v. Browner, 181 F.3d 1342, 1347-48 (D.C. Cir. 1999). Here, there can be no dispute that the government's actions were unwelcome. Moreover, Ms. Sewell has alleged a plethora of facts in which a reasonable jury could infer that

the government's treatment of her was severe and abusive enough to affect the conditions of her employment.  Ms. Sewell has proffered sufficient facts that show that she was the subject of ridicule and insults about her age, health and retirement status.  Nor could the actions of Ms. Sewell's supervisors be remotely characterized as "common workplace tribulations." Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998).  Even the Government must concede that Ms. Sewell complained early and often about the treatment she was receiving from her superiors, and the Government's contention that Ms. Sewell has failed to show that her work environment was permeated with an environment designed for her failure of performance, ridicule, insults, verbal abuse and physical intimidation because of her age and in retaliation for the lodging of protesting management's discriminatory treatment is meritless.

Significantly, in light of the Government's protest that Ms. Sewell has failed to adduce evidence that she has suffered a tangible employment action, defendant has utterly failed to assert, much less fulfill its burden of establishing an affirmative defense that it acted reasonably in correcting the harassing behavior and that Ms. Sewell failed to take advantage of any corrective opportunities. Burlington Mills v. Ellerth, 524 U.S. 742, 764-765 (1998); Faragher v, City of Boca Raton, 524 U.S. 775, 807 (1998).  On the contrary, Ms. Sewell has proffered compelling evidence that faced with Ms. Sewell's complaints of harassment on the part of Vastano, Baird-Bridges did absolutely nothing.  Further, the record is utterly devoid that an anti-harassment policy was disseminated nor what that policy was in to provide this Court with any fair basis to determine the level of care that defendant exercised to prevent or correct Vastano's abuse and its effectiveness of its purported promulgated policies.  As defendant has utterly failed to advance any proffer to this Court in support of any affirmative defense under Burlington Mills, as is its burden, the Government must now be denied the benefit of asserting an

affirmative defense to assist its baseless cause.

In sum, Ms. Sewell has alleged an abundance of facts in which a reasonable jury could and must conclude that she was the target of an impermissibly hostile work environment at her place of work because of her age and in retaliation for exercising her federally protected rights, and defendant's meritless contentions to the contrary should be rejected.

**V.    Ms. Sewell's Supervisors Created Working Conditions So Wantonly Hostile That a 63 Year Old Felt Compelled To Retire Rather Than Face Certain and Inevitable Termination.**

As asserted above, Ms. Sewell has proffered compelling evidence that because of her age and in retaliation for engaging in protected activity, her supervisors at OMAP created working conditions so demeaning and objectively devised to ensure her professional failure that her failure was literally assured. Despite the plethora of evidence that would allow a reasonable jury to conclude that Baird-Bridges and her confederates were intentionally orchestrating her termination, the Government insists that Ms. Sewell's retirement was a voluntary decision. The Government's contention on this score is wholly without merit.

To be sure, a finding of constructive discharge requires evidence that "the employer deliberately made working conditions intolerable and drove the employee [to involuntarily quit]." Clark v. Marsh, 665 F.2d 1168, 1173. The standard, moreover, is an objective one; that is, "whether a *reasonable* employee would have concluded that the conditions made remaining in the job unbearable" and thus would have felt compelled to resign. Id.

Here, a reasonable jury could more than find that Baird-Bridges and Dunn were trying to drive Ms. Sewell from the workplace entirely and that the adverse actions constructed by them were designed to be "career ending." Lindale v. Tokheim Corp., 145 F.3d 953, 956 (7th Cir. 1998). Moreover, the Government's conclusory denial that the supervisors' actions did not

involve "extreme mistreatment" or "thinly veiled (or even overt) threats of termination" is simply denying the obvious.  Indeed, as Ms. Sewell so eloquently put it during her deposition, "[a] blind man could see the setup." Ex. 2 at 137.  Simply put, Ms. Sewell has produced evidence tending to show that her retirement was nothing short of coerced. See Shoaf v. Dept. of Agriculture, 260 F.3d 1336, 1340-41 (Fed. Cir. 2001); Staats v. U.S. Postal Serv., 99 F.3d 1120, 1124 (Fed. Cir. 1996).

The Government's further assertion that no aggravating factors exist to establish that Ms. Sewell had no options is devoid of persuasion.  After all, Ms. Sewell was then 63 years old and had worked for DOL almost her entire adult life.  Given that Baird-Bridges had recently upheld Vastano's December finding of insubordination and subsequent removal from federal service in the event of further incidents, Ms. Sewell, as any reasonable person would, was entitled to take OMAP management at its word.  Get the space rent report completed by June 15, 2005, or be terminated.  Faced with managements' intentional placement of barriers which were clearly designed to make compliance with that deadline a factual impossibility, the Government's contention that Ms. Sewell acted unreasonably by deciding "to remain with [her] employer would necessarily be inconsistent with even a minimal sense of self-respect, and therefore, intolerable" is, to put it charitably, preposterous. Kalinoski v. Gutierrez, 435 F.Supp.2d 55, 78 (D.D.C. 2006).

## VI.    The Government's Proffered Excuses For Its Adverse Actions Against Ms. Sewell Were Mere Pretext.

In addition to disputing Ms. Sewell's prima facie case, the Government contends it had legitimate, nondiscriminatory reasons for assigning Ms. Sewell significantly different duties then frustrating her attempts to receive proper training in order to successfully perform those duties. The Government's protest on this score must fail.

Of course, upon a prima facie showing of intentional discrimination, the burden of production shifts to defendant to articulate a legitimate, nondiscriminatory reason for the mistreatment and "produce evidence to allow a trier of fact to <u>rationally</u> conclude that the [treatment] had not been motivated by discriminatory animus. <u>Texas Dep't. of Community Affairs v. Burdine</u>, 450 U.S. at 277.

Once defendant meets its burden of production, if it can, the burden shifts to the plaintiff to establish that the stated proffer was <u>not</u> the true reason for defendants' treatment, <u>Texas Dep't. of Community Affairs v. Burdine</u>, 450 U.S. at 256, and allege some facts "establishing an inference that defendant's proffered explanation is unworthy of credence." <u>Clifton Terrace Assoc., Ltd. v. United Tech. Corp.</u>, 929 F.2d 714, 722 (D.C. Cir. 1991). And, contrary to the Government's assertion [see Defendant's Motion, p. 42], it is equally well established that it is <u>not</u> the burden of plaintiff to establish that "discrimination was the real reason" for the adverse employment action. <u>See</u> <u>Reeves v. Sanderson Plumbing Products, Inc.</u>, 530 U.S. 133 (2000).

Further, it is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation. A reasonable jury's disbelief of the reasons put forward by the defendant may, together with the elements of the prima facie case, suffice to show intentional discrimination, and rejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional discrimination. <u>Reeves v. Sanderson Plumbing Products, Inc.</u>, 530 U.S. at 144.

The Supreme Court has repeatedly rejected the proposition that employment discrimination plaintiffs must as a routine matter do more than discredit the employer's explanation in order to avoid summary judgment. It has made it clear that "no additional proof of discrimination is required" as a matter of course once a plaintiff has shown that a jury could

reject the employer's proffered explanation. <u>St. Mary's Honor Center v. Hicks</u>, 509 U.S. 502 (1993). Evidence showing the employer's explanation to be false, standing alone, will ordinarily" permit an inference of discrimination. <u>St. Mary's Honor Center v. Hicks</u>, 509 U.S. 502 (1993); <u>Aka v. Washington Hosp. Ctr.</u>, 156 F.3d 1284 (D.C. 1998). Recently, of course, the D.C. Circuit observed that "[u]sually, proffering 'evidence from which a jury could find that [the employer's] stated reasons ... were pretextual ... will be enough to get a plaintiff's claim to a jury.'" <u>George v. Leavitt</u>, 407 F.3d 405, 413 (D.C. Cir. 2005). "Although a jury may ultimately decide to credit the version of the events described by [defendant] over that offered by [plaintiff], this is not a basis upon which a court may rest in granting a motion for summary judgment." <u>Id.</u>

Here, a trier of fact could <u>rationally</u> conclude that the justifications offered by defendant were not only unworthy of belief, but also motivated by impermissible and retaliatory animus. The Government argues that Baird-Bridges was well within the bounds of her authority to make decisions relative to staffing, reassignments and organizational structure. Where, as here, the record firmly establishes that those employment decisions took place *after* Baird-Bridges knew that Ms. Sewell had begun lodging complaints about workplace harassment and discrimination, a reasonable jury would be more than entitled to conclude that the employment decisions were motivated by animus.

Significantly, the Government proffers no legitimate justification for management's frustration of Ms. Sewell's efforts to seek training and the subsequent threat of termination on June 10, 2005. Nor can it. The Government's specious contention that Ms. Sewell brought it on herself by her "procrastination" in seeking the space rent training from Vicente Sanabria is utterly defied by the record.

Nor does the fact that two others were reassigned in a supposed organizational

restructuring undercut an inference of retaliation where under the totality of the facts of this case, Ms. Sewell can prove to a reasonable jury's satisfaction that the employment decisions motivated in part by illegal discrimination and retaliation.

That defendant proffers such an absurd proposition to justify its disparate treatment of Ms. Sewell in the face of Baird-Bridges utterly transparent motive is simply laughable.  Under the totality of these circumstances, a reasonable jury could infer from the "falsity of the explanation that the employer is dissembling to cover up it discriminatory purpose." See Reeves v. Sanderson Plumbing, 530 U.S.133 (2000).  Simply put, defendant's proffered justifications are not worthy of any jury's belief.

Given the evidence establishing Ms Sewell's prima facie case and the lack of veracity of defendant's proffered explanation, a reasonable jury could certainly conclude from all of the evidence that the adverse employment decision was made for a discriminatory reason. Holcomb v. Powell, 443 F.3d 889 (D.C. Cir. 2006); Lathram v. Snow, 336 F.3d at 1088; Aka v. Wash. Hosp. Ctr., 156 F.3d at 1289 (D.C. Cir. 1998).  In sum, Ms. Sewell has produced overwhelming evidence to rebut defendant's explanations for its adverse employment decisions that would permit a reasonable jury to infer discrimination.

## <u>CONCLUSION</u>[8]

WHEREFORE, Plaintiff Audrey L. Sewell respectfully requests that defendant's

meritless Motion for Summary Judgment be denied.

Respectfully submitted,


___/s/ Lisa Alexis Jones
Lisa Alexis Jones
1200 G Street, N.W. Suite 800
Washington, D.C. 20005
(202) 434-4507
(202) 434-8707 Fax
orbitcv@erols.com

*Counsel for Plaintiff*

Dated: December 6, 2007

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 6th day of December 2007, a true and correct copy of

Plaintiff's Opposition to Defendant's Motion for Summary Judgment, Statement of Material

Facts in Dispute, and accompanying Exhibits and Proposed Order was sent via ECF to:

Karen L. Melnik
Assistant United States Attorney
Civil Division
555 4th Street, N.W.
Washington, D.C.  20530

_____/s Lisa Alexis Jones_____
Lisa Alexis Jones

---

[8] Ms. Sewell consent to the withdrawal of her claim under the Privacy Act.