**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AUDREY L. SEWELL | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 06 CV 1534 (ESH) |
| | ) |
| ELAINE L. CHAO | ) |
| | ) |
| Defendant. | ) |
| _____ | ) |

<u>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S**</u>
<u>**OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**</u>

COMES NOW, Audrey Sewell, by and through her undersigned counsel, and hereby respectfully submits this opposition to defendant's Motion for Summary Judgment.

<u>**STATEMENT OF MATERIAL FACTS IN DISPUTE**</u>

Pursuant to Local Rule 7(h), plaintiff respectfully submits the following statement of material facts for which there exists a genuine dispute.

1.    Plaintiff admits the facts contained in paragraph 1 of defendant's Statement of Material Facts.

2.    Plaintiff admits the facts contained in paragraph 2 of defendant's Statement of Material Facts.

3.    Plaintiff admits the facts contained in paragraph 3 of defendant's Statement of Material Facts.

4.    Plaintiff admits the facts contained in paragraph 4 of defendant's Statement of Material Facts.

5.    Plaintiff admits the facts contained in paragraph 5 of defendant's Statement of

Material Facts.

6.    Plaintiff admits the facts contained in paragraph 6 of defendant's Statement of Material Facts.

7.    Plaintiff admits the facts contained in paragraph 7 of defendant's Statement of Material Facts.

8.    Plaintiff admits the facts contained in paragraph 8 of defendant's Statement of Material Facts.

9.    Plaintiff admits the facts contained in paragraph 9 of defendant's Statement of Material Facts.

10.    Plaintiff admits the facts contained in paragraph 10 of defendant's Statement of Material Facts.

11.    Plaintiff admits the facts contained in paragraph 11 of defendant's Statement of Material Facts.

12.    Plaintiff admits the facts contained in paragraph 12 of defendant's Statement of Material Facts.

13.    Plaintiff admits the facts contained in paragraph 13 of defendant's Statement of Material Facts.

14.    Plaintiff admits the facts contained in paragraph 14 of defendant's Statement of Material Facts.

15.    Plaintiff admits the facts contained in paragraph 14 of defendant's Statement of Material Facts.

16.    Plaintiff admits the facts contained in paragraph 14 of defendant's Statement of Material Facts.

17.     Plaintiff *denies* the facts contained in paragraph 17 of defendant's Statement of Material Facts. Ex. 2 at 79-83, 87.

18.     Plaintiff *denies* the facts contained in paragraph 18 of defendant's Statement of Material Facts. Ex. 2 at 100-108.

19.     Plaintiff admits the facts contained in paragraph 19 of defendant's Statement of Material Facts.

20.     Plaintiff admits the facts contained in paragraph 20 of defendant's Statement of Material Facts.

21.     Plaintiff *denies* the facts contained in paragraph 21 of defendant's Statement of Material Facts. Ex. A at 8-9.

22.     Plaintiff admits the facts contained in paragraph 22 of defendant's Statement of Material Facts to the extent that it accurately reflects Charlene Dunn's EEO Affidavit.  Plaintiff has no independent evidence to support this assertion and therefore denies it in toto.

23.     Plaintiff admits the facts contained in paragraph 23 of defendant's Statement of Material Facts.

24.     Plaintiff admits the facts contained in paragraph 24 of defendant's Statement of Material Facts to the extent that it accurately reflects Ms. Baird-Bridge's claims made in her EEO affidavit.  Plaintiff denies that the assignments were made "to meet the current needs."

25.     Plaintiff admits the facts contained in paragraph 25 of defendant's Statement of Material Facts.

26.     Plaintiff admits the facts contained in paragraph 26 of defendant's Statement of Material Facts.

27.     Plaintiff admits the facts contained in paragraph 27 of defendant's Statement of

Material Facts.

28.    Plaintiff *denies* the facts contained in paragraph 28 of defendant's Statement of Material Facts to the extent that it insinuates that plaintiff did not make an effort to seek training. Plaintiff further *denies* the facts contained in the instant paragraph to the extent that defendant never made any effort to train plaintiff. Ex. 2 at 111-121.

29.    Plaintiff admits the facts contained in paragraph 29 of defendant's Statement of Material Facts.

30.    Plaintiff admits the facts contained in paragraph 30 of defendant's Statement of Material Facts.

31.    Plaintiff admits the facts contained in paragraph 31 of defendant's Statement of Material Facts.

32.    Plaintiff admits the facts contained in paragraph 32 of defendant's Statement of Material Facts.

33.    Plaintiff *denies* the facts contained in paragraph 33 of defendant's Statement of Material Facts. Plaintiff told Dunn that she was retiring because defendant refused to provide the training necessary for her to succeed at her job. Ex. A at 10; Ex. Y.

34.    Plaintiff admits the facts contained in paragraph 34 of defendant's Statement of Material Facts.

35.    Plaintiff admits the facts contained in paragraph 35 of defendant's Statement of Material Facts.

36.    Plaintiff admits the facts contained in paragraph 36 of defendant's Statement of Material Facts.

37.    Plaintiff admits the facts contained in paragraph 37 of defendant's Statement of

Material Facts.

38.    Plaintiff admits the facts contained in paragraph 38 of defendant's Statement of

Material Facts.

39.    Plaintiff is without sufficient independent knowledge or evidence to admit the

facts contained in paragraph 39 of Defendant's Statement of Material Facts, and therefore *denies*

the facts contained therein.

40.    Plaintiff admits the facts contained in paragraph 40 of defendant's Statement of

Material Facts.

41.    Plaintiff admits the facts contained in paragraph 41 of defendant's Statement of

Material Facts to the extent that it accurately reflects the Declaration of Thomas Scales.  Plaintiff

has no independent information or knowledge that the "facts" contained in such declaration are

true, and therefore *denies* the substance of the facts contained in paragraph 41.

42.    Plaintiff admits the facts contained in paragraph 42 of defendant's Statement of

Material Facts.

43.    Plaintiff admits the facts contained in paragraph 43 of defendant's Statement of

Material Facts.

44.    Plaintiff admits the facts contained in paragraph 44 of defendant's Statement of

Material Facts.

45.    Plaintiff admits the facts contained in paragraph 45 of defendant's Statement of

Material Facts.

46.    Plaintiff admits the facts contained in paragraph 46 of defendant's Statement of

Material Facts.

47.    Plaintiff admits the facts contained in paragraph 47 of defendant's Statement of

Material Facts to the extent that a training schedule was set up for Bassett.  Plaintiff is without sufficient knowledge how long Bassett's training actually took place with each budget analyst and therefore *denies* the facts relative to those claims by defendant.

48.    Plaintiff admits the facts contained in paragraph 48 of defendant's Statement of Material Facts.

49.    Plaintiff admits the facts contained in paragraph 49 of defendant's Statement of Material Facts to the extent that it correctly reflects Charlene Dunn's EEO Affidavit.

50.    Plaintiff admits the facts contained in paragraph 50 of defendant's Statement of Material Facts.

51.    Plaintiff admits the facts contained in paragraph 51 of defendant's Statement of Material Facts.

52.    Plaintiff admits the facts contained in paragraph 52 of defendant's Statement of Material Facts.

55.[1]    Plaintiff admits the facts contained in paragraph 55 of defendant's Statement of Material Facts.

56.    Plaintiff admits the facts contained in paragraph 56 of defendant's Statement of Material Facts.

57.    Plaintiff admits the facts contained in paragraph 57 of defendant's Statement of Material Facts.

58.    Plaintiff admits the facts contained in paragraph 58 of defendant's Statement of Material Facts.

59.    Plaintiff admits the facts contained in paragraph 59 of defendant's Statement of

---

[1] Defendant's Statement of Material Facts omits numbered paragraphs 53 and 54. <u>See</u> Defendant's Statement of Material Facts, p. 8.

Material Facts.

60.    Plaintiff admits the facts contained in paragraph 60 of defendant's Statement of Material Facts to the extent that it articulates some of the basis for plaintiff's claim of hostile work environment.

61.    Plaintiff admits the facts contained in paragraph 61 of defendant's Statement of Material Facts.

62.    Plaintiff admits the facts contained in paragraph 62 of defendant's Statement of Material Facts.

63.    Plaintiff admits the facts contained in paragraph 63 of defendant's Statement of Material Facts.

64.    Plaintiff admits the facts contained in paragraph 64 of defendant's Statement of Material Facts.

65.    Plaintiff admits the facts contained in paragraph 65 of defendant's Statement of Material Facts.

66.    Plaintiff *denies* the facts contained in paragraph 66 of defendant's Statement of Material Facts.  Plaintiff slid the disability certificate and request for leave under Charlene Dunn's door herself.

67.    Plaintiff admits the facts contained in paragraph 67 of defendant's Statement of Material Facts.

68.    For 30 years and up until about 2002, Audrey Sewell had consistently maintained positive professional relationships with her supervisors and work colleagues. Ex. 2 at 51-52.

69.    Patricia Vastano, a Caucasian woman, began working at the Department of Labor in about 1997 as the Director of the Strategic Planning Division. Ex. 2 at 33.   Almost

immediately, Vastano's enmity toward Ms. Sewell surfaced.  Vastano consistently spoke to Ms. Sewell in a condescending and belittling tone. Ex. 2 at 38.  Eventually, Ms. Sewell complained to her then supervisor, Cecily Rayburn, and Vastano was counseled and instructed by Rayburn to only communicate with Ms. Sewell through her. Ex. 2 at 36-38.

70.    When Rayburn left DFM and was replaced by Gary Thayer, Vastano's harassment continued.  According to Ms. Sewell, Vastano would make comments such as "you're nothing" and other insults. Ex. 2 at 41.  Once again, Ms. Sewell complained to her supervisor, Thayer, and the harassment ceased. Ex. 2 at 41.

71.    In early 2000, Anne Baird-Bridges, an African-American woman in her 50s, came aboard DOL as OMAP's director under the Government's Senior Executive Services program. Ex. 2 at 48-49; Deposition Transcript of Anne Baird-Bridges at 19-20, incorporated herein as Plaintiff's Exhibit "B."  Soon, Vastano became Baird-Bridges's deputy director for OMAP, as well as the acting director for DFM in Thayer's place. Ex. 2 at 39-40, 48-50.  Vastano became Ms, Sewell's direct supervisor. Ex. 2 at 39; EEO Affidavit of Anne Baird-Bridges at p. 1, incorporated herein as Plaintiff's Exhibit "C."

72.    Within days, the prior comments and insults toward Ms. Sewell by Vastano began to rear their heads. Ex. 2 at 41-42.  On just one of many occasions, Vastano observed Ms. Sewell having trouble walking because of her arthritis.  Vastano "came down the hall … and said oh, you're having trouble walking today?  Why don't you just retire?" Ex. 2 at 44.

73.    Prior to Thayer's leaving DFM, he had fully prepared Ms. Sewell's performance rating for the prior rating period ending April 30, 2002. Ex. 2 at 50.  Baird-Bridges had issued a directive that OMAP employees were required to have their appraisals completed by June 15 in order to be considered for a bonus. Ex. 2 at 50.  Ms. Sewell had heard nothing about her

appraisal and began to inquire during the first week of June. Ms. Sewell was told that Vastano was "doing [Ms. Sewell's] appraisal," although she had never supervised her or discussed her duties. Further, Ms. Sewell knew that Thayer had completed her appraisal before he had left. Ex. 2 at 50.

74.    On June 5, 2002, Ms. Sewell sent Vastano and Baird-Bridges and email expressing concern that Vastano was improperly and without any basis revising the appraisal completed by Gary Thayer. Email from Audrey Sewell to Anne Baird-Bridges and Pat Vastano, dated June 5, 2002, incorporated herein as Plaintiff's Exhibit "D." In that email, Ms. Sewell protested:

> If this is a Age Discrimination tactic, to pressure me into retiring, it is not going to work. . . . I have never had to file a grievance or a discrimination complaint, but, I will if I have to." Ex. D.

Indeed, Ms. Sewell had no plans to retire until 2007. Ex. 2 at 45-46.

75.    On another occasion, Vastano refused to timely approve a vacation leave slip submitted by Ms. Sewell, causing her to eventually cancel her travel plans. When Vastano finally came to Ms. Sewell's desk to return the approved leave slip, she once again offered her opinion that it was time for Ms. Sewell to retire. This time, Vastano's comment was made in front of their supervisor, Baird-Bridges. Ex. 2 at 57, 60-61.

76.    After hiring three DFM directors in two years, Baird-Bridges decided to take over as acting director of DFM and for the first time became Ms. Sewell's direct supervisor. Ex. 2 at 84; Ex. B at 24-25, 35, 81-82. According to Baird-Bridges, Ms. Sewell had had good ratings from her former supervisors, and there were no concerns about her work performance. Ex. B at 27.

77.    In August 2004, Baird-Bridges had a confrontation with a subordinate, Charlotte

Jenkins, in which she was accused of physically attacking and yelling at Jenkins. Ex. 2 at 88-89;
Ex. B at 36-40. Ms. Sewell was two rows over when the confrontation occurred and "heard the
whole thing." Ex. 2 at 88-89. Ms. Sewell got so upset that she left the office, and was physically
intimidated by Baird-Bridges ever since. Ex. 2 at 83, 85, 88-89, 92-93, 108, 131.

78.     Meanwhile, the comments and insults by Vastano continued, and in November
2004, Ms. Sewell again complained to Baird-Bridges about Vastano's "degrading" treatment of
her. Ex. 2 at 57-60, 97, 133. Ms. Sewell received absolutely no response from Baird-Bridges.
Ex. 2 at 57, 60, 97, 133.

79.     On December 17, 2004, Vastano, while acting as OMAP director during a brief
absence by Baird-Bridge, issued a letter of reprimand against Ms. Sewell citing her for
"insubordination" for a series of emails between the two of them in which Ms. Sewell accused
Vastano of engaging in a pattern of harassment. Letter of Reprimand, dated December 17, 2004,
incorporated herein as Plaintiff's Exhibit "E."

80.     In one of the emails sent by Ms. Sewell to Vastano which formed the basis of the
reprimand, Ms. Sewell stated:

> I never in all my days have met any one who bends the truth the way that you
> does [sic]. I don't know what this is about no, but, I feel it is harassment; for
> what reason, I don't know. While you use to harass me some time back, I don't
> know why you have started up again! If you continue these variable attacks, I am
> filing a compliant [sic]. What you don't understand or don't want to understand
> is, Afro American's have a brain also. Email from Audrey Sewell to Pat Vastano,
> dated December 7, 2004, incorporated herein as Plaintiff's Exhibit "F."

81.     In her written reprimand, Vastano specifically complained about Ms. Sewell's
accusing Vastano of "lying, harassment and racism." Finding that Ms. Sewell words were
"insubordination," Vastano concluded that:

> Failure to correct such inappropriate behavior and instances of repeated outbursts
> will result in disciplinary action up to and including dismissal." Ex. E at 2.

82.    For good measure, Vastano repeated the warning of termination in the next paragraph of the reprimand letter:

> This reprimand not only outlines the intolerable behavior, but also serves as a warning to you that any repeat of similar outbursts and insubordination will result in disciplinary action up to and including removal. Ex. E at 2; Ex. 2 at 41.

83.    Ms. Sewell, having never received any reprimands or warnings in her 32 years of federal service, protested the adverse action, and on December 17, 2004, filed a union grievance against Vastano. Ex. 2 at 41; Ex. B at 45; Ex. C at 2.  In that grievance, Ms. Sewell alleged that she had been the victim of illegal age discrimination. Ex. 2 at 41. DOL/Local 12 Standard Grievance Form, dated December 17, 2004, incorporated herein as Plaintiff's Exhibit "G." Specifically, Ms. Sewell complained that the reprimand letter was "blatantly discriminatory and part of a pattern of harassment toward [Ms. Sewell]." Ex. G.  Anne Baird-Bridges, of course, was the reviewing official for the grievance. Ex. B at 57.

84.    On December 20, 2004, Ms. Sewell filed a grievance against Baird-Bridges, as well. Ex. 2 at 57.  By that complaint, Ms. Sewell alleged that Baird-Bridges had "fostered a hostile work environment against [Ms. Sewell] and" discriminated against [Ms. Sewell] on the basis of her age. DOL/Local 12 Standard Grievance Form, dated December 20, 2004, incorporated herein as Plaintiff's Exhibit "H."

85.    Although Ms. Sewell's complaint about Vastano had been documented in the supporting materials to the grievance and the emails which were the subject of the letter of reprimand, Baird-Bridges claimed that the first time she had ever heard about complaints about Vastano by Sewell was during a grievance meeting in January 2005 with Ms. Sewell, Vastano, and Local 12 of the American Federation of Government Employees union representative Linda Copening.  According to Baird-Bridges, after the meeting she asked Vastano if she knew what

Ms. Sewell had been talking about.  Vastano, according to Baird-Bridges, said she did not know. Ex. B at 29, 36, 57-59, 61, 63.  That was the extent of Baird-Bridges's efforts to investigate and remedy Ms. Sewell's claims of workplace harassment.

86.     In January 2005, Charlene Dunn was hired as OMAP's Director of Budget Formulation and Implementation ("Budget").  Baird-Bridges, however, remained acting director of DFM. Ex. B at 91-92.

87.     On March 9, 2005, a second step-2 grievance hearing was held by Baird-Bridges with Ms. Sewell and Copening, the union representative.  Pat Vastano was not present.  Once again, Ms. Sewell reiterated her claims of discrimination by Vastano. EEO Affidavit of Audrey Sewell, incorporated herein as Plaintiff's Exhibit A at 4; Ex. C at 2.

88.     The next day, Baird-Bridges sent Ms. Sewell an email stating that she was drafting Ms. Sewell's fiscal year 2004-2005 performance standards.  Although the fiscal year was almost half over, Baird-Bridges claimed that she wanted to bring Ms. Sewell "up to date" on her specific job responsibilities and to ensure that her standards were accurate. Ex. A at 4. Sewell asked for the presence of union representation at the meeting Baird-Bridges's had set up for March 14, 2005. Ex. A at 4-5.

89.     On March 14, 2005, Baird-Bridges held a meeting with Ms. Sewell and, once again, Copening.  There, instead of discussing her current duties, Baird-Bridges assigned Ms. Sewell two new responsibilities, the Detail Fund Report and the Space Rent Report. Ex. 2 at 62, 80-81; Ex. A at 4-5.  At the meeting, Baird-Bridges also informed Ms. Sewell that she would be getting new or different performance standards. Ex. B at 77-78.  Baird-Bridges did not mention or intimate that an organizational restructuring was being contemplated.

90.     Unbeknownst to Baird-Bridges, Ms. Sewell already knew how to do the detail

fund report, having learned and assisted in its preparation prior to Baird-Bridges's arrival at DOL. Ex. 2 at 64-67, 72.  On the day of the meeting, or soon thereafter, Ms. Sewell went over the detail fund report with George Baily, the contractor who had been previously engaged to complete the report. Ex. 2 at 63-66; Ex. A at 6.  Although the work was tedious, Ms. Sewell did not mind and enjoyed preparing the report. Ex. 2 at 68.

91.    Indeed, Baird-Bridges admitted that Ms. Sewell had no problem completing the assignment. Ex. B at 85.

92.    According to Ms. Sewell, once Baird-Bridges realized that Ms. Sewell could complete the report without any difficulties, however, Baird-Bridges made the task more tedious by insisting that Ms. Sewell manually type every account entry, a task that the contractor did not do. Ex. 2 at 71, 72; Ex. A at 5; Email from Anne Baird-Bridges to Audrey Sewell, dated March 30, 2005, incorporated herein as Plaintiff's Exhibit "I."

> The Detail Fund Report, once I had to start typing it, you know, I was stretched.  I was stretched.  I stayed on top of it. . . . [But] it was getting to be too much for me, you know, because she would stretch it.  And she was mad because I could do the Detailed Fund Report. . . . [T]hen that's when she took it to another level. They had to come up with things I could not do. Ex. 2 at 125.

93.    The space rent report was another matter.  From about 1997 to 2000, Ms. Sewell had assisted in compiling information for inclusion on the report until the system for compiling the information became automated, and Ms. Sewell stopped working on it as a result. Ex. 2 at 74-77; Ex. A at 5; Email from Audrey Sewell to Charlene Dunn, dated June 8, 2005).

94.    During the March 14 meeting, Ms. Sewell specifically told Baird-Bridges that she did not know what the report was or how to do the report.  Ex. 2 at 74, 81, 125-126.  Baird–Bridges told Ms. Sewell that Vicente Sanabria, a GS-13 budget analyst who had been preparing the reports, would train her. Ex. 2 at 72, 81; Ex. A at 5.

95.    Indeed, according to Larry Jarl, the Director of the Accounting Division ("Accounting") the space rent:

> report itself was not straight forward and required whoever did it to make changes at the accounting code level. Once someone learned to do the space rent report it was not complicated. However, to someone who had never done the report before, it would have looked complicated. EEO Affidavit of Larry Jarl at 1, incorporated herein as Plaintiff's Exhibit "J."

96.    According to Ms. Sewell, however, she "gave them the out" to set her up for failure when she admitted that she did not how to do the space rent report:

> I was sitting there blind like a fool hoping they going to act right, and said, you know, I don't know how to do the Space Rent Report. . . . Oh my God, I gave them the key to the Kingdom. Then I had to tell them. They had to stop guessing because they had to get me on performance which was the only way to bring me down. . . . they had to get me on performance so they had to give me things that they knew I couldn't do. . . . What can't she do? Can't do budget formulation? Fine, give it [to her] – that's the way it worked. Ex. 2 at 125-126.

97.    Immediately after the meeting on March 14, 2005, Ms. Sewell approached Sanabria about the new assignment and training. Ex. 2 at 73, 78-79; Ex. A at 5. Although the space rent report was one of Sanabria's main job functions [Ex. 2 at 79; Ex. J at 1; EEO Affidavit of Vicente Sanabria at 1, incorporated herein as Plaintiff's Exhibit "K"], he had not been told about the reassignment. Ex. 2 at 79, 82; Ex. A at 5-6.

98.    Ms. Sewell assumed then that her supervisor, Baird-Bridges, and Sanabria's, Charlene Dunn, would coordinate a training schedule. Ex. 2 at 79-82.

99.    On or about March 16, 2005, Baird-Bridges issued step 2 ruling upholding the December Letter of Reprimand. Step 2 Decision, incorporated herein as Plaintiff's Exhibit "L." Baird-Bridges acknowledged that Ms. Sewell's complaint alleged discrimination and harassment toward her, but found that Ms. Sewell had "failed to demonstrate discrimination or harassment." Ex. L at 2. Further, Baird-Bridges denied Ms. Sewell's request that any contact with Vastano be

"eliminated" and ordered that no change in the "organizational structure to eliminate the grievant from having contact with the existing chain of command." Ex. B at 66-67, 72; Ex. L at 2.

100.    Meanwhile, by the week of April 4, 2005, no supervisor had spoken to Sanabria about the reassignment or training for Ms. Sewell. Ex. 2 at 82-83, 87.

101.    On April 7, 2005, Local 12 invoked arbitration on Ms. Sewell's reprimand grievance. Letter from Alex Bastani to Sandy Keppley, dated April 7, 2005, incorporated herein as Plaintiff's Ex. "M."

102.    On April 8, 2005, Baird-Bridges approached Ms. Sewell complaining about her supposed failure to send a "return receipt" email regarding an upcoming meeting to discuss the detail fund report:

> So I didn't know what she was talking about.  There was no pop-up on the machine, and even after all of this was over, she was standing there screaming and hollering, talking about you shut up and listen to me, Missy.  She called me Missy. Ex. 2 at 93-94, 98-99.

103.    At one point during the altercation, Ms. Sewell believed that Baird-Bridges was going to slap her in the face. Ex. 2 at 98-99; Ex. B at 51, 67-68; Ex. C at 2.

104.    On late Friday afternoon, April 15, 2005, Ms. Sewell met with Lillian Winstead, EEO Coordinator of Counselors in the Civil Rights Center about the incident between her and Baird-Bridges.  The meeting lasted until about 3:00 that afternoon. Ex. 2 at 15; Ex. A at 2; EEO Counselor's Report at 1, incorporated herein as Plaintiff's Exhibit "Q."

105.    The director of the Civil Rights Center at that time was Annabelle Lockhart, a very good personal friend and fellow book club member of Baird-Bridges's. Ex. B at 100.

106.    From that Friday to Sunday, Baird-Bridges was a busy supervisor.  At some point that weekend, OMAP management surreptitiously copied from Sanabria's computer hard drive his space rent report information and placed it on Bassett's computer. Ex. A at 11-12; Ex. K at EEO

Affidavit of Audrey Sewell, <u>Sanabria v. Chao</u>, at 8, incorporated herein as Plaintiff's Exhibit "R." No such information, which would have assisted Ms. Sewell in completing the space rent report, was given to Ms. Sewell.

107.    On Sunday, April 17, 2005, Baird-Bridges disseminated an email from her home computer scheduling a Monday morning meeting with Ms. Sewell, Sanabria, Dunn and DFM clerk Bettye Keller. Ex. 2 at 96-97. Email from Ann Baird-Bridges, dated April 17, 2005, incorporated herein as Plaintiff's Exhibit "S." Copening, the employees' union representative was sent a copy of the email. Ex. 2 at 99; Ex. S. Baird-Bridges even telephoned Copening at home that Sunday and left a voice mail message about the upcoming meeting. Ex. A at 3; Ex. B at 128.

108.    On Monday, April 18, 2005, Ms. Sewell arrived at work as usual and reviewed Baird-Bridges's email about the 10:00 a.m. meeting. Ex. 2 at 99. Prior to going into the meeting, however, Ms. Sewell filed her written informal complaint of discrimination against Baird-Bridges for the April 8th incident. By that Complaint, Ms. Sewell indicated that she previously filed an age discrimination complaint with her union. Informal Complaint of Discrimination, dated April 18, 2005, incorporated herein as Plaintiff's Exhibit "T."

109.    At the meeting, Keller, Vastano (then Dunn's supervisor [Ex. 2 at 135-136]), Dunn, Sanabria, Baird-Bridges and Ms. Sewell were present. Ex. 2 at 99. Larry Jarl was not. Ms. Sewell, Sanabria and Keller each requested union representation. Despite her efforts to ensure that Copening had been informed, even calling her at home, Baird-Bridges pronounced that the presence of union representation was unnecessary since "it was not an 'adverse action'" and refused their requests. Ex. B at 101.

110.    Baird-Bridges then handed Ms. Sewell, Keller and Sanabria a memo. Keller and

Ms. Sewell were to be transferred to Budget under Dunn while Sanabria would be transferred to accounting under Larry Jarl. Ex. 2 at 100, 101, 107.  In her memo, Baird-Bridges specifically wrote that the "reassignments [were] not adverse actions since they are at the same grade level." Meeting Notes, incorporated herein as Plaintiff's Exhibit "V."  Baird-Bridges further stated that there would be "no change in position description except location." Ex. A at 3; Ex. V; Memo from Anne Baird-Bridges to Audrey Sewell, dated April 18, 2005, incorporated herein as Plaintiff's Exhibit "W."  Finally, though Baird-Bridges had insisted on meeting on an expedited basis, the transfers were to become effective May 1, 2005, almost two weeks later. Ex. B at 96; EEO Affidavit of Charlene Dunn at 3, incorporated herein as Plaintiff's Exhibit "X."  Further, Dunn recalled that Ms. Sewell brought up previous "discrimination grievances" she had filed. Ex. X at 1.

111.     No one approached Ms. Sewell about space rent training during the week of April 18th. Ex. 2 at 106.  By the end of the next week, April 25th, Ms. Sewell had received no direction from Baird-Bridges, who continued to be her supervisor, or Dunn, and management had still not clarified with Sanabria about the transfer of his space rent duties. Ex. 2 at 107-108.

112.     On May 3, 2005, Baird-Bridges was interviewed by EEO Counselor Jose Figueroa and told the counselor that the April 8th incident "did not happen," but claimed that Ms. Sewell had an "attitude" problem. Ex. Q at 3.

113.     On May 4, 2005, Ms. Sewell had her first meeting with Dunn as her direct report. Ex. at 2 at 108-109.  Dunn had requested that Ms. Sewell bring with her a list of her current duties and told her that she would be giving performance standards. Ex. A at 6.

114.     When Ms. Sewell arrived, Dunn telephoned Baird-Bridges who came into the meeting. Ex. A at 6.  Baird-Bridges clarified her previous April 18th memo, stating that Ms.

Sewell's duties would "remain the same in line with our current positions descriptions." Baird-Bridges then left the meeting. Ex. A at 6; Email from Audrey Sewell to Charlene Dunn, June 8, 2005, at 2, incorporated herein as Plaintiff's Exhibit "Y."

115. There had been no changes in Ms. Sewell's Position Description since 1999. Ex. Y at 2.

116. Without discussing the list of her current duties, Dunn handed Ms. Sewell her performance standards. The sole specific item on the standard was the space rent report. The remainder of the standards, according to Sewell, was unspecific and vague. Ex. A at 6-7; Memorandum to Charlene Dunn from Audrey Sewell, incorporated herein as Plaintiff's Exhibit "GG."

117. Ms. Sewell once again informed Dunn that she had not been trained in completing the report, and Dunn instructed Ms. Sewell to "tell [Sanabria] to stop what he was doing and train [Ms. Sewell]," although Dunn was no longer Sanabria's supervisor. Ex. 2 at 109; Ex. A at 7.

118. Ms. Sewell went immediately to Sanabria about scheduling training sessions. Ex. 2 at 109-113; Ex. A at 7. Sanabria informed Ms. Sewell that he was extremely busy due to his transfer, his own training of his new duties and training Bassett. Ex. 2 at 109, 111, 113, 117-118; Ex. A at 7; Ex. K at 1-2. Ms. Sewell nonetheless asked Sanabria to make time for her training. Ex. 2 at 109. During this period, Ms. Sewell approached Sanabria in person repeatedly to get on his schedule and sent numerous emails "begging" Sanabria for training time. Ex. 2 at 110-111, 113. Ms. Sewell told Sanabria that it was an urgent matter since the task was now in her "standards" for which she would be rated. Ex. 2 at 116. Sanabria continuously needed to change training time that had been scheduled between them because of his schedule. Ex. 2 at 111, 114;

Ex. K at 2.

119.    According to Jarl, "Sanabria was a GS-13 and had done the report for a number of years." Ex. J at 2.  Ms. Sewell, by contrast, "had never done it and was not at the same grade level or in a professional series.  It was clear that it would take [Ms. Sewell] time to master the new task." Ex. J at 2; Ex. K at 2; Ex. Y at 2.  Nevertheless, Ms. Sewell was always willing to take on new tasks. Ex. J at 2.

120.    On May 9, 2005, Dunn gave Ms. Sewell a new assignment, formulating the Agency Object Class Request Budget Exhibit for the congressional budget.  Ms. Sewell had never worked on budget formulation nor had had any training. Ex. A at 8-9; Ex. X at 6; Ex. Y at 2; Email from Audrey Sewell to Linda Copening, dated May 2, 2005, incorporated herein as Plaintiff's Exhibit "Z."

121.    In lieu of training, Dunn gave Ms. Sewell a four inch thick briefing book and told her to "figure out" how to prepare the exhibit.  Ms. Sewell inquired whether it would be more beneficial for her to take a budget formulation course in order to do the work.  Dunn "agreed but told me that we didn't have time for me to take a course." Ex. A at 9.

122.    Without any direction or training, Ms. Sewell could not "figure out" how to prepare the exhibit.

123.    On May 17, 2005, Sanabria emailed Ms. Sewell and requested that her supervisor coordinate training with his supervisor. Ex. 2 at 111-112, 118; Ex. A at 8; Email from Vicente Sanabria to Audrey Sewell, dated May 17, 2005, incorporated herein as Plaintiff's Exhibit "AA." Ms. Sewell immediately forwarded his request by email to Dunn. Ex. 2 at 116-118; Ex. A at 8; Ex. AA.  Ms. Sewell received absolutely no response from Dunn. Ex. 2 at 118, 121; Ex. A at 8.

124.    On May 23, 2005, Ms. Sewell filed a Formal Complaint of Discrimination protesting the incident on April 8, 2005. Ex. 2 at 95-97; Formal Complaint of Discrimination, incorporated herein as Plaintiff's Exhibit "BB."

125.    On June 1, 2005, Winstead forwarded to Naomi Barry-Perez, Office of Enforcement for Civil Rights Center, the two union grievances Ms. Sewell had previously filed. Handwritten Note from Lillian Winstead to Naomi Barry-Perez, dated June 1, 2005, incorporated herein as Plaintiff's Exhibit "CC."

126.    On June 6th, Ms. Sewell and Sanabria resolved to meet on June 10th for training. Ex. 2 at 118-120.  On June 7, 2005, Ms. Sewell received a call at home from Dunn on her "flex" day. Ex. 2 at 119-121; Ex. A at 9-10.  Dunn asked Ms. Sewell about the status of the space rent report. Ex. 2 at 120-121; Ex. A at 10.  Ms. Sewell reminded Dunn that she had not been trained and that Dunn had not responded to Sanabria's May 16th email regarding her coordination of the training with his supervisor. Ex. A at 10.  Ms. Sewell further told Dunn that she and Sanabria had resolved to hold the training on June 10th. Ex. 2 at 121-122.

127.    Ms. Sewell confided to Dunn that she was planning to retire on September 3, 2005, instead of waiting until 2007. Ex. 2 at 122; Ex. A at 10.  Ms. Sewell told Dunn that she had decided to retire early:

> because of her assignment to me of the budget table which I did not know how to do and for which she did not provide me any training.  I pointed out that the space rent report was another assignment that I did not know how to do and that I had not been provided training on. Ex. A at 10; Ex. Y.

128.    The following day, Wednesday, June 8th, Ms. Sewell returned to work and opened an email from Dunn. Ex. 2 at 122-123.  Dunn directed Ms. Sewell to meet with Jarl, Bassett, and Sanabria on June 10th, the day Ms. Sewell had told Dunn that she and Sanabria had previously planned to complete her training. Ex. 2 at 122-123.

129.    At the 10:30 that Friday morning, it was agreed that Sanabria would complete the May space rent report with Bassett and Ms. Sewell watching and observing on June 15, 2005. Ex. A at 12.  Immediately after the meeting, Ms. Sewell observed Jarl return to Baird-Bridges's office. Ex. A at 12.

130.    By the time Ms. Sewell returned to her desk following the meeting, she had in her in-box an email from Dunn. Ex. A at 12-13.  In that email, Dunn suddenly admonished Ms. Sewell for "refusing to do assignments."  "I expect that you will continue to perform your duties as assigned, until you are no longer employed by the Employment Standards Administration.  As such, I am giving you a deadline of June 15, to complete the May Space Rent report. . . . Failure to complete this assignment will be interpreted as insubordination, and may result in further action." Ex. 2 at 137-139; Ex. A at 12-13; Ex. X at 5; Email from Charlene Dunn to Audrey Sewell, dated June 10, 2005, incorporated herein as Plaintiff's Exhibit "EE."

131.    Based on its tone, Ms. Sewell firmly believed that Vastano, not Dunn, had written the email:

> I don't believe but one of them was wrote by her.  I believe they were done in a Word document by Pat Vastano.  It sound like her to me.  I'm familiar with her writing. Ex .2 at 138.

132.    Ms. Sewell took Dunn's threat seriously, and in response asked Sanabria to conduct an emergency training in order to meet the June 15th deadline. Ex. A at 13-14.  Sanabria agreed to train Ms. Sewell on Monday, June 13th and promised to work with her to get the report completed by the 15th. Ex. A at 14; Ex. K at 2.

133.    On Monday, June 13th, Ms. Sewell arrived for work at 8:25 a.m. for the 9:00 a.m. training with Sanabria. Ex. 2 at 144; Ex. A at 14.  When Ms. Sewell got to her desk, she opened an email from Dunn sent after the work week had ended at on Friday, June 10th canceling the

training until June 15th, the day of Dunn's imposed deadline.  Notwithstanding Dunn's clear

directive that Bassett was not to prepare the report, Dunn canceled the training because Bassett

was purportedly unable to attend. Ex. 2 at 144; Ex. A at 14; Ex. X at 6.

134.     Ms. Sewell, a 63 year old veteran of service to the United States, sat at her desk

and became physically ill. Ex. A at 15.  According to Ms. Sewell:

> The conditions was hell if there ever was hell on earth because in all of my years I had never encountered a situation that I could not have emotionally handled because if things get too bad, you normally just back off.  She they put – illegal letter of reprimand that Pat Vastano had issued back there in December.  I did an outstanding job.  She was the one—and Baird-Bridges supported her. . . .  And then Charlene sending those e-mails, talking about if I didn't have the Space Rent by that Wednesday, although she know I was in capital training from that Monday for me to get the Space Rent -- . . . . She told me that the same day as the training because – a blind man could see the setup.  I couldn't possibly get it done.  No, it wasn't meant for me to get the Space Rent [done]. Ex. 2 at 136-138.

135.     According to Ms. Sewell, moreover:

> After reading that e-mail on the morning of June 13, I felt that I had no where to turn.  I went to Personnel and told them I would retire at the end of the pay period.  I felt very sick and had to be helped home.  I was sick the next day, Tuesday, June 14. Ex. A at 15-16; Ex. 2 at 144.

136.     Ms. Sewell then left the Agency headquarters on Constitution Avenue and went to

see her doctor. Ex. 2 at 141-144; Ex. A at 16.

137.     On June 15, 2005, Linda Copening received a telephone call at home from Baird-

Bridges concerning Ms. Sewell's medical certificate and request for leave. Declaration of

Audrey Sewell, incorporated herein as Plaintiff's Exhibit "U."  Copening returned Baird-

Bridges's call after conferring with Ms. Sewell.  Copening informed Baird-Bridges that Ms.

Sewell was retiring immediately.  According to Copening, Baird-Bridges then told Copening that

she would approve the sick leave.  Baird-Bridges also relayed a message to Ms. Sewell that she

would withdraw the letter of reprimand if Ms. Sewell withdrew her EEO complaint against

Baird-Bridges. Ex. U.

138.    On August 1, 2005, Baird-Bridges's close personal friend. Lockhart, sent Ms. Sewell a letter via federal express. Letter from Annabelle Lockhart to Audrey Sewell, dated August 1, 2005, incorporated herein as Plaintiff's Exhibit "FF."  By that letter, Ms. Sewell was advised that the CRC had transferred her EEO complaint to the Chairperson of the Department of Labor's Administrative Review Board (ARB) due to a "potential conflict of interest."

139.    In August 2005, Charlene Dunn was promoted to Director of DFM. Ex. B at 25. To date, nothing has happened to Ms. Sewell's December 2004 grievance against Baird-Bridges. Ex. A at 2.

140.    No action has been taken on Ms. Sewell's grievance against Baird-Bridges.

Respectfully submitted,


    /s/ Lisa Alexis Jones
Lisa Alexis Jones
1200 G Street, N.W. Suite 800
Washington, D.C. 20005
(202) 434-4507
(202) 434-8707 Fax
orbitcv@erols.com

*Counsel for Plaintiff*

Dated: December 6, 2007