1                IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLUMBIA
2

3    AUDREY L. SEWELL,                :

4              Plaintiff,             :

5    v.                               :

6    ELAINE L. CHAO,                  :   Civil Action No.

7              Defendant.             :   06-1534 (ESH)

8    _____/

9

10

11            DEPOSITION OF ANNE BAIRD-BRIDGES,

12   a Witness in the above-entitled cause, called for

13   examination by counsel for the Plaintiff, Audrey L. Sewell,

14   pursuant to notice and by agreement of counsel as to time

15   and place, was taken on July 31, 2007 at 1200 G Street, N.W.,

16   Suite 800, Washington, D.C. 20005, commencing at 9:05 a.m.,

17   before Suja Nair, a Notary Public in and for the District of

18   Columbia, when were present on behalf of the respective parties:

19

20

21   REPORTED BY:  Suja Nair

Page 2

1  APPEARANCES:
2
3      On behalf of the Plaintiff:
4      LISA ALEXIS JONES, ESQUIRE
5      1200 G Street, N.W.
6      Suite 800
7      Washington, D.C.  20005
8      (202) 434-4507
9
10     On behalf of the Defendant:
11     KAREN L. MELNIK, ESQUIRE
12     United States Attorney's Office
13     555 Fourth Street, N.W.
14     Washington, D.C.  20530
15     (202) 307-0338
16
17
18  ALSO PRESENT: Ms. Audrey L. Sewell
19               Mr. Toye A. Olarinde
20
21

Page 3

1              INDEX
2      Deposition of Anne Baird-Bridges
3           July 31, 2007
4
5  EXAMINATION BY:              PAGE:
6  Ms. Jones                    4
7  Ms. Melnik                   128
8  Ms. Jones                    132
9
10          E X H I B I T S
11 NO.    DESCRIPTION          PAGE:
12 1      E-mail               29
13 2      E-mail               114
14 3      E-mail               117
15
16
17
18
19
20
21

Page 4

1            P R O C E E D I N G S
2              - - - - -
3  Thereupon,
4            ANNE BAIRD-BRIDGES
5      a Witness, called for examination by counsel for the
6  Plaintiff, Audrey L. Sewell, having first been duly sworn,
7  was examined and testified as follows:
8       EXAMINATION BY COUNSEL FOR PLAINTIFF
9       BY MS. JONES:
10  Q.    Good morning.
11  A.    Good morning.
12  Q.    My name is Lisa Jones, as you know, and I
13 represent Audrey Sewell in the case that she has filed
14 against the Department of Labor, and we are here today to
15 take your deposition and ask you some questions about the
16 facts of the case, Ms. Sewell's claims and the department's
17 defenses.
18       Can you state your name for the record, spelling
19 your last name?
20  A.    Anne Baird-Bridges, B-a-I-R-D, hyphen,
21 B-R-I-D-G-E-S.

Page 5

1  Q.    And when I refer to you, Ms. Baird-Bridges, or
2  Ms. Bridges, what is your preference?
3  A.    Baird-Bridges.
4  Q.    Ms. --
5  A.    Or Anne is fine.
6  Q.    Well, I prefer --
7  A.    Okay.  Baird-Bridges.
8  Q.    Okay.  Ms. Baird-Bridges.  Thank you.
9       Just to go over a few ground rules -- have you
10 ever taken a deposition before in a civil lawsuit?
11  A.    No, I haven't.
12  Q.    This is -- as you can see, there's a court
13 reporter taking the -- my questions and your testimony.
14 It's important to -- in order for us to have a clean and
15 clear record, for me to finish my question before you start
16 to answer.
17       So can we agree that we'll do that?
18  A.    Yes.
19  Q.    And I'll promise as well that I will let you
20 finish your answer before I go on to the next question,
21 okay?

Page 6

1      A.    Okay.

2      Q.    It's very important for you to say yes or no as

3   oppose to nodding or shaking your head so that the court

4   reporter can take your -- your proper response.

5      A.    Okay.

6      Q.    If you need a break -- and we probably will take

7   a break maybe once every hour and fifteen minutes, hour and

8   a half or something like that -- we can do that.  Just let

9   me know.  The only caution is that if there's a question

10  pending, you have to answer the question -- finish your

11  answer before we can take a break, okay?

12     A.    Okay.

13     Q.    If you don't understand a question that I have

14  asked, we can -- you can either have me repeat the question

15  or we can have the court reporter read -- re-read the

16  question to you, okay?

17     A.    Okay.

18     Q.    Ms. Baird-Bridges, did you do anything to

19  prepare for your deposition today?

20     A.    I re-read my affidavit and reviewed -- I read my

21  affidavit and read my notes and --

Page 7

1      Q.    Anything else?

2      A.    Just talked to --

3      Q.    Ms. Melnik?

4      A.    Ms. Melnik.

5            I'm sorry.  I keep forgetting her name.

6      Q.    That's okay.  Me too.  I forget her name too.

7            And when you say you re-read your affidavit, is

8   that the affidavit that you gave -- well, let me ask you

9   this.

10           Well, what affidavit are you talking about?

11     A.    Well, there was only one.  It's -- and I don't

12  remember the name of the person who took it but at some

13  point I was asked to -- to tell what happened, and I did

14  that.  I answered those questions.

15     Q.    And maybe to refresh your memory, was that an

16  affidavit completed by a Jeff Juster in relation to Ms.

17  Sewell's claims in the administrative aspect of this case?

18     A.    Yes.

19     Q.    Okay.  And when you say you read notes, what

20  notes are those?

21           MS. MELNIK:  Can the record reflect that I'm

Page 8

1   giving counsel --

2            MS. JONES:  Off the record.

3            (Thereupon, a brief discussion was

4            held off the record.)

5            MS. MELNIK:  Let the record reflect that I

6   turned over to counsel a one-page document with the heading

7   that says a date of 4/18 2005, meeting with Vicente -- and

8   that's V-I-C-E-N-T-E -- Audrey and Bettye -- and it's

9   B-E-T-T-Y-E.

10           BY MS. JONES:

11     Q.    And I had asked you, Ms. Baird-Bridges, what

12  notes you were referring to that you had reviewed.

13           Are these the notes that you reviewed?

14     A.    Yes.

15     Q.    Okay.  That Ms. --

16           MS. MELNIK:  Melnik.

17           BY MS. JONES:

18     Q.    -- Melnik just handed to me this morning; is

19  that correct?

20     A.    Yes.

21           MS. JONES:  Off the record.

Page 9

1            (Thereupon, a brief recess was held.)

2            MS. JONES:  For the record, Audrey Sewell has

3   joined the deposition.

4            BY MS. JONES:

5      Q.    Ms. Baird-Bridges, I was asking you about what

6   you did to prepare for the deposition.  You -- you testified

7   that you re-read your affidavit to Jeff Juster, that you

8   read your notes -- re-read your notes and you had a

9   conversation with Ms. Melnik.

10           Anything else?

11     A.    I think that's it.

12     Q.    Other than talking to counsel, have you spoken

13  to -- before your preparation for the deposition -- have you

14  spoken to anybody else about the facts in Ms. Sewell's case?

15     A.    No.

16     Q.    On a previous occasion had you had an

17  opportunity to read your affidavit from Jeff Juster?

18     A.    Yes.

19     Q.    And do you know what a report of investigation

20  is?

21     A.    No.  Well, I don't know the -- I mean, not the

Towson Reporting Co.
410-828-4148

GORE BROTHERS
410-837-3027

Whitman Reporting - Rockville
301-279-7599

1  technical term by it.

2     Q.    Do you know that in these types of -- it's
3  probably true for other cases, but in these types of EEO
4  cases at the administrative level, one of the things that
5  Jeff Juster is doing is compiling what is known as a report
6  of investigation on administrative case.  And in that
7  compilation there is -- are several exhibits that would
8  include your affidavit.

9        Have you seen anything that includes -- or that
10  was compiled that includes your affidavit, maybe Ms.
11  Sewell's affidavit and some of the other affidavits of some
12  of the other witnesses?

13     A.    No.

14     Q.    So you haven't seen any -- or read any of the
15  other affidavits from any of the other witnesses in this
16  case?

17     A.    No.

18     Q.    Ms. Baird-Bridges, can we talk about, fairly
19  briefly, your educational history talking -- discussing
20  first your education history after high school?

21     A.    Okay.  I received a bachelor's degree from

1  Hampton Institute and a master's degree from Georgia State
2  University.

3     Q.    What did you receive your master's in?

4     A.    Urban community development with an emphasis on
5  human resources.

6     Q.    And when did you receive your master's?

7     A.    1977, June.

8     Q.    And any other formal education?

9     A.    Well, I went to the Kennedy School.  I don't
10  know if you -- the four-week institute.

11     Q.    Up at Harvard University?

12     A.    At Harvard, Kennedy School of Government,
13  executive seminar.

14     Q.    Okay.  And that was a four-week certificate
15  training program?

16     A.    Yes.

17     Q.    And when did you do that?

18     A.    Pardon me?

19     Q.    When did you do that?

20     A.    In March of 2001.

21     Q.    Let's -- let's -- let me start with after you

1  received your master's degree.

2        What was your first professional employment
3  after receiving your master's degree?

4     A.    I was -- at the time that I received my master's
5  degree I was working as a field representative with the
6  Office of Economic Opportunity in the regional office in
7  Atlanta.  So I was doing that at the time when I started and
8  after I finished.

9     Q.    And you said that was the Office of Equal --

10     A.    Office of Economic Opportunity.

11     Q.    And what were you doing there?

12     A.    I was a field representative.

13     Q.    And when you say you were a field
14  representative, what were -- what were you doing?

15     A.    I would review community action programs in the
16  area that I was assigned.  I would review grant
17  applications.  I would make on-site visits to the
18  communities, meet with the local -- the community action
19  program was a three-part thing where it had representatives
20  of the poor; it had private sector representatives and it
21  had elected public officials, the government boards.

1        And my responsibility was to review and monitor
2  operations of community action agencies that I was assigned
3  to review their grant applications and make recommendations
4  for approval.

5     Q.    And how long were you there?

6     A.    I worked at the Office of Economic Opportunity
7  from March of 1967 until September of 1981 when the
8  organization closed.

9     Q.    And was the -- were you a field representative
10  that entire period?

11     A.    No.

12     Q.    After you -- what was your progression at the
13  OEO, I'm going to --

14     A.    Okay.  I began as a GS 5, field representative.
15  I became a team leader at a grade GS 12 and 13, and then I
16  became a district supervisor at a Grade 14.  I also served
17  as a special assistant to the regional director during my
18  tenure there.  When I -- when I ended my career there in
19  1981 I was a district supervisor.

20     Q.    As a GS 14?

21     A.    As a GS 14.

Towson Reporting Co.
410-828-4148

GORE BROTHERS
410-837-3027

Whitman Reporting - Rockville
301-279-7599

Page 14

1    Q.    What -- I take it this is a federal --
2    A.    Yes.
3    Q.    -- agency or part of a federal agency?
4          What department, federal department was it
5    associated with?
6    A.    It was an independent agency.
7    Q.    Do you recall why it closed?
8    A.    The legislation terminated the organization.
9    Q.    What did you do after that?
10   A.    I worked -- well, immediately after that I did
11   not work. I did my volunteer work. So I was in the
12   Leadership Atlanta Program so I spent the next 12 months
13   doing that. And then I worked for about a year for
14   Investors Diversified Service as a -- what was the title --
15   it was sales representative.
16         And then I worked for a year with United Way as
17   an evaluation associate and -- you want me to bring you all
18   the way up to --
19   Q.    Hm-mmm (affirmative).
20   A.    Okay.
21   Q.    Yes.

Page 15

1    A.    In -- in 1985 I returned to the federal
2    government here in Washington. I worked at the Consumer
3    Product Safety Commission from January until September, I
4    think it was. And then I moved from the Consumer Product
5    Safety Commission to the Department of Housing and Urban
6    Development.
7          I worked there until 1999, when I was on detail
8    to the Department of Labor in the Senior Executive Service
9    Candidate Development Program. In November of 2000 I was
10   appointed to the position that I hold now as director of
11   Office of Management, Administration and Planning and
12   Employment Standards Administration in the Department of
13   Labor.
14   Q.    Okay. Let's back up just --
15   A.    Okay.
16   Q.    -- real quickly.
17         What -- what was your title at the Consumer
18   Product Safety Commission?
19   A.    I was a compliance officer.
20   Q.    And at what GS level were you when you left the
21   Consumer Product Safety Commission?

Page 16

1    A.    Eleven.
2    Q.    And how about HUD, what were you -- what was
3    your title at HUD?
4    A.    When I went to HUD -- when I left -- I went to
5    HUD as a management analyst, GS 13, and then -- you want me
6    to tell you everything I was -- that I -- positions in HUD?
7    Q.    Yes.
8    A.    So after I was a management analyst, 13, I was a
9    section chief, still Grade 13. Then I became a branch
10   chief, Grade 14, and then I became a division director,
11   Grade 15. And that's what I was when I left HUD.
12   Q.    Is it my understanding that you were at HUD for
13   a year?
14   A.    No. I was at HUD from 1985 --
15   Q.    Oh, to 1999?
16   A.    Yes.
17   Q.    Okay. I got it.
18         Okay. Now, we started talking about your --
19   beginning of your tenure at the Department of Labor, and
20   you -- you talked about a -- and correct me if I'm wrong --
21   you talked about a program that you had entered when you

Page 17

1    first started at Labor; is that correct? It was a
2    management program?
3    A.    (The witness does not answer.)
4    Q.    You tell me.
5    A.    Okay. The Department of Labor had a Senior
6    Executive Service Candidate Development Program for which I
7    applied and was selected. I was an employee of HUD detailed
8    to the Department of Labor. And so that program ran from --
9    I think I was selected in June of 1999. I actually began --
10   I actually physically moved to the Department of Labor in
11   September of 1999.
12   Q.    So from -- from June to September of 1999 you
13   were on detail to the Department of Labor?
14   A.    No.
15         From June -- I was -- okay. I was a HUD
16   employee until -- I was on HUD's rolls until November of
17   2000. In June 1999 the -- I was selected to participate in
18   the Department of Labor's program. I did not physically
19   move. I was still at HUD at that point. I physically moved
20   to the Department of Labor in September.
21         I was on a detail. I was still a HUD employee

Towson Reporting Co.
410-828-4148

GORE BROTHERS
410-837-3027

Whitman Reporting - Rockville
301-279-7599

Page 18

1  but the Department of Labor reimbursed HUD for my salary.
2  So I physically relocated, and I was on an official detail.
3  So technically I was an employee of HUD paid by the
4  Department of Labor but I was participating in this program
5  at the Department of Labor.
6      Q.   Got it.
7      And what -- how long did this program run?
8      A.   I was in the program from September '99 until
9  November of 2000.  It was a program that was scheduled
10  from -- 12 to 18 months was the -- the time frame that
11  was -- that was set up.  And it depended upon your
12  individual assignments, training sessions and that -- the
13  actual length of time.
14     Q.   And what was the program designed to do?
15     A.   The program was designed to prepare you to be
16  certified for the Senior Executive Service.
17     Q.   In -- in getting that certification or being
18  eligible for that certification, what kinds of -- what kinds
19  of things would you do within the program in that year and a
20  half that you were there or year and some months?
21     A.   The program required a minimum of 80 hours of

Page 19

1  training and it required a minimum of two rotation
2  assignments of sixty to ninety days.  What I did in the
3  program, because I was new to the Department of Labor, I did
4  actually four rotations -- assignments.  So you would be --
5  you would move from one office to another to help you learn,
6  you know, areas that you needed, that you wanted to focus on
7  and to prepare you for the management for the Senior
8  Executive Service and then you take training classes.  So
9  that's what I did.
10     Q.   After you completed the program, where did you
11  go?
12     A.   I was appointed -- I stayed at the Department of
13  Labor.  Department of Labor selected me -- appointed me to
14  the position that I now hold.
15     Q.   Okay.  And did you apply for that position?  How
16  was it that you got into -- in that particular position?
17     A.   The -- there was a vacancy.  The position that I
18  hold now was vacant at that time.  One of the things that
19  the Senior Executive Service Candidate Development Program
20  does is that it prepares you, and then once OPM reviews
21  your -- if you successfully complete the program, OPM

Page 20

1  reviews your -- your package and you make an application.
2  And they say that you are eligible to be appointed to an
3  SES.
4      And because you have competed to get into the
5  program, then with that SES certification from OPM, any
6  federal agency can appoint you to an SES position without
7  advertising the position.
8      Q.   And just to make the record clear, what does SES
9  stand for?
10     A.   Senior Executive Service.
11     Q.   And so you went directly into the directorship
12  of OMAP?
13     A.   Yes.
14     Q.   And in any of your rotations had you served in
15  OMAP, done any work or training in OMAP?
16     A.   My last rotation in September -- I think it was
17  in September of 2000 -- until I was appointed, I was acting
18  in that -- that was part of my rotation.
19     Q.   And when you got the directorship -- how many
20  people were you directly responsible for supervising when
21  you first got the directorship, if you recall?

Page 21

1      A.   There -- there were at least three division
2  directors and -- actually, I think at that point there was a
3  fourth because I think then the legislative and regulatory
4  affairs was still a part.  So I had four division directors,
5  and there was at least one secretary.
6      So I would say my direct reports would have been
7  five, somewhere along that.
8      Q.   Okay.  And the divisions of OMAP at that time
9  were what?
10     A.   Human resources, financial management,
11  information technology and management services and
12  legislation and regulatory affairs.
13     Q.   And who did you report to?
14     A.   The -- at the time that I was selected I
15  reported to the assistant secretary who was Bernard
16  Anderson.
17     Q.   And who would he have been, the assistant
18  secretary of ESA?
19     A.   Yes.
20     Q.   And ESA stands for?
21     A.   Employment Standards Administration.

Towson Reporting Co.
410-828-4148

GORE BROTHERS
410-837-3027

Whitman Reporting - Rockville
301-279-7599

Page 22

1    Q.    At some point was there a division of -- when
2    you say financial management, does that -- that was what is
3    known as DFM?
4    A.    Yes.
5    Q.    Okay.  Before you -- before you got the
6    directorship, did you know Ms. Sewell?
7    A.    No.
8    Q.    And you remember Ms. Sewell, don't you
9    (indicating)?
10   A.    Yes.
11   Q.    And when you got the directorship though, you
12   came to know Audrey Sewell though, correct?
13   A.    Yes.
14   Q.    And, if you recall, do you recall in what
15   division Ms. Sewell was when you first got to OMAP?
16   A.    DFM.
17   Q.    And do you recall who the -- the -- would it
18   have been a -- the director of DFM or a deputy director?
19   A.    A director.
20   Q.    And do you recall who the director of DFM was at
21   the time that you first got there?

Page 23

1    A.    Gary Thayer.
2    Q.    Was Mr. Thayer Ms. Sewell's direct supervisor at
3    that time?
4    A.    Yes.
5    Q.    Would divisions also have deputy directors?
6    A.    No.
7    Q.    Did you have a deputy director at -- for OMAP?
8    A.    Yes.
9    Q.    And at the time that you first got there, did
10   you have a deputy director?
11   A.    Yes.
12   Q.    And who would that have been?
13   A.    Eleanor.  Smith, I think was her last name.
14   Q.    From November 2000 to -- maybe -- take you to
15   the spring of 2002, did you have an opportunity to interface
16   with Ms. Sewell?
17   A.    2002?
18         Well, yes.  Yes.
19   Q.    Did you see her on a daily basis?
20   A.    Not necessarily a daily basis.
21   Q.    During -- well, let me ask you this.

Page 24

1    Did, at some point, Gary Thayer leave?
2    A.    Yes.
3    Q.    Okay.  Do you recall when he left?
4    A.    Not exactly, no.  No.  I don't recall the date.
5    Q.    Okay.  Okay.  And do you recall who took Mr.
6    Thayer's place when he left?
7    A.    Yoko Albarak.
8    Q.    And do you recall how long -- we'll just say
9    Yoko -- how long Yoko stayed in that position?
10   A.    At least a year.  I don't -- I don't recall
11   exactly how long but --
12   Q.    Okay.  And do you recall who, if anybody,
13   replaced Yoko?
14   A.    Janet Hogler.
15   Q.    And Ms. Hogler didn't stay very long, did she?
16   A.    No, she didn't.  She was -- that was in '04, and
17   she was there for only maybe like a -- six months.
18   Q.    And do you recall who, if anyone, replaced Ms.
19   Hogler?
20   A.    No one immediately.  I acted in that position.
21   Q.    Was that the first time you had -- well,

Page 25

1    withdrawn.
2         When you took over Ms. Hogler's position, did
3    Ms. Sewell become one of your direct reports?
4    A.    Yes.
5    Q.    Was that the first time you had directly
6    supervised Ms. Sewell?
7    A.    Yes.
8    Q.    Did -- how long did you stay in that position?
9    A.    Until -- I think it was August of '05.  I think
10   for a year.
11   Q.    And then who replaced you?
12   A.    Charlene Dunn.
13   Q.    Do you know who Pat Vastano is?
14   A.    Yes.
15   Q.    Who is Pat Vastano?
16   A.    Well, she was my deputy.  She's retired.
17   Q.    And she was your deputy of OMAP?
18   A.    Yes.
19   Q.    And you had testified that when you were --
20   first got there, Eleanor Smith was your deputy.
21         When do you recall Ms. Vastano coming on board

Towson Reporting Co.
410-828-4148

GORE BROTHERS
410-837-3027

Whitman Reporting - Rockville
301-279-7599

Page 26

1  as your deputy?
2      A.    I don't remember the exact date but I do know
3  that in the interim, after Eleanor left, Gary Thayer acted
4  as my deputy for -- was detailed as my deputy for a period.
5  Theresa Clark James was detailed as my deputy for a period.
6  So -- and then so Pat would have been after that.  So it
7  would have been -- as I said, I don't recall the exact date
8  but -- because she was -- actually there was one other
9  division.  You asked me if there was another division.
10         There was another division.  I had forgotten
11  about that.  She -- she was heading a division when I
12  arrived.
13     Q.    And what division was that?
14     A.    Strategic planning.
15     Q.    Did she still head that division while she was
16  also your deputy or did she move out of that division
17  entirely when she --
18     A.    She moved out -- out of that.
19     Q.    Prior to Gary Thayer leaving, had you formed any
20  impression of -- about Ms. Sewell and her work performance?
21     A.    No.

Page 27

1      Q.    You had signed off on Mr. Thayer's performance
2  ratings of Ms. Sewell, didn't you?
3      A.    Yes.
4      Q.    And do you recall generally what kind of ratings
5  Mr. Thayer gave Ms. Sewell during his tenure?
6      A.    I don't remember the specific rating but I mean,
7  she had good ratings that was either -- I would say -- I
8  don't know exactly, but good ratings.
9      Q.    Okay.  And up until that time there wasn't any
10  cause of concern about Ms. Sewell's work performance from
11  your recollection; is that correct?
12     A.    That's correct.
13     Q.    After Mr. Thayer left, did there -- did Ms.
14  Sewell raise an issue, if you recall, about her performance
15  rating?
16     A.    No.  I don't recall.
17     Q.    Do you recall there being some issue about Mr.
18  Thayer not having completed or signed her -- her -- the last
19  performance rating that he was to do for her and that Ms.
20  Vastano was going to complete the rating in his stead?
21     A.    See -- and I don't remember when he left so I

Page 28

1  can't say, but if he didn't complete a rating, I think -- I
2  don't remember the date he left.  Our rating cycle is
3  September 30th now and I don't remember when he left.  So I
4  don't know if he did or did not.  Knowing Gary, he -- I
5  don't know.  I don't remember.
6      Q.    Okay.  Did there -- were you ever apprised of
7  any issues between Ms. Vastano and Ms. Sewell in terms of
8  their working relationship at around that time?  And when I
9  say around that time, it's my understanding that Gary Thayer
10  left in -- around the spring of 2004.
11     A.    Okay.
12     Q.    Is that consistent with your recollection?
13     A.    As I said, I don't remember when he left but
14  that could very well have been the time.  I know he left
15  in -- 2004?
16     Q.    I'm sorry.  2002.
17     A.    Yeah.  Okay.
18     Q.    2002.  I'm sorry.
19     A.    Okay.  Okay.  2002.
20         I don't remember the date but it could have been
21  at that time.

Page 29

1      Q.    But around 2002 did there -- did it ever come to
2  your attention that there was -- there were issues between
3  Ms. Vastano and Ms. Sewell and their working relationship?
4      A.    No.
5      Q.    Did Ms. Sewell ever complain about being
6  harassed by Ms. Vastano in any way?
7      A.    The first I heard of that was when we -- when
8  we -- I don't remember the date but when we were having a
9  meeting regarding a grievance, and she talked about that.
10     Q.    Okay.  Your indulgence for just a second.
11         (Thereupon, Deposition Exhibit Number 1
12  was marked for identification.)
13         BY MS. JONES:
14     Q.    Ms. Baird-Bridges, I'm showing you what's
15  been -- has been marked as Plaintiff's Exhibit -- Deposition
16  Exhibit Number 1.  Do you recall ever seeing -- and this is
17  an e-mail which has been cut off.  But on the page it's an
18  e-mail sent June 1 -- June 5, 2002 to several people
19  including you --
20     A.    Hm-mmm (affirmative).
21     Q.    -- and Ms. Vastano.  And it is an e-mail from --

Page 30

1    A.    Hm-mmm (affirmative).

2    Q.    -- Ms. Sewell.

3         Do you recall seeing that?

4    A.    Probably. I'm not -- I'm not specific but I

5    do -- I'll say yes. It's -- it's -- but I don't think --

6         MS. MELNIK: If I could just jump in for the

7    record. I don't recall receiving this as part of the

8    discovery responses.

9         MS. JONES: It's got -- it's Bates stamped

10   Number 48, and if you -- for some reason it didn't get

11   photocopied, I'll certainly -- either it's 40 or -- it looks

12   like 48 to me.

13        MS. MELNIK: My Bates stamp 40-some is Ms.

14   Sewell's -- Ms. Sewell's affidavit goes from 000040 to

15   000050, 51, 52. So this was not something that I -- that

16   Defendant's received in discovery.

17        MS. JONES: Okay. And I will verify that but if

18   we could do that afterwards.

19        MS. MELNIK: Sure.

20        MS. JONES: There's no reason why I would have a

21   Bates stamp on it unless I turned it over.

Page 31

1         MS. MELNIK: I mean, it's probably some

2    administrative error.

3         MS. JONES: So what you have is -- I'm sorry?

4         MS. MELNIK: I mean, it might just be some

5    administrative error when it was photocopied and sent to us.

6    I'm not saying it was you personally. It's just not -- I

7    had it bounded, your discovery, and it's all in order so --

8         MS. JONES: And 40 -- your -- your 40 to 50 is

9    all of her testimony?

10        MS. MELNIK: Actually, 0048 is this

11   (indicating).

12        MS. JONES: Okay. And 0040 or -- that doesn't

13   necessarily look like --

14        MS. MELNIK: And 40 is (indicating).

15        MS. JONES: And how about 43? Forty-three is

16   the affidavit.

17        MS. MELNIK: Well, I mean --

18        MS. JONES: Well, we'll work it out.

19        MS. MELNIK: Okay. Okay. I'm sorry about that.

20        MS. JONES: Okay. Interesting.

21        BY MS. JONES:

Page 32

1    Q.    Ms. Baird-Bridges, I want to direct your

2    attention to the first paragraph --

3    A.    Hm-mmm (affirmative).

4    Q.    -- and the next to last -- the third to last

5    sentence through the end, which states no one discussed

6    making any changes with me. If there was something wrong

7    with the appraisal, why Pat did not consult Gary before he

8    left May 3, 2002, COB, so that he could have made any

9    changes that he -- that she felt should be made. If this is

10   an age discrimination tactic to pressure me into retiring,

11   it is not going to work. I will retire when I am ready.

12        Do you -- do you recall taking note of this

13   portion of Ms. Sewell's e-mail in her complaint or her --

14   this portion of Ms. Sewell's e-mail?

15   A.    No. And I don't recall -- no, I don't. Is

16   this -- may I ask a question?

17   Q.    No.

18   A.    Okay.

19        No. No. I don't recall specifically.

20   Q.    Do you recall any complaints made to you by Ms.

21   Sewell that -- during this period -- that Ms. Vastano had

Page 33

1    made comments to her about her -- her age to the extent that

2    Ms. Vastano thought that she should be retiring?

3    A.    No.

4    Q.    Do you recall Ms. Sewell making any complaints

5    to you whatsoever about Ms. Vastano making any derogatory

6    comments about Ms. Sewell's age?

7    A.    No.

8    Q.    Ms. Baird-Bridges, what -- how would you

9    characterize your working relationship with Ms. Vastano

10   during this period?

11   A.    We had a good working relationship.

12   Q.    And by this point, what GS were you, do you

13   recall?

14   A.    I was in SES from -- from the time that I was

15   appointed in November. I've been -- I've been at the same

16   level the entire time that I've been there.

17   Q.    So you're out of the GS system? Is that fair to

18   say? And Ms. Vastano still is or she still was at the time;

19   is that correct?

20   A.    Yes.

21   Q.    When Janet Hogler left, do you recall the

9 (Pages 30 to 33)

Page 34

1  circumstances of her -- of her leaving?
2      A.    Yes.
3      Q.    And can you describe that for the record?
4      A.    She had another job.  She -- I forgot the place
5  where she went to work, somewhere close to where she lived.
6      Q.    Do you recall her complaining about the nature
7  of the work environment at OMAP?
8      A.    Yes.  Well -- yes.
9      Q.    And what do you recall about her complaints?
10     A.    She was just -- I think she and -- well, maybe
11 the work environment is not quite the thing.  I guess she --
12 she had some concerns about the closeness of supervision
13 from Pat.
14     Q.    And -- and I'm not quite sure what you mean by
15 that.
16     A.    I think she felt -- well, my impression was that
17 she felt that she was too closely supervised.
18     Q.    By Ms. Vastano?
19     A.    Yes.
20     Q.    Had she made those complaints to you before she
21 left?

Page 35

1      A.    Yes.
2      Q.    And what was your reaction to her complaints?
3      A.    Well, she was new.  I did not think that -- I
4  guess we have difference in what's close supervision.  As a
5  manager, I -- it's my responsibility and the person who's
6  supervising, I feel, to -- to give guidance and to be in
7  close contact with the people that they supervise -- that's
8  an expectation -- and particularly when you have someone
9  who's new to an organization.
10            Even if you've done something in one place, you
11 do it in another place and there -- it's a different --
12 different culture.  Department of Labor is different from
13 Department of HUD, from OEO; different places.
14     Q.    By -- by 2004 -- going to the spring or summer
15 of 2004, do you recall that that was about when you became
16 Ms. Sewell's direct supervisor?
17     A.    Actually, it was -- I think Jan left in August.
18 I recall, I think -- whenever she left.  I think it was in
19 August.
20     Q.    And did -- is it, again, your testimony that the
21 first you heard about any contentions between Ms. Sewell and

Page 36

1  Ms. Vastano was in relation to Ms. Sewell's grievance
2  regarding the letter of reprimand?
3      A.    That's my recollection.
4      Q.    And around the time Ms. Hogler left, was there a
5  confrontation between you and Charlotte Jenkins?
6      A.    Well, I wouldn't call it a confrontation.
7      Q.    Well, first of all, who is Charlotte Jenkins?
8      A.    Charlotte Jenkins was the budget team leader.
9      Q.    And what is she now, if you know?
10     A.    I don't know.  She's not with DOL.
11     Q.    And do you recall when she left DOL?
12     A.    Probably -- not exactly.  I think it was in -- I
13 think it was the early part of '05.  I know it was -- I just
14 know it was after January of '05 but I don't recall the --
15 the exact date.
16     Q.    Do you -- you wouldn't call it a confrontation
17 but so tell us what happened between you and Ms. Jenkins.
18     A.    When are you referring to?
19     Q.    In August of 2004.
20     A.    August of 2004.
21            Well, I assume -- the only thing I -- the only

Page 37

1  thing that I could say, during the -- during the preparation
2  of the budget when we were with -- doing the OME budget
3  preparation, there were things that were required by the
4  budget guide and there were things that I had asked
5  Charlotte Jenkins to do that she did not do.
6            And we were having a discussion about them,
7  because it related to the Office of Federal Contract
8  Compliance specifically.  And so I had asked her to go to
9  the -- we call them OFCCP, Office of Federal Contract
10 Compliance, to discuss with their budget person.  And
11 Charlotte said she didn't want to go.  She said she was too
12 upset to go.  So we went back to her office, and we had a
13 conversation.
14            You know, she said well, I'm upset.  And I told
15 her that I was upset also because we had to get the budget
16 done, had something that she was suppose to do that she had
17 not done.  And so then we -- we talked for a few minutes and
18 then we went down to OFCCP to resolve the issue.
19     Q.    What was she upset about?
20     A.    She was upset that I had asked her to do
21 something that she didn't think she should do as part --

Towson Reporting Co.
410-828-4148

GORE BROTHERS
410-837-3027

Whitman Reporting - Rockville
301-279-7599

Page 38

1  that was part of the budget guide.
2      Q.    Was it, during this period, that Ms. Jenkins
3  complained that you had yelled at her and grabbed her -- her
4  arm in some fashion?
5      A.    Yes.
6      Q.    And was that what she was upset about?
7      A.    No.
8      Q.    Did she get upset about you yelling at her and
9  shaking -- and grabbing her arm?
10     A.    I did not yell at her.  I did not grab her arm.
11  I took Charlotte by the arm.  I said Charlotte, let's go
12  down and talk to OFCCP.
13     Q.    So it's your characterization that you -- you
14  took her by the arm so -- to lead her down to --
15     A.    Yes.
16     Q.    -- to the office; is that right?
17         MS. MELNIK:  Wait until she's done.
18         THE WITNESS:  Okay.
19         BY MS. JONES:
20     Q.    And do you -- you do know that Ms. Jenkins has
21  characterized what happened as your yelling at her and

Page 39

1  grabbing her -- forcibly grabbing her by the arm?  Do you
2  know that?
3      A.    Yes.
4      Q.    Did Ms. Jenkins make any formal complaints about
5  that?
6      A.    Yes.
7      Q.    And what -- what did she -- what kind of
8  complaint?  Did she complain to the union?  What kind of
9  complaint did she make?
10     A.    I -- I'm going to -- I guess it must have
11  been -- I'm going to say it was an EEO complaint.  I think
12  that's what it was.
13     Q.    And what, if anything, happened to it?
14     A.    The ESA -- it wasn't the ESA, I guess.  The EO
15  hired an investigator to investigate the complaint, and the
16  person did.  And that was the end of it.  It was not
17  determined to be valid.
18     Q.    Did Ms. Jenkins, during the period in which she
19  was making the EEO complaint, did she stay in her same
20  position?
21     A.    Now, I don't recall the date she made the

Page 40

1  complaint so I'm going to tell you that she did not stay in
2  the budget position for the entire time.  But I can't tell
3  you, you know, the dates.  I can tell you that during the
4  budget -- the congressional justification budget process, I
5  think I moved her from the budget.
6      Q.    And just to clarify the record, what is Ms.
7  Vastano's race and age, if you know?
8         MS. MELNIK:  I'll object.
9         There's no age issue -- I mean, a race issue.
10        You can answer.
11        BY MS. JONES:
12     Q.    You can answer.
13     A.    She's white of Italian descent.  I don't
14  actually know how old she is.
15     Q.    Is she --
16     A.    I know she's --
17     Q.    -- 20, is she 50?
18     A.    Well, she's -- she has to be over 50, yeah,
19  because she took -- she retired so --
20     Q.    Okay.
21     A.    Yeah.

Page 41

1      Q.    And Ms. Jenkins' race and age, if you recall?
2      A.    Black female.  I don't know.  She -- I would say
3  she's under 50 but I don't know how old she is.  My guess
4  would be that she's under 50.
5      Q.    Around November of 2004 do you recall assigning
6  Ms. Sewell what is known as a commitment accounting study?
7      A.    Yes.
8      Q.    And did Ms. Sewell complain about taking on that
9  task?
10     A.    No.
11     Q.    And did she complete that work appropriately?
12     A.    Yes.
13     Q.    Any issues with how Ms. Sewell completed that --
14  that work?
15     A.    No.
16     Q.    Now, we -- we had talked about --
17  intermittently -- about a letter of reprimand given to Ms.
18  Sewell.  Can you describe your memory of -- of the events
19  leading up to the letter of reprimand and why that letter of
20  reprimand was -- was given?  Let's take it step by step.
21        The events leading up to the letter of

Towson Reporting Co.
410-828-4148

GORE BROTHERS
410-837-3027

Whitman Reporting - Rockville
301-279-7599

Page 42

1  reprimand, based on your recollection?

2     A.    Now, you know, I did not issue the letter.

3     Q.    I know.

4     A.    Okay.  The -- when we -- okay.

5         Well, I don't know if I -- I'll explain it as

6  best I can.  Okay.  Well, I need to work backwards as oppose

7  to forward.

8         The -- the reprimand was issued -- the basis for

9  the reprimand was Ms. Sewell's conversation -- telephone

10  conversation with Ms. Vastano in which there was some

11  disagreement and I guess some subsequent hanging up the

12  telephone by Ms. Sewell on Ms. Vastano.

13         What the circumstances that -- as I understand

14  it -- that led to the discussion was that Ms. Sewell had an

15  assignment -- was working on -- had been assigned to work on

16  the detail fund report.  We had a consultant, George Bailey,

17  who had been helping us with our end of the year, you know,

18  accounting and financial work, and the detail fund report

19  was a part of that process.

20         And it was -- it -- it tells expenditures, you

21  know, on a daily basis so it's a tool that's used to keep up

Page 43

1  with your money.  And so George was going to train Audrey

2  on, you know, how to review and what to look for and, you

3  know, how to use the report.  And so George -- I was -- I

4  guess I was not in the office at the time but George had

5  been set up -- he was going to walk through with Audrey.

6         And as I recall from some of the e-mails, Audrey

7  had raised a question about why -- why a consultant -- she

8  used the term super -- I think supervising her.  And, you

9  know, it was explained that George was not supervising her.

10  He was just -- he was assigned -- his task was to explain to

11  her what we wanted done with the detail fund report.

12         And so my understanding is that some of that --

13  that -- what led up to the -- ultimately -- the conversation

14  that Ms. Vastano and Ms. Sewell had related to the

15  interactions between, I guess -- during that time between

16  Pat and as it related to George -- George -- Mr. Bailey

17  doing the training.  That's my understanding of what led up

18  to the circumstances.

19     Q.    And before the letter of reprimand was issued,

20  did you and Ms. Vastano have a conversation about what had

21  happened between Vastano and Ms. Sewell and what, if

Page 44

1  anything, should be done about it?

2     A.    She had told me what had happened and that she

3  was planning to issue a reprimand.

4     Q.    Did she need your authorization to issue the

5  letter of reprimand?

6     A.    No.

7     Q.    Did you have any concerns about whether that was

8  the appropriate remedy under the circumstances?

9     A.    No.

10     Q.    So is it fair to say that she came to you, told

11  you about this telephone conversation and said that she was

12  going to -- to issue a letter of reprimand and you said

13  okay?

14         Is that fair to -- a fair characterization?

15     A.    I didn't tell her not to do it.  I mean, if --

16  so.

17     Q.    Did you read the letter of reprimand before --

18  that was drafted by Ms. Vastano before it was actually

19  issued and given to Ms. Sewell?

20     A.    No.

21     Q.    Had Ms. Sewell ever -- from your knowledge --

Page 45

1  ever had a letter of reprimand placed in her personnel file

2  up until that point?

3     A.    Not that I was aware of.

4     Q.    Were you surprised by the -- well, withdrawn.

5         What did -- were you surprised by the tone

6  and -- and nature of the confrontation between Ms. Vastano

7  and Ms. Sewell in that telephone conversation?

8     A.    No.

9     Q.    Why not?

10     A.    I mean, there was nothing to be -- there was --

11  it's not the first time I've heard that -- that people have

12  had, I guess -- I wouldn't call it confrontations but I

13  guess back and forths with Ms. Sewell.

14     Q.    Well -- well, what had you heard before?

15     A.    Just people have had difficulty sometimes in

16  discussing things with her.

17     Q.    And do you recall who reported back to you that

18  they had difficulty communicating with her?

19     A.    No.  No, I don't.  I don't have -- I don't

20  recall any specifics.

21     Q.    Up until that time, was that deficit of

12 (Pages 42 to 45)

Page 46

1  communication noted in any of her performance evaluations,
2  if you recall?
3      A.    No, not that I'm aware of.
4      Q.    Did you endeavor to -- yourself or have her
5  direct line supervisor counsel Ms. Sewell on her
6  communication skills?
7      A.    Not her direct supervisor.  I have had
8  conversations with her while I was her supervisor.  We had
9  talked about communications.
10     Q.    And what led you to have that conversation with
11  Ms. Sewell?
12     A.    It was just during the performance appraisal
13  when we -- I had -- I always ask employees to rate
14  themselves as a part of the process, and communications was
15  one of the areas that she mentioned.
16     Q.    That Ms. Sewell mentioned?
17     A.    Yes.
18     Q.    And what did she say to you about
19  communications?
20     A.    I don't remember the exact but I mean, it's
21  not -- that's not an -- an excelling area; not -- not a

Page 47

1  negative but not a -- exceeding, I guess.
2      Q.    So is it your testimony that it was actually Ms.
3  Sewell who brought up to you during her in-person
4  performance evaluation that she thought she was having
5  issues with her communication?
6      A.    No.  She did not say she was having issues with
7  her communications.  When we were just -- it was -- and I
8  can't recall -- it was whatever the last -- the appraisal
9  that I had responsibility for doing.  When we were
10  discussing and we were talking -- as I said, people -- I
11  asked people to tell what they thought of their performance.
12  And it was just not an issue -- not an issue but not
13  exceeding.  That's what I'm saying.
14     Q.    And she herself felt that she was not exceeding
15  expectations in the area of her own communications?
16     A.    Yes.
17     Q.    And what advice or counsel did you give to her
18  based on that?
19          Well, withdrawn.
20          Did you agree with her?
21     A.    Yes.

Page 48

1      Q.    Why?
2      A.    Just in my communications -- different people
3  react differently to how people talk.  Some people, you
4  know, move beyond whatever they hear, you know, that -- the
5  tone.  Some people ignore that; other people react to it.  I
6  tend not to pay a lot of attention to that myself but I know
7  that other people do.  And people -- sometimes people --
8  people -- in working with people, how they feel about -- how
9  they feel -- how they feel that they are received or how
10  people talk with them has an impact on how -- it can have
11  impacts on working relationships.
12     Q.    So let's see if we can break it down a little
13  more specifically.
14          Is it -- is it your testimony that -- that
15  people in the work environment had issues with Ms.
16  Sewell's -- the tone of Ms. Sewell's communications with
17  them?
18     A.    I have heard that.  I -- I'll give you a
19  specific example.  I had one employee that had said to me
20  that they would walk around.  They would not pass by Ms.
21  Sewell's desk because they did not want to encounter her.

Page 49

1      Q.    And do you recall who that was?
2      A.    Yes.
3      Q.    Who was it?
4      A.    Ms. Newman.
5      Q.    Ms. Newman?
6      A.    Hm-mmm (affirmative).
7      Q.    And who's Ms. Newman?
8      A.    She use to be my assistant.
9      Q.    Do you remember her first name?
10     A.    Willamina.
11     Q.    And when did Ms. Newman lodge that -- that
12  complaint?
13     A.    It wasn't a complaint.  We were just having a
14  conversation.  She didn't -- she didn't file a formal
15  complaint or anything like that.
16     Q.    And anybody else that you recall?
17     A.    Nobody came to me specifically, no.
18     Q.    So when you say nobody came to you specifically,
19  was -- are you saying that it was -- well, just general talk
20  around the office about Ms. Sewell?
21     A.    (The witness does not answer.)

13 (Pages 46 to 49)

Page 50

1    Q.    And the tone of her communication.

2    A.    I don't know.  What do you mean by general talk?

3    Q.    Well, Ms. Baird-Bridges, you have said on the

4  one hand that -- that some people had expressed concern or

5  difficulty with interacting with Ms. Sewell because the --

6  of the way she communicates or the tone of her

7  communication.  The only specific example you've given is --

8  is Ms. Newman, and you've just testified that you don't

9  recall any other specific persons making a complaint.

10    A.    Hm-mmm (affirmative).

11    Q.    So other than Ms. Newman, you know, what are you

12  basing your testimony that there were issues in the office

13  about Ms. Sewell's communication?

14    A.    I guess I don't want to use the word issues.

15    Q.    Concerns.

16    A.    It's just in an office environment generally

17  there are people who are viewed as very easy to work with,

18  very easy to get along with that probably if you ask anybody

19  about them, they would say that that's how they operate.

20  And then there are other people that there are different

21  views about.

Page 51

1    Q.    Well, how was Ms. Sewell viewed?

2    A.    She was not the easiest person to communicate

3  with.

4    Q.    And let's talk about you.

5    A.    Okay.

6    Q.    When you say that she was not the easiest person

7  to communicate with and your interaction with her, give me

8  some examples.

9    A.    Well, one example that -- that she complained

10  about, about the e-mail situation.  When I had sent an

11  e-mail to the DFM staff -- because we were going to have --

12  I wanted to have a meeting about -- to discuss how we were

13  going to use the detail fund report.  And I sent the e-mail

14  with a return receipt request.

15         And when I didn't get a return receipt, I had

16  gone to Ms. Sewell to ask her about that.  And she got all

17  upset and just, you know, I didn't get that and, you know,

18  just -- it's -- so that's been my experience.  And on other

19  occasions I've had very good communications with her, you

20  know, as far as, you know, making assignments and no

21  problems with that.

Page 52

1         And as I say, I tend not to react as much maybe

2  as some people do and tend to overlook problems, things that

3  other people may feel a little bit more difficult about.

4    Q.    Well, we'll talk a little bit more about that

5  April 2005 incident.

6         But other than that incident, any others that

7  you can -- you can point to that you remember?

8    A.    Yes.  I think of when we had a staff meeting --

9  when I had a staff meeting with the DFM staff, her manner.

10  In fact, some people had come to me after the meeting and

11  said I can't believe she talked to you like that at the

12  meeting.

13    Q.    And what -- and when was this meeting?  Was this

14  the meeting in 2005?

15    A.    I don't remember the date of the meeting but it

16  was a DFM meeting that I -- that I had with all of the DFM

17  staff.  And I'd have to go back and find the date.  I

18  don't -- I don't recall the date of the meeting but all of

19  the DFM staff people were there.

20    Q.    And how did she speak to you?

21    A.    You know, raised tone of voice.

Page 53

1         And there was a discussion about she was --

2  about people not being promoted.  She -- specifically she

3  had talked about a couple of lower grade employees in that

4  office.

5    Q.    And you don't recall the approximate date that

6  that meeting took place?

7    A.    It would have had to have been -- no, I don't.

8  I can't give you the approximate date.  All I can say it

9  would have had to have been -- no, I don't.  I don't know

10  the date.  I can go back and look it up if you like.

11    Q.    So she spoke to you in a loud -- loudly?  Is

12  that fair to say?

13    A.    Yes.

14    Q.    Was she disrespectful to you?

15    A.    Some would characterize it as that.  Some of the

16  people who spoke to me after took it as that.

17    Q.    How -- how did you characterize it?

18    A.    I took it as Audrey.

19    Q.    And therefore, are you -- is your testimony that

20  Ms. Sewell was disrespectful in the office?

21    A.    No.  I said I took it as Audrey.  I have heard

1  Audrey raise her voice.  And as I said, different people
2  react to things in different ways, and I tend not to try --
3  I try not to get sidetracked by how people are presenting --
4      Q.    Did people at the office think -- view her as
5  cantankerous?  Her meaning Ms. Sewell.
6      A.    I don't know.  Some might.  I don't know.  I
7  can't speak for --
8      MS. MELNIK:  Was that the end of the sentence?
9      THE WITNESS:  I can't speak for everybody.
10      BY MS. JONES:
11      Q.    By the way, when you received this e-mail that's
12  Plaintiff's Exhibit -- Deposition Exhibit Number 1 --
13      A.    Hm-mmm (affirmative).
14      Q.    -- and you read the complaints that -- that Ms.
15  Sewell made about age discrimination, do you recall what, if
16  anything, you -- you -- you did --
17      A.    No.
18      Q.    -- in reaction?
19      A.    I didn't -- I don't recall doing anything.
20      Q.    Is it you -- you don't recall --
21      A.    I didn't --

1      Q.    Go ahead.  I'm sorry.
2      A.    Yes.
3          I didn't -- I don't think I read that as age
4  discrimination.
5      Q.    You don't think you read it -- I'm sorry.
6      A.    I'm reading that.  No.  I did not -- no, I did
7  not do anything.  I don't think -- you're asking if I did
8  anything in response to age discrimination?
9      Q.    Hm-mmm (affirmative).
10      A.    This -- as I read this, this says, you know --
11  it asks a question, is this an age discrimination tactic.
12  No.
13      Q.    So an employee of yours has lodged -- an
14  employee who's over 40 -- and by this time she is well into
15  her 50s -- has made an allegation that the behavior by
16  another employee that supervises her, Ms. Vastano, may be
17  engaging in age discrimination and is it your testimony that
18  you did nothing as a result of that allegation being made?
19      A.    I did not see this as an allegation.  I see a
20  question here.
21      Q.    So you didn't go to Pat Vastano and say look,

1  what's going on here, let's make sure that this is --
2      A.    No.
3      Q.    -- we're not engaging in age discrimination?
4      A.    No.
5      Q.    You didn't do any investigation based on -- on
6  this e-mail?
7      A.    I don't -- no.
8      Q.    Okay.  Now, when we get to Ms. Vastano coming to
9  you after she's had a conversation with Ms. Sewell on the
10  telephone, did you think Ms. Vastano was overreacting?
11      A.    No.
12      Q.    Well, did you think that Ms. Sewell was just
13  being Audrey in her conversation with Ms. Vastano, as you
14  put it, just being Audrey?
15      A.    Yes.
16      Q.    And did you counsel Ms. Vastano that that was
17  the case and -- and -- well, withdrawn.
18          Based on Ms. Vastano's relaying to you what --
19  withdrawn.
20          You were not on that telephone conversation,
21  were you?

1      A.    No.
2      Q.    And up until that time, the only version of
3  the -- of the conversation you received was from Ms.
4  Vastano; is that right?
5      A.    Yes.
6      Q.    And based on what you know about Ms. Sewell, did
7  you believe that -- that Ms. Sewell was being intentionally
8  disrespectful to Ms. Vastano during that phone conversation?
9      A.    I don't know.
10      Q.    Ms. Sewell complained about her letter of
11  reprimand, didn't she?
12      A.    Yes.
13      Q.    And how did she complain?
14      A.    She filed a grievance.
15      Q.    And as her supervisor, what role did you play,
16  if any, in processing that grievance?
17      A.    I was the reviewing official.
18      Q.    And would that be -- would you come into the
19  process at step one or step two, do you recall?
20      A.    I think it was called step two.  I'm not
21  positive.  I'd have to look at the records to see.

Towson Reporting Co.
410-828-4148

GORE BROTHERS
410-837-3027

Whitman Reporting - Rockville
301-279-7599

1    Q.    And when Ms. Sewell lodged her grievance, she
2   did it in writing, isn't that correct?
3    A.    Yes.
4    Q.    And do you recall reading her written narration
5   supporting her grievance?
6    A.    Yes.
7    Q.    Do you recall Ms. Sewell making allegations
8   about Ms. Vastano and Ms. Vastano's treatment of Ms. Sewell?
9    A.    Yes.
10    Q.    And what do you recall about that?
11    A.    Well, I don't remember the specific detail but I
12   mean, I've read it.  I don't --
13    Q.    Okay.  But you -- you recall that Ms. -- Ms. --
14   in response to the letter of reprimand, Ms. Sewell made
15   counter-allegations about how Ms. Vastano was treating her,
16   right?
17    A.    Yes.
18    Q.    Do you recall Ms. Sewell complaining that Ms.
19   Vastano would tell her to shut up?
20    A.    I don't -- I don't recall the specifics.
21    Q.    Do you recall Ms. Sewell complaining about

1   derogatory comments made by Ms. Vastano about people of your
2   kind?
3    A.    As I said, I don't remember the specifics.
4    Q.    Okay.
5    A.    You know, I know I did read it and I know that
6   she was complaining about Ms. Vastano but I don't remember
7   specifically what she -- you know, what she said.
8    Q.    As a result of Ms. Sewell's grievance, did --
9   did you have any kind of meeting between Ms. Sewell and her
10   union representative?
11    A.    Yes.
12    Q.    Was Ms. Vastano also in that meeting?
13    A.    Yes.
14    Q.    Was it just one meeting or were there several?
15    A.    I think we had two meetings.  I think the first
16   meeting Ms. Vastano was in, and I think the second meeting
17   may have just been me and Ms. Copening and Ms. Sewell.
18    Q.    And let's talk about the first meeting.
19         What, if anything, do you recall about that
20   meeting?
21    A.    That was the meeting -- I recall that Ms. Sewell

1   said that Ms. Vastano had been harassing her.  That was, you
2   know -- you asked me before about that, that she had been --
3   she said long term.
4    Q.    That Ms. Vastano had been harassing her for a
5   while?
6    A.    Hm-mmm (affirmative).
7    Q.    Is that fair to say?
8    A.    That's what she -- yes.
9    Q.    And what else do you recall her saying?
10    A.    Just -- I mean, just speaking about her record,
11   you know, that -- that it had not been -- this was the first
12   time any -- that there had been any, you know -- anything on
13   her record.
14    Q.    Did she -- did she complain at that meeting
15   about Ms. Vastano's comments to her about -- comments to Ms.
16   Sewell about her retirement, when she was going to retire,
17   she should retire, anything like that, do you recall?
18    A.    I don't remember that.  I remember specifically,
19   you know, talking -- her talking about harassing.  That's
20   what sticks in my mind.
21    Q.    And what did you -- and -- and was there

1   anything specific that you remember that -- associated with
2   her complaints about Ms. Vastano's harassment?
3    A.    No.  I don't remember the specifics.  I just --
4   just generally remember that she said that she felt she was
5   being harassed by Ms. Vastano.
6    Q.    Were you surprised by Ms. Sewell's allegations
7   about Ms. Vastano?
8    A.    Yes.
9    Q.    Why?
10    A.    It was not anything that I had observed, not
11   anything that I had heard.  So yes, it was a surprise to me.
12    Q.    After the meeting, did you have a conversation
13   with Ms. Vastano about Ms. Sewell's allegations?
14    A.    Yes.
15    Q.    And when did that take place, if you recall?
16    A.    I don't remember the exact time but shortly
17   after we had the meeting.
18    Q.    What -- would you have had that conversation
19   with Ms. Vastano after the first meeting but before the
20   second meeting that you had with Ms. Copening and Ms.
21   Sewell?

Towson Reporting Co.
410-828-4148

GORE BROTHERS
410-837-3027

Whitman Reporting - Rockville
301-279-7599

Page 62

1   A.   I'm sure.  Yes.

2   Q.   Okay.  And tell us about that conversation.

3   A.   Well, I asked her specifically about whatever it

4  was that -- that Ms. Sewell had said, and she was not aware.

5  She didn't know what Ms. Sewell was talking about.

6   Q.   You know who Cicily Rayburn is?

7   A.   Yes.

8   Q.   Who is Cicily Rayburn?

9   A.   She's the -- well, I don't remember the exact

10  title, but she worked for the office of workers'

11  compensation program, which is a program within the

12  Employment Standards Administration.

13   Q.   Do you recall Ms. Sewell stating in -- during

14  this process, either during one of these meetings or in her

15  written grievance, that the -- during Ms. Rayburn's tenure,

16  that the harassment with Ms. Vastano had gotten so bad that

17  Ms. Vastano and Ms. Sewell were required to communicate with

18  each other through Ms. Rayburn?

19       Do you recall anything like that?

20   A.   I don't recall.  I didn't review all of the --

21  that stuff before I came here.  I'm sorry.  I didn't.

Page 63

1   Q.   Okay.  Okay.  But by December 2004 you knew that

2  there had been some issue back in 2002 that Ms. Sewell

3  had -- had lodged a complaint about Ms. Vastano's conduct

4  towards her?

5   A.   Repeat -- say that again.

6   Q.   Okay.  You knew by 2004 -- by December 2004 when

7  the letter of reprimand was -- was placed in Ms. Sewell's

8  personnel file, Ms. Sewell had already made an allegation

9  two to three years before about how Ms. Vastano was treating

10  her, correct?

11   A.   I -- I'm trying to get the timing.  The

12  reprimand was issued in December of 2004?

13   Q.   Correct.

14   A.   And I don't think -- and I don't know that we

15  met in December.  I'm trying to -- I don't remember the

16  time.  I don't know if we met in December or whether it was

17  in January.  I don't remember the --

18   Q.   Okay.

19   A.   -- the timing of it.  So when you say if I knew

20  in December, what I had said was when we had the meeting was

21  when that was brought to my attention.

Page 64

1   Q.   Okay.  So whenever you had the meeting --

2   A.   Okay.

3   Q.   -- between you and -- and Ms. Vastano following

4  up on that first meeting, the first grievance meeting, there

5  had already been -- notwithstanding her denials that she

6  had -- had harassed -- ever harassed Ms. Sewell -- there had

7  already been a complaint by Ms. Sewell about how Ms. Vastano

8  was treating her, right?

9   A.   I had not seen a complaint.

10   Q.   But you saw this -- you saw the e-mail from

11  2002 --

12   A.   Yes.

13   Q.   -- that's contained in Plaintiff's Exhibit

14  Number 1, correct?

15   A.   Yes.

16       That raised a question.  She asked a question.

17   Q.   Okay.  And to you that wasn't a complaint?

18   A.   No.

19   Q.   Okay.  When you were in that meeting with Ms.

20  Vastano and she is protesting that she had never harassed

21  Ms. Sewell, did -- did the questions or the concerns or

Page 65

1  issues contained in Exhibit -- Plaintiff's Exhibit Number 1

2  that -- did that -- did you ever recall that?

3   A.   I don't recall.  As I said, I don't recall the

4  specifics of what -- she simply said -- I recall her saying

5  that she was being harassed.  I don't recall the specifics

6  of what you showed me in Exhibit 1.

7   Q.   Do you recall in 2002 there being an issue about

8  Ms. Sewell's vacation leave?

9   A.   I recall that Ms. Sewell had asked about --

10  yeah.  I wouldn't call it an issue.  She said that she had

11  submitted her leave vacation -- her request for vacation and

12  it had not been signed.  And I think she asked me about it.

13   Q.   Who -- who is she?

14   A.   Ms. Sewell asked me about it.

15   Q.   Okay.  And what did she ask you?  When you say

16  asked you about it, what -- what did you mean?

17   A.   Just whether it was going to be signed, I think.

18  And I think at that time it was.

19   Q.   And did it ever come to your attention that

20  because it had not been signed in a timely manner that Ms.

21  Sewell had actually cancelled her vacation because she

17 (Pages 62 to 65)

Page 66

1  didn't know whether she was going to get the leave?

2      A.    No.  I wasn't aware of that.

3      Q.    And --

4          (Thereupon, a brief recess was held.)

5          (Thereupon, the court reporter read back.)

6          BY MS. JONES:

7      Q.    Ms. Baird-Bridges, other than speaking with Ms.

8  Sewell, with a representative from the union and Ms.

9  Vastano, what, if anything, else did you do to investigate

10  Ms. Sewell's grievance?

11      A.    (The witness does not answer.)

12      Q.    Regarding the letter of reprimand.

13      A.    I just read the e-mail traffic.  That was --

14  that was it.

15      Q.    Okay.  And did there come a point that you made

16  a determination based on your investigation?

17      A.    Yes.

18      Q.    And when do you recall issuing that written

19  determination?

20      A.    I don't remember the exact date but it

21  was probably the spring, probably somewhere around March

Page 67

1  or -- I would think.

2      Q.    Prior to that, Ms. Sewell made a grievance

3  against you, isn't that correct?

4      A.    I'm not sure.  I don't know when that happened,

5  you know.  The things kind of got rolled together and it was

6  difficult to know which was which.  But I do know that, yes,

7  there was a grievance against me.

8      Q.    And what was Ms. Sewell alleging against you as

9  oppose to Ms. Vastano and the letter of reprimand?

10      A.    I don't know.  I guess it was harassment.

11  This -- as I recall, the grievance was related to -- it was

12  following the -- the e-mail -- the incident regarding the

13  e-mail.  I think that's what it was related to.

14      Q.    When you say the incident regarding the e-mail,

15  when she didn't send a return --

16      A.    The return receipt.

17      Q.    -- receipt?

18          But you don't recall prior to -- withdrawn.

19          Can we agree that the e-mail that you're talking

20  about -- that you just spoke about regarding Ms.

21  Sewell's failure to send a return receipt happened in --

Page 68

1  around April of 2005?

2      A.    I think that's correct.

3      Q.    Okay.  Before then do you recall receiving a

4  grievance by Ms. Sewell against you for fostering an

5  environment of harassment?

6      A.    No.  As I said, it was really confusing.  I

7  think -- I don't know that there were separate grievances.

8  It seems like that the grievance that I thought that -- the

9  reprimand, seems like there was something else rolled into

10  it, I think other issues.  But it wasn't clear to me.

11      Q.    Okay.  So it's your recollection that within

12  that -- that grievance regarding the letter of reprimand was

13  also complaints about your management and whether you were

14  fostering a hostile work environment?  Is that your

15  recollection?

16      A.    After the fact, yes.  At the time that -- it was

17  not clear to me.

18      Q.    Okay.  And when do you think you found out that

19  there was this separate one that related directly to you?

20      A.    It was probably after I responded to the -- to

21  the reprimand grievance, when I issued that -- I issued a

Page 69

1  decision.

2      Q.    And did that come -- and how did that come

3  about, your knowledge of -- that there was a separate issue?

4      A.    I really don't recall exactly how that came

5  about.

6      Q.    Do you recall whether there was an issue as to

7  whether you should have been the deciding official in a

8  complaint against you?

9      A.    No.  I don't recall anybody asking me that.

10      Q.    Would that be problematic if someone had

11  complained -- had lodged a complaint or a grievance against

12  you for you to be the deciding official in that instance?

13      A.    (The witness does not answer.)

14      Q.    Would that be a problem?

15      A.    Yeah.

16          Normally a grievance -- the grievance goes to

17  someone else.  Yeah.  I mean, you know, there are attempts

18  to do informal resolutions and then if that doesn't work, it

19  moves to another level.  So yes.  Normally I wouldn't do a

20  grievance against myself.

21      Q.    You wouldn't decide --

Towson Reporting Co.
410-828-4148

GORE BROTHERS
410-837-3027

Whitman Reporting - Rockville
301-279-7599

Page 70

1    A.    I wouldn't be the deciding official on a
2  grievance against me.
3    Q.    And because there was confusion, to use your
4  words, about what precisely the allegations were as it
5  related to you, no other deciding official or no other
6  person had been assigned to agreive (sic) that separate
7  grievance against you?  Is that fair to say?
8    MS. MELNIK:  I'm going to object as to vague and
9  the form.
10    THE WITNESS:  (The witness does not answer.)
11    BY MS. JONES:
12    Q.    Do you understand the question?
13    A.    The only grievance -- the only grievance I --
14  what I acted upon was a grievance that was filed against Pat
15  Vastano as a result of the reprimand issue.  That's the
16  grievance that I acted upon, and that was appropriate for me
17  to do so.
18    Q.    But as it relates to Ms. Sewell's grievance
19  against you, because there was some confusion as to whether
20  she was making a -- lodging a grievance against you
21  personally, whether another individual should be assigned to

Page 71

1  process that separate grievance.  Is that fair to say?
2    A.    When I -- the grievance that I acted on, I was
3  not confused about that.  That was related to the reprimand
4  and that's what I acted upon.  I don't know about what the
5  process for -- for a separate one against me -- I can't
6  answer that.  I did not do anything with a grievance against
7  me.
8    Q.    Well, you testified that at some point you
9  understood that there was, out of that December grievance
10  that Ms. Sewell was lodging, relating -- generating out of
11  the letter reprimand that there was a separate grievance
12  against you.
13    You understood that later, right?
14    A.    Well, I heard that later.  I don't know that
15  I -- I can't say that I have seen a separate grievance that
16  is -- that was directed at me.  So that -- maybe it went
17  someplace else.
18    Q.    So you don't know whether or not there has been
19  any investigation on that separate grievance against you?
20    A.    No.  I don't know.
21    Q.    Okay.  When you made your determination on the

Page 72

1  grievance related to the letter of reprimand, what was your
2  determination?
3    A.    I upheld the reprimand and reduced the time.
4    Q.    When you say reduced the time, what do you mean?
5    A.    From -- I forgot what the original amount was,
6  and I don't remember what I reduced it to.  But whatever it
7  was, I reduced the amount of -- the length of time in which
8  the reprimand would stay in the -- would be on record.
9    Q.    And would it refresh your recollection that that
10  letter of reprimand was -- the time in which the letter of
11  reprimand would stay on the record would be reduced to two
12  years from three years?
13    A.    Yes.
14    Q.    When you found out that Ms. Sewell had -- within
15  the scope of that grievance regarding the letter of
16  reprimand -- had also lodged a separate grievance against
17  you, how did you feel about that?
18    A.    I didn't have any particular feelings about it.
19  I mean, you know, employees can lodge grievances.  That's a
20  right that they have.  I didn't think there was any basis
21  for any grievance but that's part of the process.

Page 73

1    Q.    During your tenure at OMAP, have employees,
2  other than Ms. Sewell, lodged grievances against you?
3    A.    Specifically grievances?
4    Q.    Yeah.
5    A.    I don't recall a grievance, no.  I don't think
6  so.  No.  I can't recall a grievance.
7    Q.    During your tenure at OMAP, has an employee
8  lodged an EEO complaint against you?
9    A.    I think what Charlotte Jenkins lodged was an EEO
10  complaint, I believe.
11    Q.    Other than Ms. Sewell, of course?
12    A.    Yes.  No.
13    Q.    Anyone else?
14    A.    Oh, Vicente Sannabria.  That was a -- I guess
15  that was a -- was that against me directly or was -- he
16  lodged a complaint and I don't recall -- I don't know if it
17  was specifically against me or his supervisor so --
18    Q.    Okay.  And do you recall the allegations that
19  Mr. -- how do you pronounce his name?
20    A.    Sannabria.
21    Q.    Sannabria?

Towson Reporting Co.
410-828-4148

GORE BROTHERS
410-837-3027

Whitman Reporting - Rockville
301-279-7599

Page 74

1    A.    Hm-mmm (affirmative).

2    Q.    And do you recall the allegations that Mr.

3  Sannabria made?

4    A.    Yes.

5    Q.    And what were the nature of his complaints?

6    A.    His complaint was that he was not selected for a

7  GS 14 budget analyst position.

8    Q.    And was that the position that Ms. Kimberly

9  Bassett ended up being hired for?

10    A.    Yes.

11    Q.    Anybody else that you recall?

12    A.    Not against me directly, that I am aware of.

13    Q.    Did Ms. Keller, did she ever -- Bettye Kelly,

14  did she ever lodge any complaints against you?

15    A.    No, but she did file a grievance.

16    Q.    Against you or just --

17    A.    No.

18    Q.    -- generally?

19    A.    It was -- she filed a grievance about her

20  performance appraisal.  I don't think it was -- I ended up

21  being the -- well, no.  It must not have been against me

Page 75

1  because I was the reviewing official.

2    Q.    Okay.  Do you know who Mitsy Dailey is?

3    A.    Yes.

4    Q.    Who's Mitsy Dailey?

5    A.    She's a former budget analyst in my office.

6    Q.    Do you recall whether she ever lodged a

7  discrimination complaint against you?

8    A.    She lodged a discrimination complaint, and I

9  don't know that it specifically named me but I do know she

10  filed a complaint.

11    Q.    And what kind of complaint did she file?

12    A.    An age discrimination complaint, as I recall.

13    Q.    And do you recall how long ago the facts

14  arising -- from which her complaint arises took place?

15    A.    It was probably -- I don't know if it was -- it

16  was in January, so maybe it was -- I guess it was 2006.

17    Q.    Okay.  You don't have to guess now.  If you

18  don't --

19    A.    No.  I don't --

20    Q.    -- know, you don't know.

21    A.    I don't know.  She filed it after she -- she

Page 76

1  resigned and filed a complaint.  And whenever it was she

2  resigned, that's when it took place.

3    Q.    And do you recall the nature of her allegations

4  other than it was discrimination?

5    A.    Yes, generally.  She felt that she was -- had

6  too much work to do, given work -- well, complex work, and

7  she was complaining about having to work longer hours,

8  overtime hours, I think.

9    Q.    And do you know what has been the result of her

10  complaint or where she is in the process of her complaint?

11    A.    The last that I was aware, there were going to

12  be some, I guess depositions, but I am not aware that they

13  have taken place.  I do not know the current status.  That's

14  been some -- probably a few months ago that I heard that

15  discussion but I don't know.  I haven't heard nothing

16  recently.

17    Q.    Is her matter still in the administrative stage

18  or is it in -- in court --

19    A.    I don't know.

20    Q.    -- if you know?

21        Okay.  By March of 2005 had you come to any

Page 77

1  analysis about or assessment about Ms. Sewell's workload?

2    A.    About her workload?

3    Q.    Hm-mmm (affirmative).

4    A.    Yes.

5    Q.    And what kind of assessment did you make?

6    A.    I thought that she could have additional duties.

7    Q.    And how was it that she -- well, withdrawn.

8        And as a result of that, what -- what did you

9  do?

10    A.    I think that was when I assigned the detail fund

11  report.

12    Q.    And when did you assign that to Ms. Sewell?

13    A.    I think it was in March.

14    Q.    2005?

15    A.    2005, yes.

16    Q.    And leading up to that -- well, when you made

17  that assignment, did you do that in a meeting with her or

18  did you send her a memo?  How did you make that assignment

19  to her?

20    A.    I don't recall specifically.

21    Q.    Did you have conversations with Ms. Vastano

Towson Reporting Co.
410-828-4148

GORE BROTHERS
410-837-3027

Whitman Reporting - Rockville
301-279-7599

Page 78

1  about Ms. Sewell's workload and giving her additional
2  duties?
3      A.    I don't recall.
4      Q.    Is that something that you -- that you would
5  normally --
6      A.    Well, generally, with my deputy I discuss work
7  issues so -- I just don't recall specifically.  But
8  generally I do talk to the -- my deputy.
9      Q.    Do you recall a series of communications or
10 e-mails with Ms. Sewell in around March of 2005 where you
11 indicated to her that you were going to give her some
12 performance standards or different performance standards?
13     A.    Yes.
14     Q.    And when you say performance standards, what --
15 the parlance of the government -- what does that mean?
16     A.    Each employee -- we're required to have each
17 employee on a standard that states what they're going to do
18 with their work.  What we have done -- what I've done
19 in OMAP is we have -- each individual person has five
20 standards.  We got three -- we determine that we have three
21 that are kind of generic that any job -- every job in the

Page 79

1  organization requires some analysis, communications and some
2  technical content.
3          And then the remaining two would go to
4  specifically whatever their job description is.  And there
5  would be different levels of requirement, you know, as it
6  relates to analysis and communication depending upon the
7  grade level.  So that's what the performance standard -- so
8  every employee is required to be on a performance standard.
9      Q.    And how does -- would a particular employee's
10 performance standard match up with what's in their position
11 description, if at all?
12     A.    How do they match up with their position
13 description?
14     Q.    Correct.
15     A.    They should be related, because your standards
16 grow -- I mean, what your -- what a person is expected to
17 do, their performance, is related to whatever their job is.
18     Q.    And in deciding in -- withdrawn.
19          In your communications with Ms. Sewell around
20 March of 2005 about her performance standards, was there an
21 issue about you changing her performance standards or what

Page 80

1  were you doing in relation to that?
2      A.    Because -- again, because I was acting, this was
3  the first time that I had issued her performance standards
4  because for the prior year the division director had issued
5  the standards.  And so it was my job then to make sure that
6  she was on standards.  So I was -- related it to her job.  I
7  don't know that I changed them significantly because they --
8  I think they were, you know -- they were, as I recall,
9  fairly generic, you know, because they were like reports and
10 things that she did.
11         So yes, I had that discussion with her about the
12 standards.
13     Q.    Okay.  And so did you, in fact, have a
14 discussion with her about her standards?
15     A.    Yes.
16     Q.    And when do you recall having that discussion?
17     A.    It was sometime in March.
18     Q.    Okay.  Would it have been the same time that you
19 had the discussion with her about assigning her the detail
20 fund report duties?
21     A.    It could have been in the same time span because

Page 81

1  that would have been, you know -- that's the financial
2  report, which was part of what's in her job description --
3  that was in her job description at that time.
4      Q.    There were several things that were in her job
5  description that had not been assigned to her up until that
6  point, right?
7      A.    That is true.
8      Q.    And why was that?
9      A.    I can't really answer that because I was not
10 directly supervising her.
11     Q.    And up until that point who had been directly
12 supervising her?
13     A.    Her previous supervisor prior to me was Jan
14 Hogler who had, you know, as we discussed, left in August of
15 2004.
16     Q.    And before that it was Yoko and then --
17     A.    Yoko.
18     Q.    -- before that Gary Thayer?
19     A.    And before that it was Gary, yes.
20     Q.    So -- but you started supervising her in
21 November of 2004 or August 2004?

21 (Pages 78 to 81)

Page 82

1    A.    August 2004.

2    Q.    And between August of 2004 and March 2005 you

3  determined that Ms. Sewell was not doing some tasks that

4  were properly under her performance -- her position

5  description; is that right?

6    A.    What I determined -- during the time -- I didn't

7  make any changes from the time when Jan left.  She continued

8  to do what she had been doing.  I did not make any

9  additional assignments.  As we -- one of the things that had

10  happened during the end of the fiscal year -- September

11  30th, '04 fiscal year -- is that we had identified a need to

12  do more as far as tracking expenditures and just how the

13  detail fund report came into -- became an issue.

14        And so when I was looking at her performance

15  standards for the next year, then, obviously, one of the

16  things that I did was look at her position description.

17    Q.    And so that assessment was happening in --

18  around the -- the end and the beginning of the fiscal year?

19  Is that your --

20    A.    I -- the assessment of her?

21    Q.    Yes.

Page 83

1    A.    No.  The assessment of her -- I didn't actually

2  get around to issuing standards.  I didn't issue standards,

3  I think, until March.  And it was at that point that I

4  actually looked at the position description of what she was

5  doing, what she had been doing before.  She just continued

6  to do what she had been doing, the civil money -- reports,

7  weekly reports.

8    Q.    Okay.  And before March 2005, a contractor had

9  been doing the detail fund report; is that correct?

10    A.    The contractor had started doing the detail fund

11  report, yes.  We had hired a contractor before the end of

12  the fiscal year to help us with cleanup for the year.

13    Q.    And that was George Bailey --

14    A.    That was George Bailey.

15    Q.    -- is that right?

16        And -- well, who was -- before you hired the

17  contractor, who was doing the detail fund report?

18    A.    It had been done not, as I -- as I determined,

19  it had not been done systematically.  The accountants used

20  it at some point but nobody was doing it on a systematic,

21  you know, total review.

Page 84

1    Q.    Okay.  And at -- therefore, at some point in

2  March you gave Ms. Sewell -- based on that assessment -- you

3  gave Ms. Sewell standards that you -- that you had -- had

4  developed and the additional duty of processing the detail

5  fund report, correct?

6    A.    Yes.

7    Q.    And do you recall that -- you giving her that

8  assignment, in particular the detail fund report assignment,

9  in a meeting where Linda Copening --

10    A.    Copening.

11    Q.    -- Copening was present?

12    A.    I don't recall.  If it was the standards

13  meeting, it could have been.  But I don't -- I can't say.

14    Q.    Okay.  Did Ms. Sewell complain about taking on

15  that task?

16    A.    No.

17    Q.    Did she need any additional training in order to

18  do it?

19    A.    Well, I had asked George Bailey to go over the

20  report with her because he was the one, you know, that had

21  been doing it and had, you know, looked at how it could be

Page 85

1  used and, you know, what to look for.  But Audrey has good

2  analytical skills and so I don't -- I don't know if you call

3  it specific training but I had asked George to -- to go

4  through it with her.

5    Q.    Okay.  At that -- and there -- between March

6  2005 and the time that she retired in June, did -- were any

7  performance issues related to Ms. Sewell's processing the

8  detail fund report?

9    A.    No, not that I'm aware of.

10    Q.    At that time -- at the time that you issued the

11  reassignment, did you know that Ms. Sewell had actually done

12  the detail fund report previously in her tenure at -- at

13  Labor?

14    A.    No, I did not.

15    Q.    On or about early April of 2005, the series of

16  e-mails that we had discussed earlier were generated.  Can

17  you tell me what lead to the confrontation between you and

18  Ms. Sewell in early April in terms of these e-mails?

19    A.    I had scheduled a meeting with the DFM staff to

20  discuss the detail fund report -- was one of the main

21  items -- and how we were going to be using it and what role

Towson Reporting Co.
410-828-4148

GORE BROTHERS
410-837-3027

Whitman Reporting - Rockville
301-279-7599

Page 86

1  was going to be played.  And I had sent the message with a
2  return receipt.  Our e-mail system has a feature that if you
3  want to know whether or not a person has received a message,
4  it sends back a receipt when they -- saying that the message
5  has been received.
6       And I do that frequently if I have something
7  that I need -- expect everybody to be at so that I can make
8  sure that they get it.  Some people read their e-mail more
9  frequently than others, you know.  Some people constantly
10 read them; some people don't.
11      And I had not gotten a return receipt from
12 Audrey, so I went to her desk to make sure that she had the
13 e-mail because she was an important -- because it was the
14 detail fund report.  I needed to make sure that she was
15 going to be at the meeting.  And I had not gotten a return
16 receipt so I did not know whether she had read the message
17 and was aware of the meeting.
18 Q.   Okay.  Was the she only person who did not send
19 the return receipt back or a return receipt was not
20 generated back to you?
21 A.   I don't recall, but she was a key player so she

Page 87

1  was somebody that I had to have at the meeting.
2  Q.   Okay.  So what happened when you get to her --
3  well, was she working in an office?
4  A.   We have cubicles.
5  Q.   Okay.  But you have an office --
6  A.   Yes.
7  Q.   -- correct?
8       And what happened when you went to Ms. Sewell's
9  cubicle?
10 A.   When I asked her about it, she said she didn't
11 know what I was talking about and she didn't know anything
12 about return receipts.  And I explained to her how the
13 return receipt future works, that when you get a message
14 that somebody has sent you, an e-mail, and it -- there's a
15 pop-up on the screen that says do you -- it asks you do you
16 want to reply and you can hit yes or no to acknowledge the
17 receipt.
18      And she said I've not -- she said that she
19 hadn't seen that, that wasn't on her machine.
20 Q.   Well, let's back up for one second.
21      What did you say to her to, you know -- to

Page 88

1  prompt that response?  What was your -- what did you say to
2  her --
3  A.   I said --
4  Q.   -- when you first got there?
5  A.   I asked her if she had received the e-mail.  I
6  told her I had not received a receipt and I was checking to
7  see if she received the e-mail about the meeting.
8  Q.   Okay.  And, presumably, you told her that you
9  had sent an e-mail about a detail fund report meeting and
10 asked her whether she had received the e-mail?
11      Is that fair to say?
12 A.   Yes.
13 Q.   Okay.  And that's when she said I don't know
14 what you're talking about, I didn't see a pop-up?
15 A.   I don't recall the exact words but I know -- I
16 know that I said what the -- I sent the message with a
17 return receipt and that was when she told me that she didn't
18 know what I was talking about, that she didn't get a pop-up
19 on her machine.  And so I said to her -- and I'm -- I
20 don't -- I'm trying -- I don't know if she had actually
21 received the message.

Page 89

1       And during the discussion, I think we, you know,
2  arrived at the conclusion that sometimes her messages -- she
3  was not getting messages as quickly as some of the other
4  people.  And so I said well, that's a problem because, you
5  know, the system -- if the message is not getting to you, if
6  the pop-up is not there, then something is not working
7  properly with the system and we need to call the help desk
8  so that they can fix the problem.
9       And so we did call the help desk to try to
10 figure out what -- what was wrong.
11 Q.   Did you call the help desk right then?
12 A.   Yes.
13 Q.   Okay.  And what was her reaction to -- to -- to
14 that?
15 A.   She just kept saying, you know, my machine
16 doesn't do this and I don't know what you're talking about
17 and this is not, you know -- that she didn't know anything
18 about it.
19 Q.   And you know now that Ms. Sewell has complained
20 that you were yelling at her during this conversation and
21 physically intimidating her by pointing your finger in her

Towson Reporting Co.
410-828-4148

GORE BROTHERS
410-837-3027

Whitman Reporting - Rockville
301-279-7599

Page 90

1  face? You know that that's her allegation, correct?
2  A.    Yes. I know that that is her allegation.
3  Q.    And you have denied that?
4  A.    Because it is not true.
5  Q.    And what is not true, that you did not yell --
6  A.    I --
7  Q.    Let me -- let me take it one step at a time.
8  A.    Okay.
9  Q.    That you did not yell at her?
10  A.    No. I did not yell at her.
11  Q.    And that you did not point her -- your finger in
12  her face -- in her face -- in -- in close proximity to her
13  face?
14  A.    No. I did not point my finger in her face, not
15  closely or otherwise.
16  Q.    And if witnesses came to testify that they heard
17  you yelling at Ms. Sewell on that day, would they not be
18  telling the truth?
19  A.    No.
20      MS. MELNIK: Objection.
21      BY MS. JONES:

Page 91

1  Q.    You can answer.
2  A.    I can't imagine that witnesses would be saying
3  that.
4  Q.    So if someone came in and testified that you
5  were yelling at Ms. Sewell during this conversation, would
6  they not be telling the truth?
7      MS. MELNIK: Objection to the form.
8      THE WITNESS: (The witness does not answer.)
9      BY MS. JONES:
10  Q.    You can answer.
11  Yes or no?
12  A.    Repeat the question again.
13      MS. JONES: Why don't you read it?
14      (Thereupon, the court reporter read back.)
15      MS. MELNIK: Notwithstanding the objection, you
16  can answer, if you can.
17      THE WITNESS: They would not be telling the
18  truth.
19      BY MS. JONES:
20  Q.    When was Charlene Dunn hired?
21  A.    January of 2005.

Page 92

1  Q.    And for what position was she hired into?
2  A.    The budget director.
3  Q.    So she would have been director of what is known
4  as BBIF or BBFI? Is that the acronym?
5  A.    Branch of Budget Formulation and Execution.
6  Q.    Not Implementation?
7  A.    Implementation. BBFI.
8  Q.    BBFI?
9  A.    Yes.
10  Q.    And there came a time when it was decided that
11  Ms. Sewell, along with Bettye Kelly, would be transferred
12  into the budget division, correct?
13  A.    Yes.
14  Q.    And there was a decision as well made that Mr.
15  Sannabria would be transferred out of budget to accounting;
16  is that correct?
17  A.    Yes.
18  Q.    And who was head of accounting at that point?
19  A.    Larry Jarl.
20      MS. MELNIK: That's J-a-R-L.
21      MS. JONES: Thank you, Ms. Melnik.

Page 93

1      MS. MELNIK: That's M-E-L-N-I-K.
2      BY MS. JONES:
3  Q.    And how did it come about -- how did the
4  decision come about relative to those three personnel
5  decisions?
6  A.    Well, it was my discussion. As a part of my
7  job, I have to look at how do we get the work done. We had
8  had two -- at least two accountants had left. We had -- I
9  had been acting as the DFM director for over a year -- I
10  mean, going -- well, going into a year, I guess, and I
11  didn't have any prospects at that moment for filling the
12  position.
13      So what I was doing was looking at okay, here we
14  are organizationally. This was in April. We're going to
15  come up on the end of the fiscal year. We had the, you
16  know, budget -- next budget cycle coming up. And what I was
17  looking at is okay, how can I facilitate getting things done
18  given what I have to work with.
19      Vicente -- Mr. Sannabria was an accountant and
20  he had been doing -- had been in budget doing primarily
21  execution work, which he was good at, but he had indicated

Towson Reporting Co.
410-828-4148

GORE BROTHERS
410-837-3027

Whitman Reporting - Rockville
301-279-7599

Page 94

1  his -- not as much concern or liking for the formulation
2  part of the budget, which is a lot different. It's not as
3  cut and dry. It requires a different kind of thought
4  process than execution, which traditionally accountants --
5  it's not quite their territory.
6        So I had vacancies in accounting. Vicente was
7  an accountant. So I decided to move him to accounting
8  because I needed help there. One of the things that you
9  can't afford as you come to the end of the fiscal year is to
10 not have the kind of financial support to, you know --
11 deficiencies and all of that.
12       I had looked at Ms. Sewell's job description,
13 looked at the duties that -- I'd done that during the
14 performance standards process -- and looked at the duties
15 that had budget examples in it, that, you know, had a number
16 of different things. And I thought, oh, well, this makes
17 sense then, that I would move her to the budget branch.
18       Ms. Keller also, she's an -- I guess her job
19 title is secretary or assistant. I've forgotten exactly
20 what her job title was. But basically, you know, kind of
21 clerical responsibilities that I felt that she could support

Page 95

1  in budget. So I made the determination to reassign Vicente,
2  Bettye and Audrey, and I held a meeting with them. And I
3  explained to them that because of staff losses, the workload
4  that we had, what we were doing, that I was reassigning them
5  to new positions -- to new -- well, to different areas.
6  Vicente was a totally new position. Audrey and Bettye's
7  position descriptions had not changed. Their -- their
8  duties in their position descriptions did not change, simply
9  who they would be reporting to.
10       Because I, as the OMAP director and acting as
11 DFM director, really did not have the time to do the -- the
12 kind of supervision and to give them, you know, the
13 direction and guidance that they needed. And so that was a
14 management decision that I made, to reassign all three of
15 them. And I met with them to have that discussion because I
16 wanted to say it to them before I said it to the remainder
17 of the staff. I wanted to do it in person with them.
18    Q.   When did you -- withdrawn.
19        When was Ms. Bassett hired, do you recall?
20    A.   Not exactly, in the spring of 2005, but I don't
21 remember the exact date.

Page 96

1    Q.   Had she been hired when you had this meeting
2  relaying to Ms. Sewell and Ms. Kelly and -- and Mr.
3  Sannabria the reassignments?
4    A.   April -- yes. I'm sure she was there.
5    Q.   Okay. Had you advised Ms. Dunn and Mr. Jarl
6  about the reassignment before you had the meeting?
7    A.   Yes. I was -- I would never reassign people to
8  or from supervisors without having a discussion with them
9  about it beforehand.
10   Q.   On April -- and do you recall when the meeting
11 was?
12   A.   April 18th.
13   Q.   And you sent -- on April 17, 2005 you sent an
14 e-mail to the stakeholders, I guess you would say, that is
15 to Mr. Sannabria, Ms. Sewell and Ms. Kelly --
16       MS. MELNIK: Keller.
17       MS. JONES: Keller?
18       MS. MELNIK: Yes.
19       MS. JONES: I keep -- because it's Bettye
20 that's why I keep saying Kelly. It's Ms. Keller.
21       BY MS. JONES:

Page 97

1    Q.   -- and Mr. Jarl and Ms. Dunn about an emergency
2  meeting to be held on the 18th, correct?
3    A.   Well, I know I sent a message. I don't know if
4  I said it was an emergency meeting but I did -- I know I
5  sent a message telling them that I wanted to meet with them.
6    Q.   Okay. And you sent that message on the 17th,
7  correct?
8    A.   That's probably correct.
9    Q.   And do you recall what day of the week the 17th
10 was?
11   A.   No.
12   Q.   Would it surprise you if I told you that the
13 17th of April 2005 was a Sunday?
14   A.   No.
15   Q.   What was the urgency?
16   A.   (The witness does not answer.)
17   Q.   Well, withdrawn.
18       Had you told any of these -- had you told any of
19 the employees involved, the affected employees, Mr. Jarl,
20 Ms. Keller and Ms. Sewell that there needed to be a meeting
21 to discuss reassignments prior to April 17th?

25 (Pages 94 to 97)

Towson Reporting Co.
410-828-4148

GORE BROTHERS
410-837-3027

Whitman Reporting - Rockville
301-279-7599

1    A.    Okay.  The names -- the people that I -- I --
2    the employees were Mr. Sannabria, Ms. Keller and Ms. Sewell,
3    not Mr. Jarl.
4    Q.    I'm sorry.  Okay.
5    A.    No.  I had not had a discussion with them before
6    that.
7    Q.    Okay.
8    A.    This was my first time to have the discussion
9    with them.
10    Q.    So my question is:  What was the urgency of you
11    sending an e-mail on a Sunday to have a meeting first thing
12    in the morning the next day about these reassignments?  Why
13    was it so urgent for you to do that?
14        MS. MELNIK:  Objection as to the
15    characterization.
16        But you can answer if you can.
17        THE WITNESS:  It's not a matter of it being
18    urgent.  I was scheduling a meeting for Monday morning and
19    if I wanted to have a meeting on Monday morning, I wanted to
20    make sure that the employees had the notice when they got to
21    work.  Some of them came to work before I did.  Mr.

1    Sannabria, Ms. Keller, normally -- Ms. Keller normally
2    arrives at work around 6:00 a.m.
3        And so if I wanted to have a meeting with her in
4    the morning, then I would need to -- I don't -- as a general
5    rule, I don't get to work before 8:30, sometimes 9:00.  And
6    so if I wanted to have a meeting, it's a matter of sending
7    the notice.  It wasn't a matter of being an emergency.  It's
8    a matter of giving people prior notice that I wanted to meet
9    with them.
10        BY MS. JONES:
11    Q.    And if they had not happened to have --
12    because -- well, withdrawn.
13        An employee at Labor is not required to look at
14    their e-mails on Sundays, are they?
15    A.    No.
16        Most of them don't have access.  But Monday --
17    as I said before, Ms. Keller comes to work at 6:00 a.m.  I
18    come to work generally at 8:30.  And I don't remember what
19    time I set the meeting for but the -- the message was there.
20    I did not expect them to read the message on Sunday.  I
21    wanted them to have the message when they arrived at work on

1    Monday morning.
2        My expectation is that most employees will check
3    their e-mail when they arrive at work.  And sometimes
4    people, if they -- if they aren't in the habit of getting
5    lots of e-mail, like Ms. Keller, for example, may not read
6    their e-mail constantly throughout the day.
7        So in order to make sure that she had access to
8    it, I sent, you know -- sent -- I don't know -- you said it
9    was on Sunday so I take your word for it.  But that's not --
10    that's not an emergency, and that's not uncommon.  I have
11    access to my e-mail and it's not unusual for me to send an
12    e-mail outside of the normal workday.
13    Q.    Who is Annabella Lockhart?
14    A.    She's the director of the Civil Rights Center at
15    the Department of Labor.
16    Q.    Do you know her well?
17    A.    Yes.
18    Q.    Socialize with her out of the office?
19    A.    Yes.  We belong to a book club.
20    Q.    Good friends?
21    A.    Yes.  Yes.

1    Q.    During the meeting on April 18th, were all the
2    subject parties present at the meeting?
3    A.    Yes.  The three employees were present.
4    Q.    And was Mr. Jarl there?
5    A.    I don't remember whether the supervisor -- I
6    know that the employees were there.  I don't --
7    Q.    Do you recall whether Ms. Dunn was there?
8    A.    I don't remember.
9        The meeting was primarily for the employees.
10    Q.    Okay.  Did any of the employees ask that union
11    representation be present?
12    A.    Yes.
13    Q.    And -- and what was your response to that
14    request?
15    A.    That union representation was not a requirement
16    for that meeting.  It was not an adverse action, and it was
17    not a meeting that required union representation.
18    Q.    And the employee that was requesting that, that
19    was Ms. Sewell, wasn't it, primarily?
20    A.    I don't remember.  I know all of them did.  I
21    can't say which employee but I know that there was a request

Towson Reporting Co.
410-828-4148

GORE BROTHERS
410-837-3027

Whitman Reporting - Rockville
301-279-7599

Page 102

1  for union representation.

2      Q.    Did you know that or do you know now that in

3  anticipation of that April 18th meeting that Ms. Sewell had

4  contacted the union prior to going into the meeting?

5      A.    No. I didn't know she contacted them prior to

6  the meeting.

7      Q.    Is it fair to say that the employees were

8  unhappy about the reassignments?

9      A.    Yes.

10     Q.    And let's take it -- well, withdrawn.

11          Were they all unhappy with the reassignments for

12  the same reason?

13     A.    I don't know. The only -- Vicente didn't want

14  to -- he said he didn't -- he didn't want to leave budget.

15  So I don't know the reasons that the other people -- and

16  actually I don't know that they were unhappy. I know that

17  Vicente specifically said that he did not wish to leave

18  budget.

19     Q.    And you don't recall the concerns that -- if

20  any -- that Ms. Sewell expressed to you about her transfer?

21     A.    No, I don't.

Page 103

1      Q.    And how about Ms. Kelly -- Keller?

2      A.    Keller.

3          No, I don't.

4      Q.    Did -- did there come a time that you found out

5  that Ms. Sewell had lodged a civil rights complaint against

6  you?

7      A.    I think I know that now. I'm, you know --

8  that's why I say it's still very confusing to me about what

9  the complaint was. I know that we have this complaint, and

10  I assume this is the civil rights complaint.

11     Q.    Yes.

12     A.    So yes, I do.

13     Q.    Well, when I -- that she had lodged a complaint

14  to the Office of Civil Rights against, did you -- you did

15  find that out?

16     A.    Yes.

17          An EO counselor came and talked with -- well, I

18  had a meeting with an EO counselor.

19     Q.    And was that Jose Figaroura (phonetic)? Do you

20  recall his name?

21     A.    That may be. I don't really remember who it

Page 104

1  was.

2      Q.    But --

3      A.    Somebody from EO.

4      Q.    And it was a male?

5      A.    It was a male.

6      Q.    And was that the first time that you heard about

7  it?

8      A.    Yes.

9      Q.    What did you tell the EO counselor?

10     A.    He asked -- this was -- what he interviewed me

11  about was about the e-mail incident, and I told him pretty

12  much what I have told you today. You want me to repeat

13  the -- the circumstances surrounding that?

14     Q.    No.

15     A.    I guess the only other thing that I didn't say

16  that I guess I said to him was I think he said that she said

17  that I had long fingernails and I said to him, I've never

18  had really long fingernails. So --

19     Q.    Do you recall telling the EEO counselor that Ms.

20  Sewell had an attitude problem?

21     A.    I don't know if I used those words. I don't

Page 105

1  recall that.

2      Q.    Do you recall using -- discussing Ms. Sewell in

3  a similar manner as saying that she had an attitude problem?

4      A.    When I was discussing the incident I said that

5  Ms. Sewell kept talking. She did not wish to listen to what

6  I had to tell her about the e-mail situation, and she kept

7  saying, you know, that's not -- my machine doesn't work like

8  this. It doesn't work like that on my machine, and that it

9  was difficult to get a word in edgewise with her and trying

10  to explain to her what I was asking. I did tell him that.

11     Q.    And it turns out that Ms. Sewell was right,

12  isn't that correct? Her machine didn't work that --

13     A.    No.

14     Q.    -- properly, did it?

15     A.    No. The problem was that she had turned off --

16  didn't turn the receipt feature on.

17     Q.    Now, how do you know that?

18     A.    It was not working.

19     Q.    So how do you know she turned it off?

20     A.    She's the one who has access to her machine.

21  People have passwords on their machine and so in order for

27 (Pages 102 to 105)

Towson Reporting Co.
410-828-4148

GORE BROTHERS
410-837-3027

Whitman Reporting - Rockville
301-279-7599

Page 106

1  people to do it, it has to be somebody who has access to the
2  machine. So unless she gave her password to somebody else
3  to use her machine and they turned it off, it would have had
4  to have been her.
5      Q.    Well, did anybody tell you that she had turned
6  it off?
7      A.    The help desk, when they went down to check.
8  Because as I told you, we called the help desk so that they
9  could see why it was not working. And they said it had been
10  turned off.
11      Q.    They didn't say that Ms. Sewell had turned it
12  off, did they?
13      A.    They said that it was turned off on her machine.
14  But as I said, her -- access to all machines is by password.
15  So I can't go into her machine and deal with her e-mail, and
16  she can't go into mine and deal with my e-mail.
17      Q.    But, Ms. Baird-Bridges, you're just guessing,
18  aren't you?
19      A.    No.
20      Q.    You don't know whether she turned that -- that
21  feature off or not, do you?

Page 107

1      A.    I did not see her turn it off, but it was on her
2  machine and it was off.
3      Q.    And just to clarify, the people at the help desk
4  did not tell you that Ms. Sewell had turned that feature
5  off, did they?
6      A.    No. They said that it had been turned off.
7      Q.    Did you ever speak with Ms. Lockhart about Ms.
8  Sewell's civil rights complaint?
9      A.    No. It didn't get to that.
10      Q.    It didn't get to that? What do you mean?
11      A.    Well, I mean, I know, you know -- the EEO
12  counselor -- and that's the last until I had this -- was it
13  Mr. Juster?
14      Q.    Hm-mmm (affirmative).
15      A.    I didn't have any other -- the EEO counselor was
16  the only person that had contacted me about it.
17      Q.    Did you know that there had been a
18  determination that the Office of Civil Rights could not
19  process Ms. Sewell's claim because there was a conflict of
20  interest?
21      A.    No. I did not know that.

Page 108

1      Q.    And that that conflict of interest related to
2  the fact that Ms. Lockhart, your good friend, was the head
3  of the Office of Civil Rights. Did you know that?
4      A.    No. I did not know that.
5      Q.    You had talked a little bit about -- withdrawn.
6  I'm going to withdraw that.
7      There, at some point, came a determination that
8  Ms. Sewell should take over the space rent report that Mr.
9  Sannabria was processing; is that correct?
10      A.    Yes.
11      Q.    And do you recall how that decision came about?
12      A.    No. I was not involved in that process. I know
13  that the space rent report was an element that was in her --
14  that is in -- in the position description I know she was
15  operating.
16      Q.    And, by the way, the fact that Ms. Sewell was
17  not performing tasks that were in her position description
18  because they weren't given to her, that's not Ms. Sewell's
19  fault, was it?
20      MS. MELNIK: Objection to the form.
21      But you can answer if you can.

Page 109

1      THE WITNESS: No. That's not her fault.
2      BY MS. JONES:
3      Q.    Do you know that Ms. Dunn has, in her affidavit,
4  in the administrative part of this case, said that Ms.
5  Sewell had not been properly supervised in the past?
6      A.    No. I did not know that was in her affidavit.
7      Q.    And how do you feel about that assessment?
8      A.    I would say it's an accurate assessment.
9      Q.    And you were her supervisor?
10      A.    Yes.
11      Q.    Ms. Sewell's supervisor?
12      A.    Yes.
13      Q.    Even though it wasn't your decision about the
14  space rent report, giving the space rent back to Ms. Sewell,
15  or not back to Ms. Sewell, but to Ms. Sewell --
16      A.    Hm-mmm (affirmative).
17      Q.    -- notwithstanding that, did you have a
18  conversation with Ms. Dunn before she presented that
19  assignment to Ms. Sewell about her taking on this space rent
20  report?
21      A.    I had a conversation with Ms. Dunn when I was

28 (Pages 106 to 109)

Towson Reporting Co.
410-828-4148

GORE BROTHERS
410-837-3027

Whitman Reporting - Rockville
301-279-7599

Page 110

1  doing the -- when I prepared to make the reassignment and
2  when I reviewed the position description and shared the
3  position description with her and had the discussion about
4  some of the duties, and -- yes. So the space rent report
5  was one of those things that was discussed.
6      Q.    Okay. And did you believe that that was a task
7  that Ms. Sewell could undertake?
8      A.    Yes.
9            Ms. Sewell was quite bright, analytical. And my
10 experience with her had been that any assignment, the work
11 assignments that I had given her and that I had seen had
12 been high quality. She was -- she was a -- she was --
13 she -- she was a very knowledgeable employee. She had lots
14 of skills. There's no doubt in my mind that Ms. Sewell
15 could do all of the duties that she'd been assigned and
16 probably some that she wasn't assigned, that she was able to
17 do.
18     Q.    Were there discussions between you and Ms. Dunn
19 about the nature of the type of training that Ms. Sewell
20 would need to have in order to prepare the reports?
21     A.    No. I -- I did not get into that kind of

Page 111

1  detail. I don't generally get into that kind of detail with
2  my division directors about individual employees so no. I
3  did not do that.
4      Q.    Did there come a time when there was -- that you
5  became aware of -- that there was an issue about Ms.
6  Sewell's training relative to the space rent report?
7      A.    Yes.
8      Q.    When did you -- when were you first advised --
9  or became aware that there was some issue?
10     A.    Probably in June, I guess. I think it was
11 probably June.
12     Q.    And how did you become aware of it and what did
13 you become aware of?
14     A.    There was some e-mail traffic, I guess, going --
15 as far as the training not -- training not having been done
16 and, you know, in preparing for the report.
17     Q.    And did you ever have any conversations with Ms.
18 Dunn about that issue?
19     A.    No.
20     Q.    You never had a conversation with Ms. Dunn about
21 Ms. Sewell's training?

Page 112

1      A.    I mean, not -- no, not specifically.
2            When I -- you know, as I said, I looked at the
3  e-mail -- e-mails that I recall seeing where there had been
4  some back and forth and they were setting up meetings. And
5  so it was not anything for me to deal with.
6      Q.    Do you recall there being a meeting around June
7  10, 2005 between Ms. Sewell, Ms. Dunn and Mr. Jarl about the
8  training and the space rent report?
9      A.    No. I don't recall that. I wasn't involved in
10 that.
11     Q.    Do you recall at the time that the e-mail
12 traffic concerning this training became contentious between
13 Ms. Dunn and Ms. Sewell?
14     A.    Yes. I guess that would be an apt description.
15     Q.    And what, if anything, did you do -- did that
16 alarm you that the -- the tone of the e-mails alarm you?
17     A.    No.
18     Q.    Why -- why not?
19     A.    As I said, the e-mails that I saw said that they
20 were going to have meetings, that -- you know, that they
21 would schedule meetings. So that -- if they were doing

Page 113

1  that, then there was no reason for me to be alarmed.
2      Q.    Did there come a time that you saw an e-mail in
3  which Ms. Dunn informed Ms. Sewell that if the training and
4  the report was not completed within a time certain that she
5  would be insubordinate -- that Ms. Sewell would be
6  insubordinate?
7      A.    Yes. I have seen that e-mail.
8      Q.    And had you spoken to Ms. Dunn prior to that
9  e-mail being disseminated to Ms. Sewell about that
10 employment action, that she -- that potential employment
11 action that she would be held in insubordination?
12     A.    No.
13     Q.    Did you belive that that was a proper -- at the
14 time, did you belive that that was a proper employment --
15 potential employment action?
16     A.    To be honest with you, I can't say that I read
17 the e-mail at the -- all of the details of that e-mail at
18 the time that that e-mail went. So I can't -- I can't say
19 yes or no to that question.
20     Q.    Since then do you think it was an appropriate
21 potential employment action under the circumstances?

29 (Pages 110 to 113)

1    A.    I don't know all of the circumstances.  In the
2   e-mails that I've read -- I had not read the first e-mail or
3   memo or whatever that came from Ms. Sewell.  I saw reference
4   to it but I have not personally read that so I don't know
5   what the -- what the -- I don't know all of the details of
6   the correspondence between them.
7    Q.    On -- withdrawn.
8          (Thereupon, Deposition Exhibit Number 2
9   was marked for identification.)
10         BY MS. JONES:
11   Q.    Ms. Baird-Bridges, I'm handing you -- or the
12  court reporter handed you what's been marked as Plaintiff's
13  Exhibit Number 2 -- Deposition Exhibit Number 2, which is an
14  e-mail from Charlene Dunn to Audrey Sewell on June 10, 2005.
15         Do you recall ever receiving this e-mail?
16   A.    Yes.
17   Q.    I just want to ask you a few questions about
18  some of the references by Ms. Dunn.  In the first paragraph
19  she says -- Ms. Dunn says I received your June 8, 2005
20  memorandum in which you announced your retirement.
21         Did you and Ms. Dunn discuss, prior to this

1   e-mail, that Ms. Sewell had indicated that she was going to
2   retire?
3    A.    I don't recall when -- I do recall Ms. Dunn
4   telling me that Ms. Sewell had told her that she was going
5   to retire.  I can't say that I know when it was.  And I've
6   read this e-mail so all -- all -- I mean, all she told me
7   that -- that Ms. Sewell told her that she was going to
8   retire.
9    Q.    Okay.
10   A.    And I thought it was in the end of -- I was
11  thinking that it was at the end of the fiscal year but I
12  don't remember.
13   Q.    And going down to the last paragraph on the
14  page, Ms. Dunn says to Ms. Sewell, due to your unwillingness
15  to complete this project, I was forced to reassign it to
16  another member of the team who was already performing a
17  large number of assignments due to the budget submission.  I
18  have respectfully listened to your opinions and concerns;
19  however, I will not tolerate insubordination from any
20  employee who refuses to do assignments when they are given.
21         Did Ms. Dunn ever relate to you before this

1   e-mail that Ms. Sewell was refusing to do any assignments
2   given to -- generally given to her by Ms. Dunn and
3   specifically the space rent report?
4    A.    I don't recall.
5    Q.    And then finally, the last paragraph on the
6   second page, failure to complete this -- this is Ms. Dunn
7   says -- failure to complete this assignment will be
8   interpreted as insubordination and may result in further
9   action.
10         Is it your -- again, your testimony is that you
11  didn't -- you never had a conversation with Ms. Dunn prior
12  to her disseminating this e-mail about holding Ms. Sewell in
13  insubordination?
14   A.    That is correct.
15   Q.    Before she sent you this -- before she
16  disseminated this e-mail, did Ms. Dunn ever come to you and
17  say, gees, you know, I'm just having a really big problem
18  with that Audrey and getting this space rent report done?
19   A.    Hm-mmm (affirmative).
20   Q.    Do you recall her ever coming to you and -- and
21  having a conversation about Ms. Sewell's getting the space

1   rent report done?
2    A.    The only thing I recall -- and I don't know
3   the -- I can't remember when it was, but I assume that it
4   was sometime after Audrey had told her that she was going to
5   retire that -- that Audrey was saying that somebody else
6   should do it because she was going to retire.
7          And I know Charlene and I had a discussion that
8   in our organization planning to retire does not remove your
9   duties, that you work until you retire.  So that would not
10  be -- I do recall that discussion, but that's the only
11  discussion that I had.
12   Q.    Okay.
13         (Thereupon, a brief recess was held.)
14         BY MS. JONES:
15   Q.    Ms. Baird-Bridges, did you ever have a
16  conversation with Mr. Jarl about Ms. Sewell's training in
17  the space rent report?
18   A.    I don't recall having a conversation with him
19  about that.  As I said, I'm -- I'm not involved in the
20  day-to-day assignments and directions.
21         (Thereupon, Deposition Exhibit Number 3

Towson Reporting Co.
410-828-4148

GORE BROTHERS
410-837-3027

Whitman Reporting - Rockville
301-279-7599

Page 118

1  was marked for identification.)

2      BY MS. JONES:

3      Q.    Ms. Baird-Bridges, I'm handing you what's been

4  marked as -- the court reporter has handed you what's been

5  marked as Plaintiff's Exhibit -- Deposition Exhibit Number

6  3, which is an e-mail from Ms. Sewell to Charlene Dunn.

7          Have you ever seen this e-mail?

8      A.    No.

9      Q.    I want to direct your attention to the third

10  paragraph on the first page where Ms. Sewell says well, I

11  would have loved to have worked here at the U.S. Department

12  of Labor for two more years due to the fact that I feel that

13  I still have the knowledge and skills to contribute to the

14  department's mission.  But the work environment has become

15  such that I do not feel that I can effectively contribute.

16  Therefore, as I stated on the telephone, I plan to retire.

17          MS. MELNIK:  Well, if you're going to read it,

18  you should probably read it --

19          MS. JONES:  Okay.

20          MS. MELNIK:  -- exactly.

21          BY MS. JONES:

Page 119

1      Q.    -- and therefore -- where did I stop?

2          MS. MELNIK:  Start at therefore.  That's good.

3          BY MS. JONES:

4      Q.    Therefore, as I stated on the telephone on

5  Tuesday, June 7, 2005, I plan to retire from federal service

6  after 33 years of service effective September 3, 2005.

7          After -- around this time, did Ms. Dunn ever

8  relate to you that Ms. Sewell was considering -- was

9  planning to retire because of some issues that she felt were

10  happening relating to the work environment?

11      A.    I don't recall that.  She just told me that --

12  that Audrey had told her that she was going to retire in

13  September.  That's what I thought I had remembered.

14      Q.    I'm going to direct your attention to the last

15  page, Ms. Baird-Bridges, of Plaintiff's -- Deposition

16  Exhibit Number 3, and the last sentence of that page,

17  Charlene, I do not have any hard feelings towards you.  I

18  understand that you are only following orders.

19          Do you understand what Ms. Sewell might mean

20  by -- by that?

21          MS. MELNIK:  Objection.  It calls for

Page 120

1  speculation.

2          THE WITNESS:  No.

3          BY MS. JONES:

4      Q.    Did Ms. Dunn ever relate to you that Ms. Sewell

5  had made a statement like that?

6      A.    No.

7      Q.    Were you involved in any discussions about

8  insuring that Ms. Bassett was included in the training

9  sessions with Mr. Sannabria and Ms. Sewell?

10      A.    No.

11      Q.    Were you aware that Ms. Dunn had set a firm

12  deadline for June 15th for Ms. Sewell to complete the space

13  rent report for, I believe, the month of May?

14      A.    Not in advance.

15      Q.    Since then you -- you know that?

16      A.    I've read that in the e-mail.

17      Q.    Did Ms. Dunn ever relate to you that she felt

18  that Ms. Sewell's job performance generally was -- was sub

19  par since her reassignment to budget?

20      A.    No.

21      Q.    Did Ms. Dunn ever express to you that Ms. Sewell

Page 121

1  was being hostile and resistant to her management?

2      A.    I don't recall that.

3      Q.    When did you learn that Ms. Sewell had decided

4  not to retire in September but to retire in June of 2005?

5      A.    I don't remember the date but whatever day it

6  was that she turned it in.  I -- I was told whenever it

7  happened.

8      Q.    And was that her last day, when -- was that her

9  last day of physically being in -- on the work site?

10      A.    As far as I know.

11      Q.    And were you surprised?

12      A.    Not really.

13      Q.    Why not?

14      A.    Well, the conversations that -- as I said --

15  that I shared with you earlier that when Ms. Dunn had

16  expressed to me that Ms. Sewell had thought that -- had said

17  that since she was going to be leaving that someone else

18  should do the task.  And when she was told that she had to

19  work until she left -- so no.  So that didn't really

20  surprise me then, if -- that she just decided to leave.

21      Q.    So is it your -- your testimony that at the time

31 (Pages 118 to 121)

Page 122

1  you believe that Ms. Sewell was retiring so that she didn't
2  have to do the space rent report?
3      A.    Partially; that the -- that her -- she had --
4  okay.
5          As I understood it, she had said that she was
6  going to retire. And the impression, what I -- what I heard
7  was that since she was going to have to continue doing --
8  continue the assignments until she left, so yes. I did feel
9  that that perhaps contributed to the retirement. It was my
10 thinking that if she had not had the assignments, that maybe
11 she would not have left at that moment.
12     Q.    Well, Ms. Sewell had always been a conscientious
13 employee? Is that not a fair statement?
14     A.    Yes.
15     Q.    She had never intentionally tried to get out of
16 doing work for which she was being paid to do, had she?
17     A.    No, not that I was aware of.
18     Q.    Do you now know that Ms. Sewell has alleged
19 that -- that she felt that obstacles were being placed in
20 front of her to prevent her from being adequately trained to
21 do the space rent report?

Page 123

1      A.    I know that is what she alleges, yes.
2      Q.    And based on your review of the e-mails, how do
3  you feel about her assessment?
4      A.    I don't think it's accurate.
5      Q.    Did Ms. Dunn discuss with you the leave request
6  that -- the medical leave request that Ms. Sewell had
7  provided to her on the day that she -- that she put in for
8  retirement?
9      A.    (The witness does not answer.)
10     Q.    Ms. Sewell, that is.
11     A.    I'm not sure. I know there was -- I don't know
12 if that's the day that she retired. She put in a -- you're
13 saying that there was a meeting?
14     Q.    Well, I'll withdraw that.
15     A.    Okay.
16     Q.    I'll withdraw that.
17         The last day that she was at the workplace, do
18 you know that -- do you know now that she put in a medical
19 leave to Ms. Dunn?
20     A.    Yes.
21     Q.    And did you have any conversations with Ms. Dunn

Page 124

1  about Ms. Sewell's medical leave?
2      A.    Yes. She had indicated to me that she was going
3  to ask for more specifics as for, you know -- the
4  justification for a leave request.
5      Q.    And what was the issue in terms of --
6      A.    I think it was --
7      Q.    -- more information -- let me finish the
8  question.
9      A.    Oh.
10     Q.    -- of needing more information?
11     A.    My understanding was that it was just a general
12 request. Normally when people ask for extended leave, you
13 know, it's -- you're not into your medical, you know -- it's
14 details of medical -- of what's wrong with you, but there's
15 generally more than just a person needs to be out, you know.
16 For example, like if a person is going to have to have
17 surgery, you know, doctor may say the person has to have
18 surgery and needs to be out of work for, you know,
19 recuperation time or whatever or something, you know --
20 something a little bit more specific, not what they're
21 having it for or that kind of information.

Page 125

1          But my understanding was this was a very general
2  request. It did not rise to that level.
3      Q.    And did you actually see the -- the requested
4  form that Ms. Sewell submitted to Ms. Dunn?
5      A.    I don't recall.
6      Q.    What is your understanding of the dissemination
7  of -- the authority that a supervisor has when disseminating
8  medical information about an employee?
9      A.    (The witness does not answer.)
10         MS. MELNIK: Objection as to form.
11         THE WITNESS: Could you -- what do you mean when
12 disseminating medical information?
13         BY MS. JONES:
14     Q.    What is your understanding of the -- the
15 obligations a super has -- a supervisor has to protect
16 medical information given to the supervisor by a particular
17 employee?
18     A.    Okay. As a supervisor, any medical information
19 is limited to -- you -- the supervisor, obviously, is the
20 approving person -- approving official person and then you
21 have a payroll -- a timekeeper who maintains the time and --

32 (Pages 122 to 125)

Page 126

1  you know, the time and attendance records. So there has to
2  be some record backup of, you know -- in other words, if I
3  approve some leave, then there's a, you know -- there's a
4  written record of it and then that becomes a part of the
5  record and the timekeeper would maintain that.
6       So it would be supervisor and timekeeper.
7  Q.   So is it your understanding that a supervisor is
8  authorized to disseminate medical information given to the
9  supervisor by the employee to the timekeeper?
10 A.   The part -- what -- tell me what you mean by
11 medical information? Because generally what -- tell me what
12 you mean because I know what I'm talking about but I
13 don't --
14 Q.   Well, medical diagnosis.
15 A.   Well, I'm not generally aware that -- generally,
16 as a supervisor, you don't generally have a detailed
17 diagnosis so there wouldn't be any -- anything to
18 disseminate, you know. You would have whatever the
19 doctor -- you know, what the doctor submits, the -- the
20 things that I'm familiar with that people have submitted,
21 you know, have been like specific -- like whatever is going

Page 127

1  on that the person injured themselves, you know, the time it
2  takes to recover, all of that kind of information is what
3  generally is on the leave slip or what the doctor writes to
4  support the person's absence from work.
5  Q.   Okay.
6  A.   And that information, as I said, would be -- the
7  supervisor and the timekeeper because that would be a part
8  of the file, the time and attendance record.
9  Q.   Okay. Ms. Baird-Bridges, there's been a lot of
10 issues in the press about allegations regarding age
11 discrimination and race discrimination by employees in the
12 federal government relating to their displacement in -- I
13 don't want to say in lieu of but their displacement as a
14 result of the federal government privatizing some positions.
15      Are you generally aware of those allegations?
16 A.   Yes.
17 Q.   And do those -- any of those allegations or any
18 of those persons, were any of those within OMAP and your
19 division?
20 A.   No.
21 Q.   Okay.

Page 128

1       MS. JONES:  Let me take a five-minute break.
2       (Thereupon, a brief recess was held.)
3       BY MS. JONES:
4  Q.   Just one last question, Ms. Baird-Bridges.
5       In relation to your meeting, your April 18th
6  meeting regarding the reassignment and the April 17th
7  e-mail, do you recall telephoning Linda Copening that there
8  would be this meeting on the 18th? Do you remember calling
9  her on the 17th about that or leaving a voice mail message?
10 A.   Now that you mention it, I think I did call her.
11 Q.   And does that -- withdrawn.
12      Thank you. I don't have anything further.
13      EXAMINATION BY COUNSEL FOR DEFENDANT
14      BY MS. MELNIK:
15 Q.   Ms. Baird-Bridges, why did you call Ms. Copening
16 about the meeting on the 18th of April?
17 A.   Just to give her a heads up. Linda was
18 always -- we had a, you know, good working relationship. If
19 something were coming up -- it was something that required
20 union notification -- but it's been my experience that
21 sometimes if you're having a meeting and you -- and you

Page 129

1  think that someone may have a concern about it, you just
2  give the union a heads up so that they are aware. And that
3  was the purpose for that.
4  Q.   Ms. Jones asked you or she related to you that
5  Ms. Charlene Dunn said in her affidavit that she --
6  meaning, Ms. Dunn -- had felt that Ms. Sewell had not been
7  adequately supervised in the past. And Ms. Jones asked you
8  your opinion on that here today. You agreed with it.
9       Do you recall that -- that question and that
10 answer from earlier today?
11 A.   Yes.
12 Q.   Why do you -- did you feel or why do you feel
13 that Ms. Sewell or why do you agree with that statement that
14 Ms. Dunn made about Ms. Sewell's supervision in the past?
15 A.   Well, I go back to Gary Thayer. Gary was a very
16 laid back supervisor and did not do the appropriate level of
17 supervision, not just for Ms. Sewell but for other
18 employees, budget analysts. And so that's why I said I
19 agree with it. And also, because of my multitude of duties
20 and acting -- it's -- I'll be the first to say that it is
21 very difficult to adequately do two full-time jobs well, for

33 (Pages 126 to 129)

Towson Reporting Co.
410-828-4148

GORE BROTHERS
410-837-3027

Whitman Reporting - Rockville
301-279-7599

Page 130

1  one person to do that.
2      Q.    And just briefly, when you say Mr. Thayer didn't
3  do or didn't supervise not only maybe Ms. Sewell but others
4  for whom he was responsible -- I don't know what word to use
5  but to a high level, what causes you to make that assessment
6  about Mr. Thayer's supervision?
7      A.    Because many of the -- specifically as it
8  relates to the budget people, many of the duties that they
9  had -- that they should have been performing, they had not
10  been performing. And what I discovered is that Gary did
11  much of the work himself instead of requiring the employees.
12  And he also -- I guess we talked about -- I guess Ms. Jones
13  asked me -- Ms. Sewell was not doing all of the duties in
14  her position description.
15          And my experience with Gary Thayer is that he
16  would tend to take on and do many of the responsibilities
17  himself instead of requiring the employees to do it. So
18  that's the basis for my assessment.
19      Q.    Okay. With respect to the -- that whole issue
20  with the computers and the return receipt feature on the
21  e-mail, other than Ms. Sewell, was there anyone else who you

Page 131

1  were aware of that had an issue with that, not getting them,
2  not having it turned on? Was there anyone else?
3      A.    I don't recall.
4      Q.    Earlier this morning when Ms. Jones was asking
5  you questions about a Ms. Jenkins -- do you recall her
6  asking you questions about Ms. Jenkins?
7      A.    Yes.
8      Q.    And you stated that Ms. Jenkins, at some
9  point -- was it you who moved her -- made a decision to move
10  her?
11      A.    Yes.
12      Q.    Why was that decision made?
13      A.    Because she was not performing the budget duties
14  in a satisfactory manner. She was the team leader, and it
15  was creating more disturbance within the budget preparation
16  process. And so I removed her from that process so that I
17  could get the budget completed timely and gave her different
18  duties.
19      Q.    Was she demoted?
20      A.    No. She was at the same -- she was a 14 and
21  I -- what I did is I had developed a temporary 14 job

Page 132

1  because I did not want -- I was not performing an adverse
2  action. And so she was reassigned to a temporary 14 job
3  that was established for her to fulfill after I moved her
4  from budget.
5      Q.    Were any of the decisions that you made
6  regarding Ms. Sewell in terms of assignment of duties and
7  movement of the position -- her position to budget, was Ms.
8  Sewell's -- did Ms. Sewell's age play any role in
9  those decision-planning part in your thinking?
10      A.    No.
11      Q.    That's all I have.
12          MS. JONES: Off the record for a second.
13          (Thereupon, a brief recess was held.)
14          FURTHER EXAMINATION BY COUNSEL FOR PLAINTIFF
15          BY MS. JONES:
16      Q.    Ms. Baird-Bridges, Ms. Melnik asked you
17  questions about Mr. Thayer's supervision. Do you remember
18  those questions just a moment ago?
19      A.    Hm-mmm (affirmative).
20      Q.    Mr. Thayer wasn't Ms. Sewell's only supervisor,
21  correct?

Page 133

1      A.    Correct.
2      Q.    She had Yoko, right?
3      A.    Hm-mmm (affirmative).
4      Q.    Janet Hogler?
5      A.    Correct.
6      Q.    And yourself?
7      A.    (The witness does not answer.)
8      Q.    Yes?
9      A.    Yes.
10      Q.    And at some point in time she had Ms. Vastano as
11  her direct line of supervisor, isn't that right?
12      A.    I'm not sure. Did -- I'm not positive about
13  that.
14      Q.    In any event, between the time that Mr. Thayer
15  left in 2002 and in March of 2005 when you determined that
16  Ms. Sewell's workload was not consistent with the position
17  description -- withdrawn.
18          Between the time that Mr. Thayer left and -- in
19  2002 and March 2005, she had had at least two other
20  supervisors, correct?
21      A.    Yes. That's correct.

34 (Pages 130 to 133)

Page 134

1    Q.    Ms. Sewell, that is.

2    A.    Yes.

3    Q.    And up to three years had passed, correct?

4    A.    Correct.

5    Q.    And it wasn't until March of 2005, after Ms.

6  Sewell had lodged a complaint against Ms. Vastano and lodged

7  a complaint against you was it determined that her

8  position -- that her workload was not consistent with her

9  position description, isn't that right?

10    A.    No.

11        Her workload -- I don't think anybody said

12  her -- I didn't say her workload was not consistent with her

13  position description.  What I said was that she did not

14  have -- that there were more things -- she was not doing

15  everything that was in her position description.

16        She was doing things that were a part of her

17  position description and had been doing those and had been

18  doing those things well.  There was never a question about

19  that.

20    Q.    My -- my question to you though is that for

21  years that issue was never presented or resolved --

Page 135

1  presented to Ms. Sewell until after she had lodged a

2  complaint against Ms. Vastano and lodged a complaint against

3  you, isn't that right?

4    A.    I -- I can't speak to that because I don't know

5  what anybody else may have have said to her.  But I know what --

6  if you're talking about what I did --

7    Q.    Correct.

8    A.    -- the -- it was when I made an assessment.  I

9  had not made that assessment.  As I said, a part of what

10  happens in an organization, when you lose people -- you lose

11  a number of people and when you have to reassess your

12  resources, you have to look at what do you have, who do you

13  have available, where can you fill gaps.

14        And there were lots of different kinds of

15  assignments made where people -- sometimes when people

16  didn't have enough things to do, sometimes people were

17  overworked.  And I've made many shifts.  Ms. Sewell was not

18  the only shift that was made in the organization.  Over a

19  period of years, I've moved an indeterminate number of

20  people in order to fill gaps in the organization.

21        And that's what that was.  It didn't have

Page 136

1  anything to do with her complaint.  It had to do with what

2  is the work that we have to -- have to be done.  And one of

3  the problems was that we had not been doing enough to

4  monitor our financials, you know, to make sure that we were

5  where we needed to be, like when she got the detail fund

6  report.  And I hear today that she had done that before.

7        But, again, it was related to the work, not to

8  anything else.

9    Q.    But you would agree to me -- agree with me it

10  took -- well, withdrawn.

11        I don't have anything further.

12        MS. MELNIK:  I have nothing.

13        MS. JONES:  I -- I -- for the record, I have

14  received a report of investigation regarding Mitsy Dailey

15  versus Elaine Chao today.  And it is quite voluminous.  I

16  have not had an opportunity to review it.  I am going to

17  hold Ms. Baird-Bridges's deposition open until I have had an

18  opportunity to review the materials in discovery submitted

19  by the Defendant, in the event that I need to ask her more

20  questions regarding it.

21        MS. MELNIK:  Hopefully that won't be necessary

Page 137

1  and our -- in an alternative, hopefully you can -- if -- if

2  before the discovery closes or even if we need more time, if

3  you need to propound additional interrogatories based on the

4  additional documents rather than coming together for another

5  depo -- I just put that as another option, if it's

6  necessary.

7        MS. JONES:  Well, you -- Counsel, you know that

8  discovery closes in two days?

9        MS. MELNIK:  I know but we can -- I mean, we

10  have our status hearing on -- in -- in -- no.  In two days

11  our status -- our discovery doesn't close until Friday or

12  the following Friday or --

13        (Thereupon, a brief discussion was

14        held off the record.)

15        MS. MELNIK:  And you'll have your discovery

16  that's missing to me by --

17        MS. JONES:  I will try to have it by Thursday.

18        MS. MELNIK:  Okay.

19        MS. JONES:  This is off the record.

20        (Thereupon, signature not having been

21  waived, the deposition concluded at 12:55 p.m.)

Towson Reporting Co.
410-828-4148

GORE BROTHERS
410-837-3027

Whitman Reporting - Rockville
301-279-7599

Page 138

CERTIFICATE OF DEPONENT

1
2
3        I hereby certify that I have read and
4   examined the foregoing transcript, and the same is a
5   true and accurate record of the testimony given by me.
6
7        Any additions or corrections that I feel
8   are necessary, I will attach on a separate sheet of
9   paper to the original transcript.
10
11
12
13      _____
14                  Anne Baird-Bridges
15
16
17
18
19
20
21

Page 139

CERTIFICATE OF NOTARY PUBLIC

1
2        I, Suja Nair, the officer before whom the
3   foregoing deposition was taken, do hereby certify that the
4   witness whose testimony appears in the foregoing deposition
5   was duly sworn by me to testify to the truth, the whole
6   truth, and nothing but the truth concerning the matters in
7   this case.
8        I further certify that the testimony of said
9   witness was taken by me in stenotype and thereafter reduced
10  to typewriting under my direction; that said deposition is a
11  true record of the testimony given by said witness.
12       I further certify that I am neither attorney nor
13  counsel, nor related to or employed by any of the parties to
14  the action in which this deposition is taken; and
15  furthermore, that I am not a relative or employee of any
16  attorney or counsel employed by the parties hereto, nor
17  financially or otherwise interested in the outcome of this
18  action.
19      _____
20  My commission expires:        Suja Nair
21  April 1, 2011                 Notary Public

36 (Pages 138 to 139)