## DOL/Local 12 Standard Grievance Form

**GRIEVANT'S NAME:** Audrey Sewell          **AGENCY:** ESA

### Step 1 Information

**Official Presented To:** Pat Vastano     **Agency:** ESA

**Local 12 Representative:** Linda Spanning     **Agency:** ESA A.V.P

**Date of Alleged Violation (or continuing):** 12-17-04

**Basic Facts:** Grievant Rec'd a "Letter of Reprimand" on 12/17 dated 12-17.

**Signature of Grievant:** _____     **Date Filed:** _____

**Date of Receipt and Initials:** _____

### Step 2 Information

**Official Presented To:** Ann Baird-Bridges     **Agency:** ESA/OMAP

**Local 12 Representative:** Linda Spanning     **Agency:** ESA/AVP

**Additional Information:** The letter of Reprimand is blatantly discriminatory & part of a pattern of harassment toward grievant.

**Alleged Violations of Contract Article(s) and/or Regulations:** ART. 3 Sect. 1; ART. 45, Sect. 2. ART. 20 (Race & age discrimination)

**Remedy Sought:** Immediate Recission of Reprimand. Change chain of command to eliminate contact with Ms. Vastano.

**Signature of Grievant:** Audrey Sewell     **Date Filed:** 12/17/04

**Agency Vice President's Initials:** _____     **Date of Receipt and Initials:** _____

EXHIBIT G

B( 17 of 20)

December 26, 2004

## GRIEVANT RESPONSE TO LETTER OF REPRIMAND
### DATED 12/17/04 - RECEIVED 12/17/04

| | | |
|---|---|---|
| Audrey L. Sewell | * | Patricia J. Vastano |
| Fin. Mgmt. Specialist | * | Deputy Dir., OMAP |
| **Grievant** | * | Issued Letter of |
| | * | Reprimand |

### HISTORY

Since the first day Pat Vastano arrived in the Employment Standards Administration (ESA), Division of Financial Management, sometime in 1997, she targeted me with harassment. She has always, from day one, spoken to me in a manner that demeans my inherent dignity as a human being and has use subtle racial slurs in addressing me. In the course of her tenure, she has discriminated against me, by using work assignments as a means to harass me. She has also attempted to use the performance appraisal system as a means to force me to retire.

I had never met, or recall seeing Pat Vastano before she transferred from the Department to ESA in 1997 as a Program Analyst. At the time she came on-board, I was in transition from the position of Secretary to a Career Enhancement Position under the Direction of the Director of the Division of Financial Management, at that time, Cecily A. Rayburn (she is now in the Office of Workers' Compensation Programs, National Office).

The First I ever heard of Pat Vastano, was when she started calling Ms. Rayburn, the Director, at least 10 times a day, prior to the two weeks before she came on-board. At the time, I was answering the main telephone (before Voice Mail). Each time Ms. Vastano called Ms. Rayburn; if Ms. Rayburn was at her desk, I rang her intercom, if she was not at her desk, I took a message. Sometimes, Ms. Rayburn was busy, and after received 5 or more messages in the same day, from Ms. Vastano, she asked me to just take a message. Ms. Vastano called relentlessly (every 30 min. or so). After about of a week this, I told Ms. Vastano on the phone, that Ms. Rayburn was busy, but, would return her calls ASAP. Ms. Vastano demanded that I leave more messages. I verbally reminded Ms. Rayburn to return Ms. Vastano's calls. Ms. Rayburn would take the message back to her supervisor, Ms. Copson, than the Director of OMAP, and upon returning to her desk, Ms. Rayburn would return Ms. Vastano's call(s). As soon as she would return the calls, Ms. Vastano

Rayburn every time she called, but, Ms. Rayburn could not return each call every time Ms. Vastano called because she had work projects. At one point, Ms. Vastano seem to get angry, and asked if I was giving Ms. Rayburn her messages. I told her that I was giving Ms. Rayburn her messages, and that I had also verbally reminded Ms. Rayburn to call her. I also told Ms. Vastano that the Director was busy and would return the calls as soon as she could.

About after 2 weeks after all of the telephone calling, Pat Vastano was brought on board and introduced to staff of a new member of the Division who would be working with GPRA for the Agency. Since **Ms. Vastano has never, over the years, said what she has against me, I assume that she held some sort of a grudge because she may have felt that I was impeding her transferring to ESA with the telephone calling situation before she came on-board, which was not true**.

Immediately upon her arriving, Ms. Vastano began to pick at me when the Director was not present. **Ms. Vastano has always been very careful to make sure no one was close by, and she would always walk up close to me, and speak in a low voice with a strange smile on her face**. She ask me at one point to get on my hands and knees to move something under her desk concerning her computer, I gave her a telephone number to call to get help, she would always say, "why can't you do it". When she asked about supplies, I directed her to the supply cabinet, and provided her with an in-house form and a GSA catalog to order whatever she wanted. She would tell me to order for her. I explained to Ms. Vastano that although I was performing the secretarial function for the Division, that I was not a Secretary and that she did not have a secretary. I explained that my position had changed, but, I continued to perform the duties of the Division's secretarial position, because at that time, no one had been hired for the position, and someone had to do it. Ms. Rayburn was such a good supervisor that I did not mind. **Ms. Vastano than said something to the effect "your kind should not be in any position"**. This type of attitude towards me went from bad to worst. Finally, I complained to Ms. Rayburn, and she spoke to Ms. Vastano. (Ms. Rayburn was her supervisor as well as mine). Ms. Rayburn told me at that time that she had told Ms. Vastano, that anything that she needs to say to me, is to come though her. **The harassment stopped immediately**. Ms. Vastano would speak, and at times was friendly.

2

After Ms. Rayburn moved on to another position within DOL, Mr. Gary Thayer became the Director of the Division of Financial Management, and the harassment started again (Mr. Thayer was Ms. Vastano's supervisor as well as mind). I suffer from severe rheumatoid arthritis, and at times, I have problems walking. Ms. Vastano would come up to me and say things like, "why are you here, aren't you old enough to retire." Most of the time, as a co-worker, I ignored her remarks, and let them go through one ear and out of the other. The whole situation came to a head one day, after for days of her telling me that she knew what was best for me more than I knew what was best for myself.

The Division had been renovated, and all DFM employees were allowed to select their space, and just like every other staff member, I chose mine, not knowing it was on the other side of Pat Vastano's workstation at the time. Pat Vastano immediately asked me to move to another work station so that she could expand her work space to double, after I kept refusing, she again made the remark, **I just don't understand your kind.** I finally told her to get out of my face and stop nagging me. I brought the matter to the attention of the Director, Mr. Thayer, because this had been going on for days. **He spoke to her, and the harassment stopped** again immediately.

Around year 2000, she and another DFM staff member became a separate division of two. The harassment ceased until Anne Baird-Bridges came on board sometime in 2001, as the Director of the Office of Management, Administration and Planning, and selected Pat Vastano as her Deputy.

Soon after Ms. Vastano became the Deputy Director, Mr. Thayer started talking about retirement. He retired in May 2002. It was at this time that the harassment started up again, only, in worst forms. It was at the end of the rating period when Mr. Thayer retired. Before, he retired, Mr. Thayer discussed my appraisal with me, and told me my work was good as always and that he had no complaints (I had always been rated outstanding for many years until this point in time). Mr. Thayer stated that he had forwarded the appraisals for his immediate staff to Pat Vastano. After about a month of waiting, I started inquiring about the appraisal through a temporary BLS employee who was Acting Director, DFM, and he informed me that **Pat Vastano told him that she was working on my appraisal and should have it to me within a week (see Exhibit 1)**. I knew she was changing the appraisal given how she had been treating me in the past. **(see Exhibits 1 and 2)**. What Pat did not know at the time was I had proof that Gary Thayer had completed the appraisal prior to his departure. Gary Thayer had left me his

3

home e-mail address, and had e-mailed that he had completed the appraisal after I inquired after one month after his departure, and he replied that **"he did not know why the appraisal was being held for so long"**. The e-mails between me and Pat Vastano and Anne Baird-Bridges were numerous from the period June 4th until June 7, 2002. Finally, for the good of the Agency, I presenting the proof of Mr. Thayer's confirmation that he had completed the appraisal before he retired to Anne Baird-Bridges, Director, OMAP. I received the appraisal within 10 minute after presenting that proof (**see Exhibit 1, attachment 2**). In this case, although Pat Vastano had the appraisal since May 2 or 3, 2002, and in Anne Baird-Bridges' OMAP Notice 02-11, it clearly stated that all ESA employees' appraisals should be completed by May 31, 2002; this rule did not seem to apply to me. I was being treated differently from other DFM staffs. I don't believe Mr. Thayer prepared the appraisal I received, he signed off on the face, but the appraisal was not what he prepared. I had seen Mr. Thayer preparing the appraisal, and the appraisal that I saw contained narratives (Mr. Thayer always prepared narratives). The appraisal I received contained no narratives, but, I accepted it. **Of course, I wondered, inasmuch as there were <u>no prepared narratives contained in the appraisal that I was given, what was Pat Vastano working on for over a week?</u>**

After the Departure of the Temporary Acting Director, from BLS, Anne-Baird Bridges appointed Pat Vastano as Acting Director for the Division of Financial Management. She was acting director from July 12, 2002, through November 4, 2002. During this period, she was my immediate supervisor and I tried to get along and support her (see Exhibit 3). During this period, Anne-Baird Bridges sent out a written command that I and another DFM staff member assist the Chief, Branch of Accounting to perform over 300 ESA National Office leave audits for the transition from the Automated Time and Attendance (ATA) system, in preparation for the transfer of ESA employee data to the Peopletime Automated Time and Attendance system.

I was more than glad to help. Except, the other DFM staff member did not do any audits, I was the only one assisting the branch chief. Pat Vastano was aware of the situation. **See Exhibit #4.** It was during this period of her being my direct supervisor that most of the abuse took place. When I voiced my concerns, that, in the preparation of the audits, the Chief, Branch of Accounting, (than James Briscoe) had given me supervisory access to all National Office Wage Hour and Office of Workers' Compensation Black Lung Employees' leave records as well as their personnel information in order to access the

4

audit was not what we were in violation of the privacy act, due to the fact that I was not authorized by departmental personnel to access this information. Ms. Vastano told me, to "**Shut up and do as you are told**". **At this time I told her I was not her dog.** She replied, "**what are you? you are nothing**", and with that she turned and walked away. I did not complain to her supervisor Anne Baird-Bridges because I did not feel she would believe me. Getting leave approved for medical appointments, etc, during this period was like hell. Pat Vastano would have the SF 71 Application for Leave in her hand and wave it and ask questions about what I was going to the doctor for. At one point, she caught me off guard, and I did tell her about my medical problems, and she gave me the approved SF 71 and made the remark, that there was always retirement as she walked away. Still I did not complain because I could not prove what she was doing. I avoided her as much as possible during this time.

    **On August 8, 2002**, I gave Anne Baird-Bridges' assistant a SF 71 to give to Pat Vastano for use of loss leave. I had planned a bus trip with my sister for September 6, through September 9, 2002, but, I needed to submit payment for the trip by **August 15, 2002**. I had applied for leave for the period September 3, through September 13, 2002. On August 14, 2002, I asked the Assistant would she check on Ms. Vastano's desk to see if the leave form was still there and she checked and said yes. On August 14, 2002, I cancelled my vacation plans with my sister.

    On August 16th, 2002, Anne Baird-Bridges sent me an e-mail and requested a meeting with her and Pat Vastano concerning my work. At the end of the meeting, **right in front of Anne Baird-Bridges, I asked Pat Vastano about the SF 71 concerning the use of loss leave which was given to her August 8, 2002, and she said it was on her desk.** I than ask why she had not approved the leave, and she said it was because of office coverage. I than asked her why did she not just disapprove the leave and return the SF 71. I also told her that I had canceled a trip because she did not approve my leave, and she said, **right in front of Anne Baird-Bridges, that I had not discussed my vacation plans with her**. Anne Baird-Bridges said nothing. I was feed up with being treated like property. No one else within the Division was being treated in this manner. I got upset, and I told her right in front of Anne-Baird Bridges that my telling her what I had planned on my vacation had nothing to do with approving or disapproving the leave. She was legally suppose to approve or disapprove the leave and not hold onto the SF 71 and do nothing waiting for me to come begging. On August 19, Anne Baird-Bridges returned

5

too late for my trip because the deadline to get my payment in was August 15 **(see attachment to Exhibit #5)**.

Later on August 16, 2002, I sent Anne Baird-Bridges an e-mail on the subject **(See Exhibit #5)**. Anne-Baird-Bridges read the e-mail on August 19th, but never responded, no apology was ever given by anyone. While Pat Vastano was Acting Director, DFM, I could not voice an opinion on my work, or make a suggestion concerning work, and had to constantly listen to her demeaning comments. If I objected to her treated of me, she considered that an **outburst** or insubordinate. I could not say anything to her concerning any matter, without, her looking at me, with that strange smile on her face and saying in a low voice, "shut up".

Pat Vastano carried that attitude concerning me long after she was not my acting supervisor. At one point the agency was buying flat screen monitors for staff, in response to an all division employee e-mail that had been sent by Pat Vastano, I notified her via e-mail with a cc to Anne Baird-Bridges, that I did not want one. I did not want one because I had seen the problem it was causing other employees (glare) that already had one. Pat Vastano responded that I should reconsider and go sit at other Division staffs' terminals and try one out. I had stated, that if it was not mandatory, I did not want one, but, she seen to know what was best for me. Anne-Baird-Bridges did intervene this one time, and notified me, that if I did not want one, I did not have to have a flat screen. As far as I was concerned, Pat Vastano was treating like I could not make a decision for myself. Her degrading management style and the way she to talked down to me, was very stressful.

The verbal abuse continued until November 2002 when a new Director was hired for the Division of Financial Management, Yoko Albayrak, and she became my immediately supervisor. She was a good Financial Manager and a good supervisor. At one point she got caught up in Pat Vastano's harassment of me. Pat Vastano was attempting to supervise me through the new director. She prepared my Standards, and I objected. **See Exhibit #6**. Ms. Albayrak got along with all of the Division of Financial Management staff including me. She transferred to the Department around January 2004. She made it a point on her last day in the office, to give me an appraisal, and she told me she wanted me to know that she did that appraisal herself, and that she got along with me fine. All of the Division's staff, including myself hated to see her go.

6

a Budget Analyst, a former employee from Philadelphia, Janet Hogler. Ms. Hogler was also a good Financial Manager and a good supervisor. When Ms. Hogler presented my standards to me for the 2004 year, she told me that she had no input. Pat Vastano had again prepared my standards, but, she said the the next time around, she was going to have some input into my standards as my supervisor. Again, I just signed because I did not want the new supervisor to get caught up into Pat Vastano's vendetta against me. Within about two weeks of Ms. Hogler coming on-board, I walked into Ms. Hogler's office to discuss something and she was so upset. When I asked what was wrong, she said she was looking for a new job because she could not work under Pat Vastano. She told me that Pat Vastano had met with her and made the statement that **"non of the Division of Financial Management staffs were worth a D--n"**. This upset her, and what she referred to as a "Difference in Management Style". While she was upset, it came as no surprise to me, because Pat Vastano had told me to my face, many times, that "I was nothing", and the former Director, Gary Thayer, at one point told me that Pat Vastano had told him that I was not worth a D__n. He instructed me, at that time, not to give Anne Baird-Bridges or Pat Vastano a copy of the Object Class Report that I prepare, but, to continue to prepare it for him because he found it useful. When I found Ms. Hogler, upset, I begged her to re-consider, but, she said she just could not work with Pat Vastano. She transferred to another Federal Agency within 3 months of coming on-board. I am sure, if a full investigation was done concerning this matter, Ms. Hogler would confirm the above statement.

After Ms. Hogler transferred out, Anne Baird-Bridges became the Acting Director for the Division of Financial Management. Pat Vastano had appeared to stop harassing me for a long time until December 6, 2004. Anne Baird-Bridges took the lead in any special assignments outside of my regular duties, but, she would always include Pat Vastano.

### DECEMBER 6 & 7 2004

On the mourning of December 6, 2004, I received an e-mail message from my acting supervisor, Anne Baird-Bridges, instructing me to prepare a Booklet that includes the revised codes, sent 7:43am. Priority High (**Note: No instructions were included in that e-mail, <u>nor had there been any prior discussion or meeting concerning this project, this was the first I had heard of the project from Anne Baird-Bridges</u>. This booklet was a first for the Agency**). The e-mail stated that she was going to have her

7

assistant to have an electronic version of the booklet transmitted to me from departmental personnel. I responded around 10:50 am, that I would get the booklet to her ASAP (**see Exhibit #7**). Anne Baird-Bridges also sent a separate e-mail message on the mourning of December 6, with the ESA RCC Codes attached (**see Exhibit #8**). **I assumed that the attached codes were the materials for the booklet, and that she had somehow decided to send it herself.** <u>Also, in Anne-Baird-Bridges e-mails Exhibits 7 & 8, you will note there is no mention of working with a Contractor!</u>

I was assuming that she wanted me to work on the materials that she had sent for the booklet, **see Exhibit #9**. I started working on the project right away, **see Exhibit #10**.

Around 11:30am on December 6, Larry Jarl, the Chief, Branch of Accounting, came to my desk and told me that the Contractor had called him and asked him to ask me, if I could change my flexiplace day from Tuesday to Wednesday because he wanted to meet with me. I asked Larry what did the Contractor want to meet with me about? Larry said he did not know, but, he think it was concerning what Anne had me working on. This was the first that I knew, Larry knew, what I was working on; also, I had never had any dealings in the past with the Contractor except hello. I told Larry to tell the Contractor there would be no problem, except I would like to know what did he want to meet with me about. I was still under the impression that what I was working on, the Revised ESA Code Structure was all there was to the booklet, and I did not see how anyone felt I needed a Contractor's help with that.

Around 12:00 PM on December 6, I received an e-mail from the Contractor requesting a confirmed time for a meeting on December 7 (<u>**see Exhibit #11 page 3**</u>. He **also said that Larry Jarl had some sheets for the booklet that he had drafted.** I still did not know what was going on. I responded to the contractor's e-mail message and stated that I would be available after 10:00am, and I also, stated that as an ESA Contractor, I was at odds as to why he wanted to meet with me."? **When I printed out my e-mail response to the contractor, I noticed that there was a cc e-mail message attached to the contractor's original message from Pat Vastano to me, in which she had cc the Contractor. I had not received her original message to me prior to receiving the contractor's e-mail. Her original e-mail message to me did not come up on the computer screen until after I had sent my response to the contractor. After I read her e-mail, I e-mailed her an acknowledgement and sent her an <u>FYI of my response to the contractor.</u>**

8

that Anne Baird Bridges had forwarded to me earlier was the main booklet materials in questions, and I was awaiting a reply from the contractor.

Within 5 minute after I sent Pat Vastano the e-mail (see page 2 of Exhibit #12), she called me on the phone. She started raving about the e-mail message that I sent to the contractor. I informed her that I had sent the e-mail message to the contractor in response to one he had sent me. She than said, "DO---YOU---KNOW---WHO---GEORGE---BAILY---IS?" I did not answer that question. Given her past remarks to me, I took it that she meant, I as an Afro American Women dare to ask a white man a question? It was not what she said, but, how she said it, and with her "shut up and do as you are told" pass remarks to me still in the back of my mind. I followed up with, "Pat what is this about, I sent the e-mail to the contractor not you, that was FYI only, and than she replied, that she was calling to "Speak for the Contractor." I was very upset by this time. I replied, "why do the contractor need you to speak for him, don't the contractor have a mouth, and can he not speak for himself"? I was taking this to mean that she felt that the contractor was above speaking to me. I was really confused by this point, I was wondering how was I going to work with someone that I could not ask a question? She than said "I am speaking for the contractor because you are to work with him on the project that Anne assigned you". I than said, "Anne assigned the project to me, so, I guess she trusted me to make the decisions in the reformatting and revisions, and that I was already working on it." She than said, "You are not to make any formatting changes", "you are not doing anything over there but cutting and pasting" I felt that what I was looking at needed more than cutting and pasting, and she kept going on and on about my e-mail to the contractor. She would not let me get a word in, and when she did, it was as if I had not said anything, because she continued on about the e-mail that I sent to the contractor. I could not ask her any questions, and I was already upset by her implied remarks, so, I said, "Pat, I don't know what you are talking about, I tell you want, you put into writing whatever you are talking about, and I hung up the telephone. I was still under the impression that what I had was it!

After I hung up the phone, I sent her an e-mail (see page 2 of Exhibit 12), and I told her that I was sorry that I had forwarded the copy of the e-mail message to her

9

called me to explain and clarify why George Baily needed to meet with me and why it was important that I meet with him. She also stated that she knew that I was working with Larry Jarl on the project, which was a first to me (Larry had never said that he was working with me on anything), the first I knew he was working on anything was from the Contractor's e-mail message. She also said that it was rude and inappropriate for me to have hung up on her".

Her e-mail message was full of lies! She never discussed any work except to say I was not to change the Department's format (I had already been working for over 2 hours on editing and reformatting the codes)! The rest of her conversation was concerning George's Baily's prior work history with the Department before he retired and what an important person he was! (see page 2 of Exhibit #12). I replied to her e-mail, that I did not just hang up, that I had told her to put whatever she was talking about over the phone, in writing. It was after I had said this, that I hung up. I also informed her that I did not want to continue a verbal battle with her on the telephone. I also stated that she had a communications problem and again apologized for sending her the copy of the e-mail in the first place, which seem to set her off (see page one of Exhibit #12).

She replied to the e-mail with "my message was inappropriate, and not accurate", and that she would be sitting in on the meeting with George Baily on December 7. I responded to her e-mail (see page one of Exhibit 12, that the message I sent her was the truth. I than got feed up, and for the first time in 7 years, let her dirty little secret out on paper. Note: All of my e-mail messages on December 6, and 7, to her and the contractor, a cc copy was sent to Anne-Baird Bridges, my Acting Supervisor, because, I felt she had a right to know what was going on.

While in my e-mail I stated that the problem with dealing with her was that she bends the truth. I was being kind; she is one of the biggest liars that I have had the misfortune to meet. She turns around everything that I does or speaks. Note: The only message that I originated was the on December 6, (the apology for sending her a copy of the e-mail message that I sent to the contractor in response to his), all other e-mails sent by me were in response to e-mails she sent me.

While Pat Vastano felt that she needed to speak for the contractor, the contractor had no problem speaking for himself, see Exhibit #11, the contractor's responses. The contractor and I finalized a time to meet on December 7 at 3PM. The <u>contractor requested that Larry Jarl join the meeting, not me. I did ask if he would be there, because it stands to reason that the contractor had met with Larry Jarl, not me, previously on this project just by reading the contractor's e-mail message to me.</u>

I went to see Larry Jarl, around 4PM on December 6, and asked him what did he know about the project, and informed him that the contractor had stated that he thought that it was a good idea if ESA had a booklet similar to one used within the Department. Larry also said that he was working on the table of contents, and one other page that had been assigned to him by the Contractor. I asked Larry, what else was the booklet suppose to contain beside the New RCC Codes, and he show me a blue booklet that he said was used by OASAM.

I glance through the book and most of the materials appeared to me not related to ESA. I asked Larry, what did Anne want, and he said he did not know. I than asked him where was I suppose to get the other ESA material, and he said that I should already have it.

It was mass confusion. I than asked Larry to forward to me what he had and I would complete it, and he did.

Later that day, when Anne Baird-Bridges returned to the office, she responded only to my response to the Contractor at 1:21 PM on December 6; she read the e-mails from Pat Vastano to me, and my responses, but, she never replied or commented on them (see Exhibit #13). She stated that I was to meet with the contractor to get some valuable information, etc., and that I should have received the electronic version of the Department's booklet from her assistant. I responded with, that I had planned to meet with the Contractor on December 7, and asked what was the contractor's role? I informed her that it was illegal for a contractor to supervise a federal employee and that all <u>I had received was the RCC s that she had attached to one of her e-mail messages when she issued the assignment to me the mourning of December 6. I also asked her to clarify, (via e-mail) exactly what she wanted. I was uneasy about going to her office in person at this time because, after the August 17, 2004, physical attack by Anne Baird-Bridges upon another Division</u>

11

physically attack me. In my condition, I could not afford taking the chance of being injured by her. Anne replied via e-mail that the contractor was not supervising me, he was just providing guidance, and that she wanted a "updated code book in the same format as the Department's, and she said she had asked Pat Vastano to sit in on the meeting. My final response on that matter was that I would ask the contractor for the format.

On December 7, 11:00am, I sent Vivian, Anne's Assistant, an e-mail and informed her that Anne Baird-Bridges has stated that she was suppose to send me an electronic booklet, and informed her that if she sent it, I never received it (Vivian respond on December 8th, to inquire if I had received the electronic booklet (see Exhibit #14)

Around noon, on December 7, the electronic booklet, that was the object of all of the confusion on December 6, started to be transmitted from the Department. It took departmental staff over 1/2 hour to transmit the materials. It took me over 2 hours, and work through my lunch break, to download all of the information and print it out in some type of format in order to be ready with all of the materials by 3PM, the time the contractor had set for the meeting.

The meeting with the contractor was held on December 7, 3PM. The Contractor had called Larry and notified him to be there. When the meeting started, I informed the contractor that I had just received all of the downloaded materials after 12PM that day. (If I had the materials early on December 6th, I would not have sent the contractor the e-mail asking what did he want to meet with me for; because I would have known).

If someone would have met and explained to me in advance of the project (this was a first for ESA) and allowed me to ask questions, I would have known why the contractor was requesting the meeting. This lack of communications created a very stressful and confusing situation for me. The contractor stated he understood and he asked if I had the RCC codes, I gave him the original version that Anne Baird-Bridges sent, and I gave him the modified version that I had worked on December 6th. I asked what version did he want to go with? The contractor selected the modified version that I had done. He said he though it was more user friendly, and that it was in the form of a book. I did not say anything, as I thought to myself,

12

the contractor made one suggested change, which I was happy to do. I also informed the contractor that he would have to present the Revised Version to Anne & Pat because I did not think that it would be accepted from me, and he said that he would be glad to. The Contractor went over all of the materials, deleted some and telling me what modifications he wanted on the rest (about 6 different sections), he also, ask Larry to complete the one page he had in hand and then give it to me.

In the meantime, Anne Baird-Bridges had stated in her e-mail of December 6, that she wanted to meet with me on Friday, December 10, (I assumed that is when she expected the booklet to be completed) and I informed the contractor of that meeting, and he asked if I thought that the booklet could be ready by then, and I said I would try. The contractor stated that he would be at the meeting, December 10, to present the booklet to Anne and Pat (I was grateful).

I worked at home (Flexiplace) on December 8th, and 9th, and completed the entire booklet. On December 10th, the contractor reviewed the finished product, and said it was very good, and that I had completed the project in record time.

The Contractor and I met with Anne Baird-Bridges and Pat Vastano on December 10th. The Contractor took the lead in the meeting and presented the booklet and he told both of them, not once, but three times, that he felt that I did a very good job on completing the booklet and had completed it in record time, to which, neither Pat Vastano nor Anne Baird-Bridges said anything. The only thanks that I received came from the Contractor. At the meeting, the contractor went over every page of the booklet with both of them, and noted the changes they wanted to make, and so did I, and when he presented the RCC codes that had been reformatted and told them he liked my version, neither of them said anything concerning returning to the original format. If they had, we could have gone back to the original format. The meeting ended with the Contractor noting the changes I was to make. I made the changes and I gave Anne Baird-Bridges the revised completed package on December 13th along with 3 disk, which held the electronic version of the finished booklet. On December 15, Anne Baird-Bridges had me make more changes that she wanted after she had viewed the Department's booklet that Larry Jarl had. I made the changes and returned the final package to her to be sent to print; and a copy was left for the Contractor: Larry Jarl, and Pat Vastano.

received a e-mail message from Pat Vastano notifying me that she wanted to meet with me on Friday, December 17, at 11:am in the OMAP Conference Room **(see Exhibit #15)**. When I responded as to what was the subject of the meeting, **Pat's e-mail reply was** "ou **communications of December 6 and 7**". I replied that I wanted a union representative to accompany me to the meeting, etc. <u>Note</u>: I e-mailed Anne Baird-Bridges, my acting Supervisor, every step along the way of my response to Pat Vastano's request for a meeting. <u>I even stated in my response that as my Acting Supervisor, I felt that Anne Baird Bridges should be in that meeting also. Anne read the e-mails, but, never respond</u>.

## LETTER OF REPRIMAND

At the meeting at 11:00am Pat Vastano gave me a letter of reprimand, her charges were:

<u>Charge</u>: Second Paragraph: She called me on December 6th, after she read my response to the contractor's e-mail "**as a ESA contractor, I am at odds as to why you have to meet with me**". When she read this, she states that she called to "explain to me <u>again</u>"?

<u>Response</u>: All untrue. No one ever spoke to me (I knew nothing about the project), no one gave me any directions, or met with me prior to my receiving an e-mail message from the contractor on December 6th. Also, Ms. Vastano did not call to explain any work to me except to speak to me in a demeaning manner concerning my sending the e-mail response to the contractor.

My right to have sent the e-mail is <u>in the Constitution of the United States, the Bill of Rights, Amendment 1 (Freedom of Speech)</u>.

<u>Charge</u>: That I had stated that the Director, Anne Baird-Bridges had given me the assignment, therefore, I felt she trusted me to develop the format.

<u>Answer</u>: This is true. I did say the above. Keep in mind, I thought that the RCC Code portion was <u>all there was to the booklet at that time, and it looked to me as if it needed to be reformatted, and later, the Contractor agreed and approved the reformatting!</u>

<u>Charge</u>: That I told her that she did not know what she was talking about

14

<u>Answer</u>: That is a lie! It was quite obvious that only the Contractor, Anne Baird-Bridges and herself were the only ones who knew what was going on; Larry knew very little, and I knew nothing! <u>I told her that I did not know what she was talking about!</u>

<u>Charge</u>: That I was shouting at her on the telephone and interrupting her conversation. That is a lie! 1. My voice carry and she knows that; and 2. She kept interrupting me; she would not let me get a word in as to why I sent the copy of the e-mail response to her, or why I responded with the question that I had to the Contractor's e-mail message.

<u>Charge</u>: That I abruptly hung up on her.

<u>Answer</u>: That is a lie! I hung up after she kept insulting me, and told <u>her before I hung up, to put whatever she was talking about in writing!</u>

<u>Charge</u>: My refusal to follow instructions was insubordinate.

<u>Answer</u>: This is a lie! Prior to the assignment, no instructions were given!

<u>Charge</u>: 10 min. or so later after the phone call, I sent her a rude e-mail.

<u>Answer</u>: This is a lie! See the e-mail that I sent. I don't consider someone asking to be forgiven for sending an FYI copy of an e-mail that was meant for reply from someone other than the one who was the receiver of the FYI, cc copy, rude!

<u>Charge</u>: She responded that it was rude and inappropriate for me to hang up on her and that I lack respect.

<u>Answer</u>: Her behavior was demeaning to me, and inappropriate, and I as a human being, had a right not to listen to it! None of my former supervisors or my current or former fellow co-workers, as far as I know, is complaining that I lack the showing of respect for anyone, <u>the only one complaining about "my lack of respect" is Ms. Vastano</u>. Ms. Vastano must realize <u>that in order to receive respect, one must give respect. She has never shown me any respect whatsoever</u>. I have endured 7 years of demeaning and racial verbal attacked by Pat Vastano in silence. And this silence has taken a toll on my health.

<u>Charge</u>: I refuse to take any further instructions from her, which was insubordination.

<u>Answer</u>: No instructions were even given! She called to berate me about the e-mail sent to the contractor; and to tell me about the Contractor's prior work history and his prior status of importance at the Labor Department. She was not

15

talking about work! Prior to my responding to the Contractor's e-mail to me, I had *not even seen* her original e-mail message to me and she was informed of that when I sent her the cc of my response to the contractor!

<u>Charge</u>: That I sent a copy of my e-mail responses to her to the Director, Anne Baird-Bridges, that was abusive and slanderous.

<u>Answer</u>: The e-mail message that I sent to Pat Vastano in reply to her accusations, <u>was the truth</u>. She has over the years spoken to me in a racist manner she has harassed me; and she is a liar!

<u>Charge</u>: That my conduct during the course of this project was disruptive, insubordination and interference with the mission of the agency, and that my conduct was unprofessional

<u>Answer</u>: That is a lie, if anything, regardless of what she threw at me, I accomplished the mission. Her conduct was unprofessional for a manager. She is the one that is abusing the public trust by using her position as a means to harass me.

<u>Conclusion</u>: After all of these years, the time has come for Ms. Vastano's abuse of me to stop. In the letter of reprimand, she states that I refuse to work with her. That is not true, I have never told anyone that I would not work with her, <u>but, now that she has brought it up, now, I am saying, I do not want to work with her now or ever!</u>

I want Pat Vastano to stop harassing me, and if she cannot find it in her to be courteous to me when she needs to speak to me, than I don't her speaking to me at all. I also want her to stop her attempt to gain some sick control over me by supervising me through whoever is the supervisor of record, I want her to stop preparing standards on me and attempting to rate me on the appraisal process.

She states that she wants respect; so do I! In all of the 7 years that this abuse has been on-going from Pat Vastano against me, I have never once, approach her at her desk, in her office, in the hallway or any other place concerning these abuses. She has always sought me out to perpetrate the abuse.

For the last 25 years of my 33 years of service at DOL, all of my supervisors were Caucasian or Asian American, male and female, and I never had a problem

16

with any of them. Pat Vastano has only been my <u>direct supervisor for only little ove</u> <u>3 months, but, I have endured years of harassment from her</u>!

I am requesting that the letter of reprimand withdrawn. I want to add, in all of my almost 33 years of Federal Service, I have never had to file a Grievance against any supervisor or any other manager until now.

### BACKGROUND OF GRIEVANT

Attached is a sample of what managers and department heads thought of me thoughout the Department in the past. I have many more letters and accommodations. **(Exhibit #16). I am a 1991 Recipient of the Department of Labor's Distinguished Career Service Award.**

Statement Signed: _____  Date: 12/26/04

Audrey L. Sewell