AFFIDAVIT

DISTRICT OF COLUMBIA:

I, Audrey Sewell, submit the following statement freely and voluntarily for Roderick Faulkner, who has identified himself via letter dated April 26, 2006, as a Federal Employee, employed by the United States Department of Labor (USDOL), as an EEO Specialist, investigating a complaint of discrimination filed by Vicente Sanabria, CRC No. 05-11-140. I also acknowledge receiving the copy of the Letter of Investigation Authorization, dated November 17, 2005, and signed by Annabelle Lockhart, Director, Civil Rights Center, USDOL authorizing you to conduct the investigation. I understand that this statement may be used in evidence and is not confidential and may be shown to parties with a legal right to know. I also understand from your correspondence that as a Federal Retiree I am under no obligation to cooperate with your investigation. I hereby solemnly swear or affirm:

1. I retired from the U.S. Department of Labor in June 2005. At the time of my retirement I was a GS 11, Financial Management Specialist, and worked in the Employment Standards Administration (ESA), Office of Management, Administration and Planning (OMAP), Division of Financial Management (DFM), Branch of Budget Formulation and Implementation (BBFI). My date of birth is October 6, 1941. No one advised me or had any input into the preparation of this statement.

2. Sometime in the early 1990s, Mr. Sanabria, came to work in ESA as the Back Wage Accountant. After several years he left ESA and took for a position at the Department level. There one of his main responsibilities was the Department's Space Rent function. He became an expert in this area. Sometime in either 2000 or 2001, Mr. Sanabria was hired in ESA to replace a retiring Budget Execution Analysis, Mr. Fred Poist, who's primary duty was that of Budget Execution Analyst for the Office of Workers' Compensation Programs (OWCP). Another of Mr. Poist's main duties was handling the reporting on the space rent function for ESA; therefore, Mr. Sanabria brought a lot to the table, because he was an expert in this area. Mr. Sanabria spent the last weeks of Mr. Poist's time on-board, getting familiar with the Budget Execution duties of Mr. Poist before completely taken over that job. Mr. Sanabria's budget duties were budget execution only.

   The Budget Branch had many changes over the years. In the 1970s, it was the Branch of Budget whereas all Budget Analysts performed both Budget Formulation and Budget Execution duties, sometime in the 1980s, there was a reorganization, and the

EXHIBIT R

Initials AS 0047

Budget Branch was split into two separate units and located in two separate workspaces. One group performed only Budget Formulation duties and the other performed only Budget Execution duties; thus the Branch of Budget became two separated branches, each with a branch chief, known as the Branch of Budget Formulation, and the other the Branch of Budget Execution.

Sometime in the late 1980s or early 1990s, due to increased automation in the work place, and the agency not filling vacant budget positions and to consolidate space, the Budget Branch was combined again into one, but, the Budget Analysts from the Branch of Budget Formulation continued to perform only Budget Formulation duties and the staffs from the Branch of Budget Execution continued to performed only Budget Execution duties. When Mr. Sanabria came back on-board to take over the Budget responsibilities of the Budget Execution Analyst, he was trained (he may have had outside training in this area also) only in Budget Execution. When Ms. Charlene Dunn came on-board, as the Branch Chief, for BBFI, this is the situation that existed.

3. Ms. Anne Baird-Bridges brought Ms. Dunn on-board as the new chief of the Branch of BBBI sometime around the last week of January 2005. Ms. Baird-Bridges held a meeting the first day Ms. Dunn came on Board with all DFM staffs that were present that day. In that meeting she stated that Ms. Dunn was schedule to have been on-board either two weeks prior or one week prior, but that she had gave her a vacation to rest up from her duties from her prior job. I personally had never heard of such a thing. I had heard of people delaying their reporting date to a new job because of illness or personal or family emergency, but, never being placed on duty on record, and being placed in a vacation status before they ever reported to work; therefore, I would not know when Ms. Dunn's official reporting date of record was in January 2005.

4. One day during the month of March 2005, as I sit at my desk working, I overhead a strange conversation between Ms. Dunn and Mr. Sanabria. Ms. Dunn's inner office door was parallel to my work area, about 15 feet away. It appeared that Mr. Sanabria had gone to Ms. Dunn's office to inform her of something concerning his work. I could not hear what he was talking about (he is soft spoken, Ms. Dunn's regular voice is very loud

and carry), but, I heard him say the name Cecily, and I knew she was an OWCP official, so, I just assumed he was talking about his work. Ms. Dunn stated at one point, "I don't understand you", well, Mr. Sanabria it appeared must have thought that she meant that she could not hear him, so, Mr. Sanabria started speaking more loudly, which was out of the ordinary for him. Again, Ms. Dunn stated, "I just don't understand you"; I came to the conclusion that she was not talking about the content of his conversation, but, his heavy accent. Mr. Sanabria is Hispanic and speaks with a heavy accent. I personally have never had a problem understanding Mr. Sanabria when he spoke, nor, had anyone ever told me that they had difficulty in understanding his speech.

5. On March 31, 2005, Anne Baird-Bridges the Director, OMAP, and also, the Acting Director for the DFM, sent an e-mail message to all National Office (NO) Program Heads, Deputies, Program Officials, and all DFM Staffs, to announce that she was bringing on board a Ms. Kimberly Bassett as a Senior Budget Analyst. According to Ms. Baird-Bridges' e-mail, Ms. Bassett had heavy experience as a senior budget analyst at five different Federal agencies and a BS and a MBA. I did not know anything about the advertising of the GS 14 Budget Analyst position (never saw it, all other Budget Analysts were GS 13s). I asked Ms. Elaine Stone, the Wage Hour Budget Execution Analyst about it, and she told me that Ms. Dunn had a meeting with all of the Budget Analyst some weeks prior and that she had told them that a vacancy announcement was being posted for a GS 14 Budget Analyst for the Division, and that Ms. Dunn told them that she did not want any of them to apply for the position because she already had someone in mind for the position.

6. After Ms. Bassett came on board around the first week of April 2005, one day she stopped at my work area while I was talking to Ms. Elaine Stone, and joined the conversation out of the blue, among other things she stated that she had 15 years of budget experience and that she was age 30 (verify the conversation with Ms. Stone). I found this fascinating, that she had graduated high school, got a BA and a MBA all by age 15.

Within days of Ms. Baird-Bridges' e-mail concerning bringing Ms. Basset on board, Ms. Dunn ordered extensive training in writing from all of the Budget Analysts for

Initials AB

000049

Ms. Bassett (Ms. Dunn referred to this training as shadowing, but, it was training for all practical purposes). Ms. Sanabria was the first on the list to train Ms. Bassett and he had the longest training schedule, April 5, through the 8th. The training covered the entire month of April. Once Ms. Bassett came on board, it was quite obvious that she and Ms. Dunn knew each other prior to her coming to the Agency. With their almost daily 3 hour lunch breaks, I had the impression that they were related because one day I overhead Ms. Dunn saying something to Ms. Bassett that she had seen her Uncle the other day. In my opinion, Ms. Dunn treated Ms. Bassett as if she was her little child and she was very protective of her.

One day, in April 2005, (for the exact date, see Mr. Todd Jennings, one of the Budget Analysts that was there at this time, I assume that he is still with Labor), I overhead, across the partitions in the office, Ms. Dunn, speaking to either Mr. Jennings or Mr. Sanabria (Mr. Jennings work area was located directly behind Mr. Sanabria; Ms. Dunn was standing in this area) and Ms. Dunn was saying that one or the other was being rude and mean to Kim. I only heard Mr. Jennings responding that he was not being rude to Ms. Bassett, but he was not going to continue to hold her hand or something to that effect. Ms. Dunn than said, "yes you are being rude to Kim, but, remember I sign your pay check." As you know, as a federal employee yourself, supervisors do not sign paychecks, and that they only certify that employees' time and attendance is correct which authorizes Treasury to issue payment via EFT. Very few employees still receive a paper check, and Treasury endorses those. I assume that this statement of Ms. Dunn's was a threat to Mr. Jennings or Mr. Sanabria or both, that she if got any more complaints from Kim concerning them, she was not going to certify their time worked and that they would not get paid. Ms. Bassett seem to have a problem with both male budget analysts (there were only two).

7. When I arrived to work on Monday, April 18, 2005, around 9:45am, before I could put away my purse, I was met by Ms. Bettye Keller and Mr. Sanabria. Both appeared upset and both were asking me if I had been into my e-mail to get an e-mail from Anne Baird-Bridges concerning a 10:00 am meeting that day for Ms. Keller, Mr. Sanabria and I, and

000050

Mr. Sanabria kept saying something about he could not get onto his computer. I immediately went into my e-mail and what hit me was the date the e-mail was sent, Sunday, April 17, at 10:05am. I became alarmed as to what could have been so important that Anne Baird-Bridges got up on a Sunday mourning and send out that e-mail. She had sent a copy of the e-mail to Ms. Linda Copening; the ESA Agency Vice President for Local 12, so I assumed it was a very serious matter. In the meantime, Ms. Copening was attempting to contact me. Things were moving so fast, I asked Mr. Sanabria and Ms. Keller to wait until I went to see Ms. Copening. When I reached Ms. Copening's office, she immediately asked me to listen to a voice mail message on her telephone. I recognize Anne Baird-Bridges' voice but I could not get clear on the content because Ms. Copening kept talking about that Anne Baird-Bridges knew that she was not in the office on Sunday, April 17, 2005, the day the voice mail message was left. The voice mail concerned what appeared to be an emergency meeting. Ms. Copening told me that she was unable to attend the meeting with us at 10:00 am because she had a prior appointment, and that she had called Anne Baird-Bridges and told her that. She advised me that when we got to the meeting, if we felt that we needed Union Representation, to ask Ms. Baird-Bridges to postpone the meeting until a time that she could attend or if Ms. Baird-Bridges would not postpone the meeting to ask for a short delay and call the Union Office and ask them to send someone. After the few minutes with Ms. Copening, I returned to the office and informed Mr. Sanabria and Ms. Keller of what Ms. Copening had said, then we all went into the meeting.

When we arrived to the meeting, already seated was Ms. Baird-Bridges, her Deputy, Ms. Vastano and Ms. Dunn. Mr. Sanabria stated first that he had problems getting on his computer. Ms. Dunn, replied that they had his hard drive copied over the weekend. Mr. Sanabria looked visible upset but said nothing. I than asked Anne Baird-Bridges if she would postpone the meeting until we could get Union Representation. She replied no, we did not need Union Representation. Ms. Keller than stated that she did not want to continue the meeting without Union Representation, and Ms. Baird-Bridges told her no also. Mr. Sanabria than stated that he wanted Union Representation and Ms.

000051

Baird-Bridges again said no. Then it went full circle again with my again requesting Union Representation and than Ms. Keller, and than Mr. Sanabria, and again Ms. Baird-Bridges turned us all down. I than asked Ms. Baird-Bridges for a short delay of 10 or 15 minutes for me to call the Union Office and have them send someone to this emergency meeting. She said no, she could not delay the meeting and that we did not need Union Representation. I than reminded Ms. Baird-Bridges of the Department's annual directive to all Labor Department staffs, Managers as well as rank and file concerning the Department's position on Bargaining Unit Employees "Right to Union Representation", whereas, any bargaining unit employee who requested Union Representation in any meeting with a supervisor where the employee felt it was necessary must be honored. I also reminded her of employees right to Union Representation as contained in the Local 12 Contract. Ms. Baird-Bridges again said, "you all don't need Union Representation". Ms. Dunn started to wave some papers that she had in her hand, and said something to the effect, "we no longer have to deal with the Union, because we have a new Contract." It seem Ms. Dunn saw the newly signed contract between Local 12, and the Department around March 20, 2005, as a Managers' contract, not a bargaining unit employees' contract. Ms. Anne Baird-Bridges acted as if this was a life or death meeting and could not be delayed under any circumstances.

    Ms. Baird-Bridges kept saying, can I just proceed, than she preceded with handing me and Ms. Keller a memorandum and told us that we were being transferred from under the position of Director, DFM, to Ms. Dunn's supervision in BBFI, and that our duties would remain the same, and she ordered Ms. Keller to move from the accounting area to a work area in front of me, directly outside of Ms. Dunn's inner office door. Ms. Baird-Bridges than asked me and Ms. Keller to leave. Mr. Sanabria said that he wanted me and Bettye to stay. He stated that anything that she had to say to him was OK to say in front of us.

    As I recollect, Ms. Baird-Bridges than leaned across the table and said to Mr. Sanabria,"Vicente, you are just no good as a budget analyst", that he had not been doing a good job, so, that effective May 1, 2005, he was being transferred from Ms

Initials _____

000052

Dunn's supervision to the Branch of Accounting, under the supervision of Mr. Larry Jarl.

Ms. Vastano than said, "you are just no budget analyst material" or something to that effect. Ms. Dunn (who had supervised him less than 90 days and was new to the Agency) stated, "you just don't have what it takes to be a budget analyst." Mr. Sanabria than directly ask Ms. Dunn if this action had anything to do with some budget work that she gave him, Ms. Dunn replied, that it did not matter, and that he just did not have what it took to be a budget analyst. Mr. Sanabria than said to Ms. Dunn, that he had never had any Budget Formulation training, and Ms. Dunn again stated that it did not matter. I became lost in thought at this point, and felt strongly that an experienced Union Representative should have been present. In that meeting there was no mention as to if the Performance Management System had been utilized (PIP) or if the need for training had been discussed prior or exactly what Mr. Sanabria was doing in his job that was not satisfactory.

    At one point, I asked Ms. Baird-Bridges who was leading the meeting, if she did not think perhaps it would have been better to discuss the potential reassignment with an employee first to get the employee's view before making the decision to reassign. Ms. Baird-Bridges said no, that it would not have mattered, the employee's input would not have affected the outcome, and therefore, she saw no need for discussion. I remember a similar situation that had taken place within the last 6 months. We had an Asian American who was the Black Lung Accountant with the Division for many years and had a reputation for being a good worker and spoke with a heavy accent, Ms. Grace Liang. One day, after a meeting with Anne Baird-Bridges and her deputy, Ms. Liang returned to her desk very upset, it seems all of a sudden Ms. Baird-Bridges had a problem with her ability to do her work. Ms. Liang got another job with Labor in the CFO office as the ESA Help Desk person overseeing all of ESA accounts including the Trust Fund Accounts with a promotion. The only thing Mr. Sanabria and Ms. Liang had in common was both spoke with heavy accents which it appeared Ms. Baird-Bridges did not care for. I think Ms. Liang is still with the Department of Labor.

It was not until after the April 18, 2005, meeting that I learned from Ms. Sanabria that he

Initials /s/

000053

had applied for the GS 14 Budget Analyst position, and that he had made the CERT but was never interviewed by Ms. Dunn. In the back of my head I thought at that time about the conversation with Ms. Elaine Stone previously, where according to her, Ms. Dunn had told them not to apply for the position.

9.  It seem Mr. Sanabria's hard drive (Labor's hard drive) that was downloaded the weekend of April 16-17, was downloaded to Ms. Bassett's hard drive. According to Mr. Sanabria, everything that he had on his hard drive was now on hers. Following Mr. Sanabria's move to the Accounting Branch, I saw Ms. Bassett in Mr. Sanabria's workspace numerous of times. It appeared to me as if he was instructing her either from the computer screen or verbally. Ms. Dunn conducted herself as if she was still his supervisor and not Mr. Jarl. At one point, Mr. Sanabria was standing between his desk, hands filled with paper and the desk of the Longshore Accountant, Mr. Dan Coulopoulos who's hands also was full of paper and was training Ms. Sanabria for the Federal Employee's Compensation Act (FECA) accountant position, and Ms. Bassett had somehow, taking control of Mr. Sanabria's computer and was sitting in his chair, using his computer, and everytime he attempted to move towards Ms. Coulopoulos' work area, she would wave him back. Mr. Sanabria desk was piled high with papers and he seem barely able to receive his own training and do the work that Mr. Jarl was giving him for Ms. Bassett's constantly needing budget training/help. Mr. Sanabria, in my opinion, looked as if he was afraid to say no to her. I feel the best person to confirm Ms. Bassett's constant requiring training from Mr. Sanabria is the person that was training him and that was setting right across from Mr. Sanabria's desk, Mr. Dan Coulopoulos. I saw these actions when I went to Mr. Sanabria's work area to try to seek his assistance on a matter.

On more than one occasion, as I was leaving my work space for a break, I noticed Ms. Bassett leaving Mr. Sanabria's work space in accounting and exiting the center office door, and walking around to Ms. Dunn's office and entering from the hallway from the South corridor door. (Ms. Dunn's had two entrances, one inner office door and one that lead to the south outer corridor). After about 10 minutes, I would hear Ms. Dunn's door open and she would head towards Ms. Baird-Bridges's office. When I got up

Initials

back. Whenever Ms. Dunn returned after a short period of time, she would close her inner office door behind her and Ms. Bassett. By this time in May, Ms. Keller had moved in the work area in front of my desk and she noticed Ms. Bassett's behavior also. At one point she asked me what was going on with Ms. Bassett's going on the outside and coming in Ms. Dunn's office from the outside rather than to walk through the office to Ms. Dunn's office. I am sure there were others in the Division who noticed this behavior also. After about 4 or 5 times of seeing this, I felt uneasy about the situation. and I tried to avoid Ms. Bassett; I just spoke and keep going, because I felt that they were harassing Mr. Sanabria in some manner. Ms. Dunn promoted this type of behavior. I know this for a fact, because Ms. Dunn ordered me at one point to go to Mr. Sanabria's work area and to tell him to stop what he was doing and train me in a work project and if he did not stop what he was doing, to come back and tell her. The work project had been put into my standards by Ms. Baird-Bridges, which was a previous work responsibility of Mr. Sanabria's when he was in Budget. At that meeting, I told Ms. Dunn about how busy Mr. Sanabria's seem to be, Ms. Dunn than said that Mr. Sanabria will do as he was told. I reminded Ms. Dunn that she was no longer Ms. Sanabria's supervisor and she was not the Division Director. I also felt that what she was demanding me to do was harassment of Mr. Sanabria and if she wanted him spoken to in that manner, she should do it herself. Ms. Dunn stated that she was going to be the next Division Director, and that was why Anne Baird-Bridges had brought her in because she knew that she could "whip these people in shape". She than went on and on about how great she was and about how the last two Division Directors Ms. Baird-Bridges had hired was no good, which was untrue. The last three Division Directors prior to Ms. Dunn's appointment are in the best position to confirm or not confirm Ms. Baird-Bridges destructive Micro-Management style.

    Ms. Dunn appeared to not make any decision without first checking with Anne Baird-Bridges.

Initials

000055

This statement is true and correct to the best of my knowledge and belief.

_Chuck L. Sewell_
Signature

5/8/06
Date

_District of Columbia_
Location Statement Signed

_Edna M. Reeves_
Neutral Witness

Page 10 of 10

Initials

000050