## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____<br>**AUDREY L. SEWELL,**<br><br>            **Plaintiff,**<br><br>      **v.**<br><br>**ELAINE L. CHAO,**<br>**Secretary, U.S. Dept. of Labor,**<br><br>       **Defendant.**<br>_____ | )<br>)<br>)<br>)<br>)<br>)    **Civil Action No. 06-1534 (ESH)**<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## <u>MEMORANDUM OPINION</u>

Plaintiff Audrey L. Sewell has sued the Secretary of the Department of Labor ("DOL"), alleging that DOL discriminated against her on the basis of her age; subjected her to a hostile work environment; retaliated against her for filing union grievances and an EEO complaint; and constructively discharged her in violation of the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 633a, *et. seq.* ("ADEA"). [1]  Defendant has filed a motion for summary judgment which, for the reasons stated herein, will be granted.

## <u>BACKGROUND</u>

Plaintiff's employment with DOL began in 1972.  (Def.'s Stmt of Material Facts Not in Dispute ["Def.'s Stmt"] ¶ 1; Compl. ¶ 6.)   In 1997, plaintiff started working for the Division of Financial Management ("DFM"), Office of Administration and Planning ("OMAP"), Employment

_____

[1]  Plaintiff's complaint also alleges a violation of the Privacy Act.  She has subsequently withdrawn this claim.  (*See* Pl.'s Opp'n 40 n.8.)

Standards Administration ("ESA").  (Def.'s Stmt ¶ 2; Compl. ¶ 6.)  From approximately 2000 to 2005, plaintiff "performed numerous financially analytical duties." (Def's Stmt ¶ 5.)

Around 1997, Patricia Vastano joined DOL as the Director of the Strategic Planning Division.  (Opp'n 2.)  According to plaintiff, "[a]lmost immediately Vastano's enmity toward [plaintiff] surfaced." (*Id.*)  On one occasion, early after Vastano arrived, plaintiff suggested to Vastano that she contact the employees responsible for setting up computers if she wanted her computer moved off the floor.  Plaintiff alleges that Vastano "asked [her] why couldn't [plaintiff] get down there and do that." (Def.'s Ex. 2 at 36.)   On another occasion, plaintiff explained to Vastano that she couldn't assist her in ordering desk supplies because of the other demands on her time.  Vastano responded that "your kind shouldn't be in any position . . . ." (*Id.* at 37.)  Plaintiff complained to her supervisor, Cecily Rayburn, and the harassment ceased  (*Id.* at 2-3.)  Vastano's behavior began again after Rayburn left DFM and was replaced by Gary Thayer, but stopped after plaintiff again complained to Thayer.  (*Id.* at 3.)

In early 2000, Anne Baird-Bridges joined DOL as OMAP's director (Pl.'s Ex. B [Baird-Bridges Deposition] at 16-20), and sometime thereafter Vastano became her Deputy Director.  (*Id.* at 25-27.)  In May 2002, when Thayer left DOL, Vastano became acting director for DFM and plaintiff's direct supervisor.  (Pl.'s Opp'n 3; Pl.'s Ex. C [Baird-Bridges EEO Aff.] ¶ 4.)  Plaintiff alleges that "within days" of Vastano's appointment, the harassment began again.  (Pl.'s Opp'n 3; Def.'s Ex. 2 [Sewell Deposition] at 41-42.)  On one occasion, Vastano observed plaintiff having trouble walking because of her arthritis and said "[O]h, you're having trouble walking today?  Why don't you just retire?" (*Id.* at 44.)   Plaintiff also alleges that Vastano improperly revised the performance appraisal Thayer had prepared for plaintiff before he left and that Vastano refused to

2

timely approve a leave request that she submitted.  (*Id.* at 50, 57, 60-61.)

In 2003, Yoko Albarak was hired  as director of DFM.  (Def.'s Ex. 2 at 39-40, 51.)  Plaintiff explains that although Vastano continued to make "snide" comments urging her to retire, plaintiff was able to ignore her.  (*Id.* at 42.)  In January 2004, Janet Hogler took over the position of DFM director, but left six months later.  (*Id.*)  After her departure, Baird-Bridges took over as acting director of DFM and became plaintiff's direct supervisor.  (*Id.* at 84; Pl.'s Ex. B at 24-25.)  In November 2004, plaintiff complained to Baird-Bridges about Vastano's treatment of her, but received no response.  (*Id.* at 58.)

On December 27, 2004, Vastano, while acting as OMAP director during Baird-Bridge's absence, issued a letter of reprimand citing plaintiff for insubordination based on an email exchange in which plaintiff accused Vastano of lying, harassment, and racism.   (Pl.'s Ex. E [Letter of Reprimand].)  The final paragraph of the letter stated that "[t]his reprimand not only outlines the intolerable behavior, but also serves as a warning to you that any repeat of similar outbursts and insubordination will result in disciplinary action up to and including removal."  (*Id.* at 2.) Plaintiff protested the reprimand, and on December 17, 2004, filed a union grievance against Vastano, in which plaintiff alleged that she had been a victim of race and age discrimination.  (Def.'s Ex. 2 at 41; Pl.'s Ex. G [Grievance Form against Vastano].)  On December 20, 2004, plaintiff filed a union grievance against Baird-Bridges alleging that Baird-Bridges had fostered a hostile work environment and discriminated against plaintiff on the basis of her age.  (Def.'s Ex. 2 at 57; Pl.'s Ex. H [Grievance Form against Baird-Bridges].)

On March 9, 2005, Baird-Bridge met with plaintiff and her union representative, Linda Copening, to discuss plaintiff's complaint against Vastano.  (Pl.'s Ex. A ¶ 8; Pl.'s Ex. C ¶ 4.) The

following day, Baird-Bridges sent plaintiff an email to set up a meeting to discuss plaintiff's fiscal

year 2004-2005 performance standards. (Pl.'s Ex. A ¶ 8.) The email explained that she wanted to

bring plaintiff "up to date" on her specific job responsibilities and ensure that the standards were

accurate. (*Id.*) The meeting was held on March 14, 2005, with Copening in attendance.[2] (*Id.*) At

the meeting, Baird-Bridges assigned plaintiff two new responsibilities -- the detail fund report and

the space rent report (*id.*) -- both of which were listed in her existing job description.[3] Plaintiff told

Baird-Bridges that she was not familiar with these reports. Baird-Bridges responded that George

Baily, a private contractor who had been working on the detail fund report, and Vincente Sanabria,

a GS-13 budget analyst who had been preparing the space rent report, would train her. (Pl.'s Ex. A

at 9.)

Shortly after the meeting, plaintiff approached Baily. (*Id.*) Baily gave plaintiff some brief

training on the detail fund report, which plaintiff did not need since she had assisted with its

preparation in the past.[4] (Def.'s Ex. 2 at 64-65.) Plaintiff also approached Sanabria about the new

---

[2] Plaintiff explains that she asked Copening to attend because she was afraid to be alone with Baird-Bridges. (Pl.'s Ex. A ¶ 8.)

[3] Plaintiff's position description provides in pertinent part:

> The incumbent monitors the GSA RENT program. When monthly Rent bills are received, he/she checks for billing accuracy to insure that ESA is not paying for some other Federal agency's space, both in the District as well as the regions. Contacts GSA Rental Agent to correct mistakes when they occur. Also works with the budget staff to insure that RENT records are accurately recorded in DOLAR$.

(Def.'s Ex. 1 [Position Description].)

[4] Plaintiff alleges that once Baird-Bridges realized that plaintiff could complete the report without difficulties, Baird-Bridges made the task harder by changing the way the report data was entered. (Def.'s Ex. 2 at 71-72.)

assignment and training, but found that Sanabria had not yet been told about the reassignment. (Pl.'s Ex. A ¶ 9.)  Plaintiff assumed that her supervisor would coordinate a training schedule and did not pursue the issue any further either with Sanabria or Baird-Bridges. (Def.'s Ex. 2 at 79-84.)  She did not approach Baird-Bridges because she was afraid of her temper based on two prior incidents. (*Id.* at 88.)  In August 2004, plaintiff overheard an altercation between Baird-Bridges and another employee, Charlotte Jenkins, during which she heard Jenkins "screaming for [Baird-Bridges] to let go of her arm." (Def.'s Ex. 2 at 88-89; Pl.'s Ex. B at 37-39).  A few months later, in November 2004, plaintiff went to Baird-Bridges's door to ask her a question and found her standing at her desk with her back to the door.  When plaintiff started to ask her a question, Baird-Bridges turned with her fists at her side and glared. (*Id.* at 89-92.)

On March 16, 2005, Baird-Bridges issued a step 2 ruling upholding the reprimand, in which she found that plaintiff had failed to demonstrate discrimination or harassment. (Pl.'s Ex. L [Step 2 Decision].)  Baird-Bridges denied plaintiff's request that any contact with Vastano be eliminated and refused to order any change in the organizational structure. (*Id.* at 2.)  On April 7, 2005, Local 12 invoked arbitration on plaintiff's reprimand grievance. (Pl.'s Ex. M [Letter from Alex Bastani to Sandy Keppley].)

On April 8, 2005, Baird-Bridges approached plaintiff to complain about her failure to send a "return receipt" email regarding an upcoming meeting. (*Id.* at 93-94.)  Plaintiff alleges that Baird-Bridges yelled at her and called her "Missy." (*Id.* at 94.)  She claims that she feared Baird-Bridges was going to slap her in the face. (*Id.* at 98.)  On April 15, 2005, plaintiff met with Lillian Winstead, EEO Coordinator of Counselors in the Civil Rights Center, about this incident. (Pl.'s Ex. A ¶ 6.)

On Sunday, April 17, 2005, Baird-Bridges sent an email to plaintiff, Sanabria, and DFM

clerk Bettye Keller scheduling a meeting for the morning of Monday, April 18, 2005. (Def.'s Ex. 2 at 99; Pl.'s Ex. S [Email from Baird-Bridges].) Copening was copied on the email, and Baird-Bridges left her a voice mail on her home phone about the upcoming meeting. (Pl.'s Ex. B at 128.) Prior to going to the scheduled meeting on Monday, April 18, plaintiff filed her informal complaint of harassment and age discrimination against Baird-Bridges based on the confrontation on April 8 about the email return receipt. (Pl.'s Ex. T [Informal Complaint of Discrimination].) Baird-Bridges, Vastano, and Charlene Dunn, OMAP's Director of Budget Formulation and Implementation ("Budget"), were present at the meeting, along with plaintiff, Sanabria, and Keller. (Def.'s Ex. 2 at 99.) Plaintiff, Sanabria, and Keller requested union representation, which was denied. (Pl.'s Ex. B at 101.) Each of them was given a transfer memorandum from Baird-Bridges. Plaintiff and Keller were reassigned from DFM to Budget and Sanabria was reassigned to Accounting. (Def.'s Ex. 2 at 100-01.) Plaintiff's transfer did not change her grade level or her job description, nor was she required to change work spaces. (*Id.* at 101.) All of the employees were unhappy about the transfers. (Pl.'s Ex. B at 102.)

On May 4, 2005, plaintiff had her first meeting with Dunn as her direct supervisor. (Def.'s Ex. 2 at 108-09.) Dunn had requested that plaintiff bring with her a list of her current duties. (Pl.'s Ex. A ¶ 10.) Baird-Bridges joined the meeting and reiterated that plaintiff's duties would remain in line with her job description. (*Id.*) Baird-Bridges then left the meeting, and Dunn gave plaintiff her performance standards. (*Id.*) Plaintiff claims that "the sole specific item on the standard was the space rent report" and the rest of the standards were unspecific and vague. (Opp'n 13; s*ee also* Pl.'s Ex. A ¶ 10.) When plaintiff complained to Dunn that she had not been trained to complete the report, Dunn replied that plaintiff should go tell Sanabria that she needed to be trained and that if

Sanabria refused, plaintiff should report back to her. (Pl.'s Ex. A ¶¶ 10-12.) Plaintiff asked Sanabria about scheduling training sessions, but he responded that he was very busy. (*Id.* ¶ 12.) Plaintiff did not tell Dunn about Sanabria's unavailability, because she "was not going to participate directly or in-directly in the harassment of Mr. Sanabria." (*Id.* ¶ 14.)

On May 9, 2005, Dunn gave plaintiff a new assignment, which was formulating the Agency Object Class Request Budget Exhibit for the congressional budget. (*Id.* ¶ 13.) Plaintiff told Dunn that she had never worked on a budget formulation and asked whether she should take a budget formulation course. (*Id.*) Dunn agreed that a course would be beneficial but maintained that there was inadequate time for it. (*Id.*) She provided plaintiff with a 4-inch briefing book instead. (*Id.*) Plaintiff was not able to figure out how to prepare the exhibit from the book. (*Id.*) Plaintiff believed that she was being "set up to fail" and "wondered why Ms. Dunn was participating in Ms. Baird-Bridges['s] campaign of harassment against [her] . . . ." (*Id.*)

On May 17, 2005, Sanabria emailed plaintiff to request that her supervisor coordinate training with his supervisor. (Def.'s Ex. 2 at 111-12.) Plaintiff replied to Sanabria, agreeing with his proposal, and copied Dunn on the email. (Pl.'s Ex. AA [Emails Between Sanabria and Sewell].) Dunn did not respond. (Def.'s Ex. 2 at 121.) On May 23, 2005, plaintiff filed a formal complaint of discrimination protesting Baird-Bridge's treatment of her during the confrontation on April 8, 2005. (Pl.'s Ex. BB [Formal Complaint].)

In early June, Sanabria approached plaintiff to schedule a training time. (Def.'s Ex. 2 at 118.) They agreed to meet on June 10. (*Id.* at 119.) On June 7, 2005, plaintiff received a call at home from Dunn on her "flex" day. Dunn asked plaintiff about the status of the space rent report. (*Id.* at 119-21.) Plaintiff told Dunn that she had not yet been trained and reminded Dunn that she

had not responded to the email from Sanabria.  (*Id.* at 121.)  She informed Dunn that she felt that Dunn and the new senior budget analyst, Kimberly Bassett, were harassing Sanabria and that she refused to participate in it.  (*Id.*)  Plaintiff explained that she and Sanabria were scheduled to meet on June 10  (*id.* at 122), and she told Dunn that it was "inappropriate" to hold her accountable for the space rent report before she had been trained.  Plaintiff told Dunn that due to conditions at work, she had decided to retire early in September 2005.  (*Id.*)  Plaintiff claims that Dunn told her that there would be no need to train her if she was planning on leaving in three months.  (*Id.*)

When plaintiff returned to work the following day, she found an email from Dunn directing her to meet with Larry Jarl, Chief of the Branch of Accounting Financial Services (Pl.'s Ex. J [Jarl Aff.] ¶ 1), Sanabria, and Bassett.  (*Id.* at 123.)    In the meeting, it was agreed that on June 15, 2005, Sanabria would train both plaintiff and Bassett to prepare the space rent report . (Pl.'s Ex. A ¶ 15.)  When plaintiff returned from the meeting, there was an email from Dunn waiting in her inbox, in which Dunn stated that she expected plaintiff to continue to perform her duties until her departure and set a deadline of June 15, 2005, to complete the May space report. (*Id.* ¶ 16.)  The email concluded that "[f]ailure to complete this assignment will be interpreted as insubordination, and may result in further action."  (*Id.*)    In response to that email, plaintiff asked Sanabria to conduct an "emergency training" to meet the deadline.  (*Id.*)  Sanabria agreed to conduct the training on Monday, June 13, 2005.  (*Id.*)    When plaintiff arrived at work that day, she found an email from Dunn, sent after the close of business on Friday, June 10, 2005, postponing the training until June 15, 2005, so that Bassett could also attend. (*Id.* ¶ 18.)  Upon viewing the email, plaintiff became ill and left work.  (*Id.*)    Plaintiff retired officially on June 24, 2005. (Def.'s Stmt ¶ 4.)

On August 1, 2005, plaintiff received a letter from Lockhart notifying her that the CRC had

transferred her EEO complaint to the Chairperson of DOL's Administrative Review Board due to a "potential conflict of interest."(Pl.'s Ex. FF [Letter from Lockhart to Sewell].) Plaintiff amended her complaint to allege that her "supervisor Anne Baird-Bridges [] retaliated against [her] because of [her] age and in reprisal for filing a discrimination complaint by transferring [her] to another branch . . . , assigning work for which [she] was not adequately trained, and 'forcing' [her] to retire." (Def.'s Ex. 25 at 1.)  On June 6, 2006, the Administrative Review Board of DOL issued a final agency decision finding that plaintiff had failed to prove reprisal or age discrimination.  (*Id.* at 3-4.)  On August 30, 2006, plaintiff filed suit in this Court, reiterating the allegations raised in her EEO complaint.

## ANALYSIS

### I.    Legal Standard

Under Fed. R. Civ. P. 56, a motion for summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits show that there is no genuine issue of material fact, and that the moving party is entitled to judgment as matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).    In considering a motion for summary judgment, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Id.* at 255;  *see also Wash. Post. Co. v. United States Dep't of Health and Human Servs.*, 865 F.2d 320, 325 (D.C. Cir. 1989).

The non-moving party's opposition, however, must consist of more than mere unsupported allegations or denials and must be supported by affidavits or other competent evidence setting forth specific facts showing that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e);  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  The non-moving party must provide evidence that would

permit a reasonable jury to find in the non-moving party's favor. *Laningham v. United States Navy*, 813 F.2d 1236, 1242 (D.C. Cir. 1987). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50 (internal citations omitted). "While summary judgment must be approached with special caution in discrimination cases, a plaintiff is not relieved of her obligation to support her allegations by affidavits or other competent evidence showing that there is a genuine issue for trial." *Calhoun v. Johnson*, 1998 WL 164780, at * 3 (D.D.C. March 31, 1998) (internal citation omitted), *aff'd*, 1999 WL 825425, at * 1 (D.C. Cir. Sept. 27, 2000).

## II.    Age Discrimination and Retaliation Claims

### A.    Legal Standard

Allegations of age discrimination and retaliation under the ADEA are analyzed under the familiar burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Carter v. George Washington Univ.*, 387 F.3d 872, 878 (D.C. Cir. 2004) (*McDonnell Douglas* standard applies to ADEA claims). Under that framework, plaintiff has the initial burden of proving her *prima facie* case by a preponderance of the evidence. *McDonnell Douglas*, 411 U.S. at 802; *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981). To establish a *prima facie* case of age discrimination, plaintiff must demonstrate that: (1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination. *Chappell-Johnson v. Powell*, 440 F.3d 484, 488 (D.C. Cir. 2006). To establish a *prima facie* case of retaliation, plaintiff must demonstrate that: (1) she engaged in a statutorily protected activity; (2) the employer took an adverse personnel action; and (3) a causal connection existed between the two. *Brown v. Brody*, 199 F.3d 446, 452 (D.C. Cir. 1999).

Once plaintiff has established a *prima facie* case, the burden shifts to defendant to articulate some legitimate, nondiscriminatory reason for its actions. *Burdine*, 450 U.S. at 254; *McDonnell Douglas Corp.*, 411 U.S. at 802. Defendant's burden is only one of production, and it "need not persuade the court that it was actually motivated by the proffered reasons." *Id.* If defendant is successful, then "the *McDonnell Douglas* framework -- with its presumptions and burdens -- disappear[s], and the sole remaining issue [is] discrimination *vel non*." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142-43 (2000) (internal citations and quotation marks omitted). Thereafter, plaintiff has the opportunity to prove, again by a preponderance of the evidence, that defendant's proffered nondiscriminatory reason was not the true reason for the employment decision. *Burdine*, 450 U.S. at 256; *see also Morgan v. Fed. Home Loan Mortgage Corp.*, 328 F.3d 647, 651 (D.C. Cir. 2003) ("[a]lthough the *McDonnell Douglas* framework shifts intermediate evidentiary burdens between the parties, [t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.") (internal citations and quotation marks omitted). "At this stage, if [plaintiff] is unable to adduce evidence that could allow a reasonable trier of fact to conclude that [defendant's] proffered reason was a pretext for discrimination [or retaliation], summary judgment must be entered against [plaintiff]." *Paquin v. Fed. Nat'l Mortgage Ass'n*, 119 F.3d 23, 27-28 (D.C. Cir. 1997).

**B.    Plaintiff cannot establish a *prima facie* case of discrimination or retaliation**

Plaintiff's discrimination and retaliation claims are based on the same underlying facts. Plaintiff alleges that Baird-Bridges's decision to give her new assignments without providing training was motivated by discriminatory animus and was in retaliation for the grievances she filed with her union. She further alleges that Baird-Bridges retaliated against her for filing her EEO

11

complaint by transferring her to Budget.[5]  Defendant argues that plaintiff cannot establish the elements of a *prima facie* case for either type of claim because she has failed to show that she suffered any kind of adverse employment action.

"Liability for discrimination under [the ADEA] requires an adverse employment action." *Patterson v. Johnson*, 505 F.3d 1296, 1298 (D.C. Cir. 2007) (quoting *Brown v. Brody*, 199 F.3d 446, 452-55 (D.C. Cir. 1999)).  Generally, "in determining whether a challenged action constitutes an adverse action, courts focus on 'ultimate employment decisions,' such as 'hiring, granting leave, discharging, promoting, and compensating' not intermediate decisions," which "hav[e] no immediate effect upon employment decisions." *Lester v. Natsios*, 290 F.Supp.2d 11, 28 (D.D.C. 2003) (quoting *Taylor v. FDIC*, 132 F.3d 753, 764 (D.C. Cir. 1997)).   While "[e]mployer actions short of outright firing or non-selection for promotion can be adverse . . . ." *id.,* "'[t]o establish an adverse action in the absence of diminution of pay or benefits, plaintiff must show an action with 'materially adverse consequences affecting the terms, conditions, or privileges of employment.'" *Stewart v. Evans*, 275 F.3d 1126, 1134 (D.C. Cir. 2002) (quoting *Brody*, 199 F.3d at 457).

Following the Supreme Court's decision in *Burlington N. & Santa Fe Ry. Co. v. White*, 126 S. Ct. 2405 (2006), it appears that "[a]n adverse action in the retaliation context may involve

---

[5] In her complaint, plaintiff appeared to be alleging that her reassignment to the Budget Branch was also discriminatory.  However, in her opposition, she fails to respond to defendant's argument as to this issue. (*See* Opp'n 25.)  This argument is therefore conceded.  *See Hopkins v. Women's Div., General Bd. of Global Ministries*, 238 F.Supp.2d 174, 178 (D.D.C. 2002) (citing *FDIC v. Bender*, 127 F.3d 58, 67-68 (D.C. Cir. 1997) ("It is well understood in this Circuit that when a plaintiff files an opposition to a motion to dismiss addressing only certain arguments raised by a defendant, a court may treat those arguments that the plaintiff failed to address as conceded.")).  *See also Day v. D.C. Dep't of Consumer & Regulatory Affairs*, 191 F.Supp.2d 154, 159 (D.D.C. 2002) ("If a party fails to counter an argument that the opposing party makes in a motion, the court may treat that argument as conceded.").

something short of what ordinarily would be considered a 'personnel action' (*e.g.*, denial of promotion, discharge, salary reduction) . . . ." *Rattigan v. Gonzales*, 503 F.Supp.2d 56, 75 (D.D.C. 2007). However, even under this more lenient standard, "a plaintiff must . . . point to an action that a 'reasonable employee would have found . . . materially adverse.'" *Id.* (quoting *White*, 123 S. Ct. at 2415). *See also Wiley v. Glassman*, -- F.3d -- , 2007 WL 4354431, at *8 (D.C. Cir. Dec. 14, 2007) ("Actionable retaliation claims are limited to those where an employer causes '*material* adversity,' not trivial harms.") (quoting *White*, 126 S.Ct. at 2415) (emphasis in original). Under *White*, plaintiff must show that the employment action produced an injury or harm that might well dissuade a reasonable worker from making or supporting a charge of discrimination. *White*, 126 S. Ct. at 2414-15.

Plaintiff argues that the new assignments amounted to a "tangible change in [her] duties or working conditions constituting a material employment disadvantage." (Pl.'s Opp'n 25 (quoting *Stewart*, 275 F.3d at 1134-35)). Other than her assertions, however, plaintiff has failed to offer any evidence of injury or harm resulting from her new assignments. She does not, for example, allege that her work hours or her pay were affected by the changes. *See Mungin v. Katten Munchin & Zavis*, 116 F.3d 1549, 1557 (D.C. Cir. 1997) ("[C]hanges in assignments or work-related duties do not ordinarily constitute adverse employment actions if unaccompanied by a decrease in salary or work hour changes.") Nor does she claim that the new tasks were worse than those that she had previously been assigned. *C.f. White*, 126 S.Ct. at 2417 (assignment of new tasks within job description is adverse when the tasks are less desirable and less prestigious). In fact, plaintiff admits that "she enjoyed doing the detail fund report" (Pl.'s Opp'n 26), and was "ready and willing to tackle" new tasks, as she had been throughout her career. (*Id.*) Furthermore, she has presented

evidence that she was capable of doing the new work assignments. (*See* Pl.'s Ex. J ¶ 4; Pl.'s Ex. K ¶ 6.)   The gravamen of plaintiff's complaint, therefore, is not that the tasks she was given were themselves materially adverse, but rather that she was denied the training to be able to do them successfully.   Even if the record before the Court supported that claim, which it does not (*see* Section II(C) *infra*), denial of training is an ordinary tribulation of the workplace, not an actionable adverse action.   *See, e.g.*, *Powell v. Castaneda*, -- F.R.D.-- , 2007 WL 4395058, at * 5 (D.D.C. Dec. 18, 2007) (denial of training does not constitute adverse action under *White* standard).

Furthermore, while plaintiff argues that the denial of training presented a barrier "to her successful work performance," she offers no evidence that this was true.   While plaintiff might have suffered some adverse consequence had she remained on the job and failed to complete the space rent report, she announced her retirement *before* her employer gave her any indication that there could be a penalty for her failure to complete her new tasks and she retired before any action was taken.   Therefore, whether any materially adverse consequences would have resulted from these new assignments is mere speculation.   *See Edwards v. E.P.A.*, 456 F.Supp.2d 72, 86 (D.D.C. 2006) ("[T]o be adverse, the denial of a travel or training opportunity must have a discernible, as opposed to a speculative, effect on the terms, conditions, or privileges of one's employment."); *Higgins v. Gonzales*, 481 F.3d 578, 585 (8th Cir. 2007) (Plaintiff's claim that "she was systematically denied supervision, mentoring and training so as to be 'set up for failure'" . . . did not constitute adverse action absent a "claim [that] this denial led to a decrease in pay or benefits or affected her future career prospects.")

Finally, plaintiff has failed to allege any adverse consequences, or even any changes,

resulting from her transfer to Budget.[6]  Plaintiff maintained the same job description, salary, benefits, and even the same workspace.   Because plaintiff has failed to demonstrate that she suffered an adverse action, she has failed to make out a *prima facie* case for either discrimination or retaliation.

### C.    Plaintiff has failed to show that defendant's proffered reasons were pretextual

However, even if plaintiff could successfully make out a *prima facie* case, she would still have to show that the reasons defendant has proffered for her new work assignments and her transfer to Budget were pretextual.  Baird-Bridges explained that in the year prior to the contested actions, DFM had undergone a number of changes, including "staff retirements, as well as staff departures for other organizations." (Def.'s Mot. Summ. J.  40; *see also* Def.'s Ex. 9 [Talking Points - April 18, 2005 Meeting]),  and Baird-Bridges was faced with "a number of new initiatives and increasing demands on DFM." (*Id.*)   As OMAP Director and Acting Director of DFM,  Baird-Bridges looked "to see how work shifted over time, where [DFM] might have shortages, and then [made] assignments as they best [met] the current needs." (Def.'s Ex. 5 [Baird-Bridges's Aff.] ¶ 6.) On this basis, Baird-Bridges reassigned the space rent report to plaintiff because it was the first major task listed in plaintiff's position description (*id.* ¶ 9), and the detailed fund report because it was similar to the other types of financial reports plaintiff was already completing.  Because plaintiff had "analytic skills and [had] proved herself to be very capable in the past," Baird-Bridges believed that she would be capable of taking on these new budgetary tasks.  (*Id.*  ¶ 8.)  Baird-Bridges also concluded, after reviewing plaintiff's job description, that because plaintiff's duties clearly included

---

[6] Notably "there was promotion potential" for plaintiff in Budget, whereas in Accounting she could only have "move[d] up if [she] had an accounting degree."  (Def.'s Ex. 6 [Dunn Aff.] ¶ 6.)

budget responsibilities, and because a transfer to Budget would provide plaintiff with direct supervision, plaintiff "could better contribute to the Division of Budget than in a position which reported to the vacant Director's position." (*Id.* ¶ 6.)  Plaintiff was "vastly underutilized" in DFM (*id.*), and the transfer required "no alteration to [plaintiff's] position description." (*Id.*)

Because defendant has proffered legitimate reasons for the challenged actions, plaintiff must "show that a reasonable jury could conclude from all of the evidence that the adverse employment decision was made for a discriminatory reason." *Lathram v. Snow*, 336 F.3d 1085, 1088 (D.C. Cir. 2003).  Pretext may be established "directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256.   "It is not enough for the plaintiff to show that a reason given for a job action is not just, or fair, or sensible. [She] must show that the explanation given is a phony reason." *Pignato v. Am. Trans Air, Inc.*, 14 F.3d 342, 349 (7th Cir. 1994)) (internal quotation marks omitted).  Once the employer has articulated a non-discriminatory reason for its action, . . . the issue is not the correctness or desirability of [the] reasons offered . . . [but] whether the employer honestly believes in the reasons it offers." *Fischbach v. D.C. Dept. of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (internal quotation marks and citation omitted).

Plaintiff first argues that Baird-Bridges's failure to reprimand Patricia Vastano is evidence that her proffered reasons for the challenged actions are pretextual.  This tenuous inference is not supported by the record.  Plaintiff admits that Baird-Bridges, who is herself within plaintiff's protected class, never made any comments to plaintiff about retiring.[7]  (Def.'s Ex. 2 at 131.)  *See*

---

[7] Both Baird-Bridges and plaintiff's immediate supervisor Dunn were over forty years old.  (*See* Def.'s Ex. 5 ¶ 3; Def.'s Ex. 6 [Dunn Affidavit] ¶ 3).  Baird-Bridges was born on March 22, 1946, and therefore is less than five years younger than plaintiff.  (*See* Def.'s Ex. 5 ¶ 2.)

*Walker v. Dalton*, 94 F.Supp.2d 8, 16 (D.D.C. 2000) (finding no inference of pretext where one of

the three members of the panel evaluating the applicant was in the applicant's protected class);

*Horvath v. Thompson*, 329 F.Supp.2d 1, 5 (D.D.C. 2004) (noting that discrimination more difficult

to establish when official is the same gender as plaintiff).  When asked why she attributed Baird-

Bridge's treatment of her to discriminatory animus, plaintiff's only response was that Baird-Bridges

didn't seem to like the way that she wore her reading glasses. (*See* Def.'s Ex. 2 at 131-32.)[8]

Furthermore, plaintiff has failed to identify any similarly-situated, younger employee who was

treated more favorably than she was by Baird-Bridges.[9]   In fact, at least one of the two other people

in DFM who were affected by Baird-Bridges's reallocation of tasks and reassignment of personnel

was younger than forty years old at the time of his transfer, and was not within plaintiff's protected

---

[8]  Plaintiff does not argue, nor does the record indicate, that Patricia Vastano was involved in making either of the challenged employment actions.  Therefore, even if Vastano's retirement-related remarks could be construed to reflect a discriminatory attitude, which is doubtful, they are insufficient to create a triable issue of discrimination because they were unrelated to either of the challenged employment decisions.   Evidence of discrimination "does not include stray remarks in the workplace, particularly those made by nondecision-makers or statements made by decisionmakers unrelated to the decisional process itself." *Ayala-Gerena v. Bristol Myers-Squibb* Co., 95 F.3d 86, 96 (1st Cir. 1996) (citations omitted).  *See also Valles-Hall v. Center for Nonprofit Advancement*, 481 F.Supp.2d 118, 141 (D.D.C. 2007) (same).

Furthermore, even if Vastano were alleged to have been involved in the decisionmaking, the last "harassment" of which plaintiff complained occurred in December 2004, and was based on race, not age.  (*See* Pl.'s Ex. F [Email from Plaintiff to Vastano].)   Plaintiff has therefore failed to demonstrate any "nexus" between Vastano's comments and any employment action. *Bolton v. Scrivner, Inc.*, 36 F.3d 939, 944 (10th Cir. 1994).  *See also Simms v. U.S. Gov't Printing Office, et. al.*, 87 F.Supp.2d 7, 9 n.2 (D.D.C. 2000) (stray remarks made by a supervisor must be connected to an employment decision to create a triable issue of discrimination).

[9]  Plaintiff identifies only one person, Kimberly Bassett, who was treated differently than she was, but acknowledges that Bassett is not a comparator because she was hired at a different grade for a different position.  (*See* Opp'n 27-28.)

class.[10]    This further undercuts plaintiff's claim that the reorganization was motivated by discriminatory animus based on age.

Plaintiff next argues that Baird-Bridges's explanation for the new assignments should be disbelieved because the "realignment" of her tasks with her job description occurred two months after plaintiff submitted her union grievances against Vastano and Baird-Bridges. (Pl.'s Opp'n 31.) While this kind of temporal proximity might be enough to allow plaintiff to prove the causation prong of her *prima facie* case, standing alone it is insufficient to discredit defendant's proffered explanation. *See Morgenstein v. Morgan Stanley DW Inc.*, 2007 WL 315090, at *5 (D.D.C. Jan. 31, 2007) ("[P]roximity alone does not defeat a motion for summary judgment."). Plaintiff maintains however, that Baird-Bridges's explanation for the new assignments is also belied by "management's frustration of [plaintiff's] efforts to seek training and the subsequent threat of termination of June 10, 2005." (Pl.'s Opp'n 38.) She casts the situation as a "set-up" where she was assigned a task that she was unprepared to do and then denied the training that she needed in order to be successful. This characterization finds no basis in the record.

Plaintiff was assigned the space rent report on March 14, 2005, and was told by Baird-Bridges at that time that Sanabria would provide training. Plaintiff did not immediately tell Sanabria she was taking over the Report, nor did she ask him to provide training because she felt it was "up to the supervisor to tell the employee to transport their duty to another employee." (Def.'s Ex. 2 at 79.) She did ask Sanabria whether he had heard that she was supposed to take over the space rent report and when he said he hadn't, she let the matter go. (*Id.*) She did not follow up with Sanabria

---

[10] Vicente Sanabria was born on February 23, 1968. (Pl.'s Ex. K [Sanabria Aff.] ¶ 2.) The record is silent as to Bettye Keller's age.

the following week or any time prior to the May 4 meeting with Dunn. (*Id.* at 80, 82, 106.) She also did not follow up with Baird-Bridges to let her know that Sanabria was unaware of the change in tasks or to request the training she needed because she was afraid of her. (*Id.* at 84, 87, 88.)

A month and a half later, at the meeting on May 4, Dunn told plaintiff that the space rent report would be part of her standards. Plaintiff told Dunn that she needed to be trained before she could compile the space rent report. Dunn instructed her "to go to Mr. Sanabria, and tell him to stop what he was doing and to train [her] into the space rent reporting." (Def.'s Ex. 3 [Sewell Affidavit] ¶ 12.) Dunn also said that if Sanabria refused to assist her, plaintiff should "come back and tell her." (*Id.*) A week later plaintiff approached Sanabria, but again found that he was busy. (*Id.*) She told him that "when he got time, [she] would appreciate training." (*Id.*) Plaintiff did not complain to Dunn because she didn't want to participate in what she perceived as Bassett and Dunn's "harassment" of Sanabria. (*See* Def.'s Ex. 2 at 117, 122; Def.'s Ex 3 ¶ 14.) Plaintiff believed that "the only way [the situation] could have been worked out was [for] both supervisors and both employees involved [to] come together and talk about it and . . . come up with a schedule . . . ." (Def.'s Ex. 2 at 117.) On May 17, 2005, Sanabria emailed plaintiff requesting that their supervisors coordinate the training. (Def.'s Ex. 3 ¶ 12.) Plaintiff replied to his email, agreeing with him and copying Dunn. (*Id.*) She received no response and did not follow up with Dunn. (*Id.*)

Thereafter, in early June, Sanabria finally approached plaintiff to schedule a training time. (Def.'s Ex. 2 at 118.) On June 7, 2005, Dunn and Bassett called plaintiff at her "flexi-place" to ask where the space rent report for May was. Plaintiff explained why she hadn't complied with Dunn's instructions and stated that due to circumstances at work, she planned to retire.

Given these undisputed facts, plaintiff's contention that the new assignments were a "set up"

19

designed to force her into failure cannot withstand scrutiny.  To the contrary, it appears that her supervisors expected her to do the work and reasonably believed that she was getting the training she had requested until the day she notified them that she planned to retire.  Plaintiff clearly, and perhaps accurately, believed that the reassignments should have been handled differently.  However, the Court's role is not to determine whether defendant's explanation for (or execution of) the reassignments was "just, or fair, or sensible." *Fischbach*, 86 F.3d at 1183.  Rather, it is to determine whether that explanation is pretextual.  Plaintiff's unsubstantiated assertions notwithstanding, the facts before the Court amply support defendant's proffered explanation for the new assignments.

Plaintiff's challenge to defendant's rationale for her transfer to Budget is no more persuasive.  Plaintiff again relies on temporal proximity, arguing that the  two-day time span between plaintiff's meeting at the Civil Rights Center and the meeting at which the transfer memoranda were distributed indicates that defendant's reason for the transfer was pretextual.  She characterizes the transfer as "an eleventh hour scheme to marginalize [plaintiff] away from [Baird-Bridges's] direct supervision and place in her in an environment where [plaintiff] could be 'handled' without Baird-Bridges's seemingly direct involvement." (Pl.'s Opp'n 31.)  This unsupported and conclusory statement is not evidence of pretext.  Nor is temporal proximity, standing alone, sufficient to show that defendant's proffered rationale is false, particularly given that two other people were also reassigned from DFM to other divisions where they could be directly supervised.  Plaintiff has therefore provided no credible evidence to contradict defendant's explanation for her transfer.

Plaintiff's final argument in support of a finding of pretext is that after plaintiff retired, Baird-Bridges allegedly offered to remove the letter of reprimand from her record in exchange for withdrawal of the EEO complaint. (Pl.'s Opp'n 33.)  The only evidence that plaintiff has presented

in support of this claim is her own affidavit relating what Copening told her supposedly occurred

during a telephone conversation between Copening and Baird-Bridges on June 15, 2005. (Pl.'s Ex.

U [Declaration of Audrey Sewell] ¶ 5.)   As defendant points out, however, this statement attributed

to Baird-Bridges is inadmissible because even if Baird-Bridges's statement is admissible as an

admission by a party-opponent under Fed. R. Evid. 801(d)(2), there is no exception that would

permit plaintiff to testify as to what Copening, her union representative, said to her.   Thus, "the

hearsay statement offered by plaintiff 'counts for nothing' and does not preclude summary

judgment." *Winder v. Erste*, 511 F.Supp.2d 160, 181 (D.D.C. 2007) (quoting *Gleklen v. Democratic

Congressional Campaign Comm.*, 199 F.3d 1365, 1369 (D.C. Cir. 2000)).   *See also Poullard v.

Smithkline Beecham Corp.*, 2005 WL 3244192, at *18 (D.D.C. Nov. 30, 2005) (excluding plaintiff's

deposition evidence that her colleagues told her that they had overheard two managers making

defamatory statements).

   In sum, DFM was in a transitional period during the time when these incidents occurred.

Plaintiff disagreed with the way Baird-Bridges chose to manage the changes and that contributed

to the difficult relationship between them.   Plaintiff has, however, failed to create a reasonable

inference that any action taken by Baird-Bridges was either discriminatory or retaliatory.   The

record reflects "nothing more than a routine difference of opinion and personality conflict" between

plaintiff and her supervisor.   *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 276 (4th Cir. 2000), and

therefore, summary judgment will be granted as to these claims.

## III.   Hostile Work Environment

   Plaintiff next claims that she was subjected to a hostile work environment because of her age

and in retaliation for engaging in protected activity under the ADEA.   In support of this claim she

points to Vastano's periodic comments suggesting that plaintiff should retire.  Plaintiff also alleges

that Baird-Bridges contributed to the hostile work environment through "harassment with work"[11]

(Def.'s Ex. 2 at 58), and with her threatening behavior on two occasions.[12]  An ADEA cause of

action for hostile work environment has not yet been recognized in this Circuit.  *See e.g.*, *Williams*

*v. Chertoff*, 495 F.Supp.2d 17, 41 n. 20 (D.D.C. 2007).   But even were the Court to assume, as

others have, that an ADEA provides a cause of action for a hostile work environment claim that is

analogous to the same claim under Title VII,  plaintiff's claim would still fail because her allegations

do not meet the demanding standards for a hostile work environment claim.

The workplace becomes hostile for employment purposes only when it is "permeated with

discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the

conditions of the victim's employment and create an abusive working environment . . . ."  *Harris*

*v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993) (citations and internal quotation marks omitted).

In determining whether a hostile work environment claim is substantiated, a court must look at all

the circumstances of the plaintiff's employment, specifically focusing on such factors as the

frequency of the discriminatory conduct, its severity, whether it was threatening and humiliating or

merely offensive, and whether it unreasonably interfered with the employee's work performance.

*See Taylor v. Chao*, 516 F.Supp.2d 128, 135-36 (D.D.C. 2007) (citing *Harris*, 510 U.S. at 23).  "The

---

[11]  Plaintiff claims that Baird-Bridges used work as a "harassment tool." She would "give
[plaintiff] a project and then throw up any barrier she [could] to make sure [plaintiff didn't] get it
done . . . ."  (Def.'s Ex. 2 at 72.)

[12] On one of those occasions the allegedly threatening behavior was directed towards
Jenkins, not plaintiff.  "[C]onduct directed at others rather than at plaintiff . . . is less indicative
of a hostile work environment."  *Lester*, 290 F.Supp.2d at 31.  *See also Gleason v. Mesirow Fin.
Inc.*, 118 F.3d 1134, 1144 (7th Cir. 1997) ("[T]he impact of "second-hand harassment' is
obviously not as great as the impact of harassment directed at the plaintiff.")

conduct must be sufficiently extreme to constitute an alteration in the conditions of employment, so that [the ADEA] does not evolve into a 'general civility code.'" *Id.* (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)). Moreover, the ADEA, like "Title VII does not prohibit all forms of workplace harassment," but only harassment based on a person's membership in a protected class. *Stewart*, 275 F.3d at 1133.

Under this standard, it is clear that the alleged actions taken by Vastano, Baird-Bridges, and Dunn do not constitute severe and pervasive ridicule, harassment, or intimidation. Stray remarks made occasionally over an approximately eight-year period do not come close to making the workplace hostile. *See, e.g.*, *George v. Leavitt*, 407 F.3d 405, 416-17 (D.C. Cir. 2005) (holding that statements by three employees over a six-month period telling plaintiff to "go back where she came from," separate acts of yelling and hostility; and allegations that plaintiff was singled out for undesirable work were insufficient to demonstrate a hostile work environment); *Hopkins v. Balt. Gas & Elec. Co.*, 77 F.3d 745, 753 (4th Cir. 1996) (several discriminatory incidents spread over a seven-year period suggested the absence of a pervasive condition); *Akonji v. Unity Healthcare, Inc.*, 517 F.Supp.2d 83, 98 (D.D.C. 2007) (five alleged acts of discrimination in two years, as well as additional "inappropriate comments" by a supervisor, were insufficient to constitute a hostile work environment). Nor does the occasional raising of the voice by a supervisor. *See Singh v. U.S. House of Representatives*, 300 F.Supp.2d 48, 54-57 (D.D.C. 2004) (finding that plaintiff's allegations that her employer humiliated her at important meetings, screamed at her in one instance, told her to "shut up and sit down" on one occasion, and was "constantly hostile and hypercritical" did not amount to a hostile work environment). These kinds of allegations "constitute exactly the sort of 'isolated incidents' that the Supreme Court has held cannot form the basis for a Title VII [and

by extension, an ADEA] violation." *George*, 407 F.3d at 417. *See also Bundy v. Jackson*, 641 F.2d

934, 943 n. 9 (D.C. Cir. 1981) ("[C]asual or isolated manifestations of a discriminatory environment,

such as a few ethnic or racial slurs, maybe not raise a cause of action.").

Furthermore, as previously explained, plaintiff has presented no evidence other than temporal

proximity linking Baird-Bridges's decisions to plaintiff's protected activities, and no evidence

whatsoever linking any of the employment actions about which she has complained to Vastano's

comments. Assuming that the ADEA provides a cause of action for workplace harassment, it would

still only protect against harassment that could be linked to age discrimination or retaliation. *See*

*Lester*, 290 F.Supp.2d at 31 (without "evidence of any racial element to either [alleged] event,"

defendants were entitled to summary judgment on hostile work environment claim); *Irvine v. Video*

*Monitoring Servs. Of Am., L.P.*, No. 98 Civ. 8725, 2000 WL 502863, at * 4 (S.D.N.Y. May 4, 2000)

(four emails "reflected a clash of personalities between co-workers and general animosity rather than

specifically age-based harassment."). "Rather than arising from any discriminatory [or retaliatory]

animus . . . , this harassment appears quite clearly to have arisen from personal conflicts between

plaintiff and her . . . supervisors." *Nichols v. Truscott*, 424 F.Supp.2d 124, 140 (D.D.C. 2006). As

plaintiff has noted in some detail, Baird-Bridges had difficulties with a number of people under her

supervision, including Vincent Sanabria,[13] Charlotte Jenkins,[14] Janet Hogler,[15] and Grace Liang.[16]

 At best,  plaintiff has demonstrated that Baird-Bridges was a difficult or demanding manager, but she has not shown that any of the hostility evidenced by Baird-Bridges was motivated by discriminatory or retaliatory animus.  Although understandably upsetting to plaintiff, a long-time employee, this type of conduct is not actionable under Title VII, and therefore would not be under the ADEA.  *Id*. at 144 ("Title VII . . . was enacted to redress *discrimination* . . . in employment, rather than to ensure that the American workplace would remain free from poor management or harassment of all kinds, no matter how motivated.") (emphasis in original).  *See also Moses v. City of New York*, 2007 WL 2600859, at *1 (S.D.N.Y. Aug. 28, 2007) ("The anti-discrimination laws do not require defendants to be good managers; they require only that defendants do not discriminate

---

[13] Plaintiff recalls Baird-Bridges telling Sanabria that he was "just no good as a budget analyst," before transferring him to Accounting. (Def.'s Ex. R [Sewell EEO Affidavit] at 7.) Sanabria filed an EEO complaint against Baird-Bridges for race discrimination based on her decision not to promote him to the position ultimately filled by Kimberly Bassett.  (Pl.'s Ex. B at 73-74.)

[14] Charlotte Jenkins was involved in what plaintiff characterized as a loud altercation with Baird-Bridges.  (Def.'s Ex. 2 at 88-89.)

[15] Plaintiff claims that Baird-Bridges subjected Janet Hogler to "harassment with work," causing her to leave the position.  She explains that during Janet Hogler's tenure, plaintiff was one of four or five people that Hogler assigned to work on about 600 audits.  Then, all of a sudden, all of the other people were taken off the project (apparently by Baird-Bridges) and plaintiff had to do "at least 10 to 15 at home . . . [and] at least five and [six] a day, plus [her] regular work."  (Def.'s Ex. 2 at 59.)  Hogler resigned shortly after that because "she couldn't stay there no longer."  Plaintiff alleges that "[a]ll this was spearheaded by Ann Baird-Bridges." (*Id.* at 60.)

[16] Plaintiff explains that an Asian-American woman named Grace Liang had worked in the division for many years, before "Ms. Baird-Bridges [all of a sudden] had a problem with her ability to do her work."  (Pl.'s Ex. R [Sewell Aff.] at 7.)   Liang transferred to another division in DOL.

on the basis of a protected status.").  Summary judgment will therefore be granted on this claim.

## IV.    Constructive Discharge

Finally, plaintiff contends that DOL created working conditions so hostile and intolerable that she was compelled to resign.  "A plaintiff who advances such a compound [hostile-environment constructive discharge] claim must show working conditions so intolerable that a reasonable person would have felt compelled to resign."  *Pennsylvania State Police v. Suders*, 542 U.S. 129, 147 (2004).   "A constructive discharge occurs when an employee quits her position due to working conditions that are not only 'merely intolerable,' but also 'intolerable in a discriminatory way.'" *Hendricks v. Paulson*, 520 F.Supp.2d 65, 100 (D.D.C. 2007) (quoting *Chambers v. Am. Trans Air*, 17 F.3d 998, 1005-06 (7th Cir. 1994)).   "Constructive discharge thus requires a finding of discrimination and the existence of certain 'aggravating factors.'" *Mungin*, 116 F.3d at 1558 (quoting *Clark v. Marsh*, 665 F.2d 1168, 1174 (D.C. Cir. 1981)).  The Court has already concluded that plaintiff cannot make out a case of age discrimination or hostile work environment.[17]  Therefore by definition, summary judgment must also be granted on the constructive discharge claim.

### CONCLUSION

For the reasons explained herein, defendant's motion for summary judgment will be

---

[17] Even if plaintiff could show discrimination, plaintiff still could not show that she was constructively discharged.  "The kinds of situations where courts have upheld constructive-discharge findings tend to involve extreme mistreatment or thinly veiled (or even overt) threats of termination."  *Kalinoski v. Gutierrez*, 435 F.Supp.2d 55, 78 (D.D.C. 2006).  Passing comments made by a colleague do not constitute "extreme mistreatment," and plaintiff announced her plan to retire *before* she was told that her failure to complete the space rent report could result in possible "action."  (*See* Def.'s Ex. 2 at 122; Pl.'s Ex. A ¶ 15.)  She therefore has no factual basis for claiming constructive discharge.

GRANTED, and the above-captioned case is dismissed with prejudice.  An Order consistent with this Memorandum Opinion is also being issued this date.

 

 

 

_____/s/_____
ELLEN SEGAL HUVELLE
United States District Judge


Date:   February 1, 2008